UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - -

MILESTONE SHIPPING,

S.A.,                          :

    PLAINTIFF,                 :
                               :
vs.           : CASE NO. 11 CVF 0014 (VM)
              :        ECF CASE

ESTECH TRADING LLC   :

AND AMERICAN ENERGY  :

SERVICES, INC.,      :

    DEFENDANTS.      :

- - -

Deposition of DAN SLANE, a Witness herein, called by the Plaintiff for cross-examination under the applicable Federal Rules of Civil Procedure, taken before Sylvia A. Fraley, a Registered Diplomate Reporter, Certified Realtime Reporter and Notary Public in and for the State of Ohio, pursuant to notice, at the Offices of Baker & Hostetler, 65 East State Street, Suite 2100, Columbus, Ohio 43215, commencing on Tuesday, June 21, 2011, at 9:05 a.m.

- - -

## Page 2

DEPOSITION OF DAN SLANE

APPEARANCES

- - -

CLAURISSE C. OROZCO, ESQUIRE

TISDALE LAW OFFICES

10 Spruce Street

Southport, CT 06890

(203) 254-8474

    On behalf of the Plaintiff.

JAMES C. WINTON, ESQUIRE

BAKER & HOSTETLER

1000 Louisiana

Suite 2000

Houston, TX 77002

(713) 646-1304

    On behalf of the Defendant American

    Energy Services, Inc.

ALSO PRESENT:

    THOMAS E. MOLONEY, ESQUIRE

- - -

## Page 3

DEPOSITION OF DAN SLANE

INDEX TO EXAMINATION

WITNESS                                      PAGE

DAN SLANE

    CROSS-EXAMINATION BY MS. OROZCO:          9

    CROSS-EXAMINATION BY MR. WINTON:         93

    RECROSS-EXAMINATION BY MS. OROZCO:      161

- - -

## Page 4

DEPOSITION OF DAN SLANE

INDEX TO EXHIBITS

EXHIBIT   DESCRIPTION                        PAGE

46    A THREE-PAGE DOCUMENT ENTITLED,     9
      "SUBPOENA TO TESTIFY AT A
      DEPOSITION IN A CIVIL ACTION,"
      TO:  DANIEL SLANE

47    A FOUR-PAGE DOCUMENT ENTITLED,      9
      "NOTICE OF DEPOSITION OF DANIEL
      SLANE ..."

48    A THREE-PAGE DOCUMENT ENTITLED,    40
      "ESCROW AGREEMENT DATED
      2/12/10," BATES-STAMPED
      MILESTONE00000001 THROUGH 0003

49    A SIX-PAGE E-MAIL STRING,          50
      BEGINNING WITH AN M&F
      CHARTERING/CHARTERING
      CHAIKA-AGENCY, RECEIVED:
      11/30/10, BATES-STAMPED
      MILESTONE00000058 THROUGH 0063

50    A ONE-PAGE MICHALEK/CHARTERING     57
      CHAIKA-AGENCY, DATED 12/24/10,
      BATES-STAMPED MILESTONE 0000012

51    A ONE-PAGE E-MAIL STRING,          57
      BEGINNING WITH A
      VIOLIN/MICHALEK E-MAIL DATED
      12/24/10, BATES-STAMPED
      MILESTONE 00000103

52    A TWO-PAGE DOCUMENT ENTITLED,      69
      "PROMISSORY NOTE," PRINCIPAL
      SUM: $344,190, EXECUTED BY
      MAKER AS OF 11/19/10,
      BATES-STAMPED AES-0033 AND 0034

53    A TWO-PAGE DOCUMENT ENTITLED,      70
      "PROMISSORY NOTE, PRINCIPAL
      SUM: $312,500, EXECUTED BY
      MAKER AS OF 12/21/10,
      BATES-STAMPED AES-0038 AND 0039

## Page 5

1   54     A THREE-PAGE JACOBS/MICHALEK   70
LETTER, DATED 12/10/10,
2     SUBJECT:  SALES CONTRACT,
    BATES-STAMPED AES-0035 THROUGH
3     0037
4   55     A TWO-PAGE DOCUMENT ENTITLED,   71
"PROMISSORY NOTE," PRINCIPAL
5     SUM: $500,000, EXECUTED BY
    MAKER AS OF 12/2/10,
6     BATES-STAMPED AES-0071 AND 0072
7   56     A ONE-PAGE MOLONEY/WOLFSON   86
LETTER, DATED 12/23/10,
8     BATES-STAMPED AES-0040
9   57     A FOUR-PAGE DOCUMENT BEGINNING,   88
"OHIO OIL AND GAS ASSOCIATION
10     BULLETIN ADVERTISERS," DATED
    NOVEMBER 2008, BATES-STAMPED
11     MILESTONE 00000006 THROUGH 0009
12   58     A ONE-PAGE JACOBS/MICHALEK   92
LETTER, DATED 3/9/11, AND TWO
13     PAGES OF ATTACHMENTS,
    BATES-STAMPED AES-0064 THROUGH
14     0066
15   59     A TWO-PAGE TISDALE/ESTECH   93
TRADING, LLC, LETTER, DATED
16     1/4/11
17   60     A NINE-PAGE DOCUMENT ENTITLED,   95
"SUBPOENA TO PRODUCE DOCUMENTS,
18     INFORMATION, OR OBJECTS OR TO
    PERMIT INSPECTION OF PREMISES
19     IN A CIVIL ACTION"
20   61     A FOUR-PAGE DOCUMENT ENTITLED,   112
"TIME CHARTER" (CHARTER PARTY),
21     DATED 12/2/10, AND 24 PAGES OF
    ATTACHMENTS, BATES-STAMPED
22     MILESTONE-000150 THROUGH 0177
23   62     A 29-PAGE DOCUMENT ENTITLED,   113
"VERIFIED AMENDED COMPLAINT"
24

## Page 6

1   63     A ONE-PAGE E-MAIL STRING,   123
CONTAINING A VOEVUDSKY/SLANE
2     E-MAIL, SENT: 11/30/10,
    BATES-STAMPED MILESTONE
3     00000076
4   64     A ONE-PAGE E-MAIL STRING,   124
BEGINNING WITH A
5     MICHALEK/CHARTERING
    CHAIKA-AGENCY E-MAIL, RECEIVED:
6     11/30/10, BATES-STAMPED
    MILESTONE 00000078
7
8   65     A ONE-PAGE E-MAIL STRING,   126
CONTAINING A SLANE/CHARTERING
9     CHAIKA-AGENCY E-MAIL, RECEIVED:
    11/30/10, BATES-STAMPED
10     MILESTONE 00000077,
11   66     A ONE-PAGE E-MAIL STRING,   128
BEGINNING WITH A KOK/SLANE
12     E-MAIL, BATES-STAMPED
    MILESTONE 00000079
13   67     A TWO-PAGE DOCUMENT CONTAINING   130
A VOEVUDSKY/SLANE E-MAIL, SENT:
14     12/1/10, BATES-STAMPED
    MILESTONE 00000081 AND 0082
15
16   68     A TWO-PAGE E-MAIL STRING   132
CONTAINING A SLANE/CHARTERING
17     CHAIKA-AGENCY E-MAIL, RECEIVED:
    12/1/10, BATES-STAMPED
18     MILESTONE 00000082 AND 0083
19   69     A ONE-PAGE E-MAIL STRING   139
CONTAINING A VOEVUDSKY/SLANE
20     E-MAIL, SENT: 12/1/10,
    BATES-STAMPED
21     MILESTONE 00000084
22   70     A TWO-PAGE E-MAIL STRING   141
CONTAINING A SLANE/CHARTERING
23     CHAIKA-AGENCY E-MAIL, RECEIVED:
    12/2/10, BATES-STAMPED
    MILESTONE 00000085 AND 0086
24

## Page 7

1   71     A FOUR-PAGE DOCUMENT ENTITLED,   143
"ESCROW AGREEMENT DATED
2     02/12/2010," UNSIGNED
3   72     A ONE-PAGE E-MAIL STRING,   146
CONTAINING A SLANE/CHARTERING
4     CHAIKA-AGENCY E-MAIL, RECEIVED:
    12/2/10, BATES-STAMPED
5     MILESTONE 00000085
6   73     A ONE-PAGE E-MAIL STRING,   149
CONTAINING A VOEVUDSKY/SLANE
7     E-MAIL, SENT: 12/3/10,
    BATES-STAMPED
8     MILESTONE 00000089
9   74     A TWO-PAGE E-MAIL STRING,   150
CONTAINING A SLANE/CHARTERING
10     CHAIKA-AGENCY E-MAIL, RECEIVED:
    12/6/10, BATES-STAMPED
11     MILESTONE 00000093
12   75     A TWO-PAGE E-MAIL STRING,   154
CONTAINING A
13     VOEVUDSKY/MICHALEK, SLANE
    E-MAIL, SENT: 1/7/11,
14     BATES-STAMPED
    MILESTONE 00000100 AND 0101
15
16     ---
17
18
19
20
21
22
23
24

## Page 8

1       Tuesday Morning Session
      June 21, 2011
2       9:05 a.m.
3        ---
4       STIPULATIONS
5       It is stipulated by and between counsel for
6 the respective parties that the deposition of DAN
7 SLANE, a Witness herein, called by the Plaintiff under
8 the applicable Federal Rules of Civil Procedure, may be
9 taken at this time in stenotype by the Notary, pursuant
10 to notice; that said deposition may thereafter be
11 transcribed by the Notary out of the presence of the
12 witness; that proof of the official character and
13 qualification of the Notary is waived; that the
14 examination, reading, and signature of the said DAN
15 SLANE to the transcript of his deposition are expressly
16 waived by counsel and the witness; said deposition to
17 have the same force and effect as though signed by the
18 said DAN SLANE.
19        ---
20
21
22
23
24

Page 9

```
1                    - - -
2          A THREE-PAGE DOCUMENT ENTITLED,
3      "SUBPOENA TO TESTIFY AT A
4      DEPOSITION IN A CIVIL ACTION," TO:
5      DANIEL SLANE, WAS MARKED AS EXHIBIT
6      46.
7                    - - -
8          A FOUR-PAGE DOCUMENT ENTITLED,
9      "NOTICE OF DEPOSITION OF DANIEL
10     SLANE ..." WAS MARKED AS EXHIBIT
11     47.
12                   - - -
13             DAN SLANE
14 being by me first duly sworn, as hereinafter certified,
15 deposes and says as follows:
16             CROSS-EXAMINATION
17 BY MS. OROZCO:
18     Q.   Good morning, Mr. Slane.  My name is
19 Claurisse Orozco and I am an attorney from Tisdale Law
20 Offices representing Milestone Shipping in a matter
21 that's pending in the Southern District of New York.
22         Could you please state your name for the
23 record?
24     A.   Dan Slane, S-L-A-N-E.
```

Page 10

```
1      Q.   And where is your current work address, Mr.
2  Slane?
3      A.   261 West Johnstown Road, Columbus, Ohio
4  43230.
5      Q.   Okay.
6          Mr. Slane, have you ever been deposed before?
7      A.   I have.
8      Q.   When was the last time you were deposed?  How
9  recent?
10     A.   Last few years.
11     Q.   I am just going to give you a few
12 reminders --
13     A.   Okay.
14     Q.   -- just to make sure that you recall the
15 procedure.
16         The court reporter is here taking down all of
17 the questions that I am going to ask and she is going
18 to take down all your answers.  So we are going to try
19 not to speak over each other because she can only copy
20 down one of us at a time.
21         Just, also, make sure that your answers are
22 verbal.  And if you have any question about my
23 question, if you don't understand it or want me to
24 rephrase it, please let me know.  Otherwise, I will
```

Page 11

```
1  assume that you did understand the question and that
2  you answered it based on the understanding.
3          If, at any time, you want a break for any
4  reason, let me know and we will be happy to accommodate
5  you.  Okay?
6      A.   Thank you.
7      Q.   Thank you.
8          There are two documents before you, Mr.
9  Slane, that I have marked as Exhibits 46 and 47.  The
10 first one is a subpoena and the second one is a Notice
11 of Deposition, and I'll just ask you to take a moment
12 to review those documents.
13         (Discussion off the record.)
14 BY MS. OROZCO:
15     Q.   Mr. Slane, do you recall receiving these
16 documents which we have marked as Exhibits 46 and 47?
17     A.   I do.
18     Q.   And do you recall when you received them?
19     A.   I do not.
20     Q.   Did you have a chance to review those
21 documents before today?
22     A.   No -- Well, I mean, I looked at it when I got
23 it.
24     Q.   Okay.
```

Page 12

```
1          If you could take Exhibit 46, which is the
2  subpoena, and go to Page 3 of that document.
3      A.   Yes.
4      Q.   And do you recall reviewing this page of the
5  subpoena before today?
6      A.   Yes.
7      Q.   And if you could go to Exhibit 47, which is
8  your Notice of Deposition, and review Pages 2 and 3,
9  and I'll ask you the same question:  If you viewed
10 these pages before today.
11     A.   Yes.
12     Q.   Yes, you did?
13     A.   Yes.
14     Q.   Did you bring any documents with you that
15 were outlined on Page 3 of the subpoena?
16     A.   I did not.
17     Q.   Do you have any documents?
18     A.   I do not.
19     Q.   You do not.  Okay.
20         Did you do anything to prepare for the
21 deposition today?
22     A.   No, not really.
23     Q.   Did you speak with anybody about the
24 deposition?
```

Page 13

1    A.  I think I spoke with Jim a month or two ago,
2  he called, and -- and I think he advised me to answer
3  honestly.
4    Q.  Okay.  Jim Winton?
5    A.  Yes.
6    Q.  Mr. Winton is not your lawyer in this, for
7  purposes of this deposition; is he?
8    A.  Correct.
9      (Discussion off the record.)
10 BY MS. OROZCO:
11   Q.  Mr. Slane, where are you currently employed?
12   A.  The Slane Company.
13   Q.  What is The Slane Company?
14   A.  It's a real estate development company.
15   Q.  What is your position there?
16   A.  I am one of the co-owners.
17   Q.  Where is that located?
18   A.  On Johnstown Road in Columbus.
19   Q.  What is your position with -- Oh, sorry.
20     What are your day-to-day responsibilities
21 with The Slane Company, as co-owner?
22   A.  Well, before the world fell apart, we were
23 developing real estate projects in various states in
24 The United States.  After the world fell apart, I have

Page 14

1  been dealing with banks.
2    Q.  Do you hold an officer position with The
3  Slane Company?
4    A.  I am one of the co-owners.
5    Q.  You are not a President or a CEO or
6  Vice President?
7    A.  No.  It's just a small, family-owned company.
8    Q.  About how many employees does The Slane
9  Company employ, currently?
10   A.  Three.
11   Q.  Just all family members?
12   A.  No, no.  A bookkeeper, a CFO, and an office
13 manager -- property manager.
14   Q.  Are they all located at the office in
15 Columbus?
16   A.  Yes.
17   Q.  Do you have any involvement in any other
18 companies besides The Slane Company?
19   A.  Yes.
20   Q.  What would those entities be?
21   A.  Well, actually, I don't anymore.  I did
22 before 2007.
23   Q.  What companies were you involved in before
24 2007, in addition to The Slane Company?

Page 15

1    A.  We had a waste energy company.
2    Q.  What was the name of that?
3    A.  Estech, E-S-T-E-C-H, U.S., LLC.  I think --
4  That's all I can remember at the moment.
5    Q.  How long has The Slane Company been
6  operating?
7    A.  Since 1984.
8    Q.  What was your involvement with Estech U.S.,
9  LLC?
10   A.  We purchased technology from a Columbus
11 company in 2000.
12     MR. WINTON:  I'm sorry.  Was that Estech --
13 you said U.S. -- or is it U.S.A., LLC?
14     THE WITNESS:  I think that's right.  I think
15 it's Estech U.S.A., comma, LLC.
16 BY MS. OROZCO:
17   Q.  So the Estech U.S.A., LLC, entity purchased
18 technology?
19   A.  Yes.
20   Q.  And what was your role with that entity:
21 Estech U.S.A.?
22   A.  I was one of the owners, along with my
23 brother, Charles.
24   Q.  And did Estech U.S.A. have any other

Page 16

1  employees besides yourself and Charles?
2    A.  No -- Well, I'm sorry.  We did.  Yes, we did.
3  We had three employees in England.
4    Q.  Were they employees of Estech U.S.A., LLC, or
5  a different entity?
6    A.  At that time, it had a different name, and I
7  can't remember the name.
8    Q.  And when did your involvement or relationship
9  with Estech U.S.A., LLC terminate?
10   A.  Actually, it has never terminated.  I still
11 have some interest in it.
12   Q.  Okay.  What is your interest in it today?
13   A.  I'm not sure.  We brought in a partner and
14 he's been authorized to take additional interest for
15 other partners, et cetera, so I'm not exactly sure what
16 my percentage is today.
17   Q.  Do you have any role with respect to Estech
18 U.S.A., LLC, any active role?
19   A.  No.
20   Q.  And when did that active participation in
21 Estech U.S.A. terminate?
22   A.  About two years ago.
23   Q.  Any particular reason?
24   A.  We were, really, unable to finance a project

Page 17

1  so the company was, more or less, dormant.
2  Q.  Now, you said that you hired a partner who is
3  now authorized to take an additional interest, and who
4  is that?
5  A.  Jan Michalek, M-I-C-H-A-L-E-K.  J-A-N is his
6  first name.
7  Q.  What is his role in Estech U.S.A., LLC?
8  A.  He is the CEO.
9  Q.  And do you recall when he was hired?
10  A.  I think about 2006.  In that area.
11  Q.  Did you have any role in hiring him?
12  A.  I did.
13  Q.  Did you know Mr. Michalek before he was hired
14  to act as CEO of Estech U.S.A.?
15  A.  Briefly.
16  Q.  And how did you know him?
17  A.  Someone introduced me to him.
18  Q.  And when he started in 2006, what was his
19  role?
20  A.  He was in charge of development of the
21  project.
22      He's an engineer.
23  Q.  What was the project?
24  A.  We were taking garbage and converting it into

Page 18

1  a fiber using a pressure vessel, and injecting steam at
2  very high temperatures and washing the garbage.
3  Q.  Was that the purpose of Estech U.S.A., LLC?
4  A.  Yes.
5  Q.  Did Estech U.S.A., LLC engage in any other
6  projects?
7  A.  No.
8  Q.  And is that the purpose of Estech U.S.A.
9  today?
10  A.  Yes.
11  Q.  And is it still involved in that project of
12  converting garbage into fiber?
13  A.  Yes.
14  Q.  How many employees does Estech U.S.A., LLC,
15  have today?
16  A.  None.
17  Q.  None.
18      And Mr. Michalek is the CEO?
19  A.  Yes.
20  Q.  Are there any other officers?
21  A.  No.
22  Q.  Are there any directors?
23  A.  No.
24  Q.  Are there any affiliates to Estech U.S.A.,

Page 19

1  LLC?
2  A.  No.
3  Q.  Is Mr. Michalek paid by Estech U.S.A., as
4  CEO?
5  A.  No.
6      MR. WINTON:  I'm sorry.  That was "no"?
7      THE WITNESS:  No.
8  BY MS. OROZCO:
9  Q.  Does Estech U.S.A. generate income?
10  A.  No.
11  Q.  And where does Estech U.S.A. get its money to
12  perform the project, we'll call it?
13  A.  Well, up until 2007, we were funding it.
14  Q.  "We," being The Slane Company?
15  A.  The Slane Company, yes.
16  Q.  Okay.  And then what happened?
17  A.  We were unable to continue to fund it.
18  Q.  And who funds Estech U.S.A. now?
19  A.  There is a potential project with an Italian
20  company called Falter.
21  Q.  Could you spell that?
22  A.  F-A-L-T-E-R, I think.
23  Q.  Who has been funding --
24      Who funded Estech U.S.A. in 2007 when The

Page 20

1  Slane Company's funding terminated?
2  A.  No one.
3  Q.  Did it operate?
4  A.  No, not really.
5  Q.  Does it now operate?
6  A.  No -- well, it's -- it's doing some testing.
7  Q.  And what do you mean by that?
8  A.  Falter sells diapers in Italy, and when you
9  buy a diaper in Italy, you have to pay for the disposal
10  cost, which exceeds the cost of the diaper, and Falter
11  is trying to determine if the process can treat
12  diapers.
13  Q.  The process is similar to the process of
14  converting garbage into fiber?
15  A.  Correct.  The concept being that they would
16  mix the diapers with garbage.
17  Q.  Okay.  Do you know if Falter is currently
18  funding Estech U.S.A. at all?
19  A.  They are, for the tests.
20  Q.  And does Estech U.S.A. do any other business
21  or projects besides this current test involving the
22  diapers with Falter?
23  A.  No.
24  Q.  Do you know if Mr. Michalek works anywhere

Page 21

1 else besides Estech U.S.A.?
2 **A. He works at other part-time jobs, it's my**
3 **understanding, yes.**
4 Q. But he generates no salary or compensation
5 for his role in Estech U.S.A.?
6 **A. Correct.**
7 Q. Where is Estech U.S.A. incorporated to do
8 business?
9 **A. Ohio. It's a Limited Liability Company -- an**
10 **Ohio Limited Liability Company.**
11 Q. Do you know if it does business in any other
12 jurisdictions outside of Ohio?
13 **A. It does not.**
14 Q. Does Estech U.S.A. have any joint ventures --
15 joint-venture relationships with any other entities?
16 **A. No.**
17 Q. What about The Slane Company? Does The Slane
18 Company have any joint-venture relationships with any
19 companies?
20 **A. No.**
21 Q. Does The Slane Company have any subsidiaries?
22 **A. No. We have single-entity companies that own**
23 **real estate projects.**
24 Q. The Slane Company has single-entity

Page 22

1 companies?
2 **A. Correct.**
3 Q. How many of those are there?
4 **A. Numerous.**
5 Q. And are they subsidiaries of The Slane
6 Company, or affiliates? How would you classify them?
7 **A. Yeah, I would say affiliates. Yeah.**
8 **When we would do a real estate project,**
9 **often, we would do it in the name of an individual LLC**
10 **that would be owned, ultimately, by The Slane Company.**
11 Q. Can you give me an example?
12 **A. Yes.**
13 **If we were to build this building, we would**
14 **form a company called "East Broad, LLC," and that**
15 **entity would own the project and we would own the**
16 **entity.**
17 Q. Do you know about how many single-entity
18 companies exist today?
19 **A. I don't.**
20 Q. Does Mr. Michalek have any involvement in The
21 Slane Company other than his position with Estech
22 U.S.A.?
23 **A. He does not.**
24 Q. What about, does he have any position with

Page 23

1 any single-entity companies?
2 **A. He does not.**
3 Q. And is Estech U.S.A. owned at all by The
4 Slane Company?
5 **A. No.**
6 Q. Would you consider the Estech U.S.A. entity
7 to be one of the single-entity companies that we were
8 speaking about?
9 **A. No.**
10 Q. And when you say you have an interest in
11 Estech U.S.A., LLC, can you tell me what that interest
12 is?
13 **A. I formed the trust and the trust owns some**
14 **undisclosed amount of interest and that amount is yet**
15 **to be determined depending upon how much Jan has to**
16 **give away for other potential employees that we are**
17 **seeking in the event the Falter contract materializes.**
18 Q. What's the name of the trust that was formed?
19 **A. The Daniel M. Slane Trust.**
20 Q. And is it fair to say that it's the trust
21 that owns the interest in Estech U.S.A.?
22 **A. Correct -- My interest, yes, correct.**
23 Q. And in the event that the business with
24 Falter becomes successful or results in potential

Page 24

1 employees being hired by Estech U.S.A., would you have
2 an input in that?
3 **A. No. It's my understanding that Falter would**
4 **control the project and pay us some type of royalty.**
5 Q. Do you know if Falter has any offices in the
6 U.S.?
7 **A. They are 50 percent owned by Procter &**
8 **Gamble.**
9 Q. What role, if any, would you have in Estech
10 U.S.A., LLC, if the Falter project became successful or
11 started to take off?
12 **A. None.**
13 Q. Would you receive any compensation or any
14 distribution?
15 **A. Eventually, I might be entitled to some**
16 **portion of the royalties -- at least the trust would**
17 **be.**
18 Q. And is that set out in the trust document?
19 **A. No.**
20 Q. Is that defined anywhere?
21 **A. The interest, you mean?**
22 Q. Yes.
23 **A. Well, it is in the trust document, yes. I'm**
24 **sorry. Uh-huh.**

Page 25

1    Q.   And who else --
2         I apologize, I may have already asked, but
3    who else, besides yourself, has an interest in Estech
4    U.S.A.?
5    **A.   My brother, Charles.**
6    Q.   Charles Slane?
7    **A.   Yes.**
8    Q.   Anyone else?
9    **A.   No.**
10   Q.   What is your brother's role in Estech U.S.A.?
11   **A.   He is an investor.**
12   Q.   Anything else?
13   **A.   No.**
14   Q.   Does he also have a trust?
15   **A.   Yes.**
16   Q.   And is it the Charles Slane Trust?
17   **A.   Yes.**
18   Q.   Would he also have very little role in the
19   future of the company even if the business with Falter
20   becomes successful?
21   **A.   Yes.**
22   Q.   Is it fair to say that you and your brother
23   share the same type of interest in Estech U.S.A.?
24   **A.   Yes.**

Page 26

1    Q.   Does The Slane Company do any advertising?
2    **A.   No.**
3    Q.   Now, you said you had, in the Columbus
4    office, a bookkeeper, a CFO and a property manager.
5    **A.   Yes.**
6    Q.   Who is the CFO?
7    **A.   Mark Roth.**
8    Q.   And what about the property manager?
9    **A.   Marcia McCoy.**
10   Q.   And the bookkeeper?
11   **A.   Candice.   Her last name escapes me.**
12   Q.   Do you have a secretary or a --
13   **A.   No.**
14   Q.   And do they all work part-time for Slane
15   Company?
16   **A.   No, they work full-time.**
17   Q.   Full-time.
18        Salaried?
19   **A.   Yes.**
20   Q.   Do you have a physical office in The Slane
21   Company, at the Johnstown address?
22   **A.   Yes.**
23   Q.   And do you work there every day?
24   **A.   Yes.**

Page 27

1    Q.   What about your brother, Charles; is he
2    involved at all in The Slane Company?
3    **A.   Yes.**
4    Q.   Does he also have a physical office at the
5    property in Johnstown --
6    **A.   Yes.**
7    Q.   -- I mean, on Johnstown Road, I think you
8    said.
9         What do you do on a daily basis in your
10   office?
11   **A.   Talk to banks and lawyers.**
12   Q.   What about your brother?  Is his role
13   similar?
14   **A.   Similar.**
15   Q.   Anything else you can think of?
16   **A.   No, not really.**
17   Q.   Have you ever heard of an entity called
18   "Estech Trading, LLC"?
19   **A.   Yes.**
20   Q.   And how --
21        MR. WINTON:  Claurisse, could I ask a favor?
22        MS. OROZCO:  Sure.
23        MR. WINTON:  Before you go down that path.  I
24   was waiting for you to hit a conceptual break.

Page 28

1         (Recess taken.)
2    BY MS. OROZCO:
3    Q.   And how have you heard of that company?
4    **A.   I formed it.**
5    Q.   What is Estech Trading, LLC?
6    **A.   It's a single-entity company that is owned by**
7    **Jan Michalek.**
8    Q.   Do you have any --
9         Beyond forming Estech Trading, do you have
10   any role with Estech Trading?
11   **A.   No.**
12   Q.   Do you have any --
13        Are you an officer of Estech Trading?
14   **A.   No.**
15   Q.   Are you a director?
16   **A.   No.**
17   Q.   Is Jan Michalek the only owner of Estech
18   Trading?
19   **A.   Yes.**
20   Q.   Do you know what the purpose of Estech
21   Trading is?
22   **A.   Commodities trading.**
23   Q.   What type of --
24        Any particular type of commodity?

Page 29

1    A.  No.
2    Q.  Does Estech Trading have any employees?
3    A.  Not to my knowledge.
4    Q.  Do you know what Mr. Michalek's role is, if
5    any, with Estech Trading, besides being owner?
6    A.  He is the principal.
7    Q.  Does he have any actual duties with Estech
8    Trading?
9    A.  Not to my knowledge.
10   Q.  Where are Estech Trading's offices?
11   A.  60 Elm Street, Canal Winchester, Ohio.
12   Q.  Does Estech Trading have any offices outside
13   of Ohio?
14   A.  I don't know.
15   Q.  What about in Ohio, outside of Canal
16   Winchester?
17   A.  I don't know.
18   Q.  Do you know ....
19       When did you form Estech Trading?
20   A.  2010.
21   Q.  Is Estech Trading affiliated with Estech
22   U.S.A.?
23   A.  No.
24   Q.  What about The Slane Company; is it

Page 30

1    affiliated with The Slane Company?
2    A.  No.
3    Q.  Did The Slane Company provide any startup
4    capital or investment in Estech Trading?
5    A.  No.
6    Q.  Do you know where Estech Trading received
7    startup capital, if any?
8    A.  No.
9    Q.  Where did the idea for Estech Trading come
10   from?
11   A.  Jan.
12   Q.  Is there any reason why he asked you to form
13   the company instead of him doing it, himself?
14   A.  He wanted me to help him with the legal work
15   and put up a performance bond to a Chinese steel
16   company for the purchase of iron ore.
17   Q.  To purchase the steel from the Chinese
18   company?
19   A.  No.  To purchase iron ore for the Chinese
20   steel company.
21   Q.  Okay, to purchase.
22   A.  Uh-huh.
23   Q.  Was that the reason that Estech Trading was
24   created?

Page 31

1    A.  Yes.
2    Q.  When it was created, was the sale of iron ore
3    to a Chinese steel company the only contemplated
4    business for Estech Trading?
5    A.  I don't know.
6       MR. WINTON:  I'm sorry, I couldn't hear you.
7       THE WITNESS:  I do not know.
8       MR. WINTON:  Thank you.
9    BY MS. OROZCO:
10   Q.  Do you know if Estech Trading is still in
11   business?
12   A.  Yes.
13   Q.  And is Jan Michalek still the only individual
14   involved with Estech Trading?
15   A.  To my knowledge.
16       Let me go back, Claurisse.
17   Q.  Sure.
18   A.  I don't know whether it's still in existence.
19   I mean, I've lost track of it.
20   Q.  Okay.
21       When Estech U.S.A., LLC, was formed, was that
22   company also formed by you?  The "U.S.A." entity.
23   A.  My brother may have done it.  I'm not sure.
24   Q.  Is there any particular significance to the

Page 32

1    use of the word, "Estech"?
2    A.  No.  I -- Jan asked me to -- to form the
3    company and that was his name.
4    Q.  Do you know when Estech U.S.A. --
5       Not the "Trading," now.  Back to "U.S.A."  Do
6    you know when that company was formed?
7    A.  2000, or right around there.
8    Q.  And it was either formed by yourself or your
9    brother?
10   A.  Yes.
11   Q.  Now, back to Estech Trading, okay?  With
12   respect to the Performance Bond to purchase iron ore
13   for a Chinese steel company, can you tell me about that
14   contract that Estech Trading was going to be involved
15   in?
16   A.  Jan had a contract to supply the steel
17   company with iron ore.  The contract required a
18   Performance Bond and he asked me to put up the
19   Performance Bond.
20   Q.  When you say he asked you:  He asked you,
21   personally, or he asked The Slane Company?
22   A.  He asked me, personally.
23   Q.  And did you do that?
24   A.  I did.

Page 33

```
1     Q.  Do you recall the name of the Chinese
2  company?
3     A.  Taiwan Steel.
4        Don't ask me to spell it, please.
5     Q.  Do you recall the amount of that Performance
6  Bond?
7     A.  $340,000.
8     Q.  What bank was that issued from?
9     A.  Well, the Chinese steel company required the
10 cash in their account at a Chinese bank in China.
11    Q.  And was that transfer made?
12    A.  It was.
13    Q.  Did the money come out of your personal
14 finances or did it come from The Slane Company?
15    A.  Came from my personal finances.
16    Q.  When was that transfer made?
17    A.  Approximately October 2010.
18    Q.  Did Estech Trading sell the iron ore to the
19 Chinese company?
20    A.  No.  The deal collapsed.
21    Q.  Do you know why it collapsed?
22    A.  The miner was unable to perform.
23    Q.  When you say "miner," it's M-I-N-E-R?
24    A.  Yes.  Yes.
```

Page 34

```
1     Q.  Okay.  Do you know why.
2     A.  No, I do not know why.
3     Q.  Do you know where the iron ore was supposed
4  to come from?
5     A.  Mexico.
6     Q.  Did you have any other role with respect to
7  this transaction for the sale of the iron ore from the
8  Mexican miner to Taiwan Steel?
9     A.  Yes.  Jan had arranged for shipping.  The ore
10 was to be sold to the steel company, CIF, and Jan's
11 shipping contract, for whatever reason, fell apart at
12 the end of November and he asked me to help him acquire
13 a ship.
14    Q.  And did you do that?
15    A.  Yes.
16    Q.  And, again, when he asked you:  He asked you,
17 personally, or The Slane Company?
18    A.  He asked me, personally.
19    Q.  And what was your role with respect to
20 helping him acquire a ship?
21    A.  He gave me the name of a Russian shipping
22 company, a Yuriy-something-or-another, and I started to
23 interact with him on the telephone and through e-mails.
24    Q.  And was a contract for the ship ever
```

Page 35

```
1  concluded?
2     A.  No --
3     Q.  Do you know why?
4     A.  -- not -- well, I -- I don't know if it was
5  ever concluded.  I -- we had a shipping person, whose
6  name was Johan Schild.
7     Q.  Johan, J-O-H-A-N?
8     A.  Yes.
9     Q.  Okay.
10    A.  And it was really Johan's job to deal with
11 all of the paperwork and the contracts, et cetera.  He
12 was a shipping expert.
13    Q.  Okay.  When you say, "we had a shipping
14 person," do you mean you and Mr. Michalek?
15    A.  Mr. Michalek had him, yeah.
16    Q.  Okay.  And Johan Schild, was he employed by
17 Estech Trading?
18    A.  No.
19    Q.  Is he employed by an independent third party?
20    A.  I think he's a -- some sort of a ship broker.
21    Q.  Okay.  Do you know where he is located, or
22 his office?
23    A.  Yes.  Alabama.  What's -- It's some small
24 town on the coast, Gulfport or someplace down there in
```

Page 36

```
1  Alabama.
2     Q.  You had said earlier that Mr. Michalek gave
3  you the name of a Russian shipping company and you
4  communicated with an individual, Yuriy?
5     A.  Yes.
6     Q.  Do you know where Mr. Michalek got the name
7  of that shipping company?
8     A.  I do not.
9     Q.  Okay.
10       With respect to the negotiation for the
11 ship -- for the ship contract, did you have any
12 involvement?  After your initial contact with Yuriy via
13 telephone and e-mail, did you have continuous
14 involvement in the shipping contract?
15    A.  For a period of time, I did.
16    Q.  Do you recall what that timeframe was?
17    A.  I think it started November 30th, December
18 1st, right in there.
19    Q.  Do you recall when your role concluded with
20 respect to the shipping contract?
21    A.  Toward the end of December.
22    Q.  Do you know whether Mr. Michalek communicated
23 at all with the Russian shipping company?
24    A.  I believe he did.
```

Page 37

1    Q.   Did you communicate with Yuriy directly or
2    through Johan?
3    **A.   Both.**
4    Q.   Did there ever come a time where your
5    communication did not involve Johan?
6    **A.   No.**
7    Q.   Was there ever a time when your communication
8    was only through Johan?
9    **A.   No.**
10   Q.   Okay.
11       I am going to show you a document that has
12   been marked as Exhibit 26 at an earlier deposition and
13   I am going to represent to you that it's out of
14   order -- the pages are out of order but this is how it
15   was produced to us when it was marked.  It's not my
16   version.  But just take a moment to look at that,
17   please.
18       (Discussion off the record.)
19   BY MS. OROZCO:
20   Q.   Mr. Slane, have you ever seen a copy of
21   Exhibit 26 before today?
22   **A.   I don't think so.**
23   Q.   Okay.  I am going to draw your attention
24   to -- Exhibit 26 was marked at the deposition of Garth

Page 38

1    Wolfson and has Bates Numbers M&K 0087 through 00107,
2    which Mr. Winton was kind enough to have marked, and I
3    am just going to refer you to specific pages of this
4    Exhibit 26.  It's Pages 97 and 98, which is the fixture
5    recap, and ask if that two-page e-mail looks familiar
6    to you.
7    **A.   No, not really.**
8    Q.   Is that your e-mail at the top of that Page
9    0097?
10       Do you see your e-mail address?
11   **A.   Yes I do.**
12       **Yes, that is.**
13   Q.   Do you recall receiving this document?
14   **A.   No.**
15   Q.   Can you just tell me who else is in the two
16   lines -- the other e-mails, if they look familiar to
17   you, at the top.  It says mnfchart@otenet.gr.
18   **A.   No, I don't know who that is.**
19   Q.   Okay.  And what about jkm@estechusallc?
20   **A.   That's Jan.**
21   Q.   And is this your e-mail:
22   dslane@theslanecompany.com?
23   **A.   Yes.**
24   Q.   But you don't have any recollection of

Page 39

1    receiving this two-page e-mail?
2    **A.   No.**
3    Q.   Do you recall at all what the terms of the
4    shipping contract, which I have just shown you as
5    Exhibit 26, were?
6    **A.   No.**
7    Q.   Do you know why Mr. Michalek was seeking to
8    employ a ship?
9    **A.   Yes.  He was required to transport the ore to**
10   **China.**
11   Q.   So the transportation was part of Estech
12   Trading's responsibility under the sales contract?
13   **A.   Correct.**
14   Q.   Do you know who the parties were to the sales
15   contract?
16   **A.   Estech Trading Company and Taiwan Steel.**
17   Q.   Other than the Performance Bond for $340,000,
18   did you have any other interest or involvement with the
19   sales contract?
20   **A.   No.**
21   Q.   What about The Slane Company?  Did The Slane
22   Company have any interest or involvement with the sales
23   contract?
24   **A.   No.**

Page 40

1    Q.   There was no guarantee issued by yourself or
2    The Slane Company?
3    **A.   No.**
4    Q.   Do you know who negotiated the terms of the
5    Charter Party, which is the shipping contract we just
6    looked at as Exhibit 26?
7    **A.   I do not.**
8    Q.   I am going to mark this next document as
9    Exhibit 48.  We produced this as Milestone Pages 1, 2
10   and 3.
11                  - - -
12       A THREE-PAGE DOCUMENT ENTITLED,
13       "ESCROW AGREEMENT DATED 2/12/10,"
14       BATES-STAMPED MILESTONE00000001
15       THROUGH 0003, WAS MARKED AS EXHIBIT
16       48.
17                  - - -
18   BY MS. OROZCO:
19   Q.   Exhibit 48, yes, just take a moment and look
20   at that document.  I am going to ask you a few
21   questions about it.
22   **A.   Okay.**
23   Q.   Have you ever seen that document prior to
24   today?

Page 41

1    A. I have not.
2    Q. You have never seen this document?
3    A. Not that I can recall.
4    Q. Do you recall whether or not the terms of the
5  Charter Party required Estech Trading to put $500,000
6  into an escrow account as security for performance of
7  the Charter Party, which is the shipping contract?
8    A. That's what they were requesting.
9    Q. That's who was requesting?
10   A. The shipping company.
11   Q. And do you know what led to that request?
12   A. They claimed -- the shipping company claimed
13 that there were costs associated with relocating the
14 ship from China to Mexico.
15   Q. Do you know whether or not Estech Trading put
16 that $500,000 into the escrow account?
17   A. I do not.
18   Q. Did Mr. Michalek ever ask you, Dan Slane,
19 personally, to lend him $500,000 to fund this escrow
20 account?
21   A. Yes.
22   Q. Do you recall when he asked you that?
23   A. Well, it must have been the 1st of December,
24 in that area -- end of November, beginning of December.

Page 42

1    Q. And did you lend him this $500,000?
2    A. I did not.
3    Q. Did The Slane Company entity lend Mr.
4  Michalek the $500,000?
5    A. No.
6    Q. Do you know if Estech Trading ever received
7  the $500,000 from anybody so that it could comply with
8  the terms of this Escrow Agreement?
9    A. No.
10   Q. I am going to back up a little bit and go to
11 two exhibits that were previously marked at the
12 deposition of Garth Wolfson again. It's Exhibits 8 and
13 9. Just ask you to take a moment to look at those two
14 documents.
15   A. Yes.
16   Q. Okay. Starting with Exhibit 8, which has a
17 cover sheet of an e-mail from Dan Slane to M. Seward,
18 and the "Attachment" says: "LC Copy Tianjin
19 Materials." Are you familiar with the document that's
20 attached to the cover page of Exhibit 8?
21   A. No.
22   Q. Do you recall sending this document to M.
23 Seward on December 1st, 2010?
24   A. No.

Page 43

1    Q. And who is Marie Cush? See it at the top?
2  Do you know who that is?
3    A. Where is that?
4    Q. At the very top left corner. It was
5  printed -- looks like this e-mail was printed from
6  Marie Cush's computer.
7    A. No, I don't know who that --
8     Where is that?
9    Q. Right here (indicating).
10   A. Oh.
11   Q. Actually, I think she actually worked in
12 Mr. Wolfson's office, the person who produced --
13   A. No, I don't know who she is.
14   Q. Okay. But you don't recall sending this
15 e-mail with the attached LC Copy to M. Seward?
16   A. No, I don't recall it.
17   Q. Does this Letter of Credit look familiar to
18 you at all?
19   A. Yes.
20   Q. All right. And do you know what this Letter
21 of Credit references -- or what the purpose of this
22 Letter of Credit was?
23   A. The Chinese steel company had put up a Letter
24 of Credit.

Page 44

1    Q. And do you recall what the purpose of them
2  putting up a Letter of Credit was?
3    A. For the purchase of the ore and the shipping.
4    Q. But this document had nothing to do with the
5  Letter of Credit that you funded for Mr. Michalek for
6  the purchase of the ore?
7    A. Correct.
8    Q. This is a separate Letter of Credit from the
9  Chinese steel company?
10   A. Correct.
11   Q. All right.
12    If you could look at --
13    MR. WINTON: Claurisse, you said the Letter
14 of Credit --
15    MS. OROZCO: I'm sorry. I mean the
16 Performance Bond.
17    THE WITNESS: Yeah.
18    MS. OROZCO: Thank you.
19    MR. WINTON: Okay.
20 BY MS. OROZCO:
21   Q. If I could draw your attention to Exhibit 9,
22 which is what you are now looking at, and just review
23 that for a moment.
24   A. Yes.

Page 45

1  Q.  Have you seen this document before today?
2  A.  Yes.
3 ·  Q.  And what is this document?
4  **A.  This is a document assigning proceeds from**
5  **the Letter of Credit to the miner.**
6  Q.  Is this the --
7  When you say "to the miner," is that the
8  miner in Mexico?
9  **A.  Yes.**
10  Q.  On Page 2 of Exhibit 9, which is marked
11  M&K-0016, where it says -- right in the top third, it
12  says, "Exact Name of Assignee:  Jaime Martinez Dura,
13  General Manager; Groupo Martinez Hipolito ..." is that
14  the miner in Mexico who was supposed to provide the
15  iron?
16  **A.  Yes.**
17  Q.  Was this the iron that was going to be
18  shipped on the vessel that you were helping Mr.
19  Michalek contract with?
20  **A.  Yes.**
21  Q.  Do you recall sending this e-mail to M.
22  Seward on December 1st, 2010, as indicated in the cover
23  letter?
24  **A.  Yes.**

Page 46

1  Q.  Do you know who --
2  Do you recall who Mr. Seward is in this
3  transaction?
4  **A.  He is an attorney representing the shipping**
5  **company, in England.**
6  Q.  When did you first have any communication
7  with Mr. Seward?
8  **A.  Early December.  Maybe December 1st, November**
9  **30th, someplace in there.**
10  Q.  Do you recall what the nature of your first
11  communication with him was?
12  **A.  No.**
13  Q.  Did you ever speak to Mr. Seward on the
14  phone?
15  **A.  Yes.**
16  Q.  What was the nature of the -- or the purpose
17  for your conversations?
18  **A.  How to assign part of the Chinese Letter of**
19  **Credit to the shipping company.**
20  Q.  What was the purpose of that, or the need
21  behind that?
22  **A.  As collateral or security for their shipment.**
23  Q.  Do you know if that was ever done; I mean the
24  assigning part of the Letter of Credit to the shipping

Page 47

1  company?
2  **A.  I do not.  I do not.**
3  Q.  Did Mr. Michalek ever ask you for any input
4  on the Escrow Agreement, which is Exhibit 48?
5  **A.  No.**
6  Q.  And you stated earlier that you do not know
7  whether or not Mr. Michalek ever received the funds as
8  required by the Escrow Agreement; is that correct?
9  **A.  Correct.**
10  Q.  Did you ever do anything to assist Mr.
11  Michalek in attempting to obtain the $500,000 for the
12  Escrow Agreement?
13  **A.  Yes.**
14  Q.  What was that?
15  **A.  I went to a friend of mine and asked him to**
16  **consider doing it.**
17  Q.  And who was that?
18  **A.  Jerry Jacobs.**
19  Q.  And who is Mr. Jacobs?
20  **A.  He's an owner of an oil and gas company.**
21  Q.  What is the name of that company?
22  **A.  American Standard Energy (sic).**
23  Q.  American Standard Energy (sic)?
24  **A.  Yeah.  I think that's it, or something**

Page 48

1  similar.
2  Q.  Have you ever heard of a company called
3  "American Energy Services"?
4  **A.  That's it.  Thank you.**
5  **Yes.  That's correct.  I stand corrected.**
6  Q.  That's okay.
7  And where is American Energy Services?
8  **A.  Columbus.**
9  Q.  And what kind of business do they do?
10  **A.  Well, it's my understanding they do oil and**
11  **gas investments.**
12  Q.  Do you know if American Energy Services has
13  any offices outside of Ohio?
14  **A.  I do not.**
15  Q.  Do you recall when you approached Mr. Jacobs
16  regarding this $500,000?
17  **A.  About December 1st.**
18  Q.  And what was his response to your request?
19  **A.  He would consider doing it if he had**
20  **sufficient collateral and security.**
21  Q.  Did you know if Mr. Jacobs ever did, in fact,
22  provide the $500,000 to Estech Trading?
23  **A.  I do not.**
24  Q.  Did you ever have any further communications

Page 49

1  with Mr. Jacobs or Mr. Michalek regarding collateral
2  and security to American Energy Services so that they
3  could make this transfer of the $500,000?
4  **A. No.**
5  Q. Did you ever put Mr. Jacobs in direct contact
6  with Mr. Michalek?
7  **A. Yes.**
8  Q. And do you know whether or not they
9  communicated directly?
10  **A. I believe they did.**
11  Q. But you don't know whether or not the
12  $500,000 was actually ever provided from Mr. Jacobs to
13  Estech Trading?
14  **A. I do not.**
15  Q. And you also testified that you do not know
16  whether the Charter Party or the contract for the ship
17  was ever concluded; is that correct?
18  **A. Correct.**
19  Q. Can you tell me whether or not Mr. Michalek
20  has any role with The Slane Company?
21  **A. He does not.**
22  Q. He is not an officer or director?
23  **A. He is not.**
24  Q. I am going to mark the next exhibit, which is

Page 50

1  a series of e-mail communications that we produced.
2  It's Milestone-0058 through 0063.
3        - - -
4        A SIX-PAGE E-MAIL STRING, BEGINNING
5        WITH AN M&F CHARTERING/CHARTERING
6        CHAIKA-AGENCY, RECEIVED: 11/30/10,
7        BATES-STAMPED MILESTONE00000058
8        THROUGH 0063, WAS MARKED AS EXHIBIT
9        49.
10        - - -
11  MR. WINTON: Claurisse, 059 is Exhibit 19.
12  MS. OROZCO: Oh. It starts with Exhibit 19?
13  MR. WINTON: It is Exhibit 19 -- No, I'm
14  sorry. I'm looking at Mahoney.
15  MS. OROZCO: Yeah. No, this is Milestone.
16  MR. WINTON: I'm sorry. My mistake.
17  BY MS. OROZCO:
18  Q. Okay. And just take a moment to, you know,
19  review the string of e-mails.
20  **A. Okay.**
21  Q. Okay?
22        This appears to be a string of e-mail
23  communications between the ship owner and Mr. Michalek
24  and yourself. Do you recall being involved in any of

Page 51

1  these e-mail communications?
2  **A. Yes, some of them, uh-huh.**
3  Q. Yeah?
4  **A. Yes.**
5  Q. I am going to refer you to the Exhibit 49
6  page, at the bottom left, it says Milestone 0060 but
7  it's Page 3 of the actual e-mail chain.
8  **A. Uh-huh.**
9  Q. And the first full message at the top is from
10  you -- from Dan Slane -- to Marine Business Exchange
11  and Jan Michalek and Chartering Chaika-Agency, where
12  you say: "Johan: I told Yuri (sic) you would be the
13  main contact for the shipping issues regarding the
14  port, et cetera. When you get time, please contact him
15  via e-mail. Thanks, Dan."
16        Who was "Johan" that you were speaking to in
17  this -- or directing this e-mail message to?
18  **A. Johan was the shipping expert that was**
19  **helping Jan with the shipping.**
20  Q. Okay. So he is the ship broker, as far as
21  you recall?
22  **A. Yes, yes.**
23  Q. And when you say -- you say, "I told Yuri
24  (sic)," is Yuriy the individual at the shipping company

Page 52

1  that you communicated with?
2  **A. Yes.**
3  Q. And who retained Johan as the ship broker; do
4  you recall?
5  **A. Jan.**
6  Q. Did you ever speak directly with Johan?
7  **A. Yes.**
8  Q. On a regular basis for this Charter Party?
9  **A. Yes.**
10  Q. What was the nature of your conversations
11  with him?
12  **A. Making the arrangements for the ship.**
13  Q. Is there any reason that you did this, as
14  opposed to Mr. Michalek?
15  **A. He was very consumed with dealing with the**
16  **miner and was very overwhelmed and had asked me to help**
17  **him get the ship.**
18  Q. Did The Slane Company receive -- or was The
19  Slane Company to receive any compensation for you
20  assisting Mr. Michalek with the shipping issues?
21  **A. No.**
22  Q. On Page 2 of that same e-mail, which is
23  Milestone 0059 -- but it's Page 2 in the Chartering
24  chain of Exhibit 49, at the bottom, there's a message

Page 53

1    to you and Mr. Michalek and info@marinebux --
2        A.  Uh-huh.
3        Q.  -- and it says, "Johan and Daniel."  Is that
4    Johan the ship broker and yourself?
5        A.  Yes.
6        Q.  Okay.  Where it's from Yuriy -- slash, from
7    Yuriy --
8        A.  Yes.
9        Q.  -- it says, "Please kindly be advised
10    according to Charter Party cargo to be loaded is iron
11    ore lumps, which is actually stated in the clean
12    fixture recap.
13        "Please kindly confirm cargo will be as per
14    above."
15        Do you recall whether or not you responded to
16    that message?
17        A.  I do not.
18        Q.  When these types of inquiries came in, is
19    that something you would have responded to or would
20    Johan have responded?
21        A.  Johan would have responded.
22        Q.  On Page 1 of the same Exhibit 49 -- it's
23    Milestone 0058 -- there is a message at the top to
24    Yuriy from Dimitris.  Do you know who Dimitris is?

Page 54

1        A.  He had some connection --
2        MR. WINTON:  I'm sorry.  You are on Page 1?
3        MS. OROZCO:  Page 1 of the e-mail chain,
4    0058.
5        MR. WINTON:  You are referring to this
6    (indicating), when you say from Yuriy to Dimitris.
7        MS. OROZCO:  Yeah, I'm going to get there.
8    BY MS. OROZCO:
9        Q.  Where it says, "Yuriy/Dimitris.
10        A.  Yeah.  He had some connection with the
11    shipping company.
12        Q.  Okay.  And then, below that --
13        MR. WINTON:  Object, that it misstates the
14    document when you say From, To.
15        MS. OROZCO:  I'm going to get to that after.
16        MR. WINTON:  Okay.
17    BY MS. OROZCO:
18        Q.  Do you have an understanding of whether this
19    message is to Yuriy and a Dimitris, or from Yuriy and
20    Dimitris?
21        A.  I do not.
22        Q.  Okay.
23        Then, it says below -- it appears that there
24    is a message being forwarded where it says:  FYG

Page 55

1    Received Follow, F-O-L-L.
2        "As an officer of the Estech LLC and Slane
3    Energy companies, I authorize these companies to
4    guarantee the full payment for shipping costs per
5    contract currently under negotiations fro (sic)
6    transport of iron ore to Tianjin Port, China.
7        "JKM.
8        "Jan Michalek ..."
9        Do you know why Mr. Michalek would have made
10    this representation that he is an officer of the Slane
11    Energy companies?
12        A.  No, I do not.
13        Q.  Do you know whether or not the Slane Energy
14    companies guaranteed the full payment for the shipping
15    costs under the sales contract?
16        A.  They did not.
17        Q.  Are the Slane Energy companies separate from
18    The Slane Company?
19        A.  Yes.
20        Q.  And what are the Slane Energy companies?
21        A.  I think it was a predecessor company to
22    Estech.  It has no -- I don't think it's even in
23    existence anymore.
24        Q.  Okay.  When you say you think it was a

Page 56

1    predecessor to Estech, which Estech?
2        A.  Estech LLC.
3        Q.  The U.S.A. --
4        A.  Yes.
5        Q.  -- or Trading?
6        A.  U.S.A.
7        Q.  Okay.
8        Did you have any involvement in the Slane
9    Energy companies?
10        A.  I may have.  It was years ago.
11        Q.  Did Mr. Michalek have any involvement in the
12    Slane Energy companies?
13        A.  Not to my knowledge.
14        Q.  Were you aware, before reading this e-mail
15    today, that Mr. Michalek made this representation about
16    the guarantee?
17        A.  No.
18        Q.  He never discussed it with you or told you
19    that he was going to make this representation?
20        A.  Correct.
21        Q.  I am going to show you a document that has
22    not been previously marked so we'll mark it as Exhibit
23    50, and it's Milestone production 00102.  I am going to
24    show you this document and just ask if you've ever seen

Page 57

1 that before today.
2 - - -
3 · A ONE-PAGE MICHALEK/CHARTERING
4 CHAIKA-AGENCY, DATED 12/24/10,
5 BATES-STAMPED MILESTONE 0000012,
6 WAS MARKED AS EXHIBIT 50.
7 - - -
8 **A. No, I have not seen it.**
9 Q. Do you recall Mr. Michalek ever discussing
10 with you the cancellation of the Charter Party shipping
11 contract?
12 **A. No, I do not.**
13 Q. I am going to mark the next exhibit 51, which
14 is Milestone production 0103 -- or 00103.
15 - - -
16 A ONE-PAGE E-MAIL STRING, BEGINNING
17 WITH A VIOLIN/MICHALEK E-MAIL DATED
18 12/24/10, BATES-STAMPED
19 MILESTONE 00000103, WAS MARKED AS
20 EXHIBIT 51.
21 - - -
22 BY MS. OROZCO:
23 Q. The same question: Have you ever seen that
24 document before today?

Page 58

1 **A. No.**
2 Q. Did Mr. Michalek ever discuss with you the
3 issues that had arisen as a result of the Charter Party
4 shipping contract being canceled?
5 **A. Other than the miner could not perform.**
6 Q. But nothing else?
7 **A. No.**
8 Q. I am going to show you a document which was
9 marked as Exhibit 18 at the deposition of Mr. Wolfson,
10 ask you to review that for a moment.
11 **A. Okay.**
12 Q. Okay?
13 Do you recall ever sending this document, or
14 receiving it, from Garth Wolfson?
15 MR. WINTON: Which e-mail are you talking
16 about?
17 MS. OROZCO: Exhibit 18, M&K-0049, the middle
18 e-mail, from Garth to Dan, "Thanks, Dan."
19 MR. WINTON: Okay.
20 THE WITNESS: I don't remember this.
21 BY MS. OROZCO:
22 Q. Who is Denise Amspoker; do you know?
23 **A. No.**
24 Q. Okay. You can put that one aside.

Page 59

1 **A. Denise may have been Jerry's secretary.**
2 Q. Jerry ...?
3 **A. Jacobs.**
4 Q. I am going to show you a document that was
5 marked as Exhibit 20 at the deposition of Mr. Wolfson,
6 ask you to take a moment to review that document.
7 **A. Uh-huh. Yes.**
8 Q. Do you recall sending this document to
9 Mahoney & Keane and then receiving it back from him?
10 **A. I don't recall it, but I see that I did it.**
11 Q. It says on the first page of Exhibit 20,
12 which is M&K-0060, in your e-mail to
13 lawoffices@mahoneykeane.com: "Garth: Enclosed is a
14 corrected Escrow Agreement. We have agreed to change
15 the Laycan ... Thanks, Jan Michalek."
16 **A. Uh-huh. Yes.**
17 Q. Do you know whether or not you sent this or
18 Mr. Michalek sent this, apparently, from your e-mail?
19 **A. I don't know.**
20 Q. Do you know why Mr. Michalek would be -- if
21 he did send this, why he would be using your e-mail
22 address?
23 **A. No, unless he had been in my office. But, I**
24 **don't know.**

Page 60

1 Q. Did Mr. Michalek ever work in your office in
2 the past?
3 **A. No.**
4 Q. Do you know whether or not he would have had
5 a reason to have been in your office?
6 **A. Yes, he would come to my office to discuss**
7 **the project.**
8 Q. How far apart is the offices of The Slane
9 Company and the Estech Trading?
10 **A. 30 minutes.**
11 Q. But you don't know whether or not he ever
12 actually used your e-mail?
13 **A. No.**
14 Q. Did you ever speak with Mark Seward on the
15 telephone?
16 **A. Yes.**
17 Q. And what was the nature of your discussions
18 with him?
19 **A. Details arranging the shipping.**
20 Q. Anything else that you can think of?
21 **A. No.**
22 Q. Did you ever communicate with Mr. Seward via
23 e-mail?
24 **A. Yes.**

Page 61

1    Q.  And what would the nature of those
2   communications have been?
3       **A.  He had a number of questions and issues.  I**
4   **can't remember the details, but ....**
5       Q.  Okay.
6          I am going to show you a document that was
7   marked as Exhibit 42 at the deposition of Mr. Wolfson.
8   I'd just ask you to take a moment to review the content
9   of that e-mail.
10      **A.  Yes.**
11      Q.  Do you recall ever seeing any of these
12  communications before today?
13      **A.  No.**
14      Q.  On the first page of the Exhibit 42, which is
15  M&K-0181, the second half of that first page is an
16  e-mail from Mr. Wolfson to Mr. Moloney and there is a
17  cc line that includes your address.  Do you recall ever
18  reviewing or reading this document before today, that
19  e-mail?
20      **A.  I don't.**
21      Q.  Could you just take a moment to review the
22  contents of just that e-mail which is on 0181 and 0182
23  of Exhibit 42.
24      **A.  Yes.**

Page 62

1    Q.  Okay.
2       Do the contents of that e-mail -- are they
3   familiar to you?
4       **A.  I think I remember reading it, yeah.**
5    Q.  Okay.
6       Did you ever discuss the issues raised in
7   this e-mail with anyone?
8       **A.  No.**
9    Q.  You never discussed the contents of this
10  e-mail with Mr. Michalek?
11      **A.  No.**
12   Q.  What about with Mr. Moloney?
13      **A.  You know, I might have had some brief**
14  **conversations with him about it, but nothing in any**
15  **detail.**
16   Q.  Do you recall what those would have been?
17      **A.  Yes.  Mr. Moloney's position was that the**
18  **money was put into the trust account of Mahoney & Keane**
19  **and there was never an executed Escrow Agreement and**
20  **they wanted their money back.**
21   Q.  And did you ever speak to Mr. Seward about
22  the contents of this e-mail?
23      **A.  No.**
24   Q.  What about Mr. Wolfson, who was the sender of

Page 63

1   this e-mail?
2       **A.  No.**
3    Q.  Have you ever spoken to Mr. Wolfson for any
4   reason?
5       **A.  No.**
6    Q.  Did you ever speak with anyone at the
7   shipping company, Yuriy, about the contents of this
8   e-mail?
9       **A.  Yeah, he was calling me constantly.**
10   Q.  Did you ever speak to him or --
11      **A.  Yes.**
12   Q.  And what was the nature of those
13  conversations?
14      **A.  "Send us our money," basically.**
15   Q.  Did you have any response to that?
16      **A.  I said I had, really, nothing to do with it**
17  **and he had to talk to Mr. Moloney.**
18   Q.  Do you know whether or not Yuriy ever spoke
19  to Mr. Moloney?
20      **A.  I do not.**
21   Q.  I am going to show you a document which was
22  marked as Exhibit 14 at the deposition of Mr. Wolfson.
23  Just ask you to take a moment to review that, please.
24      **A.  Yes.**

Page 64

1    Q.  Have you ever seen the attachment to Exhibit
2   14, which is on Page 0034, before today?
3       **A.  Yes.**
4    Q.  In what capacity would you have seen that?
5       **A.  I think Tom showed this to me when it was**
6   **sent out.**
7    Q.  Do you know why you would have seen that
8   document?
9          MR. WINTON:  Objection, speculation.
10         THE WITNESS:  No, I'm not sure.  But, I
11  remember reading it.
12  BY MS. OROZCO:
13   Q.  Did you ask him why he was showing you this
14  document?
15      **A.  No, I didn't.**
16   Q.  When he showed it to you, did he tell you why
17  he wanted you to read it?
18      **A.  It was an issue of notifying the shipping**
19  **company that the money had been put into the trust**
20  **account and I wanted to make sure that that had**
21  **occurred.**
22   Q.  That the money had been put into --
23      **A.  No, that the shipping company was notified**
24  **that the money was in the trust account, or was about**

Deposition of: Dan Slane, taken on June 21, 2011

Page 65

1  to be put in the trust account.
2  Q.  Do you know whose trust account?
3  A.  Yeah, the attorneys in New York, Mahoney &
4  Keane.
5  Q.  Did you ever notify the shipping company that
6  the money was put into the trust account?
7  A.  I think I told Yuriy the money was put in the
8  trust account.
9  Q.  Do you recall whether or not you sent him an
10  e-mail or whether it was through a phone call?
11  A.  It was by phone.
12  Q.  Did you ever discuss with Yuriy the Escrow
13  Agreement that we have marked as Exhibit 48?
14  A.  No.
15  Q.  When you read this letter from Mahoney &
16  Keane dated December 2nd, that's Exhibit 14, did you
17  ever ask Mr. Moloney what the Escrow Agreement in the
18  Subject line referred to?
19  A.  No.
20  Q.  Did you ever see this letter, Exhibit 14,
21  before it was actually signed?
22  A.  Yes.
23  Q.  Do you recall when that was?
24  A.  When it was going out, when it was being

Page 66

1  transmitted.
2  Q.  But was it actually a signed version or --
3  A.  No, --
4  Q.  -- was it a draft?
5  A.  -- it was -- it was an unsigned version.
6  Q.  And who --
7  A.  Oh, I'm sorry.  This is -- I'm sorry.  I'm
8  confused.
9      No, I did not see this.
10  Q.  So you only saw it in its final form as we
11  are looking at it today in Exhibit 14?
12  A.  I saw -- I saw the version that went from Tom
13  Moloney to Garth Wolfson, so it was this -- basically
14  this same letter on Tom's stationery, unsigned.
15  I don't recall seeing it signed.
16  Q.  You don't recall seeing a signed version
17  before today?
18  A.  Correct.
19  Q.  But you recall seeing an unsigned version?
20  A.  Yes.
21  Q.  Was it on any letterhead?
22  A.  I can't remember.
23  Q.  Did you have any input in drafting the
24  letter?

Page 67

1  A.  No.
2  Q.  Did you make any comments on the contents of
3  the letter?
4  A.  No.
5  Q.  Do you know who drafted it?
6  A.  Tom Moloney.
7  Q.  Do you know why he drafted it?
8  A.  He's the General Counsel for Jerry Jacobs.
9  Q.  Did he ever discuss with you why he was
10  drafting the letter?
11  A.  No, not really.
12  Q.  Did you ever ask him?
13  A.  No.
14  Q.  Do you know whether or not the money that was
15  transferred to Mahoney & Keane was ever returned to
16  American Energy Services?
17  A.  I do not.
18  Q.  With respect to the Performance Bond that you
19  posted for Mr. Michalek for Estech Trading, was that --
20  those funds under the Performance Bond ever released
21  back to you?
22  A.  No.
23  Q.  Are they still with the Chinese bank?
24  A.  No.

Page 68

1  Q.  Do you know where they are?
2  A.  I assume they are with the Chinese steel
3  company.
4  Q.  Has Estech Trading ever paid you back those
5  funds?
6  A.  No.
7  Q.  Have you ever demanded them back?
8  A.  No.
9  Q.  Do you expect to get them back?
10  A.  No.
11  Q.  Did you have any written loan agreement with
12  Estech Trading for that money?
13  A.  No.
14  Q.  Did you ever lend Estech Trading any other
15  money?
16  A.  No.
17  Q.  Did The Slane Company ever lend Estech
18  Trading any other money?
19  A.  No.
20  Q.  How about Estech U.S.A., LLC?
21  A.  No.
22  Q.  I am going to show you a document that was
23  marked as Exhibit 1 at the deposition of Mr. Wolfson
24  and ask if you've ever seen that document before?

Page 69

1    **A. No.**
2        - - -
3     **A TWO-PAGE DOCUMENT ENTITLED,**
4    **"PROMISSORY NOTE," PRINCIPAL SUM:**
5    **$344,190, EXECUTED BY MAKER AS OF**
6    **11/19/10, BATES-STAMPED AES-0033**
7    **AND 0034, WAS MARKED AS EXHIBIT 52.**
8        - - -
9    THE WITNESS: Okay.
10   BY MS. OROZCO:
11     Q. Have you ever seen that document before
12  today?
13    **A. I'm not sure. I may have, but I'm not sure.**
14     Q. Are you familiar with it at all? Do the
15  terms look familiar to you?
16    **A. No, not really.**
17     Q. Okay. No?
18    **A. No.**
19     Q. Okay.
20      I am going to show you another document,
21  which is AES production 0038, 0039, which we'll mark as
22  Exhibit 53.
23       - - -
24     A TWO-PAGE DOCUMENT ENTITLED,

Page 70

1    "PROMISSORY NOTE, PRINCIPAL SUM:
2    $312,500, EXECUTED BY MAKER AS OF
3    12/21/10, BATES-STAMPED AES-0038
4    AND 0039, WAS MARKED AS EXHIBIT 53.
5       - - -
6    THE WITNESS: Okay.
7   BY MS. OROZCO:
8     Q. And ask that same question: Have you ever
9  seen that document before today?
10   **A. No.**
11     Q. Next one is AES production 0035 to 0037,
12  which will be Exhibit 54.
13      - - -
14     A THREE-PAGE JACOBS/MICHALEK
15    LETTER, DATED 12/10/10, SUBJECT:
16    SALES CONTRACT, BATES-STAMPED
17    AES-0035 THROUGH 0037, WAS MARKED
18    AS EXHIBIT 54.
19      - - -
20    THE WITNESS: I need to take a break here for
21  a minute.
22    (Recess taken.)
23      - - -
24     A TWO-PAGE DOCUMENT ENTITLED,

Page 71

1    "PROMISSORY NOTE," PRINCIPAL SUM:
2    $500,000, EXECUTED BY MAKER AS OF
3    12/2/10, BATES-STAMPED AES-0071 AND
4    0072, WAS MARKED AS EXHIBIT 55.
5       - - -
6    MS. OROZCO: He's looking right now at
7  Exhibit 54.
8    THE WITNESS: Okay.
9  BY MS. OROZCO:
10     Q. Have you ever seen this document before?
11    **A. I think I have, yes.**
12     Q. If you go back to Exhibit 52, which was just
13  marked -- Okay? --
14    **A. Uh-huh.**
15     Q. -- and you said that you have not seen this
16  document, Exhibit 52, before today; right?
17    **A. Uh-huh. Yes.**
18     Q. Okay. And you have not either, seen Exhibit
19  53 before today; is that correct?
20    **A. I don't recall seeing it.**
21     Q. Okay.
22      So if we go back to Exhibit 54, have you had
23  a chance to review that document?
24    **A. Yes.**

Page 72

1     Q. Do you recall seeing that document before
2  today?
3    **A. I think I read it, yes.**
4     Q. The reference, the Subject line on the first
5  page is: "Sales Contract" -- I'll skip the number --
6  "between Tianjin Materials and Equipments (Group)
7  Corporation, Tianjin, China ('Buyer'), and Estech
8  Trading, LLC."
9    **A. Uh-huh.**
10     Q. Is that the sales contract that we were
11  discussing earlier in your deposition where you talked
12  about giving a Performance Bond to Estech Trading for a
13  sales contract?
14    **A. Yes.**
15     Q. Have you seen the sales contract for which
16  you provided the money for the Performance Bond?
17    **A. Yes.**
18     Q. And then in the letter -- in the body of the
19  letter, it says: "In consideration of" AES "providing
20  loan financing to Estech Trading ... including the
21  $344,190 of wire by AES to Buyer on November 19 ... for
22  the Performance Bond posted that Estech was required to
23  post with Buyer ..." -- it's referenced as the "First
24  Loan" ....

Page 73

1      Were you aware that AES wired $344,000 to the
2  buyer for a Performance Bond posted by Estech?
3      **A. Yes.**
4      Q. Do you know what the total amount of the
5  Performance Bond was that Estech was required to post
6  for the sales contract?
7      **A. 344,190.**
8      Q. Is this $344,190 that AES wired to the buyer
9  separate from the $340,000 that you provided to Estech
10  for the Performance Bond?
11     **A. No.**
12     Q. It's the same money?
13     **A. Yes.**
14     Q. Okay. So when you stated earlier that you
15  personally provided Estech Trading with funding for the
16  Performance Bond, where did you get that money?
17     **A. From my personal account.**
18     Q. From your personal account?
19     **A. (Affirmative nodding of head.)**
20     Q. And is that --
21     But you just now testified that that's the
22  same money as this $344,000.
23     **A. Yeah. I gave the checks to Jerry and then he**
24  **wired the money. It was my funds.**

Page 74

1      Q. Okay. So you gave a personal check to --
2  written out to Jerry Jacobs or written out to AES,
3  American Energy Services?
4      **A. I think it was to AES.**
5      Q. And then AES wired the money to --
6      **A. The Chinese bank.**
7      Q. -- the Chinese buyer?
8      **A. Yes.**
9      Q. Is there any reason that the money didn't go
10  directly from you to the Chinese buyer?
11     **A. No. It was just easier to do it this way.**
12     Q. Is there any reason that it was done through
13  American Energy Services as opposed to The Slane
14  Company?
15     **A. Well, The Slane Company had nothing to do**
16  **with it.**
17     Q. Well, what did American Energy Services have
18  to do with it?
19     **A. They were going to help out with the**
20  **shipping.**
21     Q. And how were they going to do that?
22     **A. Under terms and conditions acceptable to**
23  **them, they were going to put up $500,000.**
24     Q. And do you know, do you recall what the

Page 75

1  $500,000 was for?
2      **A. For a security deposit for the shipping**
3  **company.**
4      Q. How did it come to be that AES got involved
5  or you got involved with AES to transfer this money on
6  behalf of Estech Trading to the buyer?
7      **A. Which money?**
8      Q. The $344,000 for the Performance Bond.
9      **A. Well, it was all in conjunction with the --**
10  **with the 500,000, as well.**
11     Q. And did you ever receive a Promissory Note
12  from AES similar to the Promissory Note that AES
13  received from Estech, which we've marked as Exhibit 52?
14     **A. No.**
15     Q. Do you know whether or not AES ever received
16  the money under the Promissory Note, Exhibit 52, which
17  is also referenced in this letter, Exhibit 54?
18     **A. Your question is: Do I know if --**
19     MS. OROZCO: Can you repeat the question?
20     (Question read.)
21     THE WITNESS: It did not.
22  BY MS. OROZCO:
23     Q. Is there any agreement between yourself and
24  AES that if they received this money back, that it

Page 76

1  would go to you?
2      **A. No, there is no -- no agreement.**
3      Q. Is there any understanding that's not in
4  writing to that effect?
5      **A. I think the understanding was that: Had the**
6  **deal occurred, 344,000 of the profit would have gone**
7  **back to me.**
8      Q. But is that anywhere in writing?
9      **A. No.**
10     Q. Okay.
11     It then says, on the -- we are talking about
12  Exhibit 54, AES-0035, where it's -- the first section,
13  we have just finished talking about the Performance
14  Bond money, which is the first loan, and then it goes
15  on to say: "... and the $500,000 wired by AES to
16  Mahoney & Keane ... in connection with the shipping
17  arrangements required to be made by Estech pursuant to
18  the contract," and then, in parentheses, "(the 'Second
19  Loan)' Estech and AES have agreed as followed: ..."
20     Do you know what the contract is that they
21  are referencing in this letter where it says, "... in
22  connection with the shipping arrangements required to
23  be made by Estech pursuant to the contract ..."?
24     **A. I do not.**

Page 77

1    Q.  In Paragraph 2 of this letter, it states:
2  "After repayment of both loans in full, Estech
3  shall ... pay to AES ... 25 percent of the total of ...
4  all remaining contract receipts as and when received by
5  Estech after ... repayment in full of both loans less
6  ... the out-of-pocket operating and administrative
7  expenses ..."
8       It then goes on to state:  "AES and Estech
9  each acknowledge that, in agreeing to this payment of
10  25 percent of the contract's net proceeds, each is
11  relying on communications from Daniel ... Slane --
12  "('Mr. Slane') in parentheses -- "confirming that AES
13  is to receive this 25 percent, which 25 percent is a
14  reduction of any share of the net proceeds that
15  Mr. Slane or any of his affiliates, including Estech
16  Coal LLC (collectively, 'Slane Group'), are to receive
17  from the contract's net proceeds."
18       Are you familiar with that arrangement?
19  **A.  Yes.**
20  Q.  Can you tell me about that arrangement?
21  **A.  Yeah.  Originally, Jan was to receive 50**
22  **percent of the contract profits, and my brother and**
23  **myself were to receive the other 50 percent in return**
24  **for myself posting the Performance Bond.**

Page 78

1    Q.  Okay.  When you say "the contract profits,"
2  do you mean the sales contract or the shipping
3  contract?
4  **A.  Sales contract.**
5  Q.  Okay.  You and your brother were to receive
6  50 percent?
7  **A.  Correct.**
8  Q.  And who would that have come from?
9  **A.  From Jan, Estech Trading.**
10  Q.  Okay.  And then why did that change?
11  **A.  Because I had to go to Jerry to ask him to**
12  **help out with the shipping --**
13  Q.  Okay.
14  **A.  -- and in return for doing that, Jerry was**
15  **going to be compensated by 25 percent of the profits**
16  **from Estech Trading, and my brother and myself, the**
17  **remaining 25 percent, and Jan kept his 50 percent.**
18  Q.  Is there anything in writing that
19  discusses the percentage of profits that you and your
20  brother were to receive?
21  **A.  No.**
22  Q.  And where would that 25 percent to Jerry have
23  come from?
24  **A.  From Jerry.**

Page 79

1    Q.  From ...?
2  **A.  Jerry negotiating that with me in return for**
3  **his help.**
4  Q.  Okay.  So if I understand correctly, the
5  contract profits were to be split 50 percent to Jan, --
6  **A.  Yes.**
7  Q.  -- 25 percent to you and your brother, --
8  **A.  Yes.**
9  Q.  -- and 25 percent to American Energy
10  Services?
11  **A.  Yes.**
12  Q.  And the 25 percent profits that went to
13  yourself and your brother was a payment for the funding
14  of the Performance Bond?
15  **A.  Yeah, I guess that was the quid pro quo for**
16  **the profit payment.**
17  Q.  And then is it fair to say that the profit
18  payment to American Energy Services was for the
19  $500,000 shipping security?
20  **A.  Yes.**
21  Q.  On Page 2 of that Exhibit 54, which is marked
22  AES-0036, Paragraph 3, it says:  "It is the intention
23  of the parties that, if Estech or its principal, Jan
24  Michalek ... is to enter into additional sales

Page 80

1  contracts with Buyer or other buyers located in China
2  for the sale and delivery of iron ore" -- in
3  parentheses, identified as "New Contracts" -- JKM, AES
4  and Slane Group shall enter into an operating agreement
5  to restructure the ownership of Estech, effective no
6  later than the execution of the first of the New
7  Contracts."
8       Did Estech ever enter into any additional
9  sales contracts with buyers in China?
10  **A.  I don't know the answer to that.**
11  Q.  Have you ever followed up with Michalek to
12  find out whether or not Estech Trading has ever entered
13  into additional sales contracts with buyers located in
14  China?
15  **A.  I think he told me that he had another**
16  **contract.**
17  Q.  With a buyer in China?
18  **A.  Yes.**
19  Q.  Was an operating agreement ever created to
20  restructure the ownership of Estech, in compliance with
21  this Paragraph 3?
22  **A.  No.**
23  Q.  Do you know what the Slane Group's role would
24  be with respect to the operating agreement if new sales

Page 81

1 contracts were entered into?
2    **A. No.**
3    Q. Do you know what The Slane Company -- Slane
4 Group's role -- what you expected the Slane Group's
5 role to be in the operating agreement?
6    **A. No.**
7    Q. Did you have any discussions with Mr. Jacobs
8 or Mr. Michalek regarding this letter that's been
9 marked as Exhibit 54, before it was drafted?
10    **A. Did I have any discussions --**
11    Q. Yes.
12    **A. -- with ...?**
13    Q. With either Mr. Jacobs, who signed the
14 letter, or Mr. Michalek, who --
15    **A. No.**
16    Q. -- agreed to it?
17    **A. No.**
18    Q. Did you know, before you saw this letter,
19 that the Slane Group was being contemplated as being
20 part of an operating agreement with respect to new
21 contracts?
22    **A. Yes.**
23    Q. You did know?
24    **A. (Affirmative nodding of head.) Yes.**

Page 82

1    Q. And how did you know that?
2    **A. Well, he had -- Jan had potential to obtain**
3 **additional contracts and he had told us that, and we**
4 **wanted to be a part of that in the future.**
5    Q. And what type of relationship was
6 contemplated between Mr. Michalek, AES and Slane Group?
7    **A. As investors.**
8    Q. Was there ever a draft operating agreement
9 that was circulated?
10    **A. No.**
11    Q. And is the "Slane Group" different than "The
12 Slane Company"?
13    **A. Yes.**
14    Q. What's the difference?
15    **A. It's two individuals: Myself and my brother,**
16 **Charles.**
17    Q. Did Charles have any involvement in any of
18 the contents of this letter marked as Exhibit 54?
19    **A. No.**
20    Q. And are you familiar with Estech Coal LLC?
21    **A. Yes.**
22    Q. What is that entity?
23    **A. It's a company that was established to**
24 **purchase a coal mine in Kentucky.**

Page 83

1    Q. And is that an affiliate-entity of The Slane
2 Company?
3    **A. Yes.**
4    Q. Is it owned by The Slane Company?
5    **A. No. It's owned by my brother and myself.**
6    **But it was never -- It's a shell corporation.**
7 **The project was never completed -- the purchase, so**
8 **the -- the -- we formed the entity to purchase the coal**
9 **mine but then we never purchased it.**
10    Q. Is the Estech Coal LLC still in existence
11 today?
12    **A. Not to my knowledge.**
13    Q. Do you know why it would have been referenced
14 in this letter in Paragraph 2, Page 1, if it's no
15 longer in existence?
16    **A. No, I do not.**
17    Q. Do you know who drafted this letter?
18    **A. I do not. I assume Tom did.**
19    Q. Tom Moloney?
20    **A. Moloney, yes.**
21    Q. If you could go back to Exhibit Number 53,
22 which is the Promissory Note for $312,000.
23    **A. Uh-huh.**
24    Q. Do you know what that money represents?

Page 84

1    **A. Yes.**
2    Q. What is that?
3    **A. An additional investment was required to be**
4 **made at the request of Jan, in late December.**
5    Q. What was the nature of that investment?
6    **A. It was to be operating funds for Martinez,**
7 **the miner in Mexico.**
8    Q. That was the seller or the supplier of the
9 iron ore?
10    **A. Yes.**
11    Q. And do you know where that money came from?
12    **A. Yes.**
13    Q. Where did that come from?
14    **A. Bill Hlavin.**
15    Q. Who is that?
16    **A. He is a friend of Jerry's and myself.**
17    Q. Is he affiliated with Estech Trading?
18    **A. No.**
19    Q. Is he affiliated with American Energy
20 Services?
21    **A. No.**
22    Q. Is he affiliated with The Slane Company?
23    **A. No.**
24    Q. But, that $312,000, you had nothing to do

Page 85

1  with providing that money to American Energy Services
2  or Estech Trading?
3     A.   **Correct.**
4     Q.   Okay.
5       I am going to show you another document,
6  that's been marked as Exhibit 55, and ask if you have
7  ever seen that.  It is AES production 0071, 0072.
8     **A.   No.**
9     Q.   You have not ever seen this document?
10    **A.   No.**
11    Q.   Do you know what it references?
12    **A.   $500,000.**
13    Q.   But you never saw it before today?
14    **A.   No.**
15    Q.   You had no involvement in drafting it or --
16    **A.   No.**
17    Q.   -- any communications related to it?
18    **A.   No.**
19    Q.   I am going to show you another document, AES
20 production 0040, we are going to mark as Exhibit 56.
21      - - -
22      A ONE-PAGE MOLONEY/WOLFSON LETTER,
23      DATED 12/23/10, BATES-STAMPED
24      AES-0040, WAS MARKED AS EXHIBIT 56.

Page 86

1       - - -
2     **A.   Okay.**
3     Q.   Just ask you if you have ever seen that
4  document before?
5     **A.   No.**
6     Q.   Are you aware of the pending litigation in
7  New York Court involving the shipping company,
8  Milestone Shipping, and Estech Trading and American
9  Energy Services?
10    **A.   Yes.**
11    Q.   And how are you aware of that?
12    **A.   I think Tom or Jerry, somebody, had told me**
13 **about it.**
14    Q.   Do you know any of the details about the
15 litigation?
16    **A.   Other -- other than it's over the issue of**
17 **what does the Trustee do with -- who does he return the**
18 **funds to.**
19    Q.   And do you know which funds those are
20 referencing?
21    **A.   The 500,000 that's in the Trust Account.**
22    Q.   Have you had any input into that litigation
23 or any communications with anybody at American Energy
24 about seeking the return of those funds?

Page 87

1     **A.   No.**
2     Q.   Have you ever communicated with Mahoney &
3  Keane, the Escrow Agent, regarding the return of those
4  funds?
5     **A.   No.**
6     Q.   Have you ever communicated with Milestone,
7  who is the shipping company, regarding the return of
8  those funds?
9     **A.   Yes.**
10    Q.   Do you recall the nature of those
11 communications?
12    **A.   Yuriy was calling me, requesting that the**
13 **funds be sent to him.**
14    Q.   And what was your response to that?
15    **A.   That I had nothing to do with it and he had**
16 **to talk to Tom.**
17    Q.   Did you ever have any communications with
18 Mr. Seward about the return of the funds?
19    **A.   No.**
20    Q.   The next one is Milestone production 6, 7, 8
21 and 9, and it's Exhibit 57.
22      - - -
23      A FOUR-PAGE DOCUMENT BEGINNING,
24      "OHIO OIL AND GAS ASSOCIATION

Page 88

1       BULLETIN ADVERTISERS," DATED
2       NOVEMBER 2008, BATES-STAMPED
3       MILESTONE 00000006 THROUGH 0009,
4       WAS MARKED AS EXHIBIT 57.
5       - - -
6     **A.   Okay.**
7     Q.   Are you familiar with the Ohio Oil and Gas
8  Association Bulletin?
9     **A.   Yes.**
10    Q.   What is that bulletin?
11    **A.   It's a trade-association magazine that's**
12 **distributed to its members.**
13    Q.   Are you a member of that?
14    **A.   I am not.**
15    Q.   Is the Slane Company a member?
16    **A.   No.**
17    Q.   Do you advertise in the bulletin?
18    **A.   I was seeking, personally, to purchase some**
19 **leases and I was not allowed to advertise because I'm**
20 **not a member, but I asked Jerry to sponsor me to allow**
21 **me to advertise, so he did, as a favor to me.**
22    Q.   Jerry ...?
23    **A.   Jacobs.**
24    Q.   Jacobs, of American Energy Services?

Page 89

1  A.  Yes.
2  Q.  And when you say you were seeking,
3  personally, to purchase leases, what type of leases?
4  A.  Oil and gas leases.
5  Q.  And is that --
6  Do you have any understanding as to why
7  American Energy Services is listed in the Table of
8  Contents on the same page that your personal
9  advertisement is listed?
10  For example, on the page marked -- it's
11  Milestone 006 at the bottom, the Table of Contents
12  lists American Energy Services in the November 2008
13  bulletin.
14  A.  Yeah.
15  No, I don't know why.  I mean --
16  Q.  And then on the page marked Milestone 007,
17  which is Page 14 of the bulletin, it's your personal
18  ad?
19  A.  Yes.
20  Q.  You don't know why that appears like that?
21  A.  No, I do not.
22  Q.  Did you advertise, personally, in any other
23  trade-association magazines or journals?
24  A.  I may have advertised in a newspaper.

Page 90

1  Q.  But in that, did you need a sponsorship or
2  were you allowed to do it?
3  A.  No, I just did it myself, personally.
4  Q.  Does The Slane Company have any business
5  relationship with American Energy Services?
6  A.  No.
7  Q.  Does The Slane Company have any
8  relationship -- business relationship with Estech
9  Trading?
10  A.  No, other than what transpired in the present
11  case.
12  Q.  Regarding the Performance Bond?
13  A.  Well, regarding the transaction with the
14  Mexican ore supplier and the Chinese steel company.
15  Was your question The Slane Company or me?
16  Q.  The Slane Company.
17  A.  No.  Slane Company -- I'm sorry.  The Slane
18  Company had no involvement, whatsoever, with Estech
19  Trading.
20  Q.  Were you compensated at all for your
21  assistance provided to Mr. Michalek with respect to the
22  sales contract and the charter of the vessel to carry
23  the ore -- iron ore from Mexico to China?
24  A.  No.

Page 91

1  Q.  Has Mr. Michalek represented that he intends
2  to pay back the money that you lent him under the
3  Performance Bond?
4  A.  He has not.
5  Q.  Have you ever asked him about it?
6  A.  No.
7  Q.  Have you ever had any discussions with
8  Mr. Jacobs at American Energy Services regarding the
9  payment of the Performance Bond?
10  A.  The Performance Bond is gone.  The Chinese
11  took it and so they're -- the deal cratered and that
12  was the end of it.
13  Q.  But you, personally, didn't have any
14  involvement in the sales contract; did you?
15  A.  In what respect?
16  Q.  In being a signatory to the sales contract.
17  A.  No.
18  Q.  Okay.
19  A.  No.
20  Q.  Were you involved at all in negotiating the
21  sales contract?
22  A.  Yes.
23  Q.  To what extent?
24  A.  Well, we were -- we were -- we had drafted a

Page 92

1  contract for Jan.
2  Q.  Who is "we"?
3  A.  Myself.
4  Q.  Okay.  Anything else?
5  A.  That's it.
6  MS. OROZCO:  If we can take a break.
7  (Recess taken.)
8  MS. OROZCO:  Mark the next Exhibit as 58,
9  which is AES production 0064 through 0066.
10  - - -
11  A ONE-PAGE JACOBS/MICHALEK LETTER,
12  DATED 3/9/11, AND TWO PAGES OF
13  ATTACHMENTS, BATES-STAMPED AES-0064
14  THROUGH 0066, WERE MARKED AS
15  EXHIBIT 58.
16  - - -
17  BY MS. OROZCO:
18  Q.  I am going to ask you:  Have you ever seen
19  that document, Mr. Slane, before today?
20  A.  No, I have not.
21  Q.  And I'll just direct your attention to page
22  two of that Exhibit 58, which is 0065, and ask if you
23  have ever seen that communication?
24  A.  I have not.

Page 93

1    Q.   And the same question for page three of that
2    Exhibit 58, AES-0066:  Ask if you have ever seen that
3    communication.  It's --
4    **A.   No, I didn't.**
5    Q.   Okay.
6         MS. OROZCO:  This is going to be Exhibit 59.
7    It has no reference numbers.
8                      - - -
9         A TWO-PAGE TISDALE/ESTECH TRADING,
10             LLC, LETTER, DATED 1/4/11, WAS
11             MARKED AS EXHIBIT 59.
12                     - - -
13   BY MS. OROZCO:
14   Q.   And just ask the same:  Have you ever seen
15   that document before today?
16   **A.   No, not that I recall.**
17   Q.   Okay.
18        MS. OROZCO:  I have no further questions at
19   this time.
20        THE WITNESS:  Okay.
21                     - - -
22             CROSS-EXAMINATION
23   BY MR. WINTON:
24   Q.   Mr. Slane, my name is Jim Winton.  I

Page 94

1    represent American Energy Services in this matter.  I
2    do have a few questions to follow up with you on.
3         You indicated, in response to one of
4    Ms. Orozco's questions, that you and I had spoken
5    before.  Do you recall that?
6         Do you recall her asking you that question?
7    **A.   I do, yes.**
8    Q.   Let me see if I can be a little bit more
9    precise.
10   **A.   Yes, I do.**
11   Q.   Okay.  And do you recall -- I think you
12   indicated that was several weeks ago.
13   **A.   Yes.**
14   Q.   Do you recall whether or not we have ever
15   spoken any other time?
16   **A.   We have not.**
17   Q.   And do you recall that the subject matter of
18   that conversation was a Subpoena Duces Tecum that I had
19   served on The Slane Company?
20   **A.   Yes.**
21   Q.   And do you recall that that Subpoena Duces
22   Tecum was asking you to produce documents?
23   **A.   Yes.  Yeah, I have it here.**
24   Q.   Well, that may be Ms. Orozco's --

Page 95

1         MS. OROZCO:  That's different.  That's
2    correct.
3    BY MR. WINTON:
4    Q.   -- rather than mine.
5    **A.   Oh, okay.**
6    Q.   I'm sorry, this is the hard part about
7    following up, is trying to stay organized.
8         MS. OROZCO:  I know.
9         MR. WINTON:  I will ask the court reporter to
10   mark this as the next exhibit in order, which I
11   suspect, is 60.
12                     - - -
13        A NINE-PAGE DOCUMENT ENTITLED,
14            "SUBPOENA TO PRODUCE DOCUMENTS,
15            INFORMATION, OR OBJECTS OR TO
16            PERMIT INSPECTION OF PREMISES IN A
17            CIVIL ACTION," WAS MARKED AS
18            EXHIBIT 60.
19                     - - -
20   BY MR. WINTON:
21   Q.   And this subpoena which we have marked as
22   Exhibit 60 is actually directed to you, personally,
23   Care Of The Slane Company.  Do you see that?
24   **A.   Yes.**

Page 96

1    Q.   And do you see, on the sixth page, there is
2    the beginning of a list of documents that we were
3    requesting, that runs to the eighth page, which is --
4    and those are actually labeled, at the bottom, Pages 3,
5    4 and 5?
6    **A.   Yes.**
7    Q.   Did you make a search for those documents
8    after you received this?
9    **A.   Yes.**
10   Q.   And where did you search for them?
11   **A.   See if I had any files around.**
12   Q.   So you have no files on this transaction
13   relating to the purchase and sale of iron ore from
14   Mexico to China?
15   **A.   Correct.**
16   Q.   Did you -- As these documents -- Strike that.
17        As these various e-mails that Ms. Orozco
18   showed you, and other things, were being received at
19   your office, what did you do with them after you read
20   them?
21   **A.   Deleted them.**
22   Q.   And do you recall that, when you and I spoke,
23   you called me in response to a call I made to your
24   office to find out whether or not you would be

Page 97

1 producing documents?
2   A.  Yes.
3 ·   Q.  And is it correct that's the only time you
4 and I have ever spoken at all?
5   A.  Correct.
6   Q.  And that conversation lasted for two or three
7 minutes, as I recall.  Is that about right?
8   A.  Correct.
9   Q.  Mr. Slane, your deposition today is going to
10 be read and reviewed by the Judge in this matter.  It's
11 going to be tried to the Judge or ruled on by the Judge
12 on motions and cross-motions and such, and so he is
13 going to be the one who sorts out what happens in this
14 case.  Do you understand that?
15   A.  Yes.
16   Q.  And as a consequence, it's been very
17 important that you give us your best recollection, and
18 as you indicated before, an honest, truthful response
19 to the best of your ability, because it's going to
20 determine the outcome, in some respect, of what happens
21 in this case.  Do you understand that?
22   A.  Yes.
23   Q.  Okay.
24     I would like to explore with you your

Page 98

1 background a little bit just so the Judge has that
2 available to him.
3     Can you tell us how old you are?
4   A.  I'm 69.
5   Q.  Where were you born?
6   A.  Yonkers, New York.
7   Q.  Did you graduate from college?
8   A.  Yes.
9   Q.  When and where?
10   A.  1964, Ohio State University.
11   Q.  What was your degree in?
12   A.  Business Administration.
13   Q.  Do you have any advanced degrees?
14   A.  Yes.
15   Q.  What are they?
16   A.  I have a Law Degree from Ohio State.  I have
17 a Master's Degree in International Law from the
18 University of Amsterdam.
19   Q.  What year did you get your JD?
20   A.  1967.
21   Q.  That would have been an LLB, I assume, at
22 that point --
23   A.  Yes.
24   Q.  -- or was it -- Okay.

Page 99

1   A.  Uh-huh.  I think it was a JD in Ohio.  It was
2 a JD at the time, yeah.
3   Q.  That was about the time they changed them, I
4 think.
5   A.  Yeah.
6   Q.  Okay.  And you said you have a Master of Law
7 in International Law from Amsterdam?
8   A.  University of Amsterdam, yes.
9   Q.  Did you go to work immediately after you got
10 your undergraduate degree or did you go straight to Law
11 School?
12   A.  I went straight to Law School.
13   Q.  And after you got your JD, did you go to work
14 or did you go immediately on to your Master of Law?
15   A.  No, I went to work.
16   Q.  And how many employers did you have between
17 getting your JD and going to school for your Master's
18 of Law?
19   A.  One.
20   Q.  Who was that employer?
21   A.  Central Intelligence Agency.
22   Q.  How long were you in that --
23     That's what we popularly refer to as the
24 "CIA"?

Page 100

1   A.  Yes.
2   Q.  How long were you employed by the CIA?
3   A.  Six years.
4   Q.  And can you, in general, state what your job
5 was?
6   A.  I was a Case Officer.
7   Q.  And that involves managing agents who were
8 actually collecting intelligence?
9   A.  Yes.
10   Q.  I think I have now shot my wad on what the
11 CIA does and I am going to quit before I embarrass
12 myself.
13     Did you have security clearances as a Case
14 Officer?
15   A.  Yes.
16   Q.  And what was the level of your security
17 clearance?
18   A.  Top Secret.
19   Q.  And were there subdivisions or gradations of
20 Top Secret?
21   A.  Yes.
22   Q.  And what level security clearance did you
23 hold within the category of Top Secret?
24   A.  I had an SC Clearance, which gave me access

Page 101

1  to CIA information on a need-to-know basis.
2      Q.  And when you were getting your Master of Law,
3  did you do that part-time or full-time?
4          In other words, did you continue working
5  or --
6      A.  Yeah, yeah, I continued working and was going
7  to school on a part-time basis.
8      Q.  And did you continue to be employed by the
9  CIA while you were getting your Master of Law?
10     A.  Yes.
11     Q.  How long did the Master of Law take?
12     A.  18 months.
13     Q.  And how long, in total, did you work for the
14  CIA?
15     A.  Six years.
16     Q.  So the six years overlaps the Master of Law?
17     A.  Well, it was part of my cover.
18     Q.  Oh, okay.  Being enrolled as a student,
19  getting your Master of Law, was?
20     A.  Yes.
21     Q.  And did you, at the end of that six years,
22  leave the CIA?
23     A.  I did.
24     Q.  And where did you work next?

Page 102

1      A.  I worked in the White House under Gerald
2  Ford.
3      Q.  And what was your role at the White House?
4      A.  As a Staff Assistant.
5      Q.  In what capacity?
6      A.  I was in the Political Advance Office.
7      Q.  What is the "Political Advance Office"?
8      A.  The President receives thousands of
9  invitations and we would sift through them and make
10  recommendations on which he should accept and then go
11  out and staff the trip.
12     Q.  And how long did you work at the White House?
13     A.  Two years.
14     Q.  And then what did you do after that?
15     A.  Came back and went to work in Columbus as a
16  lawyer.
17     Q.  How long did you work as a lawyer in
18  Columbus?
19     A.  Until about 1984.
20     Q.  What did you do at that point?
21     A.  I started a real estate development company.
22     Q.  What was the name of that?
23     A.  The Slane Company.
24     Q.  And you have discussed in some detail with

Page 103

1  Ms. Orozco various aspects of The Slane Company's
2  business and so forth.  After 1984, were there any
3  other positions or activities that you engaged in,
4  other than with the various Slane Company-type things
5  we've talked about?
6      A.  Yes, I've had a number of political
7  appointments.
8      Q.  Okay.  Let's start with the first one
9  post-White House under President Ford.
10     A.  I was appointed to the Ohio Water Development
11  Authority by the Governor.
12     Q.  And how long were you in that position?
13     A.  About a year.
14     Q.  What year was that?
15     A.  1990.
16     Q.  What was the next political appointment?
17     A.  The Ohio Building Authority.
18     Q.  When was that?
19     A.  1991.
20     Q.  How long were you in that position?
21     A.  Eight years.
22     Q.  So through, roughly, 1999?
23     A.  Yes.
24     Q.  And what was the next appointment?

Page 104

1      A.  I was on the Ohio Board of Building Appeals.
2      Q.  And are all of these gubernatorial
3  appointments?
4      A.  Yes.
5      Q.  How long were you on the Ohio Board of
6  Building Appeals?
7      A.  About six years.
8      Q.  From when to when?
9      A.  '92 to '98.
10     Q.  And what was the next one?
11     A.  Trustee of The Ohio State University.
12     Q.  And so you were on the Board of Trustees of
13  Ohio State University?
14     A.  Yes.
15     Q.  And how long were you on the Board of "The"
16  Ohio State University Trustees?  Sorry.
17     A.  Yeah.  Nine years.
18     Q.  From when to when?
19     A.  1998 to 2006.
20     Q.  And while on the Board of Trustees of The
21  Ohio State University, did you hold any positions on
22  that board?
23     A.  I chaired the board.
24     Q.  And from --

Page 105

1    **A. I was the Chairman of the University**
2  **Hospital, Chairman of the James Hospital Board.**
3    Q. When were you chair of the Board of Trustees
4  of Ohio State?
5    **A. 2005 to 2006.**
6    Q. And you then said you were on the Board of
7  University Hospital?
8    **A. Yes.**
9    Q. And on the Board of James Hospital?
10    **A. James Cancer Hospital, yeah.**
11    Q. So those are two additional boards?
12    **A. Yeah, but they're owned by Ohio State.**
13    Q. But they are separate boards?
14    **A. Yes, separate boards, yes.**
15    Q. And were you appointed to those boards?
16    **A. I was -- the boards -- those two hospital**
17  **boards required a Trustee to chair them and so I was**
18  **designated to do that by the Board of Trustees.**
19    Q. So, effectively, a liaison from the Board of
20  Trustees of The Ohio State University --
21    **A. Correct.**
22    Q. -- to these subordinate boards?
23    **A. Correct.**
24    Q. What years were those: University Hospital

Page 106

1  and James Cancer Hospital?
2    **A. 2000 through 2006.**
3    Q. For both of them?
4    **A. Yes.**
5    Q. Any others?
6    **A. Within Ohio State or --**
7    Q. No, just other political appointments.
8    **A. Yeah, I was appointed to the U.S.-China**
9  **Economic and Security Review Commission.**
10    Q. That's a mouthful.
11    **A. Yeah.**
12    Q. And when was that?
13    **A. 2007.**
14    Q. Through ...?
15    **A. Currently serving.**
16    Q. And who appointed you to that?
17    **A. Minority Leader John Boehner.**
18    Q. I am going to assume that the court reporter
19  can figure out how to spell "Boehner" because I never
20  get it right.
21    **A. B-O-E-H-N-E-R.**
22    Q. In order to serve on the U.S.-China Economic
23  and Security Review Commission -- Did I get it right?
24    **A. Yes.**

Page 107

1    Q. Cool.
2    -- did you have to get your security
3  clearance renewed?
4    **A. Yes.**
5    Q. And so 2007 to the present, you hold a
6  security clearance again?
7    **A. Yes.**
8    Q. And that security clearance is ...?
9    **A. Top Secret.**
10    Q. Any subdivisions within Top Secret?
11    **A. Yeah, SC, which gives you access to CIA**
12  **briefings.**
13    Q. I only attained a Secret and I didn't have
14  any subdivisions or anything because nobody cared about
15  the lawyers, I don't think.
16    Any other political appointments?
17    **A. No.**
18    Q. Estech Trading, LLC, is, obviously, an LLC.
19  Do you know who the member or members of Estech Trading
20  are?
21    **A. Yes.**
22    Q. Who are they?
23    **A. Jan Michalek.**
24    Q. Sole member?

Page 108

1    **A. Yes.**
2    Q. And is Slane Energy an LLC?
3    **A. Yes.**
4    Q. And I think you said you thought that Slane
5  Energy may have devolved into Estech U.S.A.?
6    **A. Yes, I think so, yes.**
7    **(Discussion off the record.)**
8    Q. With regard to the startup of Estech Trading,
9  are you aware of any capital contribution from AES to
10  Estech Trading?
11    **A. I am not.**
12    Q. Do you know what the capitalization of Estech
13  Trading, LLC, was at startup?
14    **A. Zero.**
15    Q. As I understood your testimony, Estech
16  Trading was an entity that you formed for Mr. Michalek.
17    **A. Yes.**
18    Q. And Estech U.S.A. was an entity that you
19  believe came out of Slane Energy. Where does the name,
20  "Estech," come from? What is that?
21    **A. It -- we had -- we had a -- we had a licensee**
22  **in the UK and he -- the licensee came up with the name.**
23    Q. You've talked about a Performance Bond that
24  was required by Tianjin -- Minerals?

Page 109

```
 1    A.  Yes.
 2    Q.  -- in Taiwan.
 3        And when we talk about China with regard to
 4  this case, we are really talking about Taiwan?
 5    A.  No, mainland China.
 6    Q.  Tianjin is PRC rather than Taiwanese-owned?
 7    A.  Yes.
 8    Q.  But it's located in Taiwan?
 9    A.  No, it's located in mainland China.  It's
10  owned by the Chinese government.
11    Q.  Okay.  Then, I got confused.  Somewhere in
12  all of this, I thought there was a discussion about
13  Taiwan, so -- but that's not right?
14    A.  Correct.
15    Q.  So whenever, in this case, we talk about
16  China, we are talking about the PRC?
17    A.  Correct.
18    Q.  Okay.  Thank you.
19        Since Tianjin was buying the iron ore and
20  they were putting up a Letter of Credit that wouldn't
21  be funded until shipping documents were issued plus
22  five days, as I recall from the e-mails, what was the
23  Performance Bond for?
24    A.  They require the supplier to put up a
```

Page 110

```
 1  Performance Bond, and in the event that the supplier
 2  doesn't perform, then they will keep the bond.
 3    Q.  And I am baffled by why a buyer would require
 4  a seller to post a Performance Bond.
 5    A.  I think the concept is that they are counting
 6  on that shipment to arrive and there is great
 7  inconvenience to them if they are not going to get that
 8  iron ore, and so there is a penalty attached if you
 9  don't perform.
10    Q.  Okay.  I understand now.
11    A.  But it's standard in the industry.
12    Q.  Okay.  It's standard in the industry around
13  the world or particularly in dealing with PRC?
14    A.  No.  Around the world.
15    Q.  Okay.
16    A.  Uh-huh.
17    Q.  You talked about there having been a prior
18  ship to the ship and the arrangements that lead to this
19  lawsuit?
20    A.  Yes.
21    Q.  Did you have any involvement in making the
22  arrangements for the prior ship?
23    A.  No.
24    Q.  And you said that ship fell through, or was
```

Page 111

```
 1  it the cargo that fell through?
 2    A.  The ship fell through.  I don't know what
 3  happened.  I got a frantic phone call from Jan around
 4  November 30th and he had -- he had -- they had lost the
 5  ship.  And I don't know how he got to Yuriy.  I don't
 6  know whether Johan directed him or -- but he asked me
 7  to follow up on the shipping because he was too busy
 8  dealing with the miner.
 9    Q.  Had you, at any time before, been personally
10  involved with shipping contracts, contracts to procure
11  a ship?
12    A.  No.
13    Q.  So I take it you were largely relying on Mr.
14  Schild?
15    A.  Yes.
16    Q.  Ms. Orozco showed you a document which was
17  Exhibit 26 and it should be in front of you.
18    MR. WINTON:  I'd like to have the court
19  reporter mark this as Exhibit 61.
20        - - -
21        A FOUR-PAGE DOCUMENT ENTITLED,
22        "TIME CHARTER," (CHARTER PARTY),
23        DATED 12/2/10, AND 24 PAGES OF
24        ATTACHMENTS, BATES-STAMPED
```

Page 112

```
 1        MILESTONE-000150 THROUGH 0177, WERE
 2        MARKED AS EXHIBIT 61.
 3        - - -
 4  BY MR. WINTON:
 5    Q.  And the document that Ms. Orozco showed you
 6  that was Exhibit 26, unfortunately -- and it's probably
 7  my fault; I marked it in the order in which it was
 8  produced, but as she pointed out, it causes the pages
 9  to be a bit scrambled.  You said you had not seen that
10  document before.
11        And you are not likely to recognize it from
12  that one because I gave you the wrong document.
13        That's okay.  Go ahead, finish looking at it
14  and tell me whether or not you have seen that before.
15    A.  No, I have not.  I don't remember seeing
16  this.
17    Q.  Let me see what I gave you.
18    A.  (Handing.)
19    Q.  I think this is your Charter for the -- this
20  is the underlying Charter.
21    MS. OROZCO:  Yeah.  Uh-huh.
22    MR. WINTON:  Yeah, that's not the one I ....
23    MS. OROZCO:  If you want it, the -- We can go
24  off the record for a second.
```

Page 113

1    (Discussion off the record.)
2    MR. WINTON: Let's go ahead and mark this as
3  62.
4         - - -
5    A 29-PAGE DOCUMENT ENTITLED,
6    "VERIFIED AMENDED COMPLAINT," WAS
7    MARKED AS EXHIBIT 62.
8         - - -
9  BY MR. WINTON:
10   Q.  If you will look at the first exhibit in
11 Exhibit 62, it's labeled "Exhibit 1," --
12   A.  Yes.
13   Q.  -- you will see what the Plaintiff has
14 attached to their Complaint as the Charter Party
15 between Estech Trading and Milestone.
16   A.  Uh-huh.
17   Q.  So with it now in a logical sequence, do you
18 recognize that document?
19   A.  No, not really.
20   Q.  Okay.
21   Take a look at Exhibit 62 two again, if you
22 would.
23   A.  Okay.
24   Q.  And look at the last exhibit.  It's labeled

Page 114

1  as Exhibit 2 to Exhibit 62, and that is the document --
2  that's another copy of the document that I believe
3  Ms. Orozco showed you, that is the fully-signed
4  version.
5    (Discussion off the record.)
6  BY MR. WINTON:
7    Q.  Have you ever seen that document before?
8    A.  No.
9    Q.  Take a look at the signature for Estech.
10   So, do you recall who signed that?
11   A.  Oh, I think I signed that, yes.
12   Q.  Okay.  So that came in to Estech and/or you,
13 and you were the one who executed that document?
14   A.  Yes.  This is December 2nd.  Yeah.  Uh-huh.
15   Q.  Yeah.
16   A.  Right.
17   Q.  Is it your recollection that there were
18 various drafts of the Escrow Agreement going back and
19 forth and there was a change made to the Escrow
20 Agreement to reflect a change of the Laycan?
21   A.  Yes.
22   Q.  Do you have an understanding of what "Laycan"
23 is?
24   A.  No.

Page 115

1    Q.  You indicated that Mr. Michalek has no role
2  in The Slane Company.  Does he, or did he have any
3  direct role in Slane Energy?
4    A.  Not to my knowledge.
5    Q.  And what puzzles me is that Estech U.S.A.,
6  LLC's Web Page lists Slane Energy as an affiliate of
7  Estech U.S.A., LLC.  Are you aware of that?
8    A.  Yeah, I -- I can't recall whether there was
9  an entity formed for some other reason, that was
10 related to Estech U.S.A., or whether it was a
11 predecessor.  I can't -- but it's -- I really can't
12 recall what -- why it was formed or what it had, if
13 anything, and -- and I think it's -- it's defunct now;
14 there's nothing there.
15   Q.  Are you able to give us a precise number, or
16 perhaps to estimate the total number of entities --
17 these special-purpose entities that sort of fall under
18 The Slane -- Slane Company's umbrella?
19   A.  Well, we had real estate developments in New
20 York, New Jersey, Ohio -- 12 states, so we had a lot of
21 projects, and -- but the banks have either taken them
22 over or foreclosed or there's very -- there's probably,
23 I don't know, maybe six or eight left.
24   Q.  How many were there --

Page 116

1    How many have existed at one time or another?
2    A.  Maybe 20.  20 -- well, we -- we built 100
3  drug stores for Rite-Aid and many of them were
4  single-purpose entities.  We built shopping centers for
5  Wal-Mart, K-Mart, Big Bear, which was a large
6  supermarket chain headquartered in Columbus.  So
7  it's -- I -- some of them, we had single-purpose
8  entities; some of them, we didn't.  And then we had
9  projects in New York City, in Florida, and in ....
10   So there were a lot of them at one time.
11   Q.  Could the total number be in the hundreds?
12   A.  Perhaps, yeah.  Uh-huh.
13   Q.  You mentioned that since the -- I've
14 forgotten the phrase you used, but basically the
15 economic meltdown in the last few years, since then,
16 you have been spending a lot of time with lawyers and
17 banks, bankers.
18   A.  Yes.
19   Q.  I take it that is in dealing with reversals
20 of fortune in the real estate market and such?
21   A.  Yes.
22   Q.  At the time that that -- before the meltdown,
23 if any of us can remember it, when you were going to
24 banks requesting financing for your various projects,

Page 117

1 what would you typically represent your net worth to
2 the bank to be?
3 · **A. About $100,000,000.**
4 Q. And that was a fairly accurate statement of
5 what your net worth was at that time?
6 **A. Yes.**
7 Q. There's a series of e-mails going back and
8 forth and we will probably get to them in a few
9 minutes, but there's an exchange between you and Yuriy,
10 I believe, in which there is a discussion about a clean
11 fixture. Do you recall that?
12 **A. "Clean fixture."**
13 Q. For the ship.
14 Fixing the Charter Party, in other words.
15 **A. Oh. No, not really.**
16 Q. As you sit here right now, particularly
17 without having looked at the documents, do you have an
18 understanding of what it means when it says to "fix a
19 vessel clean"?
20 **A. No.**
21 Q. Again, is it correct that you were relying on
22 Mr. Schild for that expertise?
23 **A. Yes.**
24 Q. I apologize, I've got to kind of jump around

Page 118

1 in the notes to make sure we don't just go through the
2 same stuff all over again.
3 Exhibit 54, if you would pick that one up,
4 please. That's the December 10 letter on AES
5 letterhead.
6 (Discussion off the record.)
7 **A. Got it. Okay.**
8 Q. That is a document that is talking about
9 arrangements that affect Estech Trading and you and
10 AES; is that a fair statement?
11 **A. Yes.**
12 Q. And you said that you were aware, generally,
13 of what was going on, but you did not specifically
14 review this document at the time it was executed?
15 **A. I think I may have -- I think -- I think -- I**
16 **think Tom showed it to me and it was fine with me.**
17 Q. I don't see a place for a signature by you or
18 Slane Company or any of the Slane interests.
19 **A. Correct.**
20 Q. Do you have an understanding why?
21 **A. No.**
22 Q. But you would agree that the document is not
23 signed by you or anyone on behalf of the Slane
24 interests?

Page 119

1 **A. Correct.**
2 MR. WINTON: Why don't we take a break for
3 lunch and I'll shift gears. Let's go off the record.
4 (Recess taken.)
5 BY MR. WINTON:
6 Q. You answered a number of questions by
7 Ms. Orozco with regard to the Charter Party and some of
8 the other contracts that relate to this purchase and
9 sale of iron ore -- at least the intended purchase and
10 sale. I'd like you to focus on AES with regard to
11 those various contracts. What, if any, role did AES
12 have with regard to the negotiation of the Charter
13 Party?
14 **A. None.**
15 Q. What, if any, role did AES have with regard
16 to the negotiation of the purchase contract, purchase
17 of the iron ore?
18 **A. None.**
19 Q. What, if any, role did AES have with regard
20 to the contract for the sale of the iron ore to Tianjin
21 Materials?
22 **A. None.**
23 Q. What role did AES have, if any, with regard
24 to finding a potential seller of the iron ore, in other

Page 120

1 words, the Mexican miner?
2 **A. None.**
3 Q. What, if any, role did AES have with regard
4 to finding the potential buyer, Tianjin?
5 **A. None.**
6 Q. Is that "Tianjin"?
7 **A. "Tianjin."**
8 Q. "Tianjin"?
9 **A. Right.**
10 Q. What role, if any, did AES have with regard
11 to locating a vessel?
12 **A. None.**
13 Q. Is it correct that AES's only role, with
14 regard to the $500,000, was putting up the 500,000?
15 **A. Yes.**
16 Q. You indicated that, with regard to that, that
17 AES was willing to do that if, and only if, certain
18 conditions, terms were met.
19 **A. Yes.**
20 Q. What were those terms?
21 **A. They wanted collateral. They wanted some**
22 **type of security.**
23 Q. Did AES also -- and, here, I'm referring to
24 Mr. Moloney -- state that he wanted to review the

Page 121

1 documents to make sure that the security was
2 acknowledged by Milestone and Estech?
3  **A. Yes.**
4  Q. Was the security that was discussed a partial
5 assignment of the Letter of Credit that came from the
6 Chinese buyer?
7  **A. Yes.**
8  Q. Do you know whether or not that partial
9 assignment of the Letter of Credit was ever made to
10 AES?
11  **A. I do not.**
12  Q. You do not know?
13  **A. Yeah, I -- I don't think so but I'm ....**
14  **I don't think it ever was.**
15  Q. You've talked at times about various
16 investors and transactions. Is it your understanding
17 that AES's role, with regard to the $500,000, was to be
18 as a lender?
19  **A. Yes.**
20  Q. Are you aware of any time in which AES
21 authorized Estech to negotiate or enter contracts on
22 behalf of AES?
23  **A. No.**
24  Q. Are you aware of any time that Estech

Page 122

1 authorized AES to negotiate or enter contracts on
2 behalf of Estech?
3  **A. No.**
4  Q. Are you aware of any circumstance in which
5 anyone brought business to AES via Estech? In other
6 words, Estech acted as a representative of AES in
7 finding business?
8  **A. No.**
9  Q. Was it your understanding that AES's intent,
10 and its position with regard to the $500,000, was that
11 it would, at all times, have the right to recall those
12 funds until its demands with regard to security and
13 other terms were satisfied?
14  **A. Correct.**
15  Q. As I looked at the communications back and
16 forth and listened to the various testimony from you
17 and from Mr. Wolfson, it seems that there was a -- all
18 of this, with regard to the $500,000 at least, was
19 being done under great time pressure. Do you recall
20 that?
21  **A. Correct. Yes, I do.**
22  Q. What was causing this time pressure?
23  **A. There was a ship that was available and we**
24  **had to deliver the iron ore -- or Estech Trading had to**

Page 123

1  **deliver the iron ore by a certain date, which I think**
2  **was December 30th; the ship had to leave the port in**
3  **Mexico by December 30th; and if we couldn't get the**
4  **ship en route to Mexico by December 2nd or 3rd, we**
5  **couldn't make the time schedule.**
6  Q. So because Estech had had to put up a
7 Performance Bond in favor of Tianjin, in order to meet
8 a delivery date in China with the ore, the rush was:
9 You had to get a Charter fixed and a vessel en route to
10 Mexico to load the iron ore in time to make it back to
11 China to meet the delivery date, or the Performance
12 Bond would be forfeited?
13  **A. Correct.**
14  Q. The good thing is that Ms. Orozco has already
15 gone over some of these questions.
16  - - -
17  A ONE-PAGE E-MAIL STRING,
18  CONTAINING A VOEVUDSKY/SLANE
19  E-MAIL, SENT: 11/30/10,
20  BATES-STAMPED MILESTONE 00000076,
21  WAS MARKED AS EXHIBIT 63.
22  - - -
23 BY MR. WINTON:
24  Q. I wanted to call your attention to the e-mail

Page 124

1 in the middle of the page. This is Milestone 076,
2 which we've marked as Exhibit 63. Do you see that this
3 is an e-mail that indicates it's to you, it's dated
4 November 30, coming from Yuriy Voevudsky?
5  **A. Yes.**
6  Q. Do you recall receiving this?
7  **A. Yes, I think I do.**
8  Q. And I think you mentioned that there was a
9 discussion that the ship interests were looking for
10 some security for their costs of getting the vessel
11 from China to the load port in Manzanillo, Mexico?
12  **A. Yes.**
13  Q. Is it your recollection that that's what this
14 is about?
15  **A. Yes.**
16  - - -
17  **A ONE-PAGE E-MAIL STRING, BEGINNING**
18  **WITH A MICHALEK/CHARTERING**
19  **CHAIKA-AGENCY E-MAIL, RECEIVED:**
20  **11/30/10, BATES-STAMPED**
21  **MILESTONE 00000078, WAS MARKED AS**
22  **EXHIBIT 64.**
23  - - -
24 BY MR. WINTON:

Page 125

1    Q.  Mr. Slane, we have marked as Exhibit 64
2    another e-mail.  And most of what we are going to look
3    at for the next few minutes are going to be e-mails.
4    This is from Jan Michalek --
5    **A.  Yes.**
6    Q.  -- copied to you and it's going to Yuriy.
7    **A.  Yes.**
8    Q.  Do you see that at the top?
9    **A.  Yes.**
10   Q.  Do you recall receiving this at about that
11   time?
12   **A.  Yes.**
13   Q.  And this is a reference --
14       It says, "Attached is the copy of LC from
15   Tianjin Materials.  We have issued one assignment to
16   Martinez group, the max value $6,120,000."
17   **A.  Yes.**
18   Q.  Was the total Letter of Credit 10,000,000?
19   **A.  I think it was just under**
20   **10,000,000-something.**
21   Q.  So this would indicate it was roughly
22   9,120,000, and 6,120,000 is being assigned to the
23   seller in Mexico?
24   **A.  Yes.**

Page 126

1    Q.  So that what Mr. Michalek is saying is:  That
2    leaves 3,000,000 for assignment to Milestone?
3    **A.  Yes.**
4           - - -
5    **A ONE-PAGE E-MAIL STRING,**
6    **CONTAINING A SLANE/CHARTERING**
7    **CHAIKA-AGENCY E-MAIL, RECEIVED:**
8    **11/30/10, BATES-STAMPED**
9    **MILESTONE 00000077, WAS MARKED AS**
10   **EXHIBIT 65.**
11          - - -
12   **BY MR. WINTON:**
13   Q.  And on the e-mails that we've marked as
14   Exhibit 65, I want to call your attention to the one
15   that's on the bottom of the first page.  I guess this
16   is a one-page exhibit.
17   **A.  Yes.**
18   Q.  And this, apparently, is to you, sent
19   November 30th from Yuriy?
20   **A.  Yes.**
21   Q.  And he's copying Mr. Michalek -- Well, it
22   looks like it's both going to you and Mr. Michalek ....
23       I'm sorry.  There's no copy.  It's to you and
24   Mr. Michalek.  Do you see that?

Page 127

1    **A.  Yes.**
2    Q.  Do you recall receiving this at or about the
3    time indicated?
4    **A.  Yes.**
5    Q.  And these were produced by Milestone so I'm
6    assuming that these are coming from Mr. Voevudsky --
7    **A.  Yes.**
8    Q.  -- in Ukraine?
9    **A.  Yes.**
10   Q.  So it says 30/11/2010, and is it your
11   understanding that's the European format of 30th
12   November 2010?
13   **A.  Yes.**
14   Q.  And then, after that, it says 23:06:35?
15   **A.  Yes.**
16   Q.  Is it your understanding that's
17   11:06-and-35-seconds -- 11 p.m.?
18   **A.  Yes.**
19   Q.  And based on the times that your office here
20   in Columbus was open and conducting business, would it
21   be your understanding that this means that this e-mail
22   was received at 23:06:35 in Ukraine?
23   **A.  Yes.**
24   Q.  And is it your understanding there's roughly

Page 128

1    a seven-hour time difference between Columbus and
2    Ukraine?
3    **A.  Yes.**
4    Q.  So apparently this would have been -- I'm
5    working on it -- 16:06?
6    **A.  Yes.**
7    Q.  So that would be 4:06 in the afternoon?
8    **A.  Yes.**
9    Q.  And so was it your understanding, when you
10   received this, that Mr. Voevudsky was telling you that
11   they had English solicitors working on an Escrow
12   Agreement?
13   **A.  Yes.**
14   Q.  And below that, he again asks you how much
15   the Charterer, Estech, would be willing to post to the
16   Escrow Account?
17   **A.  Yes.**
18          - - -
19   **A ONE-PAGE E-MAIL STRING, BEGINNING**
20   **WITH A KOK/SLANE E-MAIL,**
21   **BATES-STAMPED MILESTONE 00000079,**
22   **WAS MARKED AS EXHIBIT 66.**
23          - - -
24   **BY MR. WINTON:**

Page 129

1  Q. On Exhibit 66, I'd like you to focus your
2  attention on the bottom e-mail.
3  A. Yes.
4  Q. Do you recall receiving this e-mail from --
5  I'm sorry.
6  This is from you to Mr. Voevudsky --
7  A. Yes.
8  Q. -- Yuriy?
9  And you sent this on the 30th of November at
10 4:57 p.m. Columbus time?
11 A. Yes.
12 Q. And this appears to be responding to his
13 e-mail that we just looked at, Exhibit 65?
14 A. Yes.
15 Q. And you are telling him that you should be
16 able to post $500,000?
17 A. Yes.
18 Q. And you are looking at the language of the
19 Letter of Credit with regard to the request for an
20 assignment?
21 A. Yes.
22                  - - -
23     A TWO-PAGE DOCUMENT CONTAINING A
24     VOEVUDSKY/SLANE E-MAIL, SENT:

Page 130

1     12/1/10, BATES-STAMPED
2     MILESTONE 00000081 AND 0082, WAS
3     MARKED AS EXHIBIT 67.
4                  - - -
5  BY MR. WINTON:
6  Q. Exhibit 67. I'd like to call your attention
7  to the e-mail at the bottom of the first page.
8  A. Yes.
9  Q. Do you recall receiving this on or about the
10 1st of December at 5:53, so almost 6 p.m.?
11 A. Yes.
12 Q. Now, would you have gotten it then or would
13 you have picked it up the next morning?
14 A. No, I probably got it then.
15 Q. And this is to you and Mr. Michalek from
16 Mr. Voevudsky?
17 A. Yes.
18 Q. Again, talking about working on the Escrow
19 Agreement?
20 A. Yes. Well, the Letter of Credit.
21 Q. Well, the first paragraph says: "Meanwhile,
22 please note we are preparing the Escrow Agreement and
23 should send it to you in" the "next hour."
24 A. Yes, you are correct. Yeah.

Page 131

1  Q. Then the next paragraph says: "Please kindly
2  note that we are there to fix the biz ..."
3  Is it your understanding that means the
4  "business"?
5  A. Yes.
6  Q. -- "after" signing "of Escrow Agreement and
7  confirmation that money received on Escrow Account."
8  A. Yes.
9  Q. So was it your understanding that what
10 Milestone, Mr. Voevudsky, was looking for, was: He
11 expected the money to come to them in escrow before
12 they fixed the Charter Party?
13 A. I don't really know what he ....
14 He expected --
15 Can you rephrase that, the question?
16 Q. Yeah.
17 Based on this exchange of e-mails that we
18 have been going through, was it your understanding that
19 what Milestone, Mr. Voevudsky, was expecting was that
20 money was going to go into escrow, and once they
21 received that money, they were going to fix the Charter
22 or enter the contract?
23 A. Yes.
24 Q. And then the bottom paragraph is talking

Page 132

1  about the status of the motor vessel called RODON,
2  R-O-D-O-N.
3  A. Yes.
4  Q. And that goes to the discussion you and I had
5  earlier about needing to find a vessel, get it fixed,
6  so that it could make a timely transit; but while
7  they're waiting to get final instructions and
8  arrangements from Estech to fix the Charter, there are
9  other people trying to charter those same vessels, so
10 they're pressing you to get this wrapped up so that
11 they can fix a Charter before they lose that vessel;
12 correct?
13 A. Yes. Correct.
14 Q. That was your understanding.
15 A. Yes, clearly.
16                  - - -
17     A TWO-PAGE E-MAIL STRING CONTAINING
18     A SLANE/CHARTERING CHAIKA-AGENCY
19     E-MAIL, RECEIVED: 12/1/10,
20     BATES-STAMPED MILESTONE 00000082
21     AND 0083, WAS MARKED AS EXHIBIT 68.
22                  - - -
23 BY MR. WINTON:
24 Q. On Exhibit 68, I wanted to draw your

Page 133

1  attention to the e-mail at the bottom --
2    A. Yes.
3    Q. -- of the first page. It's a two-page
4  e-mail. This is to you, again, from Mr. Voevudsky?
5    A. Yes.
6    Q. And he is transmitting to you a draft of the
7  Escrow Agreement?
8    A. Yes.
9    Q. And this one, apparently, is coming out of
10  Ukraine on the 1st of December at 2:52 in the
11  afternoon, so that would be 7:52, almost 8 o'clock,
12  here in Columbus?
13    A. Yes.
14    Q. So they are sending to you a proposed final
15  draft of the Escrow Agreement which they had already
16  signed. They are indicating that they are going to ask
17  Mahoney --
18       Was it your understanding that refers to
19  Mahoney & Keane?
20    A. Yes.
21    Q. -- to act as the Escrow Agent. They are
22  asking you to countersign it, stating, upon completion
23  of above procedures, they will notify you and ask you
24  to remit the agreed amount to the Escrow Account as

Page 134

1  soon as possible; correct?
2    A. Yes.
3    Q. So they signed the Escrow Agreement, they are
4  sending it to you, looking to you to sign it, and then
5  once everything has been signed, then they expect
6  Estech to put money in escrow?
7    A. Yes.
8    Q. So this is 7 o'clock -- almost 8 o'clock in
9  the morning on December 1st; correct?
10    A. Yes.
11    Q. And is it December 1st that you met with
12  Mr. Jacobs and Mr. Moloney at American Energy
13  Services --
14    A. Yes.
15    Q. -- at their office here in Columbus?
16    A. Yes.
17    Q. If you'll look at the second page on Exhibit
18  68, at the bottom, there is an e-mail from you to Mark
19  Seward, and that's the individual Ms. Orozco asked you
20  about; correct?
21    A. Correct.
22    Q. The solicitor on behalf of Milestone in
23  London?
24    A. Correct. Yeah. It's from Seward to me.

Page 135

1    Q. No, the one on the bottom says "From: Dan
2  Slane," "To: Mark Seward." Second page at the bottom.
3    MS. OROZCO: Of Exhibit 60- --
4    MR. WINTON: -8.
5    THE WITNESS: Oh, in the middle of the page?
6  Yeah, okay, I see it.
7    MS. OROZCO: Oh, okay.
8  BY MR. WINTON:
9    Q. I'm at the very bottom. If you work your way
10  up from the bottom, there's a "From: Mark Seward," to
11  you, but above that, "From: Dan Slane," "To: Mark
12  Seward," and it says: "The bank has confirmed it."
13  And I assume, there, you are referring to the Letter of
14  Credit?
15    A. Yes.
16    Q. And you are telling him the funding will
17  occur, on the Letter of Credit, five business days
18  after receipt of the shipping docs?
19    A. Correct.
20    Q. Is it your understanding that what that
21  refers to is that, upon loading of the cargo, the
22  vessel will issue Bills of Lading and other documents
23  relating to the export of the material; they will be
24  delivered to the buyer, Estech, and then Estech will

Page 136

1  forward those to the bank in China, and five days
2  later, the Letter of Credit will fund?
3    A. Well, the documents would be issued. Then
4  those documents would go to US Bank in St. Louis. They
5  would take a day to review them and then they would
6  forward them on to the Chinese bank, who had five
7  banking days to review them and fund.
8    Q. What was US Bank's role in this?
9    A. They were handling the Letter of Credit from
10  the Chinese bank.
11    Q. Okay. So the Letter of Credit is issued on
12  the Chinese bank but US Bank is acting to facilitate
13  the transaction with regard to the Letter of Credit
14  here in The United States?
15    A. Yeah, and Jan had an account with US Bank so
16  the funds were going to go from the Chinese bank to the
17  US Bank once the Letter of Credit had been executed --
18  or complied with.
19    Q. During Mr. Wolfson's deposition, he indicated
20  that he had never heard of US Bank before and didn't
21  know whether it was a legitimate entity or not. Can
22  you tell us what you know about US Bank?
23    A. It's one of the major banks in The United
24  States. It's -- I forget exactly. It's like the

Page 137

1  fifth- or seventh-largest bank in The United States and
2  they have a very extensive international office, and
3  the bank officer handling this had done numerous
4  commodity projects.
5      - - -
6      DOCUMENT MARKED AS EXHIBIT 69, LATER
7      WITHDRAWN.
8      - - -
9  BY MR. WINTON:
10     Q.  This is a one-page e-mail that we've marked
11  as Exhibit 69.
12     A.  Yes.
13     Q.  In the middle, there is an e-mail from
14  Mr. Seward to you --
15         MS. OROZCO:  Can we stop for a moment?
16         (Discussion off the record.)
17  BY MR. WINTON:
18     Q.  So if we go to the top of the second page of
19  68, you say, "Got it" -- This is from you. -- "Got it
20  and will get it done."  You're referring to the Escrow
21  Agreement or the Letter of Credit?
22     A.  I think I'm referring to the Letter of
23  Credit.
24     Q.  Yeah, there is an e-mail from you to Mark

Page 138

1  Seward right below that, where you say, "Mark:  The
2  L/C.  Dan."
3     A.  Yeah.
4     Q.  So were you transmitting the Letter of Credit
5  to him?
6     A.  Yes, right.
7     Q.  Sometimes, these don't show when there is an
8  attachment so it's a little hard to follow at times.
9     A.  Right.
10     Q.  Then the one right above that, you're saying,
11  "Got it and will get it done," so that must be
12  referring back down to Mr. Seward's e-mail to you?
13     A.  Yes.
14     Q.  And he is saying:  "Still await comments on
15  the escrow."
16         So he is asking you for comments on the
17  escrow; correct?
18     A.  No, I think he's -- I think he's waiting for
19  his U.S. lawyer to give him comments.
20     Q.  Okay.
21         (Discussion off the record.)
22         - - -
23         A ONE-PAGE E-MAIL STRING CONTAINING
24         A VOEVUDSKY/SLANE E-MAIL, SENT:

Page 139

1         12/1/10, BATES-STAMPED
2         MILESTONE 00000084, WAS MARKED AS
3         EXHIBIT 69.
4         - - -
5  BY MR. WINTON:
6     Q.  Exhibit 69, again, is a -- this one is a
7  one-page exhibit that has a series of e-mails on it.
8  This is one of the problems with this production of
9  documents, is:  Now, it looks like we've partially got
10  the exact same page, only we've got a new e-mail in the
11  middle of it, so ....
12         And I'd like you to focus on the one that is
13  all caps:  "Dear Mr. Daniel Slane.
14         "Please kindly note ..."
15     A.  Yes.
16     Q.  Okay.  Do you recall receiving this one from
17  Mr. Voevudsky?
18     A.  Yes.
19     Q.  And you would have received this one on the
20  1st of December at 2 o'clock, roughly, in the
21  afternoon, Columbus time?
22     A.  Yes.
23     Q.  Do you remember what time you met with
24  Mr. Jacobs and Mr. Moloney?  Was it late in the day?

Page 140

1     A.  I think it was sometime in the afternoon but
2  I really can't remember.
3     Q.  So Mr. Voevudsky is saying to you:  "... we
4  are glad that we managed to come to the solution.
5  Nevertheless, please ..."
6         Do you know what that refers to?
7     A.  Yeah.  They wanted a million dollars and I
8  said we could never raise that kind of money, so we
9  agreed on $500,000.
10     Q.  Oh, they wanted a million dollars for the
11  escrow?
12     A.  Right.  Yes.
13     Q.  He goes on:  "Nevertheless, please kindly
14  note till signing of Escrow Agreement and confirmation
15  that USD 500,000.00 are on Escrow Account, we cannot
16  fix the vessel"; correct?
17     A.  Yes.
18     Q.  So, again, this is the same comment from Mr.
19  Voevudsky that they are not going to fix the Charter,
20  enter the Charter, until the 500,000 is in escrow;
21  correct?
22     A.  Correct.
23     Q.  And on these e-mails we have been looking at,
24  I don't see any of this going to American Energy

Page 141

1    Services.  Am I missing something here?
2        A.  No, you are not.
3        Q.  So this is strictly between Mr. Voevudsky and
4    Estech?
5        A.  Yes.
6        Q.  I am going to try to skip some of this.
7                    - - -
8            A TWO-PAGE E-MAIL STRING CONTAINING
9            A SLANE/CHARTERING CHAIKA-AGENCY
10           E-MAIL, RECEIVED:  12/2/10,
11           BATES-STAMPED MILESTONE 00000085
12           AND 0086, WAS MARKED AS EXHIBIT 70.
13                   - - -
14   BY MR. WINTON:
15       Q.  We have marked another group of e-mails as
16   Exhibit 70.  I wanted to call your attention to the one
17   that begins at the bottom of the first page, and as I
18   understand it, this is an e-mail from you to something
19   called Operations AfinaPallada?
20       A.  Yes.
21       Q.  Do you have a recollection of who or what
22   that is?
23       A.  No.
24       Q.  Do you recall sending this e-mail?

Page 142

1        A.  I don't recall it.
2        Q.  This appears to have been sent at almost
3    midnight Ukraine time, so that would be 17:00,
4    basically, here, so 5 p.m.?
5        A.  Yes.
6        Q.  So this, apparently, is at the end of the
7    day?
8        A.  Yes.
9        Q.  Is it your recollection that, by this point,
10   you had met with Mr. Jacobs and Mr. Moloney?
11       A.  Yes.
12       Q.  And do you recall that it was during that
13   meeting that AES said that they were willing to loan
14   $500,000 if, and only if, they obtained security and
15   some other conditions were met with regard to
16   documentation?
17       A.  Correct.
18       Q.  And do you also recall that Mr. Moloney was
19   puzzled by the draft of the Escrow Agreement that you
20   brought to him, in terms of what it meant?
21       A.  Yes.
22       Q.  Is it your recollection that he was
23   unfamiliar with some of the abbreviations that were
24   used in that document?

Page 143

1        A.  Yes.
2        Q.  Were you familiar with them and able to
3    explain them to him?
4        A.  I was not.
5        Q.  Do you recall that Mr. Moloney made some
6    changes to that draft of the Escrow Agreement
7    consistent with his statement that AES wanted to make
8    sure that they had reviewed and approved the
9    documentation of the underlying transaction?
10       A.  Yes.
11       Q.  Did he give you those changes at that time --
12       A.  No.
13       Q.  -- or did he say he'd have them the next day?
14       A.  I really can't remember.  It's probably the
15   next day.
16       Q.  And you are indicating here, late on the 1st,
17   that changes to the Escrow Agreement will follow.
18       A.  Correct.
19                   - - -
20           A FOUR-PAGE DOCUMENT ENTITLED,
21           "ESCROW AGREEMENT DATED
22           02/12/2010," UNSIGNED, WAS MARKED
23           AS EXHIBIT 71.
24                   - - -

Page 144

1    BY MR. WINTON:
2        Q.  I've handed you what we have marked as
3    Exhibit 71.
4        A.  71, yes.
5        Q.  And that is what I understand to be a draft
6    of what's been referred to in this case as an "Escrow
7    Agreement."
8        A.  Yes.
9        Q.  Do you recognize that to be a document that
10   has some insertions by Mr. Moloney adding definitions
11   to some of the abbreviations?
12       A.  Yes.
13       Q.  Do you remember transmitting that to either
14   Mahoney & Keane or to Mr. Voevudsky?
15       A.  I think I sent it to Yuriy.
16       Q.  To Mr. Voevudsky?
17       A.  Yes.
18       Q.  In that meeting with Mr. Jacobs and
19   Mr. Moloney, did he, at that time, show you a draft of
20   a letter that he was going to send to the proposed
21   Escrow Agents, Mahoney & Keane, in New York?
22       A.  Yes.
23       Q.  And I believe you indicated earlier that you
24   had some comments on it about showing -- about allowing

Page 145

1    Mahoney & Keane to let Milestone know that it had
2    received the money?
3        **A. Yes.**
4        Q. And did Mr. Moloney add that comment to his
5    initial draft of the letter?
6        **A. Yeah, he was concerned about**
7    **misinterpretation and, I think, added a couple of**
8    **sentences to clarify the issue, at the end of the**
9    **letter.**
10       Q. And is it your understanding that Mr. Moloney
11   then sent that letter to the proposed Escrow Agents in
12   New York?
13       **A. Yes.**
14       Q. And was it your understanding from that
15   discussion that when that money was transmitted to New
16   York, that it would not be immediately available to
17   Milestone but it would have to await further
18   developments with regard to securing the loan and
19   further documentation?
20       **A. Yes.**
21       MS. OROZCO: Objection.
22       - - -
23       A ONE-PAGE E-MAIL STRING,
24       CONTAINING A SLANE/CHARTERING

Page 146

1        CHAIKA-AGENCY E-MAIL, RECEIVED:
2        12/2/10, BATES-STAMPED
3        MILESTONE 00000085, WAS MARKED AS
4        EXHIBIT 72.
5        - - -
6    BY MR. WINTON:
7        Q. Exhibit 72 is, I believe, a one-page
8    document; correct?
9        **A. Yes.**
10       Q. And again, we have a series of e-mails here?
11       **A. Yes.**
12       Q. And up at the top is an e-mail from you to --
13   this is going to Yuriy Voevudsky?
14       **A. Yes.**
15       Q. And this is on December 2nd?
16       **A. Correct.**
17       Q. It's being received in Ukraine at basically
18   01:00 in the morning on December 2nd, so you were
19   sending it at, basically, 8 o'clock at night Columbus
20   time?
21       **A. Yes.**
22       Q. And here, you say: "Juri (sic): We are
23   prepared to wire the $500,000 per your request this
24   afternoon subject to approval of the Escrow Agreement

Page 147

1    tomorrow. We cannot get our changes on the Escrow
2    Agreement done until tomorrow. We only have one hour
3    left to wire. Waiting to hear from Mr. Garth Wolfson
4    at Mahoney & Keane"; correct?
5        **A. Yes.**
6        Q. You've got Milestone saying to you: "We are
7    not going to fix the vessel until we have the 500,000;"
8    and you've got AES telling you: "We will send the
9    money but we are not going to release it until we've
10   had certain conditions met"; correct?
11       **A. Yes.**
12       Q. Did you understand there was a conflict
13   between those two?
14       **A. Well, Yuriy backed off and said: "As long as**
15   **the money is in the Trust Account, we will fix the**
16   **ship."**
17       Q. Was it your understanding that what that
18   meant is that, as long as the money was physically in
19   Mahoney & Keane's possession, even though AES had,
20   effectively, not taken its hand off the money, it still
21   was subject to recall by AES for any reason, at any
22   time, that that was sufficient for Milestone's
23   purposes?
24       **A. Yes.**

Page 148

1        MS. OROZCO: Objection.
2    BY MR. WINTON:
3        Q. So was it your understanding that there was,
4    in fact, no conflict between these two documents?
5        **A. Correct.**
6        **He was -- Yuriy was more interested in**
7    **knowing that the money existed than completing the**
8    **formalities of the Escrow Agreement, and willing to**
9    **move on fixing the ship on that basis.**
10       Q. There's an e-mail that talks about sending
11   the money to Mahoney & Keane simply to prove that
12   Estech has those funds available, and this is an e-mail
13   from someone else to someone else, so I haven't shown
14   it to you, nor has Ms. Orozco?
15       **A. Correct.**
16       Q. Is it your understanding that that statement
17   is consistent with what Milestone was telling you?
18       **A. Yes.**
19       MS. OROZCO: Objection.
20       - - -
21       A ONE-PAGE E-MAIL STRING,
22       CONTAINING A VOEVUDSKY/SLANE
23       E-MAIL, SENT: 12/3/10,
24       BATES-STAMPED MILESTONE 00000089,

Page 149

```
1          WAS MARKED AS EXHIBIT 73.
2                  - - -
3    BY MR. WINTON:
4        Q.  Mr. Slane, we have marked as Exhibit 73 a
5    one-page series of e-mails.  We talked earlier about
6    whether or not the Charter Party was ever entered and I
7    want to draw your attention to the e-mail immediately
8    under the words, "Original Message," with arrows going
9    in both directions, that is to you, sent December 12,
10   shortly before 1 a.m., presumably Ukraine time, so 6
11   p.m. your time, here in Columbus.
12       A.  Yes.
13       Q.  I am sorry.  I wanted to go to the one below
14   that -- My mistake. -- From you to Chaika Agency, so
15   that would be Yuriy Voevudsky?
16       A.  Yes.
17       Q.  And you are saying:  "Yuri (sic):  We hereby
18   confirm MV SANTA BARBARA is clean fix on previously
19   agreed terms"; correct?
20       A.  Yes.
21       Q.  So does that refresh your recollection as to
22   when the Charter Party apparently was agreed to?
23       A.  Yes.
24                 - - -
```

Page 150

```
1        A TWO-PAGE E-MAIL STRING,
2        CONTAINING A SLANE/CHARTERING
3        CHAIKA-AGENCY E-MAIL, RECEIVED:
4        12/6/10, BATES-STAMPED
5        MILESTONE 00000093, WAS MARKED AS
6        EXHIBIT 74.
7                  - - -
8    BY MR. WINTON:
9        Q.  Mr. Slane, Exhibit 74 consists of two pages
10   of e-mails and I wanted to call your attention to the
11   e-mail on the first page right below the mid-point,
12   beginning, "Original Message" with arrows in both
13   directions.  It says:  From:  Dan Slane, To:
14   Chartering Chaika-Agency, 6 December, 17:10.  So,
15   again, since this was produced by Milestone, that
16   apparently was around midnight your time?  17 -- Maybe
17   noon?
18       A.  Yeah, right.
19       Q.  Only off by 12 hours.
20       A.  Yes.
21       Q.  There's a reason I'm not a mathematician.
22          Okay.  So, noon your time?
23       A.  Yes.
24       Q.  And you are telling Mr. Voevudsky that -- it
```

Page 151

```
1    says:  "Should be issued today."  Does that refer to
2    the assignment of the Letter of Credit?
3        A.  Yes.
4        Q.  And do you recall that there, apparently, was
5    some mixup in terms of where the assignment was
6    delivered?  Because there is a series of e-mails back
7    and forth --
8        A.  Yes.
9        Q.  -- trying to figure out where it went.
10       A.  Yes.
11       Q.  And do you recall that it was ultimately
12   located?
13       A.  Yes.
14       Q.  I think you indicated that there never was a
15   partial assignment of the Letter of Credit to AES to
16   secure the loan of $500,000?
17       A.  Correct.
18       Q.  Do you recall a discussion with Mr. Moloney
19   that you could perhaps reduce the amount of the
20   assignment -- the partial assignment of the Letter of
21   Credit to Milestone by the $500,000 being loaned by
22   AES?
23       A.  I may have but I'm vague on it.
24       Q.  Is it your recollection that, even though
```

Page 152

```
1    arrangements were being made for a $500,000 loan to
2    Estech, that the assignment, in fact, went in the full
3    value of the freight due under the contract between
4    Milestone and Estech?
5        A.  Yes.
6        Q.  And do you recall that was 2,502,500?
7        A.  Yes.
8        Q.  And that's calculated based on $32.50 per
9    metric ton of cargo loaded, and the vessel was to load
10   70,000 to 77,000 tons of iron ore at vessel's option?
11       A.  Yes.
12       Q.  So 32.5 times 77,000 gets you to 2,502,500?
13       A.  Yes.
14       Q.  Do you recall why this shipment fell through?
15       A.  The only thing that I knew was that the miner
16   was unable to come up with the ore at the dock.
17       Q.  Do you recall receiving e-mail demands from
18   Milestone for payment of damages as a result of breach
19   of the Charter Party?
20       A.  I think I did, yeah.
21       Q.  Do you recall receiving an e-mail from
22   Mr. Schild forwarding an e-mail from Igor Violin at
23   Chaika Agency indicating that, by the 24th of December,
24   that Milestone had already been able to fix a
```

Page 153

1  replacement Charter?
2      **A.  Yes.**
3  ·  Q.  Do you recall ever receiving any
4  documentation indicating how much revenue they had
5  received off of that substitute Charter that would
6  reduce any claim they had against Estech?
7      **A.  Johan told me that the profit to Milestone**
8  **was larger than shipping the iron ore.  It was -- I**
9  **think it was a grain load that they were to take out of**
10 **Florida.**
11     Q.  Grain?
12         Or coal out of New Orleans, maybe?
13     **A.  Yeah, maybe that was it.  Yes.**
14     Q.  Whatever it was, your recollection of your
15 conversation with him was that he said they made more
16 money on that deal than they would have on yours?
17     **A.  Yes.**
18     Q.  Do you recall, at any point, telling
19 Milestone that AES was an investor in this business?
20     **A.  I may have, yeah.**
21     Q.  Was it your understanding that AES, in fact,
22 was an investor in this transaction?
23     **A.  No.  I would view them more as a lender, but,**
24 **you know, I'm dealing with a Russian or a Ukrainian and**

Page 154

1  **there were some language issues.  Tried to simplify**
2  **everything for him.**
3         **- - -**
4      **A TWO-PAGE E-MAIL STRING,**
5      **CONTAINING A VOEVUDSKY/MICHALEK,**
6      **SLANE E-MAIL, SENT:  1/7/11,**
7      **BATES-STAMPED MILESTONE 00000100**
8      **AND 0101, WAS MARKED AS EXHIBIT 75.**
9         **- - -**
10 **BY MR. WINTON:**
11     Q.  Mr. Slane, I have marked as Exhibit 75 a
12 two-page set of e-mails.
13     **A.  Yes.**
14     Q.  Bottom half of the first page of Exhibit
15 75 --
16     **A.  Yeah.**
17     Q.  -- is what appears to be an e-mail to you and
18 Mr. Michalek --
19     **A.  Yes.**
20     Q.  -- from Mr. Voevudsky?
21     **A.  Yes.**
22     Q.  Do you recall receiving this?
23     **A.  Yes.**
24     Q.  And if you look at the paragraph that says:

Page 155

1  "Mr. Slane," reference "your last message," and you see
2  down in there, they indicate that you have said that
3  AES is an investor?
4      **A.  Yes.**
5      Q.  Was it your understanding that that's in
6  response to something that you said?
7      **A.  Yeah, it was clarifying the fact that AES was**
8  **not part of Estech Trading.**
9      Q.  And with regard to the use of the term,
10 "investor," is that what you just explained to us?
11     **A.  Yes.**
12     Q.  There is an allegation in the Plaintiff's
13 Complaint, which was --
14         Turn to Page 4 of that Complaint, if you
15 would.  Do you see Paragraph 26 --
16     **A.  Yes.**
17     Q.  -- where Plaintiff alleges -- and "Plaintiff"
18 is Milestone -- that, "... Defendant Estech is an alias
19 or agent of American Energy ..."?
20     **A.  Yes.**
21     Q.  Are you aware of any circumstance in which
22 "Estech" and "American Energy" have been used as an
23 alias, one of the other?
24     **A.  I am not.**

Page 156

1      Q.  And I assume that, as a former case agent,
2  you are familiar with the term, "alias"?
3      **A.  Yes.**
4      Q.  Are you aware of any circumstance in which
5  Estech or American Energy have acted as an agent of
6  each other, one of the other?
7      **A.  I am not.**
8      Q.  Paragraph 27 alleges that Estech and American
9  Energy share common ownership.
10         Are you aware of any common ownership between
11 Estech and American Energy?
12     **A.  I am not.**
13     Q.  And then, in that same paragraph, it goes on
14 to allege that Estech and American Energy share
15 operations.
16         Are you aware of any circumstance in which
17 either has ever shared the operation of the other?
18     **A.  I am not.**
19     Q.  And then the final allegation of Paragraph 27
20 is that Estech is owned or managed by American Energy.
21         Are you aware of any context in which Estech
22 is owned or managed by American Energy?
23     **A.  I am not.**
24     Q.  In Paragraph 28, Plaintiff Milestone again

Page 157

1    alleges that Estech is the agent of American Energy.
2         Again, are you aware of any circumstance in
3    which Estech has acted as the agent of American Energy?
4         **A.  I am not.**
5         Q.  It goes on to allege that Estech is the
6    entity that is contacted when business opportunities
7    are presented to American Energy.
8         Are you aware of any circumstance in which
9    anyone has presented an opportunity to do business to
10   American Energy through Estech?
11        **A.  No.**
12        Q.  Paragraph 29 says that Estech is the agent of
13   American Energy, such that American Energy funded the
14   Escrow Agreement that is referenced in the Complaint,
15   on behalf of Estech, in the amount of $500,000.
16        Other than the loan transaction that was
17   proposed, are you aware of any context in which
18   American Energy funded the Escrow Account on behalf of
19   Estech?
20        **A.  I am not.**
21        Q.  Paragraph 30 alleges that:  "... Estech and
22   American Energy share the same contact phone number
23   published in trade journals which rings at Estech's
24   offices in Ohio."

Page 158

1         Are you aware of any circumstance in which a
2    phone number of American Energy rings at Estech's
3    offices in Ohio?
4         **A.  I am not.**
5         Q.  Other than the trade journal that Ms. Orozco
6    showed you, are you aware of any advertising that
7    involves Estech -- Strike that.
8         The pages out of the trade journal that
9    Ms. Orozco showed you, do you have that in mind or do
10   we need to pick those up and show them to you?
11        **A.  No, I have them here.**
12        Q.  That ad was by Dan Slane, individually;
13   correct?
14        **A.  Correct.**
15        Q.  This alleges that Estech and American Energy
16   have a common phone number published in trade journals.
17   Do you see that?
18        **A.  Yes.**
19        Q.  Have you ever seen a phone number of American
20   Energy that is common with Estech, at all?
21        **A.  No.**
22        Q.  Have you ever seen any phone number of both
23   that was published in a trade journal?
24        **A.  I have not.**

Page 159

1         Q.  Turn the page to look at Paragraph 31, if you
2    would.  There, Plaintiff Milestone alleges that
3    "... Estech is merely a shell-corporation through which
4    American Energy conducts its business."
5         Do you see that?
6         **A.  Yes.**
7         Q.  Are you aware of any circumstance in which
8    Estech -- I'm sorry.
9         Are you aware of any circumstance in which
10   American Energy has conducted its business through
11   Estech as a shell-corporation?
12        **A.  I am not.**
13        Q.  Are you aware of any circumstance in which
14   American Energy has conducted its business through
15   Estech in any capacity?
16        **A.  No.**
17        Q.  Paragraph 32 alleges that, "... Estech and
18   American Energy are joint venturers in the Charter
19   Party ..."
20        You are familiar with the term, "joint
21   venturer"; right?
22        **A.  Yes.**
23        Q.  As an attorney and as a businessman who has
24   certainly formed lots of entities?

Page 160

1         **A.  Yes.**
2         Q.  Are you aware of any way that American Energy
3    and Estech joined in the Charter Party as joint
4    venturers?
5         **A.  I am not.**
6         Q.  Are you aware of any context in which Estech
7    and American Energy could be said to have been joint
8    venturers in the purchase of the iron ore or the sale
9    of the iron ore?
10        **A.  I am not.**
11        Q.  Other than with regard to how American
12   Energy's loan was to be paid back, did American Energy
13   share in the profits of the proposed transaction?
14        **A.  Yes.**
15        Q.  And how was that?
16        **A.  They were to receive 25 percent of the**
17   **profits.**
18        Q.  Which was to repay the loan; correct?
19        **A.  Yes.**
20        Q.  Other than that?
21        **A.  No.  That's it.**
22        Q.  Did American Energy, in any respect, direct
23   or control the negotiations of any of the contracts
24   that relate to the iron ore deal?

Page 161

1    A.  No.
2        MR. WINTON:  Let me take a short break and
3    then I may be done.
4        (Recess taken.)
5        MR. WINTON:  Back on the record.
6        I have no further questions for Mr. Slane at
7    this time.  Thank you very much.
8        MS. OROZCO:  I have recross, whatever you
9    call it.  Redirect.
10                - - -
11           RECROSS-EXAMINATION
12   BY MS. OROZCO:
13       Q.  Mr. Slane, you testified this morning, when I
14   was asking you a few questions, that you did not recall
15   seeing the Escrow Agreement before today, which is
16   marked as Exhibit 48, which is also Exhibit 2 to the
17   Amended Complaint which was marked as Exhibit 62, and
18   during the examination by Mr. Winton, you indicated
19   that you signed the Escrow Agreement; is that correct?
20       A.  That's correct.
21       Q.  Is that your name that you signed or is it
22   someone else's name?
23       A.  No, it was Jan's.
24       Q.  How did it come to be that you signed Mr.

Page 162

1    Michalek's name to the Escrow Agreement?
2        A.  Because it had to get out.  I think Jan
3    was -- was a couple of hours away and couldn't --
4    couldn't get here in time so I signed his name.  There
5    was some urgency.
6        Q.  Did you review it before you signed it?
7        A.  No.
8        Q.  Was that the first time you saw it, was the
9    day that you signed it?
10       A.  Yes.
11       Q.  You also testified that you had a meeting, in
12   person, with Mr. Moloney and Mr. Jacobs --
13       A.  Yes.
14       Q.  -- regarding the $500,000.  Was that the same
15   day that you signed the Escrow Agreement?
16       A.  Yes, I think so.
17       Q.  And you stated that, during that meeting,
18   Mr. Moloney had some changes to the Escrow Agreement?
19       A.  Yes.
20       Q.  Do you know what those changes were?
21       A.  I do not.
22       Q.  Do you recall, in your e-mail that you had
23   sent to Mark Seward about changes to the proposed
24   escrow -- It was marked as Exhibit 70.

Page 163

1    A.  Uh-huh.
2        Q.  If you want to find it, it might help you.
3        It's at the very bottom of that e-mail and
4    it's page Milestone 0085, it's from you to Operations
5    AfinaPallada, where it says:  "Will have Escrow
6    Agreement revised tomorrow morning and e-mailed to you
7    and Mark."
8        You don't recall what the revisions to the
9    Escrow Agreement were?
10       A.  I don't.
11       Q.  Did Mr. Moloney discuss the revisions to the
12   Escrow Agreement with you?
13       A.  No.
14       Q.  You had also testified this morning that when
15   Mr. Michalek approached you regarding the $500,000, you
16   put him in contact with Mr. Jacobs; is that correct?
17       A.  No.  No.  I told him that I was going to go
18   see Jerry Jacobs.
19       Q.  Okay.
20       This morning, you testified that Mr. Jacobs
21   and Mr. Michalek spoke directly.  Do you recall if that
22   is -- if they ever did speak directly?
23       A.  Yeah, I know they spoke directly.  I can't
24   remember the time sequence.

Page 164

1    Q.  Okay.
2        You also testified that you didn't know
3    whether or not the funds -- the $500,000 funds were
4    ever provided to Estech Trading under the Escrow
5    Agreement.  As you sit here right now, do you recall or
6    do you know whether or not they were, in fact,
7    provided?
8        A.  The only thing I recall is that the funds
9    were wired to the Trust Account.
10       Q.  Okay.  That being Mahoney & Keane?
11       A.  Yes.
12       Q.  Do you know -- do you know that Mahoney &
13   Keane was also --
14       Do you have an understanding that Mahoney &
15   Keane was also the Escrow Agent in this transaction?
16       A.  I believe they were, yes.
17       Q.  Do you know whether or not the Escrow Account
18   and the Trust Account at Mahoney & Keane were two
19   different accounts?
20       A.  That was my understanding.
21       Q.  And what was that understanding based on?
22       A.  That there wasn't time to do the Escrow
23   Agreement so the -- the money was not to be put into
24   the Escrow Account until AES had sufficient collateral

Page 165

1  and security.
2      Q.  And what was that collateral and security
3  that AES was seeking?
4      A.  Part of it was an assignment on the Letter of
5  Credit, and there may have been other things that they
6  wanted that I wasn't aware of.
7      Q.  Do you know if they ever received a partial
8  assignment on the Letter of Credit?
9      A.  I don't think they ever did.  Not to my
10  knowledge.
11      Q.  Who was involved in making sure or providing
12  the security or collateral that AES wanted for the
13  transfer of the $500,000?
14      A.  Well, that would have been Jan because the
15  bank was not -- US Bank was not authorized to deal with
16  anybody other than Jan.
17      Q.  And you're saying "Jan."  That's Jan
18  Michalek?
19      A.  Yes.
20      Q.  You also testified this afternoon that AES's
21  role, with respect to the $500,000, was to be a lender.
22  Do you recall that?
23      A.  Yes.
24      Q.  What is that understanding based on?

Page 166

1      A.  My request to them.
2      Q.  Your request to AES?
3      A.  Yes.
4      Q.  And what was your request to AES?
5      A.  That they lend $500,000 as a security deposit
6  for the ship.
7      Q.  Do you know whether or not a loan agreement
8  was ever entered into between AES and Estech?
9      A.  I think it was, but I'm unclear about that.
10  I thought I saw a document here referencing that,
11  but ....
12      Q.  Did you have --
13          Would you have had any role in any type of a
14  loan document or loan agreement between AES and Estech
15  Trading?
16      A.  No.  That was between Jan Michalek and AES.
17      Q.  And do you know who Jan Michalek dealt with
18  at AES?
19      A.  Jerry Jacobs and Tom Moloney.
20      Q.  You stated, also, this afternoon that it was
21  your understanding that, at all times, AES had the
22  right to demand the return of the funds.  What is that
23  understanding based on?
24      A.  The letter that Tom had prepared when he

Page 167

1  wired the money to Keane & Mahoney (sic).
2      Q.  Mahoney & Keane?
3      A.  Mahoney & Keane.  I'm sorry.
4      Q.  That's okay.
5          You also testified you had no input on that
6  letter.
7      A.  Well, no, I -- I requested that Tom notify --
8  or that the -- shipping company be notified that
9  the money was being wired to the Trust Account, and so
10  Tom made some changes from the original draft; I think
11  a couple of sentences at the end of the letter.
12      Q.  Do you know what those sentences' references
13  were?
14      A.  I think he was worried about any
15  misinterpretation and he wanted some clarification.
16      Q.  You also testified this afternoon that it was
17  your understanding that the Charter Party would not be
18  fixed until the Escrow Agreement was funded with the
19  $500,000.  Do you recall that?
20      A.  Yes.
21      Q.  And that's in some e-mails laid out by the
22  owners to you in Exhibits 67, 68 and 69?
23      A.  Yes.
24      Q.  You, thereafter, testified that Yuriy backed

Page 168

1  off on this and he just wanted to be sure that the
2  money was in the trust, and if that was the case, they
3  would fix the ship?
4      A.  Yes.
5      Q.  Is there an e-mail communication that
6  indicates that he was backing off and that was his new
7  understanding -- or his new position?
8      A.  No, these were phone conversations that we
9  were having.
10      Q.  Did you ever document the phone conversation
11  of his new understanding?
12      A.  No.
13      Q.  When you were having these communications
14  with Yuriy and these e-mail communications through
15  e-mails marked as Exhibits 68, 69 and 70, where it was
16  your understanding that the escrow had to be funded
17  before the Charter Party was fixed, did you ever relay
18  that to Mr. Moloney or Mr. Michalek?
19      A.  I can't remember.
20      Q.  Do you remember having any conversations with
21  Mr. Moloney about these e-mails you were receiving from
22  Yuriy that the receipt of the $500,000 was -- was
23  required before they would fix the ship?
24      A.  No, I -- no, I do not.

Page 169

1    Q.  You also testified that "Johan," who was the
2  ship broker --
3       .    That's Johan Schild?
4    A.   Yes.
5    Q.  -- told you that the profit to Milestone, as
6  a result of a substitute fixture, was greater than the
7  profit they would have made on the iron ore.  Was that
8  a conversation that you had with Mr. Johan Schild
9  through e-mail?
10   A.   No.  By phone.
11   Q.  Did Johan ever provide you with the
12  documentation to support that statement?
13   A.   No.
14   Q.  Do you know where Mr. Johan Schild ever got
15  the information that led him to believe that they had a
16  substitute fixture that resulted in a greater profit?
17   A.   He organized it.
18   Q.  He organized what?
19   A.   The subsequent fixture.
20   Q.  Do you know when that subsequent fixture took
21  place?
22   A.   Late December.
23   Q.  Late December of 2010?
24   A.   Yes.

Page 170

1    Q.  But you don't have any e-mails or written
2  communications about that?
3    A.   No.
4    Q.  Now, you also testified about AES's contracts
5  and negotiations of anything -- or their involvement in
6  the Charter Party contract we have been discussing
7  today and the sales contract.  Have you ever worked for
8  AES?
9    A.   No.
10   Q.  Have you ever been an officer or director of
11  AES?
12   A.   No.
13   Q.  And you have never been an officer or
14  director of Estech Trading?
15   A.   Correct.
16   Q.  Do you know whether or not you were involved
17  in all of the communications between AES and Estech
18  Trading regarding the matter that we have been
19  discussing today?
20   A.   I'm sorry.  Your question is ...?
21       (Question read.)
22   A.   I was not.
23   Q.  With respect to the Letter of Credit that we
24  were discussing earlier this morning, Mr. Winton had

Page 171

1  asked you some follow-up questions.
2       This (indicating) is Exhibits 8 and 9 that
3  were marked at Mr. Wolfson's deposition, if you just
4  want a quick reference.
5       You indicated that this was -- the purpose of
6  this particular Letter of Credit was to assign part of
7  it to the shipping company as security for the
8  shipment.  Do you recall that?
9    A.   Yes.
10   Q.  But you had also stated that you do not know
11  if this was ever done?
12   A.   Correct.
13   Q.  Okay.
14       This afternoon, you indicated that you
15  recalled that the full Letter of Credit was actually
16  issued for the full amount of freight under the Charter
17  Party.  Do you recall that?
18   A.   Yes, I remember that the Letter of Credit was
19  roughly in excess of $9,000,000, and roughly 6,000,000
20  was for the miner and two-and-a-half million was for
21  the shipping company.
22   Q.  Okay.  So, now, is it your understanding now
23  that the Letter of Credit was actually finalized and
24  fully funded?

Page 172

1    A.   No.  No, I don't know if it was or not.
2       MS. OROZCO:  I believe I have no more
3  questions, Mr. Slane.
4       THE WITNESS:  Okay.
5       MS. OROZCO:  Thank you so very much for your
6  time.
7       THE WITNESS:  Okay.  Sure.
8       MS. OROZCO:  You have been incredibly
9  patient.
10       (Discussion off the record.)
11       THE WITNESS:  I'll waive.
12       (Signature waived.)
13            - - -
14       Thereupon, at 2:03 p.m., on Tuesday, June 21,
15  2011, the deposition was concluded.
16            - - -
17
18
19
20
21
22
23
24

## Page 173

```
 1                  CERTIFICATE
 2    STATE OF OHIO      :
                            SS:
 3    .COUNTY OF FRANKLIN  :
 4           I, Sylvia A. Fraley, a Registered Diplomate
      Reporter and Certified Realtime Reporter and Notary
 5    Public in and for the State of Ohio, duly commissioned
      and qualified, do hereby certify that the within-named
 6    DAN SLANE was by me first duly sworn to testify to the
      truth, the whole truth, and nothing but the truth in
 7    the cause aforesaid; that the deposition then given by
      him was by me reduced to stenotype in the presence of
 8    said witness; that the foregoing is a true and correct
      transcript of the deposition so given by him; that the
 9    deposition was taken at the time and place in the
      caption specified and was completed without
10    adjournment; and that I am in no way related to or
      employed by any attorney or party hereto or financially
11    interested in the action; and I am not, nor is the
      court reporting firm with which I am affiliated, under
12    a contract as defined in Civil Rule 28(D).
13           IN WITNESS WHEREOF, I have hereunto set my
      hand and affixed my seal of office at Columbus, Ohio on
14    this 29th day of June, 2011.
15
16           _____
             SYLVIA A. FRALEY, RDR, CRR
17           NOTARY PUBLIC - STATE OF OHIO
18    My Commission Expires:  May 4, 2013.
19                     - - -
20
21
22
23
24
```

**A**

**abbreviations** 142:23 144:11
**ability** 97:19
**able** 115:15 129:16 143:2 152:24
**accept** 102:10
**acceptable** 74:22
**access** 100:24 107:11
**accommodate** 11:4
**account** 33:10 41:6,16,20 62:18
    64:20,24 65:1,2,6,8 73:17,18
    86:21 128:16 131:7 133:24
    136:15 140:15 147:15 157:18
    164:9,17,18,24 167:9
**accounts** 164:19
**accurate** 117:4
**acknowledge** 77:9
**acknowledged** 121:2
**acquire** 34:12,20
**act** 17:14 133:21
**acted** 122:6 156:5 157:3
**acting** 136:12
**action** 4:5 5:19 9:4 95:17 173:11
**active** 16:18,20
**activities** 103:3
**actual** 29:7 51:7
**ad** 89:18 158:12
**add** 145:4
**added** 145:7
**adding** 144:10
**addition** 14:24
**additional** 16:14 17:3 79:24 80:8
    80:13 82:3 84:3 105:11
**address** 10:1 26:21 38:10 59:22
    61:17
**adjournment** 173:10
**Administration** 98:12
**administrative** 77:6
**Advance** 102:6,7
**advanced** 98:13
**advertise** 88:17,19,21 89:22
**advertised** 89:24
**advertisement** 89:9
**ADVERTISERS** 5:10 88:1
**advertising** 26:1 158:6
**advised** 13:2 53:9
**AES** 69:21 70:11 72:19,21 73:1,8
    74:2,4,5 75:4,5,12,12,15,24 76:15
    76:19 77:3,8,12 80:3 82:6 85:7,19
    92:9 108:9 118:4,10 119:10,11,15
    119:19,23 120:3,10,17,23 121:10
    121:20,22 122:1,5,6 142:13 143:7
    147:8,19,21 151:15,22 153:19,21
    155:3,7 164:24 165:3,12 166:2,4
    166:8,14,16,18,21 170:8,11,17
**AES's** 120:13 121:17 122:9 165:20
    170:4
**AES-0033** 4:21 69:6

**AES-0035** 5:2 70:17 76:12
**AES-0036** 79:22
**AES-0038** 4:24 70:3
**AES-0040** 5:8 85:24
**AES-0064** 5:13 92:13
**AES-0066** 93:2
**AES-0071** 5:6 71:3
**affect** 118:9
**affiliate** 115:6
**affiliated** 29:21 30:1 84:17,19,22
    173:11
**affiliates** 18:24 22:6,7 77:15
**affiliate-entity** 83:1
**Affirmative** 73:19 81:24
**affixed** 173:13
**AfinaPallada** 141:19 163:5
**aforesaid** 173:7
**afternoon** 128:7 133:11 139:21
    140:1 146:24 165:20 166:20
    167:16 171:14
**Agency** 99:21 149:14 152:23
**agent** 87:3 133:21 155:19 156:1,5
    157:1,3,12 164:15
**agents** 100:7 144:21 145:11
**ago** 13:1 16:22 56:10 94:12
**agree** 118:22
**agreed** 59:14 76:19 81:16 133:24
    140:9 149:19,22
**agreeing** 77:9
**agreement** 4:9 7:1 40:13 42:8 47:4
    47:8,12 59:14 62:19 65:13,17
    68:11 75:23 76:2 80:4,19,24 81:5
    81:20 82:8 114:18,20 128:12
    130:19,22 131:6 133:7,15 134:3
    137:21 140:14 142:19 143:6,17
    143:21 144:7 146:24 147:2 148:8
    157:14 161:15,19 162:1,15,18
    163:6,9,12 164:5,23 166:7,14
    167:18
**ahead** 112:13 113:2
**Alabama** 35:23 36:1
**alias** 155:18,23 156:2
**allegation** 155:12 156:19
**allege** 156:14 157:5
**alleges** 155:17 156:8 157:1,21
    158:15 159:2,17
**allow** 88:20
**allowed** 88:19 90:2
**allowing** 144:24
**Amended** 5:23 113:6 161:17
**American** 1:8 2:11 47:22,23 48:3,7
    48:12 49:2 67:16 74:3,13,17 79:9
    79:18 84:19 85:1 86:8,23 88:24
    89:7,12 90:5 91:8 94:1 134:12
    140:24 155:19,22 156:5,8,11,14
    156:20,22 157:1,3,7,10,13,13,18
    157:22 158:2,15,19 159:4,10,14

    159:18 160:2,7,11,12,22
**amount** 23:14,14 33:5 73:4 133:24
    151:19 157:15 171:16
**Amspoker** 58:22
**Amsterdam** 98:18 99:7,8
**and/or** 114:12
**answer** 13:2 80:10
**answered** 11:2 119:6
**answers** 10:18,21
**anybody** 12:23 42:7 86:23 165:16
**anymore** 14:21 55:23
**apart** 13:22,24 34:11 60:8
**apologize** 25:2 117:24
**apparently** 59:18 126:18 128:4
    133:9 142:6 149:22 150:16 151:4
**Appeals** 104:1,6
**APPEARANCES** 2:2
**appears** 50:22 54:23 89:20 129:12
    142:2 154:17
**applicable** 1:14 8:8
**appointed** 103:10 105:15 106:8,16
**appointment** 103:16,24
**appointments** 103:7 104:3 106:7
    107:16
**approached** 48:15 163:15
**approval** 146:24
**approved** 143:8
**Approximately** 33:17
**area** 17:10 41:24
**arisen** 58:3
**arranged** 34:9
**arrangement** 77:18,20
**arrangements** 52:12 76:17,22
    110:18,22 118:9 132:8 152:1
**arranging** 60:19
**arrive** 110:6
**arrows** 149:8 150:12
**aside** 58:24
**asked** 25:2 30:12 32:2,18,20,20,21
    32:22 34:12,16,16,18 41:22 47:15
    52:16 88:20 91:5 111:6 134:19
    171:1
**asking** 94:6,22 133:22 138:16
    161:14
**asks** 128:14
**aspects** 103:1
**assign** 46:18 171:6
**assigned** 125:22
**Assignee** 45:12
**assigning** 45:4 46:24
**assignment** 121:5,9 125:15 126:2
    129:20 151:2,5,15,20,20 152:2
    165:4,8
**assist** 47:10
**assistance** 90:21
**Assistant** 102:4
**assisting** 52:20

associated 41:13
Association 5:9 87:24 88:8
assume 11:1 68:2 83:18 98:21
    106:18 135:13 156:1
assuming 127:6
attached 42:20 43:15 110:8 113:14
    125:14
attachment 42:18 64:1 138:8
ATTACHMENTS 5:13,21 92:13
    111:24
attained 107:13
attempting 47:11
attention 37:23 44:21 92:21 123:24
    126:14 129:2 130:6 133:1 141:16
    149:7 150:10
attorney 9:19 46:4 159:23 173:10
attorneys 65:3
Authority 103:11,17
authorize 55:3
authorized 16:14 17:3 121:21
    122:1 165:15
available 98:2 122:23 145:16
    148:12
await 138:14 145:17
aware 56:14 73:1 86:6,11 108:9
    115:7 118:12 121:20,24 122:4
    155:21 156:4,10,16,21 157:2,8,17
    158:1,6 159:7,9,13 160:2,6 165:6
a.m 1:21 8:2 149:10

**B**

back 31:16 32:5,11 42:10 59:9
    62:20 67:21 68:4,7,9 71:12,22
    75:24 76:7 83:21 91:2 102:15
    114:18 117:7 122:15 123:10
    138:12 151:6 160:12 161:5
backed 147:14 167:24
background 98:1
backing 168:6
baffled 110:3
Baker 1:18 2:8
bank 33:8,10 67:23 74:6 117:2
    135:12 136:1,4,6,10,12,12,15,16
    136:17,20,22 137:1,3 165:15,15
bankers 116:17
banking 136:7
banks 14:1 27:11 115:21 116:17,24
    136:23
Bank's 136:8
BARBARA 149:18
based 11:2 127:19 131:17 152:8
    164:21 165:24 166:23
basically 63:14 66:13 116:14 142:4
    146:17,19
basis 27:9 52:8 101:1,7 148:9
Bates 38:1
BATES-STAMPED 4:9,13,15,18

4:21,24 5:2,6,8,10,13,21 6:2,6,9
    6:11,14,17,20,23 7:4,7,10,14
    40:14 50:7 57:5,18 69:6 70:3,16
    71:3 85:23 88:2 92:13 111:24
    123:20 124:20 126:8 128:21
    130:1 132:20 139:1 141:11 146:2
    148:24 150:4 154:7
Bear 116:5
beginning 4:11,17 5:9 6:4,11 41:24
    50:4 57:16 87:23 96:2 124:17
    128:19 150:12
begins 141:17
behalf 2:7,11 75:6 118:23 121:22
    122:2 134:22 157:15,18
believe 36:24 49:10 108:19 114:2
    117:10 144:23 146:7 164:16
    169:15 172:2
best 97:17,19
Beyond 28:9
Big 116:5
Bill 84:14
Bills 135:22
bit 42:10 94:8 98:1 112:9
biz 131:2
board 104:1,5,12,15,20,22,23
    105:2,3,6,9,18,19
boards 105:11,13,14,15,16,17,22
body 72:18
Boehner 106:17,19
bond 30:15 32:12,18,19 33:6 39:17
    44:16 67:18,20 72:12,16,22 73:2
    73:5,10,16 75:8 76:14 77:24
    79:14 90:12 91:3,9,10 108:23
    109:23 110:1,2,4 123:7,12
bookkeeper 14:12 26:4,10
born 98:5
bottom 51:6 52:24 89:11 96:4
    126:15 129:2 130:7 131:24 133:1
    134:18 135:1,2,9,10 141:17
    154:14 163:3
breach 152:18
break 11:3 27:24 70:20 92:6 119:2
    161:2
brief 62:13
briefings 107:12
Briefly 17:15
bring 12:14
Broad 22:14
broker 35:20 51:20 52:3 53:4 169:2
brother 15:23 25:5,22 27:1,12
    31:23 32:9 77:22 78:5,16,20 79:7
    79:13 82:15 83:5
brother's 25:10
brought 16:13 122:5 142:20
build 22:13
building 22:13 103:17 104:1,6
built 116:2,4

bulletin 5:10 88:1,8,10,17 89:13,17
business 20:20 21:8,11 23:23 25:19
    31:4,11 48:9 51:10 90:4,8 98:12
    103:2 122:5,7 127:20 131:4
    135:17 153:19 157:6,9 159:4,10
    159:14
businessman 159:23
busy 111:7
buy 20:9
buyer 72:7,21,23 73:2,8 74:7,10
    75:6 80:1,17 110:3 120:4 121:6
    135:24
buyers 80:1,9,13
buying 109:19
B-O-E-H-N-E-R 106:21

**C**

C 2:4,8
calculated 152:8
call 19:12 65:10 96:23 111:3
    123:24 126:14 130:6 141:16
    150:10 161:9
called 1:13 8:7 13:2 19:20 22:14
    27:17 48:2 96:23 132:1 141:19
calling 63:9 87:12
Canal 29:11,15
canceled 58:4
cancellation 57:10
Cancer 105:10 106:1
Candice 26:11
capacity 64:4 102:5 159:15
capital 30:4,7 108:9
capitalization 108:12
caps 139:13
caption 173:9
Care 95:23
cared 107:14
cargo 53:10,13 111:1 135:21 152:9
carry 90:22
case 1:6,7 90:11 97:14,21 100:6,13
    109:4,15 144:6 156:1 168:2
cash 33:10
category 100:23
cause 173:7
causes 112:8
causing 122:22
cc 61:17
centers 116:4
Central 99:21
CEO 14:5 17:8,14 18:18 19:4
certain 120:17 123:1 147:10
certainly 159:24
CERTIFICATE 173:1
certified 1:16 9:14 173:4
certify 173:5
cetera 16:15 35:11 51:14
CFO 14:12 26:4,6

Chaika 149:14 152:23
Chaika-Agency 4:12,15 6:5,8,16 6:22 7:4,10 50:6 51:11 57:4 124:19 126:7 132:18 141:9 146:1 150:3,14
chain 51:7 52:24 54:3 116:6
chair 105:3,17
chaired 104:23
Chairman 105:1,2
chance 11:20 71:23
change 59:14 78:10 114:19,20
changed 99:3
changes 143:6,11,17 147:1 162:18 162:20,23 167:10
character 8:12
charge 17:20
Charles 15:23 16:1 25:5,6,16 27:1 82:16,17
charter 5:20,20 40:5 41:5,7 49:16 52:8 53:10 57:10 58:3 90:22 111:22,22 112:19,20 113:14 117:14 119:7,12 123:9 131:12,21 132:8,9,11 140:19,20 149:6,22 152:19 153:1,5 159:18 160:3 167:17 168:17 170:6 171:16
Charterer 128:15
Chartering 51:11 52:23 150:14
CHARTERING/CHARTERING 4:12 50:5
check 74:1
checks 73:23
China 33:10 39:10 41:14 55:6 72:7 80:1,9,14,17 90:23 96:14 106:8 106:22 109:3,5,9,16 123:8,11 124:11 136:1
Chinese 30:15,17,19 31:3 32:13 33:1,9,10,19 43:23 44:9 46:18 67:23 68:2 74:6,7,10 90:14 91:10 109:10 121:6 136:6,10,12,16
CIA 99:24 100:2,11 101:1,9,14,22 107:11
CIF 34:10
circulated 82:9
circumstance 122:4 155:21 156:4 156:16 157:2,8 158:1 159:7,9,13
City 116:9
Civil 1:14 4:5 5:19 8:8 9:4 95:17 173:12
claim 153:6
claimed 41:12,12
clarification 167:15
clarify 145:8
clarifying 155:7
classify 22:6
Claurisse 2:4 9:19 27:21 31:16 44:13 50:11
clean 53:11 117:10,12,19 149:18

clearance 100:17,22,24 107:3,6,8
clearances 100:13
clearly 132:15
coal 77:16 82:20,24 83:8,10 153:12
coast 35:24
collapsed 33:20,21
collateral 46:22 48:20 49:1 120:21 164:24 165:2,12
collecting 100:8
collectively 77:16
college 98:7
Columbus 1:19 10:3 13:18 14:15 15:10 26:3 48:8 102:15,18 116:6 127:20 128:1 129:10 133:12 134:15 139:21 146:19 149:11 173:13
come 30:9 33:13,14 34:4 37:4 60:6 75:4 78:8,23 84:13 108:20 131:11 140:4 152:16 161:24
coming 124:4 127:6 133:9
comma 15:15
commencing 1:20
comment 140:18 145:4
comments 67:2 138:14,16,19 144:24
Commission 106:9,23 173:18
commissioned 173:5
Commodities 28:22
commodity 28:24 137:4
common 156:9,10 158:16,20
communicate 37:1 60:22
communicated 36:4,22 49:9 52:1 87:2,6
communication 37:5,7 46:6,11 92:23 93:3 168:5
communications 48:24 50:1,23 51:1 61:2,12 77:11 85:17 86:23 87:11,17 122:15 168:13,14 170:2 170:17
companies 14:18,23 21:19,22 22:1 22:18 23:1,7 55:3,3,11,14,17,20 56:9,12
company 13:12,13,14,21 14:3,7,9 14:18,24 15:1,5,11 17:1 19:14,15 19:20 21:9,10,17,18,21,24 22:6 22:10,14,21 23:4 25:19 26:1,15 26:21 27:2 28:3,6 29:24 30:1,3,13 30:16,18,20 31:3,22 32:3,6,13,17 32:21 33:2,9,14,19 34:10,17,22 36:3,7,23 39:16,21,22 40:2 41:10 41:12 42:3 43:23 44:9 46:5,19 47:1,20,21 48:2 49:20 51:24 52:18,19 54:11 55:18,21 60:9 63:7 64:19,23 65:5 68:3,17 74:14 74:15 75:3 81:3 82:12,23 83:2,4 84:22 86:7 87:7 88:15 90:4,7,14 90:15,16,17,18 94:19 95:23

102:21,23 115:2 118:18 167:8 171:7,21
Company's 20:1 103:1 115:18
Company-type 103:4
compensated 78:15 90:20
compensation 21:4 24:13 52:19
Complaint 5:23 113:6,14 155:13 155:14 157:14 161:17
completed 83:7 173:9
completing 148:7
completion 133:22
compliance 80:20
complied 136:18
comply 42:7
computer 43:6
concept 20:15 110:5
conceptual 27:24
concerned 145:6
concluded 35:1,5 36:19 49:17 172:15
conditions 74:22 120:18 142:15 147:10
conducted 159:10,14
conducting 127:20
conducts 159:4
confirm 53:13 149:18
confirmation 131:7 140:14
confirmed 135:12
confirming 77:12
conflict 147:12 148:4
confused 66:8 109:11
conjunction 75:9
connection 54:1,10 76:16,22
consequence 97:16
consider 23:6 47:16 48:19
consideration 72:19
consistent 143:7 148:17
consists 150:9
constantly 63:9
consumed 52:15
contact 36:12 49:5 51:13,14 157:22 163:16
contacted 157:6
CONTAINING 6:1,8,13,16,19,22 7:3,6,9,12 123:18 126:6 129:23 132:17 138:23 141:8 145:24 148:22 150:2 154:5
contemplated 31:3 81:19 82:6
content 61:8
contents 61:22 62:2,9,22 63:7 67:2 82:18 89:8,11
context 156:21 157:17 160:6
continue 19:17 101:4,8
continued 101:6
continuous 36:13
contract 5:2 23:17 32:14,16,17 34:11,24 36:11,14,20 39:4,12,15

39:19,23 40:5 41:7 45:19 49:16
55:5,15 57:11 58:4 70:16 72:5,10
72:13,15 73:6 76:18,20,23 77:4
77:22 78:1,2,3,4 79:5 80:16 90:22
91:14,16,21 92:1 119:16,20
131:22 152:3 170:6,7 173:12
**contracts** 35:11 80:1,3,7,9,13 81:1
81:21 82:3 111:10,10 119:8,11
121:21 122:1 160:23 170:4
**contract's** 77:10,17
**contribution** 108:9
**control** 24:4 160:23
**conversation** 94:18 97:6 153:15
168:10 169:8
**conversations** 46:17 52:10 62:14
63:13 168:8,20
**converting** 17:24 18:12 20:14
**Cool** 107:1
**copied** 125:6
**copy** 10:19 37:20 42:18 43:15
114:2 125:14 126:23
**copying** 126:21
**corner** 43:4
**corporation** 72:7 83:6
**correct** 13:8 20:15 21:6 22:2 23:22
23:22 39:13 44:7,10 47:8,9 48:5
49:17,18 56:20 66:18 71:19 78:7
85:3 95:2 96:15 97:3,5,8 105:21
105:23 109:14,17 117:21 118:19
119:1 120:13 122:14,21 123:13
130:24 132:12,13 134:1,9,20,21
134:24 135:19 138:17 140:16,21
140:22 142:17 143:18 146:8,16
147:4,10 148:5,15 149:19 151:17
158:13,14 160:18 161:19,20
163:16 170:15 171:12 173:8
**corrected** 48:5 59:14
**correctly** 79:4
**cost** 20:10,10
**costs** 41:13 55:4,15 124:10
**counsel** 8:5,16 67:8
**countersign** 133:22
**counting** 110:5
**COUNTY** 173:3
**couple** 145:7 162:3 167:11
**court** 1:1 10:16 86:7 95:9 106:15
111:18 173:11
**cover** 42:17,20 45:22 101:17
**co-owner** 13:21
**co-owners** 13:16 14:4
**cratered** 91:11
**created** 30:24 31:2 80:19
**Credit** 43:17,21,22,24 44:2,5,8,14
45:5 46:19,24 109:20 121:5,9
125:18 129:19 130:20 135:14,17
136:2,9,11,13,17 137:21,23 138:4
151:2,15,21 165:5,8 170:23 171:6

171:15,18,23
**cross-examination** 1:13 3:5,5 9:16
93:22
**cross-motions** 97:12
**CRR** 173:16
**CT** 2:5
**current** 10:1 20:21
**currently** 13:11 14:9 20:17 55:5
106:15
**Cush** 43:1
**Cush's** 43:6
**CVF** 1:6

### D

**daily** 27:9
**damages** 152:18
**Dan** 1:12 2:1 3:1,4 4:1 8:6,14,18
9:13,24 41:18 42:17 51:10,15
58:18,18 135:1,11 138:2 150:13
158:12 173:6
**Daniel** 4:5,7 9:5,9 23:19 53:3 77:11
139:13
**date** 123:1,8,11
**dated** 4:9,15,17 5:1,7,10,12,15,21
7:1 40:13 57:4,17 65:16 70:15
85:23 88:1 92:12 93:10 111:23
124:3 143:21
**day** 26:23 136:5 139:24 142:7
143:13,15 162:9,15 173:14
**days** 109:22 135:17 136:1,7
**day-to-day** 13:20
**deal** 33:20 35:10 76:6 91:11 153:16
160:24 165:15
**dealing** 14:1 52:15 110:13 111:8
116:19 153:24
**dealt** 166:17
**Dear** 139:13
**December** 36:17,21 41:23,24 42:23
45:22 46:8,8 48:17 65:16 84:4
114:14 118:4 123:2,3,4 130:10
133:10 134:9,11 139:20 146:15
146:18 149:9 150:14 152:23
169:22,23
**Defendant** 2:11 155:18
**DEFENDANTS** 1:9
**defined** 24:20 173:12
**definitions** 144:10
**defunct** 115:13
**degree** 98:11,16,17 99:10
**degrees** 98:13
**Deleted** 96:21
**deliver** 122:24 123:1
**delivered** 135:24 151:6
**delivery** 80:2 123:8,11
**demand** 166:22
**demanded** 68:7
**demands** 122:12 152:17

**Denise** 58:22 59:1
**depending** 23:15
**deposed** 10:6,8
**deposes** 9:15
**deposit** 75:2 166:5
**deposition** 1:12 2:1 3:1 4:1,5,7 8:6
8:10,15,16 9:4,9 11:11 12:8,21,24
13:7 37:12,24 42:12 58:9 59:5
61:7 63:22 68:23 72:11 97:9
136:19 171:13 172:15 173:7,8,9
**DESCRIPTION** 4:3
**designated** 105:18
**detail** 62:15 102:24
**details** 60:19 61:4 86:14
**determine** 20:11 97:20
**determined** 23:15
**developing** 13:23
**development** 13:14 17:20 102:21
103:10
**developments** 115:19 145:18
**devolved** 108:5
**diaper** 20:9,10
**diapers** 20:8,12,16,22
**difference** 82:14 128:1
**different** 16:5,6 82:11 95:1 164:19
**Dimitris** 53:24,24 54:6,19,20
**Diplomate** 1:16 173:4
**direct** 49:5 92:21 115:3 160:22
**directed** 95:22 111:6
**directing** 51:17
**directions** 149:9 150:13
**directly** 37:1 49:9 52:6 74:10
163:21,22,23
**director** 28:15 49:22 170:10,14
**directors** 18:22
**discuss** 58:2 60:6 62:6 65:12 67:9
163:11
**discussed** 56:18 62:9 102:24 121:4
**discusses** 78:19
**discussing** 57:9 72:11 170:6,19,24
**discussion** 11:13 13:9 37:18 108:7
109:12 113:1 114:5 117:10 118:6
124:9 132:4 137:16 138:21
145:15 151:18 172:10
**discussions** 60:17 81:7,10 91:7
**disposal** 20:9
**distributed** 88:12
**distribution** 24:14
**District** 1:1,2 9:21
**dock** 152:16
**docs** 135:18
**document** 4:4,6,8,19,22 5:4,9,17,20
5:23 6:13 7:1 9:2,8 12:2 24:18,23
37:11 38:13 40:8,12,20,23 41:2
42:19,22 44:4 45:1,3,4 54:14
56:21,24 57:24 58:8,13 59:4,6,8
61:6,18 63:21 64:8,14 68:22,24

69:3,11,20,24 70:9,24 71:10,16
71:23 72:1 85:5,9,19 86:4 87:23
92:19 93:15 95:13 111:16,21
112:5,10,12 113:5,18 114:1,2,7
114:13 118:8,14,22 129:23 137:6
142:24 143:20 144:9 146:8
166:10,14 168:10
**documentation** 142:16 143:9
145:19 153:4 169:12
**documents** 5:17 11:8,12,16,21
12:14,17 42:14 94:22 95:14 96:2
96:7,16 97:1 109:21 117:17 121:1
135:22 136:3,4 139:9 148:4
**doing** 20:6 30:13 47:16 48:19 78:14
**dollars** 140:7,10
**dormant** 17:1
**draft** 66:4 82:8 133:6,15 142:19
143:6 144:5,19 145:5 167:10
**drafted** 67:5,7 81:9 83:17 91:24
**drafting** 66:23 67:10 85:15
**drafts** 114:18
**draw** 37:23 44:21 132:24 149:7
**drug** 116:3
**dslane@theslanecompany.com**
38:22
**Duces** 94:18,21
**due** 152:3
**duly** 9:14 173:5,6
**Dura** 45:12
**duties** 29:7

---

**E**

**E** 2:14
**earlier** 36:2 37:12 47:6 72:11 73:14
132:5 144:23 149:5 170:24
**Early** 46:8
**easier** 74:11
**East** 1:19 22:14
**ECF** 1:7
**economic** 106:9,22 116:15
**effect** 8:17 76:4
**effective** 80:5
**effectively** 105:19 147:20
**eight** 103:21 115:23
**eighth** 96:3
**either** 32:8 71:18 81:13 115:21
144:13 156:17
**Elm** 29:11
**else's** 161:22
**embarrass** 100:11
**employ** 14:9 39:8
**employed** 13:11 35:16,19 100:2
101:8 173:10
**employees** 14:8 16:1,3,4 18:14
23:16 24:1 29:2
**employer** 99:20
**employers** 99:16

**en** 123:4,9
**Enclosed** 59:13
**energy** 1:8 2:12 15:1 47:22,23 48:3
48:7,12 49:2 55:3,11,13,17,20
56:9,12 67:16 74:3,13,17 79:9,18
84:19 85:1 86:9,23 88:24 89:7,12
90:5 91:8 94:1 108:2,5,19 115:3,6
134:12 140:24 155:19,22 156:5,9
156:11,14,20,22 157:1,3,7,10,13
157:13,18,22 158:2,15,20 159:4
159:10,14,18 160:2,7,12,22
**Energy's** 160:12
**engage** 18:5
**engaged** 103:3
**engineer** 17:22
**England** 16:3 46:5
**English** 128:11
**enrolled** 101:18
**enter** 79:24 80:4,8 121:21 122:1
131:22 140:20
**entered** 80:12 81:1 149:6 166:8
**entities** 14:20 21:15 115:16,17
116:4,8 159:24
**entitled** 4:4,6,8,19,22 5:4,17,20,23
7:1 9:2,8 24:15 40:12 69:3,24
70:24 95:13 111:21 113:5 143:20
**entity** 15:17,20 16:5 22:15,16 23:6
27:17 31:22 42:3 82:22 83:8
108:16,18 115:9 136:21 157:6
**Equipments** 72:6
**escapes** 26:11
**escrow** 4:9 7:1 40:13 41:6,16,19
42:8 47:4,8,12 59:14 62:19 65:12
65:17 87:3 114:18,19 128:11,16
130:18,22 131:6,7,11,20 133:7,15
133:21,24 134:3,6 137:20 138:15
138:17 140:11,14,15,20 142:19
143:6,17,21 144:6,21 145:11
146:24 147:1 148:8 157:14,18
161:15,19 162:1,15,18,24 163:5,9
163:12 164:4,15,17,22,24 167:18
168:16
**ESQUIRE** 2:4,8,14
**established** 82:23
**estate** 13:14,23 21:23 22:8 102:21
115:19 116:20
**Estech** 1:7 15:3,8,12,15,17,21,24
16:4,9,17,21 17:7,14 18:3,5,8,14
18:24 19:3,9,11,18,24 20:18,20
21:1,5,7,14 22:21 23:3,6,11,21
24:1,9 25:3,10,23 27:18 28:5,9,10
28:13,17,20 29:2,5,7,10,12,19,21
29:21 30:4,6,9,23 31:4,10,14,21
32:1,4,11,14 33:18 35:17 39:11
39:16 41:5,15 42:6 48:22 49:13
55:2,22 56:1,1,2 60:9 67:19 68:4
68:12,14,17,20 72:7,12,20,22

**73**:2,5,9,15 75:6,13 76:17,19,23
77:2,5,8,15 78:9,16 79:23 80:5,8
80:12,20 82:20 83:10 84:17 85:2
86:8 90:8,18 107:18,19 108:5,8
108:10,12,15,18,20 113:15 114:9
114:12 115:5,7,10 118:9 121:2,21
121:24 122:2,5,6,24 123:6 128:15
132:8 134:6 135:24,24 141:4
148:12 152:2,4 153:6 155:8,18,22
156:5,8,11,14,20,21 157:1,3,5,10
157:12,15,19,21 158:7,15,20
159:3,8,11,15,17 160:3,6 164:4
166:8,14 170:14,17
**Estech's** 157:23 158:2
**estimate** 115:16
**et** 16:15 35:11 51:14
**European** 127:11
**event** 23:17,23 110:1
**Eventually** 24:15
**exact** 45:12 139:10
**exactly** 16:15 136:24
**examination** 3:2 8:14 161:18
**example** 22:11 89:10
**exceeds** 20:10
**excess** 171:19
**exchange** 117:9 131:17
**executed** 4:20,23 5:5 62:19 69:5
70:2 71:2 114:13 118:14 136:17
**execution** 80:6
**exhibit** 4:3 9:5,10 12:1,7 37:12,21
37:24 38:4 39:5 40:6,9,15,19
42:16,20 44:21 45:10 47:4 49:24
50:8,11,12,13 51:5 52:24 53:22
56:22 57:6,13,20 58:9,17 59:5,11
61:7,14,23 63:22 64:1 65:13,16
65:20 66:11 68:23 69:7,22 70:4
70:12,18 71:4,7,12,16,18,22
75:13,16,17 76:12 79:21 81:9
82:18 83:21 85:6,20,24 87:21
88:4 92:8,15,22 93:2,6,11 95:10
95:18,22 111:17,19 112:2,6 113:7
113:10,11,11,21,24 114:1,1 118:3
123:21 124:2,22 125:1 126:10,14
126:16 128:22 129:1,13 130:3,6
132:21,24 134:17 135:3 137:6,11
139:3,6,7 141:12,16 143:23 144:3
146:4,7 149:1,4 150:6,9 154:8,11
154:14 161:16,16,17 162:24
**exhibits** 4:2 11:9,16 42:11,12
167:22 168:15 171:2
**exist** 22:18
**existed** 116:1 148:7
**existence** 31:18 55:23 83:10,15
**expect** 68:9 134:5
**expected** 81:4 131:11,14
**expecting** 131:19
**expenses** 77:7

expert 35:12 51:18
expertise 117:22
Expires 173:18
explain 143:3
explained 155:10
explore 97:24
export 135:23
expressly 8:15
extensive 137:2
extent 91:23
e-mail 4:11,16,17 6:1,2,4,5,7,8,10
  6:11,13,15,16,18,19,21,22 7:3,4,6
  7:7,9,10,12,13 36:13 38:5,8,10,21
  39:1 42:17 43:5,15 45:21 50:1,4
  50:22 51:1,7,15,17 52:22 54:3
  56:14 57:16,17 58:15,18 59:12,18
  59:21 60:12,23 61:9,16,19,22
  62:2,7,10,22 63:1,8 65:10 123:17
  123:19,24 124:3,17,19 125:2
  126:5,7 127:21 128:19,20 129:2,4
  129:13,24 130:7 132:17,19 133:1
  133:4 134:18 137:10,13,24
  138:12,23,24 139:10 141:8,10,18
  141:24 145:23 146:1,12 148:10
  148:12,21,23 149:7 150:1,3,11
  152:17,21,22 154:4,6,17 162:22
  163:3 168:5,14 169:9
e-mailed 163:6
e-mails 34:23 38:16 50:19 96:17
  109:22 117:7 125:3 126:13
  131:17 139:7 140:23 141:15
  146:10 149:5 150:10 151:6
  154:12 167:21 168:15,21 170:1
E-S-T-E-C-H 15:3

## F

facilitate 136:12
fact 48:21 148:4 152:2 153:21
  155:7 164:6
fair 23:20 25:22 79:17 118:10
fairly 117:4
fall 115:17
Falter 19:20 20:8,10,17,22 23:17
  23:24 24:3,5,10 25:19
familiar 38:5,16 42:19 43:17 62:3
  69:14,15 77:18 82:20 88:7 143:2
  156:2 159:20
family 14:11
family-owned 14:7
far 51:20 60:8
fault 112:7
favor 27:21 88:21 123:7
Federal 1:14 8:8
fell 13:22,24 34:11 110:24 111:1,2
  152:14
fiber 18:1,12 20:14
fifth 137:1

figure 106:19 151:9
files 96:11,12
final 66:10 132:7 133:14 156:19
finalized 171:23
finance 16:24
finances 33:14,15
financially 173:10
financing 72:20 116:24
find 80:12 96:24 132:5 163:2
finding 119:24 120:4 122:7
fine 118:16
finish 112:13
finished 76:13
firm 173:11
first 9:14 11:10 17:6 46:6,10 51:9
  59:11 61:14,15 72:4,23 76:12,14
  80:6 103:8 113:10 126:15 130:7
  130:21 133:3 141:17 150:11
  154:14 162:8 173:6
five 109:22 135:17 136:1,6
fix 117:18 131:2,21 132:8,11
  140:16,19 147:7,15 149:18
  152:24 168:3,23
fixed 123:9 131:12 132:5 167:18
  168:17
fixing 117:14 148:9
fixture 38:4 53:12 117:11,12 169:6
  169:16,19,20
Florida 116:9 153:10
focus 119:10 129:1 139:12
follow 55:1 94:2 111:7 138:8
  143:17
followed 76:19 80:11
following 95:7
follows 9:15
follow-up 171:1
force 8:17
Ford 102:2 103:9
foreclosed 115:22
foregoing 173:8
forfeited 123:12
forget 136:24
forgotten 116:14
form 22:14 29:19 30:12 32:2 66:10
formalities 148:8
format 127:11
formed 23:13,18 28:4 31:21,22
  32:6,8 83:8 108:16 115:9,12
  159:24
former 156:1
forming 28:9
forth 103:2 114:19 117:8 122:16
  151:7
fortune 116:20
forward 136:1,6
forwarded 54:24
forwarding 152:22

FOUR-PAGE 4:6 5:9,20 7:1 9:8
  87:23 111:21 143:20
Fraley 1:15 173:4,16
FRANKLIN 173:3
frantic 11:3
freight 152:3 171:16
friend 47:15 84:16
fro 55:5
front 111:17
full 51:9 55:4,14 77:2,5 152:2
  171:15,16
fully 171:24
fully-signed 114:3
full-time 26:16,17 101:3
fund 19:17 41:19 136:2,7
funded 19:24 44:5 109:21 157:13
  157:18 167:18 168:16 171:24
funding 19:13,23 20:1,18 73:15
  79:13 135:16
funds 19:18 47:7 67:20 68:5 73:24
  84:6 86:18,19,24 87:4,8,13,18
  122:12 136:16 148:12 164:3,3,8
  166:22
further 48:24 93:18 145:17,19
  161:6
future 25:19 82:4
FYG 54:24
F-A-L-T-E-R 19:22
F-O-L-L 55:1

## G

Gamble 24:8
garbage 17:24 18:2,12 20:14,16
Garth 37:24 42:12 58:14,18 59:13
  66:13 147:3
gas 5:9 47:20 48:11 87:24 88:7 89:4
gears 119:3
general 45:13 67:8 100:4
generally 118:12
generate 19:9
generates 21:4
Gerald 102:1
getting 99:17 101:2,9,19 124:10
give 10:11 22:11 23:16 97:17
  115:15 138:19 143:11
given 173:7,8
gives 107:11
giving 72:12
glad 140:4
go 12:2,7 27:23 31:16 42:10 71:12
  71:22 74:9 76:1 78:11 83:21 99:9
  99:10,13,14 102:10 112:13,23
  113:2 118:1 119:3 131:20 136:4
  136:16 137:18 149:13 163:17
goes 76:14 77:8 132:4 140:13
  156:13 157:5
going 10:11,17,17,18 32:14 37:11

37:13,23 38:3 40:8,20 42:10
45:17 49:24 51:5 54:7,15 56:19
56:21,23 57:13 58:8 59:4 61:6
63:21 65:24 68:22 69:20 74:19,21
74:23 78:15 85:5,19,20 92:18
93:6 97:9,11,13,19 99:17 100:11
101:6 106:18 110:7 114:18
116:23 117:7 118:13 125:2,3,6
126:22 131:18,20,21 133:16
136:16 140:19,24 141:6 144:20
146:13 147:7,9 149:8 163:17
**good** 9:18 123:14
**gotten** 130:12
**government** 109:10
**Governor** 103:11
**gradations** 100:19
**graduate** 98:7
**grain** 153:9,11
**great** 110:6 122:19
**greater** 169:6,16
**group** 72:6 77:16 80:4 81:19 82:6
82:11 125:16 141:15
**Groupo** 45:13
**Group's** 80:23 81:4,4
**guarantee** 40:1 55:4 56:16
**guaranteed** 55:14
**gubernatorial** 104:2
**guess** 79:15 126:15
**Gulfport** 35:24

### H

**half** 61:15 154:14
**hand** 147:20 173:13
**handed** 144:2
**Handing** 112:18
**handling** 136:9 137:3
**happened** 19:16 111:3
**happens** 97:13,20
**happy** 11:4
**hard** 95:6 138:8
**head** 73:19 81:24
**headquartered** 116:6
**hear** 31:6 147:3
**heard** 27:17 28:3 48:2 136:20
**help** 30:14 34:12 52:16 74:19 78:12
79:3 163:2
**helping** 34:20 45:18 51:19
**hereinafter** 9:14
**hereto** 173:10
**hereunto** 173:13
**high** 18:2
**Hipolito** 45:13
**hired** 17:2,9,13 24:1
**hiring** 17:11
**hit** 27:24
**Hlavin** 84:14
**hold** 14:2 100:23 104:21 107:5

**honest** 97:18
**honestly** 13:3
**hospital** 105:2,2,7,9,10,16,24 106:1
**Hostetler** 1:18 2:8
**hour** 130:23 147:2
**hours** 150:19 162:3
**House** 102:1,3,12 103:9
**Houston** 2:10
**hundreds** 116:11

### I

**idea** 30:9
**identified** 80:3
**Igor** 152:22
**immediately** 99:9,14 145:16 149:7
**important** 97:17
**includes** 61:17
**including** 72:20 77:15
**income** 19:9
**inconvenience** 110:7
**incorporated** 21:7
**incredibly** 172:8
**independent** 35:19
**INDEX** 3:2 4:2
**indicate** 125:21 155:2
**indicated** 45:22 94:3,12 97:18
115:1 120:16 127:3 136:19
144:23 151:14 161:18 171:5,14
**indicates** 124:3 168:6
**indicating** 43:9 54:6 133:16 143:16
152:23 153:4 171:2
**individual** 22:9 31:13 36:4 51:24
134:19
**individually** 158:12
**individuals** 82:15
**industry** 110:11,12
**information** 5:18 95:15 101:1
169:15
**info@marinebux** 53:1
**initial** 36:12 145:5
**injecting** 18:1
**input** 24:2 47:3 66:23 86:22 167:5
**inquiries** 53:18
**insertions** 144:10
**INSPECTION** 5:18 95:16
**instructions** 132:7
**intelligence** 99:21 100:8
**intended** 119:9
**intends** 91:1
**intent** 122:9
**intention** 79:22
**interact** 34:23
**interest** 16:11,12,14 17:3 23:10,11
23:14,21,22 24:21 25:3,23 39:18
39:22
**interested** 148:6 173:11
**interests** 118:18,24 124:9

**international** 98:17 99:7 137:2
**introduced** 17:17
**investment** 30:4 84:3,5
**investments** 48:11
**investor** 25:11 153:19,22 155:3,10
**investors** 82:7 121:16
**invitations** 102:9
**involve** 37:5
**involved** 14:23 18:11 27:2 31:14
32:14 50:24 75:4,5 91:20 111:10
165:11 170:16
**involvement** 14:17 15:8 16:8 22:20
36:12,14 39:18,22 56:8,11 82:17
85:15 90:18 91:14 110:21 170:5
**involves** 100:7 158:7
**involving** 20:21 86:7
**iron** 30:16,19 31:2 32:12,17 33:18
34:3,7 45:15,17 53:10 55:6 80:2
84:9 90:23 96:13 109:19 110:8
119:9,17,20,24 122:24 123:1,10
152:10 153:8 160:8,9,24 169:7
**issue** 64:18 86:16 135:22 145:8
**issued** 33:8 40:1 109:21 125:15
136:3,11 151:1 171:16
**issues** 51:13 52:20 58:3 61:3 62:6
154:1
**Italian** 19:19
**Italy** 20:8,9

### J

**Jacobs** 47:18,19 48:15,21 49:1,5,12
59:3 67:8 74:2 81:7,13 88:23,24
91:8 134:12 139:24 142:10
144:18 162:12 163:16,18,20
166:19
**JACOBS/MICHALEK** 5:1,12
70:14 92:11
**Jaime** 45:12
**James** 2:8 105:2,9,10 106:1
**Jan** 17:5 23:15 28:7,17 30:11 31:13
32:2,16 34:9 38:20 51:11,19 52:5
55:8 59:15 77:21 78:9,17 79:5,23
82:2 84:4 92:1 107:23 111:3
125:4 136:15 162:2 165:14,16,17
165:17 166:16,17
**Jan's** 34:10 161:23
**JD** 98:19 99:1,2,13,17
**Jerry** 47:18 59:2 67:8 73:23 74:2
78:11,14,22,24 79:2 86:12 88:20
88:22 163:18 166:19
**Jerry's** 59:1 84:16
**Jersey** 115:20
**Jim** 13:1,4 93:24
**JKM** 55:7 80:3
**jkm@estechusallc** 38:19
**job** 35:10 100:4
**jobs** 21:2

**Johan** 35:6,7,16 37:2,5,8 51:12,16
51:18 52:3,6 53:3,4,20,21 111:6
153:7 169:1,3,8,11,14
**Johan's** 35:10
**John** 106:17
**Johnstown** 10:3 13:18 26:21 27:5,7
**joined** 160:3
**joint** 21:14 159:18,20 160:3,7
**joint-venture** 21:15,18
**journal** 158:5,8,23
**journals** 89:23 157:23 158:16
**Judge** 97:10,11,11 98:1
**jump** 117:24
**June** 1:20 8:1 172:14 173:14
**Juri** 146:22
**jurisdictions** 21:12
**J-A-N** 17:5
**J-O-H-A-N** 35:7

**K**

**Keane** 59:9 62:18 65:4,16 67:15
76:16 87:3 133:19 144:14,21
145:1 147:4 148:11 164:10,13,15
164:18 167:1,2,3
**Keane's** 147:19
**keep** 110:2
**Kentucky** 82:24
**kept** 78:17
**kind** 38:2 48:9 117:24 140:8
**kindly** 53:9,13 131:1 139:14 140:13
**knew** 152:15
**know** 10:24 11:4 17:13,16 20:17,24
21:11 22:17 24:5 28:20 29:4,14
29:17,18 30:4 31:5,7,10,18 32:4,6
33:21 34:1,2,3 35:3,4,21 36:6,22
38:18 39:7,14 40:4 41:11,15 42:6
43:2,7,13,20 46:1,23 47:6 48:12
48:21 49:8,11,15 50:18 53:24
55:9,13 58:22 59:17,19,20,24
60:4,11 62:13 63:18 64:7 65:2
67:5,7,14 68:1 73:4 74:24 75:15
75:18 76:20 80:10,23 81:3,18,23
82:1 83:13,17,24 84:11 85:11
86:14,19 89:15,20 95:8 107:19
108:12 111:2,5,6 115:23 121:8,12
131:13 136:21,22 140:6 145:1
153:24 162:20 163:23 164:2,6,12
164:12,17 165:7 166:7,17 167:12
169:14,20 170:16 171:10 172:1
**knowing** 148:7
**knowledge** 29:3,9 31:15 56:13
83:12 115:4 165:10
**KOK/SLANE** 6:11 128:20
**K-Mart** 116:5

**L**

**labeled** 96:4 113:11,24

**Lading** 135:22
**laid** 167:21
**language** 129:18 154:1
**large** 116:5
**largely** 111:13
**larger** 153:8
**lasted** 97:6
**late** 84:4 139:24 143:16 169:22,23
**Law** 2:4 9:19 98:16,17 99:6,7,10,12
99:14,18 101:2,9,11,16,19
lawoffices@mahoneykeane.com
59:13
**lawsuit** 110:19
**lawyer** 13:6 102:16,17 138:19
**lawyers** 27:11 107:15 116:16
**Laycan** 59:15 114:20,22
**LC** 42:18 43:15 125:14
**lead** 110:18
**Leader** 106:17
**leases** 88:19 89:3,3,4
**leave** 101:22 123:2
**leaves** 126:2
**led** 41:11 169:15
**left** 43:4 51:6 115:23 147:3
**legal** 30:14
**legitimate** 136:21
**lend** 41:19 42:1,3 68:14,17 166:5
**lender** 121:18 153:23 165:21
**lent** 91:2
**letter** 5:1,7,12,15 43:17,20,22,23
44:2,5,8,13 45:5,23 46:18,24
65:15,20 66:14,24 67:3,10 70:15
72:18,19 75:17 76:21 77:1 81:8
81:14,18 82:18 83:14,17 85:22
92:11 93:10 109:20 118:4 121:5,9
125:18 129:19 130:20 135:13,17
136:2,9,11,13,17 137:21,22 138:4
144:20 145:5,9,11 151:2,15,20
165:4,8 166:24 167:6,11 170:23
171:6,15,18,23
**letterhead** 66:21 118:5
**Let's** 103:8 113:2 119:3
**level** 100:16,22
**Liability** 21:9,10
**liaison** 105:19
**licensee** 108:21,22
**Limited** 21:9,10
**line** 61:17 65:18 72:4
**lines** 38:16
**list** 96:2
**listed** 89:7,9
**listened** 122:16
**lists** 89:12 115:6
**litigation** 86:6,15,22
**little** 25:18 42:10 94:8 98:1 138:8
**LLB** 98:21
**LLC** 1:7 5:15 15:3,9,13,15,17 16:4

16:9,18 17:7 18:3,5,14 19:1 22:9
22:14 23:11 24:10 27:18 28:5
31:21 55:2 56:2 68:20 72:8 77:16
82:20 83:10 93:10 107:18,18
108:2,13 115:7
**LLC's** 115:6
**load** 123:10 124:11 152:9 153:9
**loaded** 53:10 152:9
**loading** 135:21
**loan** 68:11 72:20,24 76:14,19
142:13 145:18 151:16 152:1
157:16 160:12,18 166:7,14,14
**loaned** 151:21
**loans** 77:2,5
**located** 13:17 14:14 35:21 80:1,13
109:8,9 151:12
**locating** 120:11
**logical** 113:17
**London** 134:23
**long** 15:5 99:22 100:2 101:11,13
102:12,17 103:12,20 104:5,15
147:14,18
**longer** 83:15
**look** 37:16 38:16 40:19 42:13 43:17
44:12 69:15 113:10,21,24 114:9
125:2 134:17 154:24 159:1
**looked** 11:22 40:6 117:17 122:15
129:13
**looking** 44:22 50:14 66:11 71:6
112:13 124:9 129:18 131:10
134:4 140:23
**looks** 38:5 43:5 126:22 139:9
**lose** 132:11
**lost** 31:19 111:4
**lot** 115:20 116:10,16
**lots** 159:24
**Louis** 136:4
**Louisiana** 2:9
**lumps** 53:11
**lunch** 119:3
**L/C** 138:2

**M**

**M** 23:19 42:17,22 43:15 45:21
**magazine** 88:11
**magazines** 89:23
**Mahoney** 50:14 59:9 62:18 65:3,15
67:15 76:16 87:2 133:17,19
144:14,21 145:1 147:4,19 148:11
164:10,12,14,18 167:1,2,3
**main** 51:13
**mainland** 109:5,9
**major** 136:23
**MAKER** 4:21,24 5:5 69:5 70:2
71:2
**making** 52:12 110:21 165:11
**managed** 140:4 156:20,22

**manager** 14:13,13 26:4,8 45:13
**managing** 100:7
**Manzanillo** 124:11
**Marcia** 26:9
**Marie** 43:1,6
**Marine** 51:10
**mark** 26:7 40:8 49:24 56:22 57:13
60:14 69:21 85:20 92:8 95:10
111:19 113:2 134:18 135:2,10,11
137:24 138:1 162:23 163:7
**marked** 9:5,10 11:9,16 37:12,15,24
38:2 40:15 42:11 45:10 50:8
56:22 57:6,19 58:9 59:5 61:7
63:22 65:13 68:23 69:7 70:4,17
71:4,13 75:13 79:21 81:9 82:18
85:6,24 88:4 89:10,16 92:14
93:11 95:17,21 112:2,7 113:7
123:21 124:2,21 125:1 126:9,13
128:22 130:3 132:21 137:6,10
139:2 141:12,15 143:22 144:2
146:3 149:1,4 150:5 154:8,11
161:16,17 162:24 168:15 171:3
**market** 116:20
**Martinez** 45:12,13 84:6 125:16
**Master** 99:6,14 101:2,9,11,16,19
**Master's** 98:17 99:17
**material** 135:23
**materializes** 23:17
**Materials** 42:19 72:6 119:21
125:15
**mathematician** 150:21
**matter** 9:20 94:1,17 97:10 170:18
**max** 125:16
**McCoy** 26:9
**mean** 11:22 20:7 24:21 27:7 31:19
35:14 44:15 46:23 78:2 89:15
**means** 117:18 127:21 131:3
**meant** 142:20 147:18
**meet** 123:7,11
**meeting** 142:13 144:18 162:11,17
**meltdown** 116:15,22
**member** 88:13,15,20 107:19,24
**members** 14:11 88:12 107:19
**mentioned** 116:13 124:8
**merely** 159:3
**message** 51:9,17 52:24 53:16,23
54:19,24 149:8 150:12 155:1
**met** 120:18 134:11 139:23 142:10
142:15 147:10
**metric** 152:9
**Mexican** 34:8 90:14 120:1
**Mexico** 34:5 41:14 45:8,14 84:7
90:23 96:14 123:3,4,10 124:11
125:23
**Michalek** 17:5,13 18:18 19:3 20:24
22:20 28:7,17 31:13 35:14,15
36:2,6,22 39:7 41:18 42:4 44:5

45:19 47:3,7,11 49:1,6,19 50:23
51:11 52:14,20 53:1 55:8,9 56:11
56:15 57:9 58:2 59:15,18,20 60:1
62:10 67:19 79:24 80:11 81:8,14
82:6 90:21 91:1 107:23 108:16
115:1 125:4 126:1,21,22,24
130:15 154:18 163:15,21 165:18
166:16,17 168:18
**Michalek's** 29:4 162:1
**MICHALEK/CHARTERING**
4:14 6:5 57:3 124:18
**middle** 58:17 124:1 135:5 137:13
139:11
**midnight** 142:3 150:16
**mid-point** 150:11
**Milestone** 8:4 4:15,18 5:11 6:2,6,9
6:12,14,17,20,23 7:5,8,11,14 9:20
40:9 50:15 51:6 52:23 53:23
56:23 57:5,14,19 86:8 87:6,20
88:3 89:11,16 113:15 121:2
123:20 124:1,21 126:2,9 127:5
128:21 130:2 131:10,19 132:20
134:22 139:2 141:11 145:1,17
146:3 147:6 148:17,24 150:5,15
151:21 152:4,18,24 153:7,19
154:7 155:18 156:24 159:2 163:4
169:5
**Milestone's** 147:22
**MILESTONE-000150** 5:22 112:1
**Milestone-0058** 50:2
**MILESTONE00000001** 4:10
40:14
**MILESTONE00000058** 4:13 50:7
**million** 140:7,10 171:20
**mind** 158:9
**mine** 47:15 82:24 83:9 95:4
**miner** 33:22,23 34:8 45:5,7,8,14
52:16 58:5 84:7 111:8 120:1
152:15 171:20
**Minerals** 108:24
**Minority** 106:17
**minute** 70:21
**minutes** 60:10 97:7 117:9 125:3
**misinterpretation** 145:7 167:15
**missing** 141:1
**misstates** 54:13
**mistake** 50:16 149:14
**mix** 20:16
**mixup** 151:5
**mnfchart@otenet.gr** 38:17
**Moloney** 2:14 61:16 62:12 63:17,19
65:17 66:13 67:6 83:19,20 120:24
134:12 139:24 142:10,18 143:5
144:10,19 145:4,10 151:18
162:12,18 163:11 166:19 168:18
168:21
**Moloney's** 62:17

**MOLONEY/WOLFSON** 5:7
85:22
**moment** 11:11 15:4 37:16 40:19
42:13 44:23 50:18 58:10 59:6
61:8,21 63:23 137:15
**money** 19:11 33:13 62:18,20 63:14
64:19,22,24 65:6,7 67:14 68:12
68:15,18 72:16 73:12,16,22,24
74:5,9 75:5,7,16,24 76:14 83:24
84:11 85:1 91:2 131:7,11,20,21
134:6 140:8 145:2,15 147:9,15,18
147:20 148:7,11 153:16 164:23
167:1,9 168:2
**month** 13:1
**months** 101:12
**morning** 8:1 9:18 130:13 134:9
146:18 161:13 163:6,14,20
170:24
**motions** 97:12
**motor** 132:1
**mouthful** 106:10
**move** 148:9
**MV** 149:18
**M&F** 4:11 50:5
**M&K** 38:1
**M&K-0016** 45:11
**M&K-0049** 58:17
**M&K-0060** 59:12
**M&K-0181** 61:15
**M-I-C-H-A-L-E-K** 17:5
**M-I-N-E-R** 33:23

---

**N**

**name** 9:18,22 15:2 16:6,7 17:6 22:9
23:18 26:11 32:3 33:1 34:21 35:6
36:3,6 45:12 47:21 93:24 102:22
108:19,22 161:21,22 162:1,4
**nature** 46:10,16 52:10 60:17 61:1
63:12 84:5 87:10
**need** 46:20 70:20 90:1 158:10
**needing** 132:5
**need-to-know** 101:1
**negotiate** 121:21 122:1
**negotiated** 40:4
**negotiating** 79:2 91:20
**negotiation** 36:10 119:12,16
**negotiations** 55:5 160:23 170:5
**net** 77:10,14,17 117:1,5
**never** 16:10 41:2 56:18 62:9,19
83:6,7,9 85:13 106:19 136:20
140:8 151:14 170:13
**Nevertheless** 140:5,13
**new** 1:2 9:21 65:3 80:3,6,24 81:20
86:7 98:6 115:19,20 116:9 139:10
144:21 145:12,15 153:12 168:6,7
168:11
**newspaper** 89:24

**night** 146:19
**Nine** 104:17
**NINE-PAGE** 5:17 95:13
**nodding** 73:19 81:24
**noon** 150:17,22
**Notary** 1:17 8:9,11,13 173:4,17
**note** 4:20,23 5:4 69:4 70:1 71:1
    75:11,12,16 83:22 130:22 131:2
    139:14 140:14
**notes** 118:1
**notice** 1:18 4:7 8:10 9:9 11:10 12:8
**notified** 64:23 167:8
**notify** 65:5 133:23 167:7
**notifying** 64:18
**November** 5:10 34:12 36:17 41:24
    46:8 72:21 88:2 89:12 111:4
    124:4 126:19 127:12 129:9
**number** 61:3 72:5 83:21 103:6
    115:15,16 116:11 119:6 157:22
    158:2,16,19,22
**numbers** 38:1 93:7
**numerous** 22:4 137:3

O

**Object** 54:13
**Objection** 64:9 145:21 148:1,19
**OBJECTS** 5:18 95:15
**obtain** 47:11 82:2
**obtained** 142:14
**obviously** 107:18
**occur** 135:17
**occurred** 64:21 76:6
**October** 33:17
**office** 14:12,14 26:4,20 27:4,10
    35:22 43:12 59:23 60:1,5,6 96:19
    96:24 102:6,7 127:19 134:15
    137:2 173:13
**officer** 14:2 28:13 49:22 55:2,10
    100:6,14 137:3 170:10,13
**officers** 18:20
**offices** 1:18 2:4 9:20 24:5 29:10,12
    48:13 60:8 157:24 158:3
**official** 8:12
**Oh** 13:19 43:10 50:12 66:7 95:5
    101:18 114:11 117:15 135:5,7
    140:10
**Ohio** 1:17,19 5:9 10:3 21:9,10,12
    29:11,13,15 48:13 87:24 88:7
    98:10,16 99:1 103:10,17 104:1,5
    104:11,13,16,21 105:4,12,20
    106:6 115:20 157:24 158:3 173:2
    173:5,13,17
**oil** 5:9 47:20 48:10 87:24 88:7 89:4
**okay** 10:5,13 11:5,24 12:19 13:4
    16:12 19:16 20:17 30:21 31:20
    32:11 34:1 35:9,13,16,21 36:9
    37:10,23 38:19 40:22 42:16 43:14

44:19 48:6 50:18,20,21 51:20
    53:6 54:12,16,22 55:24 56:7
    58:11,12,19,24 61:5 62:1,5 69:9
    69:17,19 70:6 71:8,13,18,21
    73:14 74:1 76:10 78:1,5,10,13,18
    79:4 85:4 86:2 88:6 91:18 92:4
    93:5,17,20 94:11 95:5 97:23
    98:24 99:6 101:18 103:8 109:11
    109:18 110:10,12,15 112:13
    113:20,23 114:12 118:7 135:6,7
    136:11 138:20 139:16 150:22
    163:19 164:1,10 167:4 171:13,22
    167:8
**old** 98:3
**once** 131:20 134:5 136:17
**one-page** 4:14,16 5:7,12 6:1,4,7,10
    6:18 7:3,6 57:3,16 85:22 92:11
    123:17 124:17 126:5,16 128:19
    137:10 138:23 139:7 145:23
    146:7 148:21 149:5
**open** 127:20
**operate** 20:3,5
**operating** 15:6 77:6 80:4,19,24
    81:5,20 82:8 84:6
**operation** 156:17
**operations** 141:19 156:15 163:4
**opportunities** 157:6
**opportunity** 157:9
**opposed** 52:14 74:13
**option** 152:10
**order** 37:14,14 95:10 106:22 112:7
    123:7
**ore** 30:16,19 31:2 32:12,17 33:18
    34:3,7,9 39:9 44:3,6 53:11 55:6
    80:2 84:9 90:14,23,23 96:13
    109:19 110:8 119:9,17,20,24
    122:24 123:1,8,10 152:10,16
    153:8 160:8,9,24 169:7
**organized** 95:7 169:17,18
**original** 149:8 150:12 167:10
**Originally** 77:21
**Orleans** 153:12
**Orozco** 2:4 3:5,6 9:17,19 11:14
    13:10 15:16 19:8 27:22 28:2 31:9
    37:19 40:18 44:15,18,20 50:12,15
    50:17 54:3,7,8,15,17 57:22 58:17
    58:21 64:12 69:10 70:7 71:6,9
    75:19,22 92:6,8,17 93:6,13,18
    95:1,8 96:17 103:1 111:16 112:5
    112:21,23 114:3 119:7 123:14
    134:19 135:3,7 137:15 145:21
    148:1,14,19 158:5,9 161:8,12
    172:2,5,8
**Orozco's** 94:4,24
**outcome** 97:20
**outlined** 12:15
**outside** 21:12 29:12,15 48:13

**out-of-pocket** 77:6
**overlaps** 101:16
**overwhelmed** 52:16
**owned** 22:10 23:3 24:7 28:6 83:4,5
    105:12 109:10 156:20,22
**owner** 28:17 29:5 47:20 50:23
**owners** 15:22 167:22
**ownership** 80:5,20 156:9,10
**owns** 23:13,21
**o'clock** 133:11 134:8,8 139:20
    146:19

P

**page** 3:3 4:3 12:2,4,15 38:8 42:20
    45:10 51:6,7 52:22,23 53:22 54:2
    54:3 59:11 61:14,15 64:2 72:5
    79:21 83:14 89:8,10,16,17 92:21
    93:1 96:1,3 115:6 124:1 126:15
    130:7 133:3 134:17 135:2,5
    137:18 139:10 141:17 150:11
    154:14 155:14 159:1 163:4
**pages** 5:13,21 12:8,10 37:14 38:3,4
    40:9 92:12 96:4 111:23 112:8
    150:9 158:8
**paid** 19:3 68:4 160:12
**paperwork** 35:11
**paragraph** 77:1 79:22 80:21 83:14
    130:21 131:1,24 154:24 155:15
    156:8,13,19,24 157:12,21 159:1
    159:17
**parentheses** 76:18 77:12 80:3
**part** 39:11 46:18,24 81:20 82:4
    95:6 101:17 155:8 165:4 171:6
**partial** 121:4,8 151:15,20 165:7
**partially** 139:9
**participation** 16:20
**particular** 16:23 28:24 31:24 171:6
**particularly** 110:13 117:16
**parties** 8:6 39:14 79:23
**partner** 16:13 17:2
**partners** 16:15
**party** 5:20 35:19 40:5 41:5,7 49:16
    52:8 53:10 57:10 58:3 111:22
    113:14 117:14 119:7,13 131:12
    149:6,22 152:19 159:19 160:3
    167:17 168:17 170:6 171:17
    173:10
**part-time** 21:2 26:14 101:3,7
**path** 27:23
**patient** 172:9
**pay** 20:9 24:4 77:3 91:2
**payment** 55:4,14 77:9 79:13,16,18
    91:9 152:18
**penalty** 110:8
**pending** 9:21 86:6
**people** 132:9
**percent** 24:7 77:3,10,13,13,22,23

78:6,15,17,17,22 79:5,7,9,12
160:16
**percentage** 16:16 78:19
**perform** 19:12 33:22 58:5 110:2,9
**performance** 30:15 32:12,18,19
33:5 39:17 41:6 44:16 67:18,20
72:12,16,22 73:2,5,10,16 75:8
76:13 77:24 79:14 90:12 91:3,9
91:10 108:23 109:23 110:1,4
123:7,11
**period** 36:15
**PERMIT** 5:18 95:16
**person** 35:5,14 43:12 162:12
**personal** 33:13,15 73:17,18 74:1
89:8,17
**personally** 32:21,22 34:17,18 41:19
73:15 88:18 89:3,22 90:3 91:13
95:22 111:9
**phone** 46:14 65:10,11 111:3 157:22
158:2,16,19,22 168:8,10 169:10
**phrase** 116:14
**physical** 26:20 27:4
**physically** 147:18
**pick** 118:3 158:10
**picked** 130:13
**place** 118:17 169:21 173:9
**Plaintiff** 1:5,13 2:7 8:7 113:13
155:17,17 156:24 159:2
**Plaintiff's** 155:12
**please** 9:22 10:24 33:4 37:17 51:14
53:9,13 63:23 118:4 130:22 131:1
139:14 140:5,13
**plus** 109:21
**point** 98:22 102:20 142:9 153:18
**pointed** 112:8
**political** 102:6,7 103:6,16 106:7
107:16
**popularly** 99:23
**port** 51:14 55:6 123:2 124:11
**portion** 24:16
**position** 13:15,19 14:2 22:21,24
62:17 103:12,20 122:10 168:7
**positions** 103:3 104:21
**possession** 147:19
**possible** 134:1
**post** 72:23 73:5 110:4 128:15
129:16
**posted** 67:19 72:22 73:2
**posting** 77:24
**post-White** 103:9
**potential** 19:19 23:16,24 82:2
119:24 120:4
**PRC** 109:6,16 110:13
**precise** 94:9 115:15
**predecessor** 55:21 56:1 115:11
**PREMISES** 5:18 95:16
**prepare** 12:20

**prepared** 146:23 166:24
**preparing** 130:22
**presence** 8:11 173:7
**present** 2:13 90:10 107:5
**presented** 157:7,9
**President** 14:5,6 102:8 103:9
**pressing** 132:10
**pressure** 18:1 122:19,22
**presumably** 149:10
**previously** 42:11 56:22 149:18
**principal** 4:20,23 5:4 29:6 69:4
70:1 71:1 79:23
**printed** 43:5,5
**prior** 40:23 110:17,22
**pro** 79:15
**probably** 112:6 115:22 117:8
130:14 143:14
**problems** 139:8
**procedure** 1:14 8:8 10:15
**procedures** 133:23
**proceeds** 45:4 77:10,14,17
**process** 20:11,13,13
**Procter** 24:7
**procure** 111:10
**produce** 5:17 94:22 95:14
**produced** 37:15 40:9 43:12 50:1
112:8 127:5 150:15
**producing** 97:1
**production** 56:23 57:14 69:21
70:11 85:7,20 87:20 92:9 139:8
**profit** 76:6 79:16,17 153:7 169:5,7
169:16
**profits** 77:22 78:1,15,19 79:5,12
160:13,17
**project** 16:24 17:21,23 18:11 19:12
19:19 22:8,15 24:4,10 60:7 83:7
**projects** 13:23 18:6 20:21 21:23
115:21 116:9,24 137:4
**Promissory** 4:20,23 5:4 69:4 70:1
71:1 75:11,12,16 83:22
**proof** 8:12
**property** 14:13 26:4,8 27:5
**proposed** 133:14 144:20 145:11
157:17 160:13 162:23
**prove** 148:11
**provide** 30:3 45:14 48:22 169:11
**provided** 49:12 72:16 73:9,15
90:21 164:4,7
**providing** 72:19 85:1 165:11
**Public** 1:17 173:5,17
**published** 157:23 158:16,23
**purchase** 30:16,17,19,21 32:12
44:3,6 82:24 83:7,8 88:18 89:3
96:13 119:8,9,16,16 160:8
**purchased** 15:10,17 83:9
**purpose** 18:3,8 28:20 43:21 44:1
46:16,20 171:5

**purposes** 13:7 147:23
**pursuant** 1:17 8:9 76:17,23
**put** 30:15 32:18 41:5,15 43:23 49:5
58:24 62:18 64:19,22 65:1,6,7
74:23 109:24 123:6 134:6 163:16
164:23
**putting** 44:2 109:20 120:14
**puzzled** 142:19
**puzzles** 115:5
**p.m** 127:17 129:10 130:10 142:4
149:11 172:14

Q

**qualification** 8:13
**qualified** 173:5
**question** 10:22,23 11:1 12:9 57:23
70:8 75:18,19,20 90:15 93:1 94:6
131:15 170:20,21
**questions** 10:17 40:21 61:3 93:18
94:2,4 119:6 123:15 161:6,14
171:1 172:3
**quick** 171:4
**quid** 79:15
**quit** 100:11
**quo** 79:15

R

**raise** 140:8
**raised** 62:6
**RDR** 173:16
**read** 64:17 65:15 72:3 75:20 96:19
97:10 170:21
**reading** 8:14 56:14 61:18 62:4
64:11
**real** 13:14,23 21:23 22:8 102:21
115:19 116:20
**really** 12:22 16:24 20:4 27:16 35:10
38:7 63:16 67:11 69:16 109:4
113:19 115:11 117:15 131:13
140:2 143:14
**Realtime** 1:16 173:4
**reason** 14:16 23:20 30:12,23 34:11
52:13 60:5 63:4 74:9,12 115:9
147:21 150:21
**recall** 10:14 11:15,18 12:4 17:9
33:1,5 36:16,19 38:13 39:3 41:3,4
41:22 42:22 43:14,16 44:1 45:21
46:2,10 48:15 50:24 51:21 52:4
53:15 57:9 58:13 59:8,10 61:11
61:17 62:16 65:9,23 66:15,16,19
71:20 72:1 74:24 87:10 93:16
94:5,6,11,14,17,21 96:22 97:7
109:22 114:10 115:8,12 117:11
122:11,19 124:6 125:10 127:2
129:4 130:9 139:16 141:24 142:1
142:12,18 143:5 147:21 151:4,11
151:18 152:6,14,17,21 153:3,18

154:22 161:14 162:22 163:8,21
164:5,8 165:22 167:19 171:8,17
**recalled** 171:15
**recap** 38:5 53:12
**receipt** 135:18 168:22
**receipts** 77:4
**receive** 24:13 52:18,19 75:11 77:13
77:16,21,23 78:5,20 160:16
**received** 4:12 6:5,8,16,22 7:4,10
11:18 30:6 42:6 47:7 50:6 55:1
75:13,15,24 77:4 96:8,18 124:19
126:7 127:22 128:10 131:7,21
132:19 139:19 141:10 145:2
146:1,17 150:3 153:5 165:7
**receives** 102:8
**receiving** 11:15 38:13 39:1 58:14
59:9 124:6 125:10 127:2 129:4
130:9 139:16 152:17,21 153:3
154:22 168:21
**Recess** 28:1 70:22 92:7 119:4 161:4
**recognize** 112:11 113:18 144:9
**recollection** 38:24 97:17 114:17
124:13 141:21 142:9,22 149:21
151:24 153:14
**recommendations** 102:10
**record** 9:23 11:13 13:9 37:18 108:7
112:24 113:1 114:5 118:6 119:3
137:16 138:21 161:5 172:10
**recross** 161:8
**RECROSS-EXAMINATION** 3:6
161:11
**Redirect** 161:9
**reduce** 151:19 153:6
**reduced** 173:7
**reduction** 77:14
**refer** 38:3 51:5 99:23 151:1
**reference** 72:4 93:7 125:13 155:1
171:4
**referenced** 72:23 75:17 83:13
157:14
**references** 43:21 85:11 167:12
**referencing** 76:21 86:20 166:10
**referred** 65:18 144:6
**referring** 54:5 120:23 135:13
137:20,22 138:12
**refers** 133:18 135:21 140:6
**reflect** 114:20
**refresh** 149:21
**regard** 108:8 109:3 119:7,10,12,15
119:19,23 120:3,10,14,16 121:17
122:10,12,18 129:19 136:13
142:15 145:18 155:9 160:11
**regarding** 48:16 49:1 51:13 81:8
87:3,7 90:12,13 91:8 162:14
163:15 170:18
**Registered** 1:15 173:4
**regular** 52:8

**relate** 119:8 160:24
**related** 85:17 115:10 173:10
**relating** 96:13 135:23
**relationship** 16:8 82:5 90:5,8,8
**relationships** 21:15,18
**relay** 168:17
**release** 147:9
**released** 67:20
**relocating** 41:13
**relying** 77:11 111:13 117:21
**remaining** 77:4 78:17
**remember** 15:4 16:7 58:20 61:4
62:4 64:11 66:22 112:15 116:23
139:23 140:2 143:14 144:13
163:24 168:19,20 171:18
**reminders** 10:12
**remit** 133:24
**renewed** 107:3
**repay** 160:18
**repayment** 77:2,5
**repeat** 75:19
**rephrase** 10:24 131:15
**replacement** 153:1
**reporter** 1:16,16 10:16 95:9 106:18
111:19 173:4,4
**reporting** 173:11
**represent** 37:13 94:1 117:1
**representation** 55:10 56:15,19
**representative** 122:6
**represented** 91:1
**representing** 9:20 46:4
**represents** 83:24
**request** 41:11 48:18 84:4 129:19
146:23 166:1,2,4
**requested** 167:7
**requesting** 41:8,9 87:12 96:3
116:24
**require** 109:24 110:3
**required** 32:17 33:9 39:9 41:5 47:8
72:22 73:5 76:17,22 84:3 105:17
108:24 168:23
**respect** 16:17 32:12 34:6,19 36:10
36:20 67:18 80:24 81:20 90:21
91:15 97:20 160:22 165:21
170:23
**respective** 8:6
**responded** 53:15,19,20,21
**responding** 129:12
**response** 48:18 63:15 87:14 94:3
96:23 97:18 155:6
**responsibilities** 13:20
**responsibility** 39:12
**restructure** 80:5,20
**result** 58:3 152:18 169:6
**resulted** 169:16
**results** 23:24
**retained** 52:3

**return** 77:23 78:14 79:2 86:17,24
87:3,7,18 166:22
**returned** 67:15
**revenue** 153:4
**reversals** 116:19
**review** 11:12,20 12:8 44:22 50:19
58:10 59:6 61:8,21 63:23 71:23
106:9,23 118:14 120:24 136:5,7
162:6
**reviewed** 97:10 143:8
**reviewing** 12:4 61:18
**revised** 163:6
**revisions** 163:8,11
**right** 15:14 32:7 36:18 43:9,20
44:11 45:11 71:6,16 97:7 106:20
106:23 109:13 114:16 117:16
120:9 122:11 138:1,6,9,10 140:12
150:11,18 159:21 164:5 166:22
**rings** 157:23 158:2
**Rite-Aid** 116:3
**Road** 10:3 13:18 27:7
**RODON** 132:1
**role** 15:20 16:17,18 17:7,11,19 21:5
24:9 25:10,18 27:12 28:10 29:4
34:6,19 36:19 49:20 80:23 81:4,5
102:3 115:1,3 119:11,15,19,23
120:3,10,13 121:17 136:8 165:21
166:13
**Roth** 26:7
**roughly** 103:22 125:21 127:24
139:20 171:19,19
**route** 123:4,9
**royalties** 24:16
**royalty** 24:4
**Rule** 173:12
**ruled** 97:11
**Rules** 1:14 8:8
**runs** 96:3
**rush** 123:8
**Russian** 34:21 36:3,23 153:24
**R-O-D-O-N** 132:2

_____
| S |
| --- |

**Salaried** 26:18
**salary** 21:4
**sale** 31:2 34:7 80:2 96:13 119:9,10
119:20 160:8
**sales** 5:2 39:12,14,19,22 55:15
70:16 72:5,10,13,15 73:6 78:2,4
79:24 80:9,13,24 90:22 91:14,16
91:21 170:7
**SANTA** 149:18
**satisfied** 122:13
**saw** 66:10,12,12 81:18 85:13 162:8
166:10
**saying** 126:1 138:10,14 140:3
147:6 149:17 165:17

**says** 9:15 38:17 42:18 45:11,12 51:6 53:3,9 54:9,23,24 59:11 72:19 76:11,21 79:22 117:18 125:14 127:10,14 130:21 131:1 135:1,12 150:13 151:1 154:24 157:12 163:5
**SC** 100:24 107:11
**schedule** 123:5
**Schild** 35:6,16 111:14 117:22 152:22 169:3,8,14
**school** 99:11,12,17 101:7
**scrambled** 112:9
**seal** 173:13
**search** 96:7,10
**second** 11:10 61:15 76:18 112:24 134:17 135:2 137:18
**Secret** 100:18,20,23 107:9,10,13
**secretary** 26:12 59:1
**section** 76:12
**secure** 151:16
**securing** 145:18
**security** 41:6 46:22 48:20 49:2 75:2 79:19 100:13,16,22 106:9,23 107:2,6,8 120:22 121:1,4 122:12 124:10 142:14 165:1,2,12 166:5 171:7
**see** 38:10 43:1 59:10 65:20 66:9 94:8 95:23 96:1,11 112:17 113:13 118:17 124:2 125:8 126:24 135:6 140:24 155:1,15 158:17 159:5 163:18
**seeing** 61:11 66:15,16,19 71:20 72:1 112:15 161:15
**seeking** 23:17 39:7 86:24 88:18 89:2 165:3
**seen** 37:20 40:23 41:2 45:1 56:24 57:8,23 64:1,4,7 68:24 69:11 70:9 71:10,15,18 72:15 85:7,9 86:3 92:18,23 93:2,14 112:9,14 114:7 158:19,22
**sell** 33:18
**seller** 84:8 110:4 119:24 125:23
**sells** 20:8
**send** 59:21 63:14 130:23 144:20 147:8
**sender** 62:24
**sending** 42:22 43:14 45:21 58:13 59:8 133:14 134:4 141:24 146:19 148:10
**sent** 6:2,13,19 7:7,13 59:17,18 64:6 65:9 87:13 123:19 126:18 129:9 129:24 138:24 142:2 144:15 145:11 148:23 149:9 154:6 162:23
**sentences** 145:8 167:11,12
**separate** 44:8 55:17 73:9 105:13,14
**sequence** 113:17 163:24

**series** 50:1 117:7 139:7 146:10 149:5 151:6
**serve** 106:22
**served** 94:19
**Services** 1:8 2:12 48:3,7,12 49:2 67:16 74:3,13,17 79:10,18 84:20 85:1 86:9 88:24 89:7,12 90:5 91:8 94:1 134:13 141:1
**serving** 106:15
**Session** 8:1
**set** 24:18 154:12 173:13
**seventh-largest** 137:1
**seven-hour** 128:1
**Seward** 42:17,23 43:15 45:22 46:2 46:7,13 60:14,22 62:21 87:18 134:19,24 135:2,10,12 137:14 138:1 162:23
**Seward's** 138:12
**share** 25:23 77:14 156:9,14 157:22 160:13
**shared** 156:17
**sheet** 42:17
**shell** 83:6
**shell-corporation** 159:3,11
**shift** 119:3
**ship** 34:13,20,24 35:20 36:11,11 39:8 41:14 49:16 50:23 51:20 52:3,12,17 53:4 110:18,18,22,24 111:2,5,11 117:13 122:23 123:2,4 124:9 147:16 148:9 166:6 168:3 168:23 169:2
**shipment** 46:22 110:6 152:14 171:8
**shipped** 45:18
**shipping** 1:4 9:20 34:9,11,21 35:5 35:12,13 36:3,7,14,20,23 39:4 40:5 41:7,10,12 44:3 46:4,19,24 51:13,18,19,24 52:20 54:11 55:4 55:14 57:10 58:4 60:19 63:7 64:18,23 65:5 74:20 75:2 76:16 76:22 78:2,12 79:19 86:7,8 87:7 109:21 111:7,10 135:18 153:8 167:8 171:7,21
**shopping** 116:4
**short** 161:2
**shortly** 149:10
**shot** 100:10
**show** 37:11 56:21,24 58:8 59:4 61:6 63:21 68:22 69:20 85:5,19 138:7 144:19 158:10
**showed** 64:5,16 96:18 111:16 112:5 114:3 118:16 158:6,9
**showing** 64:13 144:24
**shown** 39:4 148:13
**sic** 47:22,23 51:12,24 55:5 146:22 149:17 167:1
**sift** 102:9
**sign** 134:4

**signatory** 91:16
**signature** 8:14 114:9 118:17 172:12
**signed** 8:17 65:21 66:2,15,16 81:13 114:10,11 118:23 133:16 134:3,5 161:19,21,24 162:4,6,9,15
**significance** 31:24
**signing** 131:6 140:14
**similar** 20:13 27:13,14 48:1 75:12
**simplify** 154:1
**simply** 148:11
**single-entity** 21:22,24 22:17 23:1,7 28:6
**single-purpose** 116:4,7
**sit** 117:16 164:5
**six** 100:3 101:15,16,21 104:7 115:23
**sixth** 90:1
**SIX-PAGE** 4:11 50:4
**skip** 72:5 141:6
**Slane** 1:12 2:1 3:1,4 4:1,5,7 7:13 8:7,15,18 9:5,10,13,18,24 10:2,6 11:9,15 13:11,12,13,21 14:3,8,18 14:24 15:5 19:14,15 20:1 21:17 21:17,21,24 22:5,10,21 23:4,19 25:6,16 26:1,14,20 27:2 29:24 30:1,3 32:21 33:14 34:17 37:20 39:21,21 40:2 41:18 42:3,17 49:20 51:10 52:18,19 55:2,10,13 55:17,18,20 56:8,12 60:8 68:17 74:13,15 77:11,12,15,16 80:4,23 81:3,3,4,19 82:6,11,12 83:1,4 84:22 88:15 90:4,7,15,16,17,17 92:19 93:24 94:19 95:23 97:9 102:23 103:1,4 108:2,4,19 115:2 115:3,6,18,18 118:18,18,23 125:1 135:2,11 139:13 149:4 150:9,13 154:6,11 155:1 158:12 161:6,13 172:3 173:6
**SLANE/CHARTERING** 6:8,16,22 7:3,9 126:6 132:18 141:9 145:24 150:2
**slash** 53:6
**small** 14:7 35:23
**sold** 34:10
**Sole** 107:24
**solicitor** 134:22
**solicitors** 128:11
**solution** 140:4
**somebody** 86:12
**someplace** 35:24 46:9
**soon** 134:1
**sorry** 13:19 15:12 16:2 19:6 24:24 31:6 44:15 50:14,16 54:2 66:7,7 90:17 95:6 104:16 126:23 129:5 149:13 159:8 167:3 170:20
**sort** 35:20 115:17

sorts 97:13
Southern 1:2 9:21
Southport 2:5
speak 10:19 12:23 46:13 52:6 60:14
    62:21 63:6,10 163:22
speaking 23:8 51:16
special-purpose 115:17
specific 38:3
specifically 118:13
specified 173:9
speculation 64:9
spell 19:21 33:4 106:19
spending 116:16
split 79:5
spoke 13:1 63:18 96:22 163:21,23
spoken 63:3 94:4,15 97:4
sponsor 88:20
sponsorship 90:1
Spruce 2:5
SS 173:2
St 136:4
staff 102:4,11
stand 48:5
standard 47:22,23 110:11,12
start 103:8
started 17:18 24:11 34:22 36:17
    102:21
Starting 42:16
starts 50:12
startup 30:3,7 108:8,13
state 1:17,19 9:22 77:8 98:10,16
    100:4 104:11,13,16,21 105:4,12
    105:20 106:6 120:24 173:2,5,17
stated 47:6 53:11 73:14 162:17
    166:20 171:10
statement 117:4 118:10 143:7
    148:16 169:12
states 1:1 13:23,24 77:1 115:20
    136:14,24 137:1
stating 133:22
stationery 66:14
status 132:1
stay 95:7
steam 18:1
steel 30:15,17,20 31:3 32:13,16
    33:3,9 34:8,10 39:16 43:23 44:9
    68:2 90:14
stenotype 8:9 173:7
stipulated 8:5
STIPULATIONS 8:4
stop 137:15
stores 116:3
straight 99:10,12
Street 1:19 2:5 29:11
strictly 141:3
Strike 96:16 158:7
string 4:11,16 6:1,4,7,10,15,18,21

7:3,6,9,12 50:4,19,22 57:16
    123:17 124:17 126:5 128:19
    132:17 138:23 141:8 145:23
    148:21 150:1 154:4
student 101:18
stuff 118:2
subdivisions 100:19 107:10,14
subject 5:2 65:18 70:15 72:4 94:17
    146:24 147:21
subordinate 105:22
subpoena 4:4 5:17 9:3 11:10 12:2,5
    12:15 94:18,21 95:14,21
subsequent 169:19,20
subsidiaries 21:21 22:5
substitute 153:5 169:6,16
successful 23:24 24:10 25:20
sufficient 48:20 147:22 164:24
Suite 1:19 2:9
SUM 4:20,23 5:5 69:4 70:1 71:1
supermarket 116:6
supplier 84:8 90:14 109:24 110:1
supply 32:16
support 169:12
supposed 34:3 45:14
sure 10:14,21 16:13,15 27:22 31:17
    31:23 64:10,20 69:13,13 118:1
    121:1 143:8 165:11 168:1 172:7
suspect 95:11
sworn 9:14 173:6
Sylvia 1:15 173:4,16
S-L-A-N-E 9:24
S.A 1:4

## T

Table 89:7,11
Taiwan 33:3 34:8 39:16 109:2,4,8
    109:13
Taiwanese-owned 109:6
take 10:18 11:11 12:1 16:14 17:3
    24:11 37:16 40:19 42:13 50:18
    59:6 61:8,21 63:23 70:20 92:6
    101:11 111:13 113:21 114:9
    116:19 119:2 136:5 153:9 161:2
taken 1:15 8:9 28:1 70:22 92:7
    115:21 119:4 147:20 161:4 173:9
talk 27:11 63:17 87:16 109:3,15
talked 72:11 103:5 108:23 110:17
    121:15 149:5
talking 58:15 76:11,13 109:4,16
    118:8 130:18 131:24
talks 148:10
technology 15:10,18
Tecum 94:18,22
telephone 34:23 36:13 60:15
tell 23:11 32:13 38:15 49:19 64:16
    77:20 98:3 112:14 136:22
telling 128:10 129:15 135:16 147:8

148:17 150:24 153:18
temperatures 18:2
term 155:9 156:2 159:20
terminate 16:9,21
terminated 16:10 20:1
terms 39:3 40:4 41:4 42:8 69:15
    74:22 120:18,20 122:13 142:20
    149:19 151:5
test 20:21
testified 49:15 73:21 161:13 162:11
    163:14,20 164:2 165:20 167:5,16
    167:24 169:1 170:4
testify 4:4 9:3 173:6
testimony 108:15 122:16
testing 20:6
tests 20:19
Thank 11:6,7 31:8 44:18 48:4
    109:18 161:7 172:5
Thanks 51:15 58:18 59:15
thing 123:14 152:15 164:8
things 96:18 103:4 165:5
think 13:1,2 15:3,14,14 17:10
    19:22 27:7,15 35:20 36:17 37:22
    43:11 47:24 55:21,22,24 60:20
    62:4 64:5 65:7 71:11 72:3 74:4
    76:5 80:15 86:12 94:11 99:1,4
    100:10 107:15 108:4,6 110:5
    112:19 114:11 115:13 118:15,15
    118:15,16 121:13,14 123:1 124:7
    124:8 125:19 137:22 138:18,18
    140:1 144:15 145:7 151:14
    152:20 153:9 162:2,16 165:9
    166:9 167:10,14
third 35:19 45:11
THOMAS 2:14
thought 108:4 109:12 166:10
thousands 102:8
three 14:10 16:3 93:1 97:6
THREE-PAGE 4:4,8 5:1 9:2 40:12
    70:14
Tianjin 42:18 55:6 72:6,7 108:24
    109:6,19 119:20 120:4,6,7,8
    123:7 125:15
till 140:14
time 5:20 8:9 10:8,20 11:3 16:6
    36:15 37:4,7 51:14 93:19 94:15
    97:3 99:2,3 111:9,22 116:1,10,16
    116:22 117:5 118:14 121:20,24
    122:19,22 123:5,10 125:11 127:3
    128:1 129:10 139:21,23 142:3
    143:11 144:19 146:20 147:22
    149:10,11 150:16,22 161:7 162:4
    162:8 163:24 164:22 172:6 173:9
timeframe 36:16
timely 132:6
times 121:15 122:11 127:19 138:8
    152:12 166:21

**Tisdale** 2:4 9:19
**TISDALE/ESTECH** 5:15 93:9
**today** 11:21 12:5,10,21 16:12,16
  18:9,15 22:18 37:21 40:24 45:1
  56:15 57:1,24 61:12,18 64:2
  66:11,17 69:12 70:9 71:16,19
  72:2 83:11 85:13 92:19 93:15
  97:9 151:1 161:15 170:7,19
**told** 51:12,23 56:18 65:7 80:15 82:3
  86:12 153:7 163:17 169:5
**Tom** 64:5 66:12 67:6 83:18,19
  86:12 87:16 118:16 166:19,24
  167:7,10
**tomorrow** 147:1,2 163:6
**Tom's** 66:14
**ton** 152:9
**tons** 152:10
**top** 38:8,17 43:1,4 45:11 51:9 53:23
  100:18,20,23 107:9,10 125:8
  137:18 146:12
**total** 73:4 77:3 101:13 115:16
  116:11 125:18
**town** 35:24
**track** 31:19
**trade** 157:23 158:5,8,16,23
**trade-association** 88:11 89:23
**trading** 1:7 5:15 27:18 28:5,9,10,13
  28:18,21,22 29:2,5,8,12,19,21
  30:4,6,9,23 31:4,10,14 32:5,11,14
  33:18 35:17 39:16 41:5,15 42:6
  48:22 49:13 56:5 60:9 67:19 68:4
  68:12,14,18 72:8,12,20 73:15
  75:6 78:9,16 80:12 84:17 85:2
  86:8 90:9,19 93:9 107:18,19
  108:8,10,13,16 113:15 118:9
  122:24 155:8 164:4 166:15
  170:14,18
**Trading's** 29:10 39:12
**transaction** 34:7 46:3 90:13 96:12
  136:13 143:9 153:22 157:16
  160:13 164:15
**transactions** 121:16
**transcribed** 8:11
**transcript** 8:15 173:8
**transfer** 33:11,16 49:3 75:5 165:13
**transferred** 67:15
**transit** 132:6
**transmitted** 66:1 145:15
**transmitting** 133:6 138:4 144:13
**transpired** 90:10
**transport** 39:9 55:6
**transportation** 39:11
**treat** 20:11
**tried** 97:11 154:1
**trip** 102:11
**true** 173:8
**trust** 23:13,13,18,19,20 24:16,18

  24:23 25:14,16 62:18 64:19,24
  65:1,2,6,8 86:21 147:15 164:9,18
  167:9 168:2
**Trustee** 86:17 104:11 105:17
**Trustees** 104:12,16,20 105:3,18,20
**truth** 173:6,6,6
**truthful** 97:18
**try** 10:18 141:6
**trying** 20:11 95:7 132:9 151:9
**Tuesday** 1:20 8:1 172:14
**Turn** 155:14 159:1
**two** 5:12 11:8 13:1 16:22 38:15
  42:11,13 82:15 92:12,22 97:6
  102:13 105:11,16 113:21 147:13
  148:4 150:9 164:18
**two-and-a-half** 171:20
**two-page** 4:19,22 5:4,15 6:13,15,21
  7:9,12 38:5 39:1 69:3,24 70:24
  93:9 129:23 132:17 133:3 141:8
  150:1 154:4,12
**TX** 2:10
**type** 24:4 25:23 28:23,24 82:5 89:3
  120:22 166:13
**types** 53:18
**typically** 117:1

---

**U**

**uh-huh** 24:24 30:22 51:2,8 53:2
  59:7,16 71:14,17 72:9 83:23 99:1
  110:16 112:21 113:16 114:14
  116:12 163:1
**UK** 108:22
**Ukraine** 127:8,22 128:2 133:10
  142:3 146:17 149:10
**Ukrainian** 153:24
**ultimately** 22:10 151:11
**umbrella** 115:18
**unable** 16:24 19:17 33:22 152:16
**unclear** 166:9
**undergraduate** 99:10
**underlying** 112:20 143:9
**understand** 10:23 11:1 79:4 97:14
  97:21 110:10 141:18 144:5
  147:12
**understanding** 11:2 21:3 24:3
  48:10 54:18 76:3,5 89:6 114:22
  117:18 118:20 121:16 122:9
  127:11,16,21,24 128:9 131:3,9,18
  132:14 133:18 135:20 145:10,14
  147:17 148:3,16 153:21 155:5
  164:14,20,21 165:24 166:21,23
  167:17 168:7,11,16 171:22
**understood** 108:15
**undisclosed** 23:14
**unfamiliar** 142:23
**unfortunately** 112:6
**United** 1:1 13:24 136:14,23 137:1

**University** 98:10,18 99:8 104:11,13
  104:16,21 105:1,7,20,24
**unsigned** 7:2 66:5,14,19 143:22
**urgency** 162:5
**USD** 140:15
**use** 32:1 155:9
**U.S** 15:3,8,13 24:6 106:8,22 138:19
**U.S.A** 15:13,15,17,21,24 16:4,9,18
  16:21 17:7,14 18:3,5,8,14,24 19:3
  19:9,11,18,24 20:18,20 21:1,5,7
  21:14 22:22 23:3,6,11,21 24:1,10
  25:4,10,23 29:22 31:21,22 32:4,5
  56:3,6 68:20 108:5,18 115:5,7,10

---

**V**

**vague** 151:23
**value** 125:16 152:3
**various** 13:23 96:17 103:1,4 114:18
  116:24 119:11 121:15 122:16
**venturer** 159:21
**venturers** 159:18 160:4,8
**ventures** 21:14
**verbal** 10:22
**VERIFIED** 5:23 113:6
**version** 37:16 66:2,5,12,16,19
  114:4
**vessel** 18:1 45:18 90:22 117:19
  120:11 123:9 124:10 132:1,5,11
  135:22 140:16 147:7 152:9
**vessels** 132:9
**vessel's** 152:10
**Vice** 14:6
**view** 153:23
**viewed** 12:9
**Violin** 152:22
**VIOLIN/MICHALEK** 4:17 57:17
**VM** 1:6
**Voevudsky** 124:4 127:6 128:10
  129:6 130:16 131:10,19 133:4
  139:17 140:3,19 141:3 144:14,16
  146:13 149:15 150:24 154:20
**VOEVUDSKY/MICHALEK** 7:13
  154:5
**VOEVUDSKY/SLANE** 6:1,13,19
  7:6 123:18 129:24 138:24 148:22
**vs** 1:6

---

**W**

**wad** 100:10
**waiting** 27:24 132:7 138:18 147:3
**waive** 172:11
**waived** 8:13,16 172:12
**Wal-Mart** 116:5
**want** 10:23 11:3 112:23 126:14
  149:7 163:2 171:4
**wanted** 30:14 62:20 64:17,20 82:4
  120:21,21,24 123:24 132:24

140:7,10 141:16 143:7 149:13
150:10 165:6,12 167:15 168:1
**washing** 18:2
**wasn't** 164:22 165:6
**waste** 15:1
**Water** 103:10
**way** 74:11 135:9 160:2 173:10
**Web** 115:6
**weeks** 94:12
**went** 47:15 66:12 79:12 99:12,15
102:15 151:9 152:2
**West** 10:3
**we'll** 19:12 56:22 69:21
**we've** 75:13 103:5 124:2 126:13
137:10 139:9,10 147:9
**whatsoever** 90:18
**WHEREOF** 173:13
**White** 102:1,3,12
**willing** 120:17 128:15 142:13 148:8
**Winchester** 29:11,16
**Winton** 2:8 3:5 13:4,6 15:12 19:6
27:21,23 31:6,8 38:2 44:13,19
50:11,13,16 54:2,5,13,16 58:15
58:19 64:9 93:23,24 95:3,9,20
111:18 112:4,22 113:2,9 114:6
119:2,5 123:23 124:24 126:12
128:24 130:5 132:23 135:4,8
137:9,17 139:5 141:14 144:1
146:6 148:2 149:3 150:8 154:10
161:2,5,18 170:24
**wire** 72:21 146:23 147:3
**wired** 73:1,8,24 74:5 76:15 164:9
167:1,9
**WITHDRAWN** 137:7
**within-named** 173:5
**witness** 1:12 3:3 8:7,12,16 15:14
19:7 31:7 44:17 58:20 64:10 69:9
70:6,20 71:8 75:21 93:20 135:5
172:4,7,11 173:8,13
**Wolfson** 38:1 42:12 58:9,14 59:5
61:7,16 62:24 63:3,22 66:13
68:23 122:17 147:3
**Wolfson's** 43:12 136:19 171:3
**word** 32:1
**words** 101:4 117:14 120:1 122:6
149:8
**work** 10:1 26:14,16,23 30:14 60:1
99:9,13,15 101:13,24 102:12,15
102:17 135:9
**worked** 43:11 102:1 170:7
**working** 101:4,6 128:5,11 130:18
**works** 20:24 21:2
**world** 13:22,24 110:13,14
**worried** 167:14
**worth** 117:1,5
**wouldn't** 109:20
**wrapped** 132:10

**writing** 76:4,8 78:18
**written** 68:11 74:2,2 170:1
**wrong** 112:12

**Y**

**yeah** 22:7,7 35:15 44:17 47:24
50:15 51:3 54:7,10 62:4 63:9 65:3
73:23 77:21 79:15 89:14 94:23
99:2,5 101:6,6 104:17 105:10,12
106:8,11 107:11 112:21,22
114:14,15 115:8 116:12 121:13
130:24 131:16 134:24 135:6
136:15 137:24 138:3 140:7 145:6
150:18 152:20 153:13,20 154:16
155:7 163:23
**year** 98:19 103:13,14
**years** 10:10 16:22 56:10 100:3
101:15,16,21 102:13 103:21
104:7,17 105:24 116:15
**Yonkers** 98:6
**York** 1:2 9:21 65:3 86:7 98:6
115:20 116:9 144:21 145:12,16
**Yuri** 51:12,23 149:17
**Yuriy** 36:4,12 37:1 51:24 53:6,7,24
54:6,19,19 63:7,18 65:7,12 87:12
111:5 117:9 124:4 125:6 126:19
129:8 144:15 146:13 147:14
148:6 149:15 167:24 168:14,22
**Yuriy-something-or-another** 34:22
**Yuriy/Dimitris** 54:9

**Z**

**Zero** 108:14

**$**

**$100,000,000** 117:3
**$312,000** 83:22 84:24
**$312,500** 4:23 70:2
**$32.50** 152:8
**$340,000** 33:7 39:17 73:9
**$344,000** 73:1,22 75:8
**$344,190** 4:20 69:5 72:21 73:8
**$500,000** 5:5 41:5,16,19 42:1,4,7
47:11 48:16,22 49:3,12 71:2
74:23 75:1 76:15 79:19 85:12
120:14 121:17 122:10,18 129:16
140:9 142:14 146:23 151:16,21
152:1 157:15 162:14 163:15
164:3 165:13,21 166:5 167:19
168:22
**$6,120,000** 125:16
**$9,000,000** 171:19

**0**

**00000006** 5:11 88:3
**00000076** 6:3 123:20
**00000077** 6:9 126:9

**00000078** 6:6 124:21
**00000079** 6:12 128:21
**00000081** 6:14 130:2
**00000082** 6:17 132:20
**00000084** 6:20 139:2
**00000085** 6:23 7:5 141:11 146:3
**00000089** 7:8 148:24
**00000093** 7:11 150:5
**00000100** 7:14 154:7
**00000103** 4:18 57:19
**0000012** 4:15 57:5
**0003** 4:10 40:15
**0009** 5:11 88:3
**00102** 56:23
**00103** 57:14
**00107** 38:1
**0014** 1:6
**0034** 4:21 64:2 69:7
**0035** 70:11
**0037** 5:3 70:11,17
**0038** 69:21
**0039** 4:24 69:21 70:4
**0040** 85:20
**0058** 53:23 54:4
**0059** 52:23
**006** 89:11
**0060** 51:6
**0063** 4:13 50:2,8
**0064** 92:9
**0065** 92:22
**0066** 5:14 92:9,14
**007** 89:16
**0071** 85:7
**0072** 5:6 71:4 85:7
**0082** 6:14 130:2
**0083** 6:17 132:21
**0085** 163:4
**0086** 6:23 141:12
**0087** 38:1
**0097** 38:9
**01:00** 146:18
**0101** 7:14 154:8
**0103** 57:14
**0177** 5:22 112:1
**0181** 61:22
**0182** 61:22
**02/12/2010** 7:2 143:22
**059** 50:11
**06890** 2:5
**076** 124:1

**1**

**1** 40:9 53:22 54:2,3 68:23 83:14
113:11 149:10
**1st** 36:18 41:23 42:23 45:22 46:8
48:17 130:10 133:10 134:9,11
139:20 143:16

**1/4/11** 5:16 93:10
**1/7/11** 7:13 154:6
**10** 2:5 118:4
**10,000,000** 125:18
**10,000,000-something** 125:20
**100** 116:2
**1000** 2:9
**11** 1:6 127:17
**11/19/10** 4:21 69:6
**11/30/10** 4:13 6:2,6,9 50:6 123:19
    124:20 126:8
**11:06-and-35-seconds** 127:17
**112** 5:20
**113** 5:23
**12** 115:20 149:9 150:19
**12/1/10** 6:14,17,19 130:1 132:19
    139:1
**12/10/10** 5:1 70:15
**12/2/10** 5:5,21 6:23 7:4 71:3 111:23
    141:10 146:2
**12/21/10** 4:24 70:3
**12/23/10** 5:7 85:23
**12/24/10** 4:15,18 57:4,18
**12/3/10** 7:7 148:23
**12/6/10** 7:10 150:4
**123** 6:1
**124** 6:4
**126** 6:7
**128** 6:10
**130** 6:13
**132** 6:15
**139** 6:18
**14** 63:22 64:2 65:16,20 66:11 89:17
**141** 6:21
**143** 7:1
**146** 7:3
**149** 7:6
**150** 7:9
**154** 7:12
**16:06** 128:5
**161** 3:6
**17** 150:16
**17:00** 142:3
**17:10** 150:14
**18** 58:9,17 101:12
**19** 50:11,12,13 72:21
**1964** 98:10
**1967** 98:20
**1984** 15:7 102:19 103:2
**1990** 103:15
**1991** 103:19
**1998** 104:19
**1999** 103:22

---

**2**

**2** 12:8 40:9 45:10 52:22,23 77:1
    79:21 83:14 114:1 139:20 161:16

**2nd** 65:16 114:14 123:4 146:15,18
**2,502,500** 152:6,12
**2/12/10** 4:9 40:13
**2:03** 172:14
**2:52** 133:10
**20** 59:5,11 116:2,2
**2000** 2:9 15:11 32:7 106:2
**2005** 105:5
**2006** 17:10,18 104:19 105:5 106:2
**2007** 14:22,24 19:13,24 106:13
    107:5
**2008** 5:10 88:2 89:12
**2010** 29:20 33:17 42:23 45:22
    127:12 169:23
**2011** 1:20 8:1 172:15 173:14
**2013** 173:18
**203** 2:6
**21** 1:20 8:1 172:14
**2100** 1:19
**23:06:35** 127:14,22
**24** 5:21 111:23
**24th** 152:23
**25** 77:3,10,13,13 78:15,17,22 79:7
    79:9,12 160:16
**254-8474** 2:6
**26** 37:12,21,24 38:4 39:5 40:6
    111:17 112:6 155:15
**261** 10:3
**27** 156:8,19
**28** 156:24
**28(D)** 173:12
**29** 157:12
**29th** 173:14
**29-PAGE** 5:23 113:5

---

**3**

**3** 12:2,8,15 40:10 51:7 79:22 80:21
    96:4
**3rd** 123:4
**3,000,000** 126:2
**3/9/11** 5:12 92:12
**30** 60:10 124:4 157:21
**30th** 36:17 46:9 111:4 123:2,3
    126:19 127:11 129:9
**30/11/2010** 127:10
**31** 159:1
**32** 159:17
**32.5** 152:12
**344,000** 76:6
**344,190** 73:7

---

**4**

**4** 96:5 155:14 173:18
**4:06** 128:7
**4:57** 129:10
**40** 4:8
**42** 61:7,14,23

**43215** 1:20
**43230** 10:4
**46** 4:4 9:6 11:9,16 12:1
**47** 4:6 9:11 11:9,16 12:7
**48** 4:8 40:9,16,19 47:4 65:13
    161:16
**49** 4:11 50:9 51:5 52:24 53:22

---

**5**

**5** 96:5 142:4
**5:53** 130:10
**50** 4:11,14 24:7 56:23 57:6 77:21
    77:23 78:6,17 79:5
**500,000** 75:10 86:21 120:14 140:20
    147:7
**500,000.00** 140:15
**51** 4:16 57:13,20
**52** 4:19 69:7 71:12,16 75:13,16
**53** 4:22 69:22 70:4 71:19 83:21
**54** 5:1 70:12,18 71:7,22 75:17
    76:12 79:21 81:9 82:18 118:3
**55** 5:4 71:4 85:6
**56** 5:7 85:20,24
**57** 4:14,16 5:9 87:21 88:4
**58** 5:12 92:8,15,22 93:2
**59** 5:15 93:6,11

---

**6**

**6** 87:20 130:10 149:10 150:14
**6,000,000** 171:19
**6,120,000** 125:22
**60** 5:17 29:11 95:11,18,22 135:3
**61** 5:20 111:19 112:2
**62** 5:23 113:3,7,11,21 114:1 161:17
**63** 6:1 123:21 124:2
**64** 6:4 124:22 125:1
**646-1304** 2:10
**65** 1:18 6:7 126:10,14 129:13
**66** 6:10 128:22 129:1
**67** 6:13 130:3,6 167:22
**68** 6:15 132:21,24 134:18 137:19
    167:22 168:15
**69** 4:19 6:18 98:4 137:6,11 139:3,6
    167:22 168:15

---

**7**

**7** 87:20 134:8
**7:52** 133:11
**70** 4:22 5:1 6:21 141:12,16 162:24
    168:15
**70,000** 152:10
**71** 5:4 7:1 143:23 144:3,4
**713** 2:10
**72** 7:3 146:4,7
**73** 7:6 149:1,4
**74** 7:9 150:6,9
**75** 7:12 154:8,11,15

**77,000** 152:10,12
**77002** 2:10

---
### 8
---

**8** 42:12,16,20 87:20 133:11 134:8
  135:4 146:19 171:2
**86** 5:7
**88** 5:9

---
### 9
---

**9** 3:5 4:4,6 42:13 44:21 45:10 87:21
  171:2
**9,120,000** 125:22
**9:05** 1:20 8:2
**92** 5:12 104:9
**93** 3:5 5:15
**95** 5:17
**97** 38:4
**98** 38:4 104:9