## Page 1

```
1                    Wolfson
2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    -----------------------------x
     MILESTONE SHIPPING S.A.,
4
            Plaintiff,
5
         against      11 CV 0014(VM)
6                     ECF CASE
     ESTECH TRADING LLC and
7    AMERICAN ENERGY SERVICES,
     INC.,
8
            Defendants.
9    -----------------------------x
10
11          GARTH SETH WOLFSON
12          New York, New York
13          Friday, May 6, 2011
14
15
16
17
18
19
20
21
22   Reported by:  Steven Neil Cohen, RPR
23   Job No. 319710
24
25
```

## Page 2

```
1                    Wolfson
2             May 6, 2011
3              9:30 a.m.
4
5          Deposition of GARTH SETH WOLFSON,
6    taken by Defendants, pursuant to notice, at
7    the offices of Mahoney & Keane, LLP, 76
8    Beaver Street, New York, New York, before
9    Steven Neil Cohen, a Registered Professional
10   Reporter and Notary Public of the State of
11   New York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
1                    Wolfson
2             APPEARANCES
3
4    TISDALE LAW OFFICES, LLC
5    60 East 42nd Street
6    Suite 1638
7    New York, New York 10165
8          Attorneys for Plaintiff
9    BY:   CLAURISSE C. OROZCO, ESQ.
10
11   BAKER & HOSTETLER LLP
12   1000 Louisiana
13   Suite 2000
14   Houston, Texas 77002-5009
15         Attorneys for Defendant American
16         Energy Services
17   BY:   JAMES C. WINTON, ESQ.
18
19   MAHONEY & KEANE, LLP
20   76 Beaver Street
21   10th Floor
22   New York, New York 10005
23         Attorneys for Garth Seth Wolfson
24   BY:   EDWARD KEANE, ESQ.
25
```

## Page 4

Wolfson

IT IS HEREBY STIPULATED AND AGREED, by and between counsel for the respective parties hereto, that the sealing and filing of the within deposition be waived; that such deposition may be signed and sworn to before any officer authorized to administer an oath; that all objections, except as to form are reserved to the time of trial.

## Page 5

Wolfson

1   GARTH SETH WOLFSON,  called as a witness
2   by the Defendants, having been duly
3   sworn, testified as follows:
4   EXAMINATION
5   BY MR. WINTON:
6       Q.   Would you state your name for the
7   record please?
8       **A.   Garth Seth Wolfson.**
9       Q.   Mr. Wolfson, it is my
10  understanding that you are an attorney
11  admitted to practice in the State of New
12  York?
13      **A.   Yes, I am.**
14      Q.   And you are a partner in the law
15  firm of Mahoney & Keane?
16      **A.   That's correct.**
17      Q.   We are here in your offices for
18  your deposition today, correct?
19      **A.   Yes, we are.**
20      Q.   I assume that you have -- this may
21  be the first time you have ever been deposed
22  but you have taken lots of depositions,
23  right?
24      **A.   It is the first time I have been**

## Page 6

Wolfson

1   **deposed and I have taken many depositions.**
2   **I don't know what many is.  More than 100**
3   **easily.**
4       Q.   I wasn't going to ask you for a
5   number because I don't think any of us could
6   accurately state what that is.
7           What I was really getting to is we
8   don't have to go through all the rules about
9   depositions I assume and cut to the chase?
10      **A.   Sure.**
11      Q.   Okay.  How long have you been
12  admitted to practice law in New York?
13      **A.   I believe since 1997.**
14      Q.   Where did you graduate from law
15  school?
16      **A.   George Washington University.**
17      Q.   And have you been with Mahoney &
18  Keane since 1977?
19      **A.   I believe I started in the fall of**
20  **1996.**
21      Q.   I am sorry.
22      **A.   I believe I started in the fall of**
23  **1996 before I was admitted and then I was**
24  **admitted after passing the bar and all the**

## Page 7

Wolfson

1   **rest of it in 1997.**
2       Q.   I apologize.  I just added 20
3   years to your life. I am a '77 graduate so
4   that is why that number popped up.  Sorry.
5           It is my understanding that your
6   involvement in this matter was sort of in, I
7   suppose in three different capacities; you
8   executed a trust agreement with a letter
9   that contained terms of a trust with
10  American Energy Services that I will often
11  refer to as AES; is that correct?
12      **A.   I don't know what you mean by**
13  **"three different capacities."  I did sign**
14  **that letter.  Some would call it a side**
15  **letter, some called it a trust agreement,**
16  **whatever you want to characterize it.  I did**
17  **sign that.**
18      Q.   Who calls it a side letter?
19      **A.   I believe I called it a side**
20  **letter in certain correspondence which is in**
21  **the file.**
22      Q.   AES has never referred to it as a
23  side letter, have they?
24      **A.   I don't specifically recall them**

## Page 8

Wolfson

1   **referring to it as anything in particular.**
2       Q.   And in fact that letter is the
3   only agreement you are aware of that AES
4   entered, correct?
5       **A.   Written agreement?**
6       Q.   Yes, sir.
7       **A.   It is the only written agreement I**
8   **know of although I know they have made**
9   **allegations all through this.  I don't mean**
10  **to suggest they are right or wrong on that**
11  **score.**
12      Q.   "They" being plaintiff Milestone?
13      **A.   Yes.**
14      Q.   You also are the signatory to an
15  escrow agreement that we will talk about and
16  we will talk about the side letter.
17      **A.   Sure.**
18      Q.   You also signed an escrow
19  agreement, correct?
20      **A.   Yes.**
21      Q.   And it is my understanding that
22  you and Mahoney & Keane also acted as
23  counsel to Milestone in this matter relating
24  to the charter party between Milestone and

Page 9

Wolfson

1
2  Estech Trading LLC which I will refer to as
3  Estech; is that correct?
4      A.   It is not really correct, no.
5           We were retained as escrow agent.
6  We were approached to act as an escrow agent
7  and we agreed to act as escrow agent.
8           I believe over the years we have a
9  relationship with More Fisher Brown as we do
10  with other solicitors in England and other
11  lawyers around the world and sometimes we
12  are asked questions and give answers as
13  counsel.  Sometimes they are referring
14  counsel.  Sometimes they act in concert on
15  cases with an international dimension.
16           In this case looking through the
17  file he did ask me a legal question.  I
18  construed a legal question about assignments
19  that had something to do with this and I
20  gave them an off the cuff answer just
21  casually but my role was limited to being
22  escrow agent as far as the escrow agreement
23  was concerned and for that matter this side
24  letter or trust agreement.
25      Q.   You in fact gave legal advice to

Page 10

Wolfson

1
2  him with regard to a partial assignment of a
3  letter of credit that was to secure the
4  performance of this charter party between
5  Estech and Milestone, correct?
6      A.   That is what I was just referring
7  to, yes.
8      Q.   Okay.  And you, in fact, billed
9  Milestone for your services in rendering
10  that opinion, correct, the time you put in?
11      A.   I probably -- I believe my work
12  was predominantly just December 1 and
13  December 2 and as I recall there was a lot
14  of time spent doing various tasks, probably
15  billed for it altogether so my short answer
16  to your question is yes, I think I did.
17      Q.   So that is how I got to three
18  different capacities.
19           One, trustee under the December 2
20  trust agreement, escrow agent under the, and
21  I am not sure the date, December 2 escrow
22  agreement and then also rendering legal
23  advice at the request of Mark Seward of More
24  Fisher Brown?
25      A.   Yes, as long as it is understood

Page 11

Wolfson

1
2  that that legal advice was limited to that
3  one question about assignments.
4           It had nothing to do with the
5  escrow agreement.
6      Q.   We will -- you have produced your
7  billing records and we will come to those
8  and we can talk about that a little bit
9  more.
10      A.   Sure.
11      Q.   You mentioned, I am sorry, that
12  you have done some work for More Fisher
13  Brown, you being Mahoney & Keane?
14      A.   I would not say we don't work for
15  them.  What it is sometimes there will be
16  a client and there will be, for example, an
17  arbitration in London and a proceeding in
18  New York, for example, like this proceeding.
19           There will be a proceeding in
20  which case we will both be acting for the
21  same client and they might be referring
22  solicitors.
23           Similarly, there might be other
24  instances where you have large casualties
25  with litigation or arbitration in multiple

Page 12

Wolfson

1
2  fora and we might be working for the same
3  team.
4           I know there are instances where
5  More Fisher Brown have been involved with my
6  adversaries.  So we have worked both on the
7  same side and opposite sides but we were
8  never working -- representing More Fisher
9  Brown in an action where More Fisher Brown
10  is a party.  It would be a situation where
11  we have mutual clients.
12      Q.   And that was sloppy on my part.
13           The relationship with More Fisher
14  Brown is as referring counsel, is that a
15  fair statement?
16      A.   Sometimes it is referring counsel.
17  Sometimes as the referring counsel to my
18  adversaries and sometimes just -- they just
19  happen to be assigned by the same client so
20  they didn't refer us to them but the same
21  client hired us both.
22           It is not just More Fisher Brown.
23  It is many different firms over in London in
24  particular.
25      Q.   Sure.  And that is pretty common

Page 13

Wolfson

1  with maritime firms in New York?
2      A.   Yes, it is.
3      Q.   They have relationships with
4  solicitors in London who refer cases to
5  them.
6          And I hear what you are saying
7  that at times they are referring counsel for
8  your opponent?
9      A.   Yes.
10     Q.   Do you recall how many times
11 Mahoney & Keane has acted as New York
12 counsel on a referral from More Fisher Brown
13 where you were on the same side?
14     A.   It is hard to recall.  In the past
15 since the infamous case of Winterstorm there
16 was a lot of Rule B activity and many
17 maritime firms were very, very busy with
18 Rule B work most of which was referred from
19 London in particular because Rule B work is
20 to secure the results of London arbitration.
21         So the majority of my experience
22 personally with More Fisher Brown has been
23 in that context and so since the Second
24 Circuit overturned Winterstorm, there has

*(numbering shown is 1–25)*

Page 14

Wolfson

1  been practically none of that work coming in
2  and it is really hard for me to estimate how
3  many cases they referred.  Probably more
4  than ten.  But also probably certainly less
5  than 50 for example.  It is hard to even
6  come up with a number.  But during that time
7  we had hundreds of Rule B cases probably.
8      Q.   In each of those cases were you
9  working with Mark Seward of More Fisher
10 Brown?
11     A.   No.
12     Q.   How many times have you worked
13 with Mr. Seward?
14     A.   Again it is very difficult to say.
15 I don't know.  I am taking a stab in the
16 dark, maybe 20 times at most.
17     Q.   Have you been to London and met
18 with him?
19     A.   No.
20     Q.   Has he been to New York and met
21 with you here?
22     A.   No.
23     Q.   It is also my understanding that
24 Mahoney & Keane has represented Milestone

Page 15

Wolfson

1  prior to this particular action, is that
2  your understanding?
3      A.   I don't recall that.
4          MR. WINTON:  Would you mark this
5  as Exhibit 1?
6          Off the record.
7          (Discussion off the record)
8          (Complaint was marked Exhibit 1
9  for identification)
10 BY MR. WINTON:
11     Q.   Mr. Wolfson, the court reporter
12 has handed you what we marked as Exhibit 1.
13         I apologize.  I don't have
14 multiple copies of that.
15         Wait a minute.  Lawyers are the
16 worst witnesses and I am sure that was true
17 when my deposition was taken but let me get
18 the question out before you start going.
19         So I have handed you or the court
20 reporter has handed you what we marked as
21 Exhibit 1 which is a complaint in a matter
22 called Namviet Shipping versus somebody or
23 other or somebody versus Namviet.  I am
24 looking at it upside down.  I am sorry.

Page 16

Wolfson

1          Milestone versus Namviet.  I think
2  if you look at the signature page you will
3  see that complaint was filed by Mahoney &
4  Keane?
5      A.   Yes.  It looks like this is a
6  complaint that was signed by my partner.
7          I personally don't recall any role
8  in this and have no personal recollection of
9  it as I said but I don't doubt that it is
10 entirely possible that this could have --
11 that we did this.  I mean, no reason to
12 doubt the authenticity of this document.
13         If you are testing my recollection
14 I certainly have no recollection of ever
15 being involved in this nor do I recall who
16 referred it to us.
17         MR. KEANE:  I will stipulate that
18 it is our file and we were counsel.
19 BY MR. WINTON:
20     Q.   This is dated February 13, 2009.
21     A.   2009.
22     Q.   So looking at that does not
23 refresh your recollection?
24     A.   I have no recollection of that.

Page 17

1          **Wolfson**
2     Q.   Did you testify earlier that you
3   have no recollection of Mahoney & Keane
4   representing Milestone Shipping other than
5   this matter that we are here to talk about
6   today and obviously you have seen this and
7   heard Mr. Keane's stipulation?
8     **A.   Right.  That is my recollection.**
9   **I personally have no recollection of ever**
10  **working for Milestone before.**
11          **You have showed me this document.**
12  **It has been stipulated so obviously the firm**
13  **has represented Milestone through Mr. Keane.**
14    Q.   How many attorneys do you have at
15  Mahoney & Keane?
16    **A.   Six.**
17    Q.   How many partners?
18    **A.   Three.**
19    Q.   How many of them are active?
20    **A.   I don't know what you mean by**
21  **"active."**
22    Q.   Is Mr. Mahoney still actively
23  practicing?
24    **A.   Yes.**
25    Q.   It would be Mr. Mahoney, Mr. Keane

Page 18

1          Wolfson
2   and you are the three partners?
3     **A.   Yes.**
4          MR. WINTON:  Mark this as Exhibit
5   2.
6          (Cover letter was marked Exhibit 2
7   for identification)
8          MR. WINTON:  Mark this as Exhibit
9   3.
10         (Subpoena Duces Tecum was marked
11  Exhibit 3 for identification)
12  BY MR. WINTON:
13    Q.   Mr. Wolfson, the court reporter
14  has handed you what we marked as Exhibits 2
15  and 3.
16         Would you take a look at those
17  please?
18    **A.   I am looking at them.**
19    Q.   I assume you recognize those as a
20  cover letter and a subpoena DT that I sent
21  to you for documents in this matter?
22    **A.   Yes.  As I recall we discussed the**
23  **matter and I agreed to produce the documents**
24  **voluntarily and to accept the subpoena**
25  **voluntarily since you preferred to serve a**

Page 19

1          **Wolfson**
2   **formal subpoena.**
3          MR. WINTON:  Would you mark this
4   as Exhibit 4?
5          (Letter from Mr. Wolfson to Mr.
6   Winton was marked Exhibit 4 for
7   identification)
8   BY MR. WINTON:
9     Q.   Would you take a look at the
10  document that the court reporter has marked
11  Exhibit 4?
12    **A.   Sure.**
13    Q.   Do you recognize that to be your
14  letter to me that accompanied your
15  production of documents?
16    **A.   Yes, I do.**
17    Q.   Do you see in there a reference
18  indicating that you claim no privilege but
19  you are not necessarily waiving any
20  privilege?
21    **A.   Yes.  We basically are reserving**
22  **our objections to the extent we have any and**
23  **I gave you everything I could dig up on**
24  **this.**
25    Q.   So did you withhold any documents

Page 20

1          Wolfson
2   based on privilege?
3     **A.   Well, you asked for every**
4   **communication over the last several years**
5   **between myself and my partner for example.**
6          **As I said in my letter I don't**
7   **think that was really your intent to the**
8   **extent it was then, yes, I object to the**
9   **extent it is vague, overbroad and unduly**
10  **burdensome.  We can call the court right now**
11  **about it.**
12          **You similarly asked for every**
13  **communication over the years with More**
14  **Fisher Brown.**
15          **Similarly, I would say the same**
16  **thing.  We have acted as co-counsel together**
17  **for certain cases but I have given you**
18  **everything regarding this matter including**
19  **the opinion on assignments and to the extent**
20  **you wish to characterize that as us acting**
21  **as counsel and to the extent the court**
22  **agrees then, for example, the privilege**
23  **might apply there and we don't wish to waive**
24  **it.**
25    Q.   You correctly interpreted my

Page 21

Wolfson

1    request not to be a request for every
2    communication you ever had with your partner
3    on any subject but was intended to relate
4    solely to this case.
5         **A.   Jim, I gave you everything I could**
6    **find on this case, including my billing**
7    **slips, including everything that couldn't**
8    **even arguably relate to this case.**
9         Q.   When you say "billing slips,"
10   what are those?
11        **A.   My bill.**
12        Q.   Your bill?
13        **A.   Yes.**
14        Q.   I have rough time charges I made
15   in addition to the final that comes out from
16   the firm so I just wanted to make sure what
17   you were talking about because you didn't
18   give me your roughs, however you do it.
19        **A.   This is the typed up version of**
20   **exactly what I wrote.**
21        Q.   That is fine.
22             If you look at the subpoena DT in
23   the attached list of documents that we were
24   asking for one of the things we requested

Page 22

Wolfson

1    was electronically stored information under
2    the rules.
3             Did you not produce any of the
4    electronically stored information.  In other
5    words, the series of e-mails and such that
6    you produced are hard copy only.
7             Was there a reason you did not
8    produce the electronic versions?
9         **A.   Do you want me to prepare a CD ROM**
10   **for you with the same material?  My**
11   **understanding of the rules, I could print**
12   **out a hard copy for you or I could put it on**
13   **some sort of electronic format but I really**
14   **don't know what you are referring to as far**
15   **as any sort of noncompliance in that regard.**
16        **I have given you hard copies of**
17   **everything that was stored electronically or**
18   **otherwise.  It all --**
19        Q.   I think we are entitled to the
20   electronically stored information in its
21   native formats so that it comes with --
22        **A.   I don't know what you are**
23   **referring to.  If you want to follow up with**
24   **me about that I will be happy to respond.**

Page 23

**Wolfson**

1         Q.   Okay.
2         **A.   I have given you every document in**
3    **hard copy.**
4         MR. KEANE:  Yes, Mr. Winton, we
5    are not trying to hold back anything.
6    We view ourselves as escrow agents only.
7             I would be happy to talk to you
8    about what is required under the rule.
9         MR. WINTON:  This whole area of
10   ESI is sort of a mine field and I am not
11   pitching a fit about this at this point.
12            I am not sure there is anything in
13   any of these documents where I need to
14   see the electronic form but I would ask
15   that you make sure that it be preserved
16   so that if it becomes necessary then we
17   have got it.
18            One of the things that I -- that
19   we are going to struggle through today
20   is reconciling the sequence of
21   communications that went back and forth
22   particularly between you and London
23   because of the time difference and then
24   even two e-mails from the same source,

Page 24

Wolfson

1    either you or London will go back and
2    forth in the date time convention that
3    is used and it makes it sometimes very
4    hard to track so that is part of what I
5    want to do today.
6             Unfortunately that is going to be
7    tedious, boring and probably irritating
8    to all four of us but I have to sort
9    that out.
10            So at this point all I am asking
11   you to do is make sure that you impose
12   whatever document retention is necessary
13   to retain that in its electronic form
14   unmodified, unedited, whatever.
15        MR. KEANE:  It seemed odd at first
16   partly electronic but I can see the
17   distinction.
18   BY MR. WINTON:
19        Q.   So, anyway, I am good with what
20   you have done for now and with a
21   representation that you will hold on to that
22   stuff in its native format.  We need not
23   spend anymore time on that.
24            One of the -- request one, the

(Pages 21 to 24)

Page 25

Wolfson

1 first entity that I was asking for
2 communications about is Milestone Shipping
3 S.A., the plaintiff in this matter.
4        In terms of your dealings with
5 Milestone in this matter and I understand
6 you said you are not aware of any other
7 dealings between -- you have no personal
8 knowledge of any other dealings between
9 Mahoney & Keane and Milestone.  That is
10 fine.
11        In your dealings with Milestone
12 who, in fact, did you deal with?
13    **A.   The truth of the matter is I dealt**
14 **with Mr. Seward.  The only time I dealt with**
15 **Milestone is when he told me to forward**
16 **documents on to the various parties.**
17    **As I recall he asked me once or**
18 **twice to forward a document for circulation**
19 **and I believe if I am not mistaken that**
20 **Milestone was included in that e-mail**
21 **reference.  But I never communicated**
22 **directly with Milestone.  It was always**
23 **through Mark Seward.**
24    Q.   When you were forwarding to

Page 26

Wolfson

1 Milestone who was it that you were
2 forwarding to?  Was it in fact Milestone?
3 Because there is a shipping agent,
4 apparently Chaika agencies, here, is that
5 who you are --
6    **A.   It would be in the e-mail which is**
7 **basically the information I had.**
8    Q.   We will come to it.
9    **A.   I know there was somebody named**
10 **Yuri that was mentioned at some point.**
11 **Other than that it is just an e-mail address**
12 **that I had from -- that was supplied to me**
13 **from Mark Seward.**
14    Q.   So your communications are your
15 back and forth are entirely with Mr. Seward
16 who is the London solicitor with More Fisher
17 Brown?
18    **A.   Yes.**
19    Q.   And on a couple of occasions as
20 you recall you sent an e-mail forwarding
21 some documents to an e-mail address you
22 understood to be a point of contact
23 Mr. Milestone, fair statement?
24    **A.   Sure.  On those occasions at**

Page 27

Wolfson

1 **Mr. Seward's instructions to forward the**
2 **document for circulation.  I think it was**
3 **the escrow agreement or whatever so everyone**
4 **could sign it.**
5    Q.   Did you have any direct dealings
6 with Dan Slane?
7    **A.   No.**
8    Q.   The Slane company?
9    **A.   No.  Again I think I may have**
10 **circulated the agreement to an e-mail**
11 **address to be executed or whatever.  I never**
12 **spoke to Mr. Slane.**
13    Q.   Estech Trading, same sort of deal,
14 you may have forwarded documents to an
15 e-mail address you understood to be Estech?
16    **A.   Yes.**
17    Q.   But you had no communications
18 directly with Estech in the form of oral
19 communication or something other than just
20 an e-mail?
21    **A.   Not that I recall.**
22    Q.   American Energy Services, same
23 thing with the exception that you did in
24 fact talk on the phone to Tom Moloney?

Page 28

Wolfson

1    **A.   Yes, I spoke to Mr. Moloney.**
2 **Aside from that, no.**
3    Q.   Jan or Jan Michalek?
4    **A.   That doesn't ring a bell with me.**
5    **You are testing my recollection.**
6 **I don't remember ever speaking to somebody**
7 **by that name but if you have a document that**
8 **you can refer me to maybe --**
9    Q.   We will see it as we go through
10 it.
11        How about Johan Schild?
12    **A.   I don't know.  Again he might be**
13 **somebody just on an e-mail list but I never**
14 **spoke to anyone by that name that I can**
15 **recall.  Nor do I know who he is off the top**
16 **of my head.**
17    Q.   Okay.  Another name I see floating
18 around in the documents is Mikhail
19 Gerasimov?
20    **A.   Now again I can make assumptions**
21 **about who he might be but I don't know.**
22    Q.   Demitrus, same thing?
23    **A.   Same thing.**
24    Q.   There were discussions about

Page 29

Wolfson

1
2  Milestone as owner of the vessel that at one
3  point RODON, at another time SANTA BARBARA.
4  Do you have any understanding of what the
5  actual relationship between Milestone and
6  either of the two vessels is?
7      A.  Well, as you know --
8      Q.  Actual personal knowledge.
9      A.  As you know being a maritime
10  attorney yourself the term owner and
11  charterer is often bandied about with a
12  little less than absolute precision.
13      You can be a disponent owner, you
14  can be a registered owner, you can be a head
15  owner a and owner vis-a-vis one charterer
16  may be a charterer vis-a-vis another party.
17      As a general matter we may be
18  dealing with agents and brokers and we just
19  refer to owners' interests as owners and
20  charterers' interests as charterers.
21      So the answer is, no, I don't know
22  but I would refer to them as owners since
23  they were the -- they were representing the
24  interests of the owners of the charter
25  party.

Page 30

Wolfson

1
2      Q.  Is the answer to my question, no?
3      A.  Repeat the question.
4      Q.  Do you have any personal knowledge
5  of the actual relationship between Milestone
6  and either the vessel RODON or the vessel
7  SANTA BARBARA?
8      A.  I stand by my answer.  I would say
9  personal knowledge, no.  I was not
10  personally involved in negotiating that
11  charter party, no.
12      Q.  This is why deposing lawyers is
13  frustrating.
14      If you would, just like I am sure
15  you have instructed witnesses a thousand
16  times, please listen to the question and
17  answer the question asked.
18      We will get out of here in time to
19  make it to the dinner tonight.
20      A.  And I instruct my witnesses to
21  give a full and complete answer.
22      Q.  Nobody is asking you not to give
23  an accurate answer but --
24      A.  That is what I tried to do, Jim.
25      Q.  Well, the direct answer was, no, I

Page 31

Wolfson

1
2  have no personal knowledge but anyway.
3      Take a look at our list of
4  requested documents, item 12.
5      MS. OROZCO:  From Exhibit 3?
6      MR. WINTON:  Yes.
7  BY MR. WINTON:
8      Q.  That request is, "Any and all
9  writings or recordings that refer, relate or
10  pertain to your" meaning Mahoney & Keane,
11  "deposit of the $500,000 transferred to you
12  by AES or any transferee reallocation,
13  redeposit or the movement or change in
14  status of said $500,000 since your receipt
15  thereof on December 3, 2010."
16      Do you see that?
17      A.  Yes.
18      Q.  Did you look personally or
19  instruct anyone to look to see whether or
20  not there are any documents in the
21  possession of Mahoney & Keane that relate to
22  the receipt or transfer of that money?
23      A.  Yes.  I did it myself and I found
24  correspondence and I produced
25  correspondence.

Page 32

Wolfson

1
2      It was of some interest to the
3  parties that the funds be received quickly
4  and I know people were anxious to hear when
5  they were received and I produced the
6  correspondence to that effect as I recall.
7      MR. WINTON:  Objection.
8  Non-responsive.  Beyond, yes, I did look
9  and I produced what I found.
10      THE WITNESS:  I did look and I
11  produced what I found.
12  BY MR. WINTON:
13      Q.  If you could just answer the
14  question this will go a lot faster.
15      Ms. Orozco is here.  If she thinks
16  that Milestone's position needs to be
17  brought out at this point in time I suspect
18  she is completely capable of doing so.
19      A.  I didn't think I was bringing out
20  Milestone's position so I would object to
21  that characterization.
22      I was simply telling you what I
23  did.
24      Q.  Is it your understanding that as a
25  fiduciary that you are required to keep, to

(Pages 29 to 32)

Page 33

Wolfson

1 create, maintain and keep records relating
2 to the receipt and movement of money
3 specifically deposit slips and so forth?
4 **A. I don't know what you mean by**
5 **"fiduciary."**
6 **In my role as -- under that letter**
7 **agreement and in my role as escrow**
8 **agreement -- under the escrow agreement I**
9 **did have those records of when I received**
10 **the funds into our attorney trust account**
11 **and I relayed those advices on.**
12 **I don't know what you are**
13 **referring to.**
14 Q. Is it your understanding that
15 under the terms of the December 2, 2010
16 trust agreement that you executed with AES
17 that you were by that document and by the
18 receipt of the $500,000 that you on behalf
19 of Mahoney & Keane became a fiduciary with
20 regard to that money and with regard to AES?
21 **A. I guess, yes. I was supposed to**
22 **hold it in trust and according to that side**
23 **letter or however you want to characterize**
24 **it and I did. It is still held in trust.**

*(Note: line numbers 1–25)*

Page 34

**Wolfson**

1 Q. Okay. So is the answer yes, it
2 was your understanding that by entering into
3 that agreement and receiving that money you
4 undertook fiduciary duties to AES?
5 **A. I undertook all the duties**
6 **outlined in that agreement. You can call it**
7 **trust duties, you can call it escrow duties,**
8 **I did undertake those duties.**
9 MR. KEANE: I will stipulate that
10 we acted as fiduciary.
11 THE WITNESS: Absolutely. I don't
12 know what you are getting at.
13 If you want to ask me, ask about a
14 legal question, I --
15 MR. KEANE: He is just defining
16 our relationship. We were escrow
17 agents, fiduciaries and that is
18 stipulated.
19 MR. WINTON: Follow his lead. He
20 responds directly to the questions.
21 MR. KEANE: I have been deposed
22 ten days. It is unfamiliar turf.
23 MR. WINTON: I know. As I said I
24 got deposed for four days myself and it

Page 35

Wolfson

1 is not fun.
2 THE WITNESS: Yes, so was I. I
3 counsel my witnesses not to answer legal
4 questions. If you want a legal opinion
5 I go to the judge. That is my only
6 concern.
7 MR. WINTON: I don't think I asked
8 for a legal opinion. I think I asked
9 you, is it your understanding --
10 MR. KEANE: Normally I would have
11 said something but in this case it is
12 stipulated. That is our role.
13 THE WITNESS: That is fine.
14 BY MR. WINTON:
15 Q. And is it your understanding that
16 it is your, and I am talking about Mahoney &
17 Keane, your obligation to account for and to
18 create records that track the receipt into
19 the bank account and any movement of that
20 money?
21 **A. I don't know about making records**
22 **but we have records. I don't know, I am not**
23 **saying it was my obligation to maintain**
24 **records like that but it was certainly my**

Page 36

**Wolfson**

1 **obligation to maintain that money and I did**
2 **and in fact I have all the documents**
3 **relating to it. Nothing is deleted.**
4 **If the money was going to be moved**
5 **anywhere there would be a record of it and**
6 **it would not be deleted.**
7 Q. You did not produce a deposit slip
8 that relates to the $500,000, correct?
9 **A. The $500,000 was wired. I don't**
10 **believe we necessarily get a deposit slip.**
11 **It is often done just by the phone.**
12 Q. You would get a confirmation from
13 your bank by --
14 **A. That's right.**
15 Q. -- by wire saying this money was
16 received into XYZ account?
17 **A. That's right. As I recall in this**
18 **particular instance everyone was waiting for**
19 **the funds so it was in fact done by**
20 **telephone.**
21 MR. KEANE: If we had not produced
22 banking records and you want any --
23 MR. WINTON: Yes.
24 MR. KEANE: -- I will be happy to

Page 37

Wolfson

1  get them.  Maybe I can get them while
2  you are here.
3      MR. WINTON:  If you could.  None
4  of us want to come back and resume this
5  deposition.
6      MR. KEANE:  Let me see.
7      MR. WINTON:  Because what I was
8  asking for with this request is any
9  deposit slip, any record from the bank
10  indicating receipt of the money.
11     MR. KEANE:  I have you now.  That
12  may have gone over my head.
13     MR. WINTON:  Let me finish.
14     Any record from the bank of any
15  movement of the money to a different
16  account.
17     Any internal record bookkeeping
18  entry that said this money which was
19  received in trust under the December 2
20  trust agreement has now been moved over
21  to the December 2 escrow agreement.
22     So any kind of internal
23  bookkeeping entry.  That is what I was
24  after.

*(line numbers 1–25)*

Page 38

Wolfson

1      MR. KEANE:  I take your point.
2      THE WITNESS:  We will get you
3  those bank documents to the extent we
4  have any but I can tell you that
5  unequivocally the funds never moved.
6      The escrow account and the trust
7  account were the same account.
8      MR. WINTON:  I understand, you
9  call it an IOLA.
10     THE WITNESS:  Yes.
11  BY MR. WINTON:
12     Q.   We call it an IOLTA but it is the
13  same thing.  It is a non-interest bearing
14  account that law firms have basically for
15  short-term money and the interest instead of
16  having to be accounted for, it ends up going
17  for indigent legal services.
18     **A.   That is correct.**
19     Q.   Okay.  Same system.
20     **A.   Yes.**
21     Q.   Do you want to wait until
22  Mr. Mahoney gets back -- Mr. Keane, sorry.
23  But I don't know them.  Mr. Keane.
24     **A.   That is okay.**

Page 39

Wolfson

1      Q.   I really trip up when we get to
2  Mahoney and Moloney.
3      MR. WINTON:  Off the record.
4      (Recess)
5  BY MR. WINTON:
6      Q.   Back on the record.
7      Ms. Orozco pointed out as we were
8  off the record and I should have noted it
9  that the documents that were sent to me by
10  Mahoney & Keane I have added Bates numbers
11  to so that as they came from Mahoney & Keane
12  they were not Bates labeled and I go crazy
13  when I try to deal with that so I went ahead
14  and added M and K with a number.
15     **A.   That is fine.  As I pointed out**
16  **off the record there is a great deal of**
17  **duplication.  There are string e-mails.**
18     **I did my best not to mess with the**
19  **way they were bound and that is how I**
20  **produced them and I certainly have no**
21  **problem with you Bates stamping them.**
22     Q.   I appreciate that.
23     So back on task here, I was asking
24  questions about the money and you said that

Page 40

Wolfson

1  it has never been moved out of the IOLA
2  account, is that how you guys pronounce it?
3      MR. KEANE:  IOLA.
4      THE WITNESS:  IOLA.
5      MR. KEANE:  Can I interrupt?
6      MR. WINTON:  Off the record.
7      (Discussion off the record)
8      MR. WINTON:  Number 5.
9      (Banking records that relate to
10  receipt and holding of $500,000 received
11  from AES was marked Exhibit 5 for
12  identification)
13  BY MR. WINTON:
14     Q.   Back on the record.
15     Mr. Wolfson, Mr. Keane has
16  produced what we have marked as Exhibit 5
17  which as I understand it are the firm's
18  banking records that relate to the receipt
19  and holding of the $500,000 received from
20  AES under the trust agreement letter of
21  December 2, 2010.
22     Is that your understanding?
23     **A.   Yes.  That is my understanding.  I**
24  **haven't seen the document before but that is**

Page 41

| | |
|---|---|
| 1 | **Wolfson** |
| 2 | my understanding. |
| 3 | MR. KEANE:  I should probably add |
| 4 | we no doubt I didn't ask but I am sure |
| 5 | we have monthly statements with the same |
| 6 | information repeated over and over |
| 7 | again. |
| 8 | BY MR. WINTON: |
| 9 | Q.   If you want to stipulate on behalf |
| 10 | of the firm that the money has never been |
| 11 | moved out of that IOLA account that is fine. |
| 12 | **A.   The money has never been moved nor** |
| 13 | **would we ever have any sort of indication as** |
| 14 | **to whether it was held under one agreement** |
| 15 | **or another agreement.  It would just be in** |
| 16 | **the IOLA.** |
| 17 | Q.   Okay.  Well, let me ask this -- |
| 18 | MR. KEANE:  It stayed where it has |
| 19 | been. |
| 20 | MR. WINTON:  I wasn't questioning |
| 21 | that that was the case. |
| 22 | BY MR. WINTON: |
| 23 | Q.   But you then got to my next |
| 24 | question which was obviously the fight in |
| 25 | this lawsuit is whether that money is |

Page 42

| | |
|---|---|
| 1 | Wolfson |
| 2 | subject to the trust agreement, the terms of |
| 3 | the trust agreement or is subject to the |
| 4 | escrow agreement? |
| 5 | **A.   Yes, I get it.** |
| 6 | Q.   That is good because if you didn't |
| 7 | it was going to be a really long day. |
| 8 | So the question is whether or not |
| 9 | there are any bookkeeping entries made by |
| 10 | Mahoney & Keane that would indicate that |
| 11 | that money had been -- come out from under |
| 12 | the jurisdiction of the trust agreement |
| 13 | letter and come under the jurisdiction of |
| 14 | the escrow agreement? |
| 15 | **A.   There would be no indication one** |
| 16 | **way or another.** |
| 17 | Q.   And based on the documents I have |
| 18 | seen there has never been a letter, e-mail, |
| 19 | communication of any sort from Mahoney & |
| 20 | Keane to AES saying that the money is |
| 21 | jurisdictionally effectively moving from the |
| 22 | trust agreement to the escrow agreement |
| 23 | because some conditions precedent that |
| 24 | Milestone believe existed had been met and |
| 25 | therefore money is now in escrow rather than |

Page 43

| | |
|---|---|
| 1 | Wolfson |
| 2 | trust, is that a fair statement? |
| 3 | **A.   We never sent anything to AES like** |
| 4 | **that.** |
| 5 | Q.   And correspondingly you never sent |
| 6 | anything to Milestone saying this money is |
| 7 | now under the jurisdiction of the escrow |
| 8 | agreement? |
| 9 | **A.   No.  I didn't.  It wouldn't be for** |
| 10 | **me to say.  I didn't.  I didn't say anything** |
| 11 | **about it at all.** |
| 12 | **There -- after this money was** |
| 13 | **received there was largely silence until a** |
| 14 | **breach occurred around Christmas.** |
| 15 | Q.   The breach you are referring to? |
| 16 | **A.   The charter party.** |
| 17 | Q.   The charter party, the alleged |
| 18 | breach of the charter party between |
| 19 | Milestone and Estech? |
| 20 | **A.   Yes.** |
| 21 | Q.   Has Mahoney & Keane ever rendered |
| 22 | any accounts to AES or Milestone regarding |
| 23 | the money, sent them any notices and I guess |
| 24 | what you said is no? |
| 25 | **A.   I believe there was interest when** |

Page 44

| | |
|---|---|
| 1 | **Wolfson** |
| 2 | **we received it.  I confirmed when we** |
| 3 | **received it and after that point there was** |
| 4 | **no communication with AES at all until** |
| 5 | **Mr. Moloney demanded the return of the funds** |
| 6 | **I guess around Christmastime, I forget the** |
| 7 | **exact date.  It is in the e-mail.** |
| 8 | Q.   So I take it you did not consider |
| 9 | when that money supposedly came out from |
| 10 | under the jurisdiction of the trust |
| 11 | agreement and fell under the jurisdiction of |
| 12 | the escrow agreement that effectively |
| 13 | is a disbursement of AES trust funds over to |
| 14 | Milestone trust funds? |
| 15 | **A.   I thought there were these two** |
| 16 | **agreements that were signed.  I signed both** |
| 17 | **of them with the consent and approval of** |
| 18 | **both Milestone and AES, and Estech was** |
| 19 | **involved in it as well, and whatever** |
| 20 | **happened to those funds was governed by** |
| 21 | **those agreements.** |
| 22 | Q.   You say you signed the escrow |
| 23 | agreement with the approval of AES -- |
| 24 | **A.   Well, AES was aware of the escrow** |
| 25 | **agreement and the letter agreement** |

Page 45

Wolfson

1  referenced the escrow agreement and
2  specifically referenced the escrow agreement
3  substantively so I am pretty sure AES was
4  aware of that escrow agreement.
5      Q.   It specifically referenced that
6  there were documents that were being
7  discussed, correct?  We can get to that.  We
8  don't need to argue about that.  We can look
9  at it and see exactly what it says.
10     A.   AES can testify as to whether they
11  saw that escrow agreement and if so, when
12  and in what form.
13     Q.   And whether or not they ever saw a
14 final agreement?
15     A.   Right.
16         My understanding certainly was
17 that AES was aware of the escrow agreement
18 since it was specifically referenced in the
19 letter.
20     Q.   I will object as non-responsive
21 your answer to my question.
22         Let me ask the question again.
23         Was it your understanding that
24 when that money, as a fiduciary, when that

Page 46

Wolfson

1  money came out from under the terms of the
2  trust agreement letter that you signed with
3  AES and came under the jurisdiction of the
4  escrow agreement that you signed with Estech
5  and Milestone that that is effectively a
6  disbursement of AES money to the escrow
7  agreement that was a separate agreement with
8  separate parties?
9      A.   I don't know what you mean by
10 "disbursement."
11         The way I understood the
12 transaction is that when the escrow
13 agreement was finalized, when the charter
14 party was finalized that these funds would
15 become the escrow funds.
16         Now I understand -- you are
17 forcing me to take sides by asking my
18 opinion on the matter.  I was with --
19     Q.   No.  I am not asking your opinion.
20 I asked your understanding.
21     A.   All right.  My understanding.
22         My understanding was that this is
23 what the parties agreed to that -- where is
24 the side letter?  It helps if we have the

Page 47

Wolfson

1  actual agreement in front of us.
2      Q.   We will get to the subject.  It is
3  not a side letter.  We have a trust
4  agreement.
5          I would object to the designation
6  of it as a side letter which is something
7  that AES has never called that.
8      A.   You can call it a Diet Coke for
9  all I care.
10         The agreement speaks for itself
11 and my understanding of that agreement was
12 that AES had an absolute right to return
13 that money at any time prior to the
14 finalization of the escrow agreement.
15         And that the whole purpose of this
16 because it wasn't clear to me at first was
17 that there be simultaneity to that.  Before
18 Milestone or whoever the owner may be
19 chartered this vessel and undertook these
20 burdens and obligations with respect to
21 carrying this cargo that there be a
22 mechanism by which security would
23 immediately be in place.
24         And AES, I understood, wanted

Page 48

Wolfson

1  similarly a mechanism through which it could
2  get the money returned to the extent that
3  the charter party was not fixed and an
4  escrow agreement was not reached.
5          That was my understanding and
6  sorry if it is not your understanding but
7  that was my understanding.
8      Q.   I would say that is absolutely
9  correct.  That is not my understanding.
10 That is certainly not AES's understanding.
11         What do you base that
12 understanding on that you just laid out for
13 us?
14     A.   The letter.
15     Q.   Which letter?  Just tell me which
16 letter?
17     A.   The trust agreement, side letter,
18 whatever you want to call it.
19     Q.   All right.  We will get to that.
20     A.   Okay.
21     Q.   So even with that your stated
22 perspective on what the deal was here?
23     A.   It wasn't my deal.
24     Q.   I understand that.  You said what

Page 49

Wolfson

1    your understanding was.
2    **A.   Yes.**
3    Q.   I am accepting that is what your
4    understanding is.
5    **A.   Yes.**
6    Q.   When did you achieve that
7    understanding?
8    **A.   Well, when, after Mr. Moloney**
9    **called me and said -- this was all**
10   **completely out of the blue.  I didn't know**
11   **who he was.  I --**
12   Q.   The question was when?
13   **A.   I am telling you.**
14   **It was when Mr. Moloney -- after**
15   **Mr. Moloney called me and when I wrote to**
16   **Mark Seward saying what is this about, that**
17   **he described it to me and right about**
18   **practically the same time I got the side**
19   **letter and saw the language in the side**
20   **letter and at that time I understood what**
21   **the transaction was about because it made no**
22   **sense to me before.**
23   Q.   So your statement is that you
24   reached this understanding upon receipt of

(continued)

Page 50

Wolfson

1    the trust agreement from Mr. Moloney?
2    **A.   Yes.  That in combination with the**
3    **advices from Mark Seward.**
4    Q.   Did you ever discuss that
5    understanding with Mr. Moloney to make sure
6    that you and he were on the same page?
7    **A.   Mr. Moloney -- my conversation**
8    **with Mr. Moloney was before that so I don't**
9    **believe that this was ever explicitly**
10   **discussed so I don't recall saying --**
11   **speaking about that with Mr. Moloney at all.**
12   Q.   So you obtained your understanding
13   from discussions with Mr. Seward and your
14   interpretation of the trust letter?
15   **A.   And there is also a prior**
16   **conversation with Mr. Moloney but it**
17   **wasn't -- it hadn't crystalized by then**
18   **because my understanding -- I got a call**
19   **from somebody, I don't know who he is and**
20   **says we are the people putting the $500,000**
21   **in but we need a side letter from you making**
22   **sure we can get the money back.**
23   Q.   I thought we agreed that
24   Mr. Moloney has never referred to the trust

Page 51

Wolfson

1    letter as a side agreement?
2    MR. KEANE:  Let's agree --
3    THE WITNESS:  You are hung up on
4    semantics.
5    I don't care what you call it --
6    MS. OROZCO:  Can we mark the
7    document and that way refer to it as an
8    exhibit because I think that would be
9    much better?  That would be my
10   suggestion but --
11   MR. KEANE:  Or we can come up with
12   any term.
13   THE WITNESS:  Do you want me to
14   call it a trust agreement, I will call
15   it a trust agreement.
16   MR. WINTON:  That is what I have
17   been calling it.
18   THE WITNESS:  I will try to.
19   I had a conversation with
20   Mr. Moloney.  He called me out of the
21   blue.  I didn't know who he was.  He
22   introduced himself.  He said, "I am the
23   counsel for the party that will be
24   putting in the $500,000."

Page 52

Wolfson

1    I believe in my e-mail to
2    Mr. Seward I called him charterer's
3    counsel.  I understand now that may be
4    incorrect in that he was actually with AES
5    and not technically the charterer.
6    He says, we need your confirmation
7    that we can get this money back, you
8    know if the security does not come in or
9    if -- he didn't really say if.  He said,
10   I need some assurance that I can get the
11   money back upon my demand.
12   And so then I didn't understand
13   what he was talking about because we
14   have an escrow agreement and the whole
15   point of the escrow agreement is to have
16   the security.
17   So then I wrote to Mark and I said
18   I got a call from some guy saying, you
19   know, he needs our confirmation that he
20   can get the money back at any time upon
21   his demand.  Is this true?
22   And Mark wrote back and said,
23   well, you can confirm for him that he
24   can get it back at any time prior to I

Page 53

Wolfson

1
2  think he said the escrow agreement
3  coming into place.
4      And then I understood that what
5  Mr. Moloney was referring to, which he
6  didn't articulate very well and
7  certainly did not clearly to me was just
8  for that interim period before the
9  finalization of the escrow agreement he
10  wanted an assurance that should the deal
11  fall apart that they get their money
12  back.  Just like Mr. Seward wanted
13  assurance that should the deal go
14  through that money would be in place.
15      Practically simultaneously I
16  received from Mr. Moloney a proposed
17  draft letter from -- letter from us,
18  agreement from us and I looked at the
19  language of that letter and there was
20  particular language in there saying that
21  they had basically an absolute right to
22  return of those funds at any time prior
23  to the reaching of the escrow agreement.
24      I thought that that contingency
25  that it applied only to prior reaching

Page 54

Wolfson

1
2  the escrow agreement was the product of
3  a negotiation between AES and Estech and
4  Mark Seward and Milestone which I was
5  not privy to.
6      When Mr. Moloney called he
7  obviously had discussions with other
8  people, not me, and it had been a fait
9  accompli.  He advised me about this and
10  so I advised Mark Seward, is this true.
11      Then I see the agreements.  This
12  is what they are talking about.  I sent
13  it on to Mark Seward.  I said, is this,
14  okay, is this what you want me to sign.
15  He said, yes, and I did it.
16      MR. WINTON:  Objection.
17      Non-responsive.
18  BY MR. WINTON:
19      Q.   So you based the understanding
20  that you have articulated on the initial
21  call from Mr. Moloney, an exchange you had
22  with Mr. Seward and your interpretation of
23  the trust agreement sent to you by
24  Mr. Moloney.  Is that a fair statement?
25      A.   Yes.  But I also relied on my

Page 55

Wolfson

1
2  brain and there was no other way this deal
3  made any sense to me because it made no
4  sense, the interpretation which I heard for
5  the first time only around Christmastime
6  from Mr. Moloney that what we actually
7  agreed to was they could get their money
8  back at any time made no sense to me because
9  why did he send me money to be held in
10  escrow or to be held in trust for no reason
11  other than that he can demand it back at any
12  time making no interest.  It made no sense.
13      And so I kept asking Mr. Moloney
14  for an explanation before I reached any
15  decision on who should get the funds and I
16  never got a good answer as to why he did
17  this under his explanation.
18      The only explanation that made
19  commercial sense to me was that -- was what
20  Milestone was suggesting.  I am sorry.  That
21  is my opinion.
22      MR. WINTON:  Objection.
23      Non-responsive.
24  BY MR. WINTON:
25      Q.   You received -- you had

Page 56

Wolfson

1
2  Mr. Moloney's initial statement in his
3  telephone call.  You conveyed that
4  information to Mr. Seward, you got
5  Mr. Seward's response.
6      You received the trust agreement
7  letter from Mr. Moloney and you did not at
8  any time prior to the December 23 time
9  frame, late December, you did not at any
10  time go back to Mr. Moloney and ask for
11  confirmation that your understanding was
12  correct, is that a fair statement?
13      A.   That is a fair statement.  I mean
14  I didn't ask him to explain what he meant by
15  the terms of the letter agreement.
16      For all I know these parties
17  negotiated this so that it would be
18  intentionally ambiguous.  For all I know it
19  is not ambiguous.  Maybe they are right.
20  Maybe you are right.
21      My reading of it is, as I said, I
22  think there is a condition that it only
23  applies to the reaching of the escrow
24  agreement.  If I am wrong Judge Marrero will
25  say so.

Page 57

Wolfson

1
2    Q.   So you as a fiduciary to AES made
3    your own decision about what the agreement
4    was, is that a fair statement?
5    **A.   The agreement was AES's language**
6    **and you are asking me what my understanding**
7    **of the agreement was.  That was my**
8    **understanding.**
9         **I can read English just like**
10   **Mr. Moloney can read English and it is not**
11   **uncommon that people have different**
12   **interpretations.**
13   Q.   You were a fiduciary to AES,
14   correct?
15   **A.   Yes.**
16   Q.   As a fiduciary you have very high
17   obligations to the beneficiary of the trust,
18   correct?
19   **A.   Yes, I do and I also have**
20   **fiduciary obligations under the escrow**
21   **agreement and there was a dispute as to**
22   **whether this falls under the escrow**
23   **agreement or whether it falls under the**
24   **trust agreement.**
25        MR. WINTON: Objection.

Page 58

Wolfson

1
2    Non-responsive.
3    BY MR. WINTON:
4    Q.   Please answer my questions.
5    You are here as a combatant for
6    Milestone and that is not your role.
7         MS. OROZCO: Objection.
8         THE WITNESS: Don't ask my
9    understanding if you don't want it.
10   BY MR. WINTON:
11   Q.   I didn't.  I asked you -- this
12   question was what you did.  Okay?
13   **A.   Okay.**
14   Q.   And would you agree with me that
15   you were a fiduciary with obligations to AES
16   and what you did rather than calling
17   Mr. Moloney and making certain that as a
18   fiduciary to AES you and AES were on the
19   same page as to what the agreement was, you
20   made your own decision about what made sense
21   and what was right and wrong?
22   **A.   That was not my duty as a**
23   **fiduciary to Mr. Moloney to help him draft**
24   **his own agreement.**
25   Q.   It is your obligation to carry

Page 59

Wolfson

1
2    out --
3    **A.   That's right.  And I understood --**
4         MR. KEANE:  Garth, you are
5    speaking over him.
6         THE WITNESS:  It was my
7    understanding to carry out the terms of
8    the agreement were and I understood the
9    agreement --
10        MR. KEANE:  It is going to take a
11   longer amount of time and that's my
12   point.  You can't cut his question off.
13        Let him get his question out and
14   just answer.
15   BY MR. WINTON:
16   Q.   So what you did was you made your
17   own decision about what the agreement was
18   without at any time confirming with
19   Mr. Moloney that your understanding was
20   correct?
21        MR. KEANE:  Objection.  I don't
22   think that fairly recapitulates his
23   testimony to be honest.
24        I think you asked him a question
25   subsequent to those events as to what he

Page 60

Wolfson

1
2    thought about the construct of that
3    agreement and I think your question is
4    in a different time frame.
5         MR. KEANE:  I don't think so.
6         I think my question or the problem
7    is he is not answering my questions and
8    so he goes off on a tangent and it is
9    hard to figure out where the question is
10   originally going.
11        MR. KEANE:  Maybe if we got
12   clarified.  My view of his answer so far
13   is that --
14        MR. WINTON:  Wait.
15        MR. KEANE:  Okay.  My objection is
16   there is a time frame shift going on
17   here.
18        MR. WINTON:  Feel free to make
19   your objections.
20        THE WITNESS:  If you give me a
21   sentence that says Spot is a dog and I
22   read that as Spot is a dog I don't
23   necessarily need to go back to the
24   person who gave it to me and say are you
25   sure Spot is a dog and not a cat.

Page 61

Wolfson

1
2       I had an agreement in front of me.
3   It said what it said.
4       I had the understanding that I had
5   the understanding.  I felt no need to go
6   back to Mr. Moloney and ask him to
7   further clarify his own language.  I
8   went --
9   BY MR. WINTON:
10      Q.   But you did --
11      A.   I went to the people I was working
12  for under the escrow agreement and I said is
13  this okay with them.
14      Q.   But you did feel it was necessary
15  to go to Mr. Seward --
16      A.   Absolutely.
17      Q.   -- and ask for his understanding?
18      A.   Absolutely because the funds -- to
19  try to separate the trust agreement from the
20  escrow agreement is inaccurate and futile.
21  They were linked.  They were linked
22  expressly.
23          MR. WINTON:  Objection.
24      Non-responsive.
25

Page 62

Wolfson

1
2   BY MR. WINTON:
3       Q.   Please just answer my questions.
4       A.   I did feel it necessary to go to
5   Mr. Seward.  I was not going to sign that
6   agreement unless all parties were on board.
7       Q.   "That agreement" being the trust
8   agreement?
9       A.   The trust agreement.
10      Q.   So you got Mr. Seward's
11  understanding of what was going on but you
12  did not go back to Mr. Moloney to make sure
13  he agreed with what Mr. Seward said?
14          MS. OROZCO:  Objection.
15          THE WITNESS:  No.  I got a draft
16      from one side and I sent it to the other
17      side, is this okay.  Both parties have
18      to approve the draft.
19          You are really twisting it.  I am
20      not trying to be evasive but I am trying
21      to answer your question.
22  BY MR. WINTON:
23      Q.   You never sent the escrow
24  agreement to Mr. Moloney for his approval,
25  did you?

Page 63

Wolfson

1
2       A.   He wasn't signing the escrow
3   agreement.  I assumed he was aware of the
4   escrow agreement.
5       Q.   Mr. Seward didn't sign the trust
6   agreement, right?
7       A.   But it affected his interest under
8   the escrow agreement.
9       Q.   But you are telling me that the
10  escrow agreement affected Mr. Moloney's
11  funds.
12      A.   I understood that he was aware of
13  the escrow agreement.
14      Q.   You understood it but you never
15  asked him?  That is the simple question.
16      A.   He referenced in his own letter
17  that he gave to me.
18          You are pushing fiduciary duty to
19  suggest I should have done a lot more.
20      Q.   I just want you to answer the
21  question.
22          MR. KEANE:  This is a yes or no
23      question.
24          THE WITNESS:  I did not send him,
25      as far as I recall, another copy of the

Page 64

Wolfson

1
2   escrow agreement.
3   BY MR. WINTON:
4       Q.   Very simple.  You got it.
5       A.   It was still being negotiated as I
6   understood it.
7       Q.   You got the phone call from
8   Mr. Moloney stating his understanding of
9   what was going to happen, you sent that in
10  an e-mail to Mr. Seward on behalf of
11  Milestone.
12      A.   Yes.
13      Q.   You got Mr. Seward's position on
14  what was supposed to happen.
15          You thought that makes sense and
16  you -- and he approved your signing the
17  letter once you finally got it, the trust
18  agreement.
19          You executed both agreements but
20  you never sent the escrow agreement that you
21  signed to Mr. Moloney, correct?
22      A.   I don't recall ever sending that
23  escrow agreement to Mr. Moloney.
24      Q.   Thank you.
25          And you never called Mr. Moloney

Page 65

Wolfson

1  and said, Tom, here is my understanding of
2  how this whole thing fits together, is that
3  what you intend.  It never happened, right?
4  MR. KEANE:  Up to December.
5  THE WITNESS:  No.  Not --
6  BY MR. WINTON:
7  Q.   Late December, I agree --
8  A.   We have written agreements.  I
9  never did that.
10  Q.   Okay.  Mr. Keane, you are right.
11  I am focusing on December 1, 2.  What
12  happens down the road once the wheels come
13  off this trolley obviously is a totally
14  different situation.
15  MR. KEANE:  I got it.
16  MR. WINTON:  Mark that as number
17  6, please.
18  (Three-page string of e-mails was
19  marked Exhibit 6 for identification)
20  BY MR. WINTON:
21  Q.   Exhibit 6 is a three-page e-mail
22  exchange that you produced.  Do you
23  recognize it?
24  A.   Yes.  I think it is four pages but

Page 66

Wolfson

1  I do recognize it.
2  Q.   It is -- on page, it says 1 of 3,
3  2 of 3 and 3 of 3.
4  A.   I think there is --
5  Q.   Oh, I am sorry.  I shifted my
6  stuff around to be in what I believe to be
7  the right order.
8  MR. WINTON:  Would you make that
9  one Exhibit 6 and we will change the
10  printout.  My apologies.
11  Mark this as 7.
12  (One page e-mail with attachment
13  of an escrow agreement was marked Exhibit 7
14  for identification)
15  BY MR. WINTON:
16  Q.   Now, what we have marked as
17  Exhibit 6 is a three-page string of e-mails,
18  the third page of which is just the bottom
19  of the e-mail from Mr. Seward.
20  If you look at the second page
21  this is from Mark Seward, "Garth, Hi, I need
22  a U.S. escrow agent to hold some charter
23  security and so forth."
24  Do you see that?

Page 67

Wolfson

1  A.   Yes, I do.
2  Q.   Is it your recollection this is
3  the very first communication starts this
4  whole wonderful sequence of events?
5  A.   Yes, that is my recollection.
6  I should have said no.
7  Q.   What we see here is that this one
8  indicates it was sent December 1, 9:42:52,
9  2010?
10  A.   Yes.  As you know as we discussed,
11  maybe it was off the record, different
12  computers have different clocks going.
13  There are different -- it is hard to say
14  exactly but that is certainly what the
15  e-mail says.  It should give you a rough
16  idea when it came in.
17  Q.   I am assuming that -- this one I
18  am struggling to figure out whether that is
19  London time or New York time.
20  A.   Yes.
21  Q.   It could be either.
22  A.   Well, if you look, I think it
23  is --
24  Q.   That one uses the American

Page 68

Wolfson

1  convention on the month, day and it uses the
2  American convention on hours but that is not
3  going to hold true as a way of sorting this
4  out as we go through them.
5  A.   Well, my final response if you see
6  when I said okay is 9:48 a.m. on December 1.
7  Q.   Okay.  So this must be 9:42 --
8  A.   London time.
9  Q.   Okay.
10  A.   Really the previous evening.
11  Q.   Okay.  So the very next one above
12  that from Mark, and this one is totally
13  different in terms of the date time format.
14  Apparently one is from the office and the
15  other from his home or BlackBerry or some
16  such.
17  A.   That's right.
18  Q.   Sometimes we will see that he is
19  sending stuff that specifically says it is
20  from his mobile.
21  And here this one says, 1
22  December 2010 so that is the European
23  convention on dates and 13:23, again
24  European, so 13:23 would be 1:23 in the

Page 69

Wolfson

1  afternoon, London, minus 5 would be 8:23 in
2  the morning here?
3      A.   Yes.
4      MR. KEANE:  It could be minus 6.
5  BY MR. WINTON:
6      Q.   I am sorry.  It is -- it is minus
7  5.  This is December so we should be off
8  daylight savings so it should be minus 5 for
9  New York.  I am minus 6.  Houston is minus
10  6.
11      Okay.  So he is coming back saying
12  I need to do it today.  What we will see
13  throughout all of these exchanges and I
14  think you have alluded to it before is, this
15  whole deal, and it may be part of the
16  problem, was done in a huge rush, would you
17  agree with that?
18      A.   I would say there was a lot of
19  time pressure to get it done as quickly as
20  possible.
21      Q.   Right.
22      And we see that in the e-mails
23  coming from Mr. Seward, I need it right now,
24  I have to have it immediately and so forth.

*Numbering appears as:*

1 (Wolfson header)
1  afternoon...
2  the morning here?
3  A. Yes.
4  MR. KEANE: It could be minus 6.
5  BY MR. WINTON:
6  Q. I am sorry. It is -- it is minus
7  5. This is December so we should be off
8  daylight savings so it should be minus 5 for
9  New York. I am minus 6. Houston is minus
10 6.
11 Okay. So he is coming back saying
12 I need to do it today. What we will see
13 throughout all of these exchanges and I
14 think you have alluded to it before is, this
15 whole deal, and it may be part of the
16 problem, was done in a huge rush, would you
17 agree with that?
18 A. I would say there was a lot of
19 time pressure to get it done as quickly as
20 possible.
21 Q. Right.
22 And we see that in the e-mails
23 coming from Mr. Seward, I need it right now,
24 I have to have it immediately and so forth.

Page 70

Wolfson

1
2  So did you ever acquire an
3  understanding of what the rush was to get
4  this thing done?
5      A.   I mean I guess I had assumptions.
6      Q.   Don't -- let's not do assumptions.
7      A.   I knew that there was a charter
8  and it had to be fixed and vessels generally
9  have locations and schedules and it is not
10  uncommon that you would have time pressure
11  on fixing vessels and firming up chartering
12  arrangements, you know, very quickly.
13      I guess I did assume it was one of
14  those situations which is not uncommon as I
15  said.
16      Q.   So you didn't draw any conclusions
17  from it, you just dealt with it?
18      A.   No.  Not unusual.
19      Q.   The next one as we go up is on the
20  bottom of the first page and you are going
21  back to him saying that you are on your way
22  to court and this is 1:45 so that is
23  probably London time again, right?
24      A.   Yes.
25      Q.   So this should be 8:45 in the

Page 71

Wolfson

1  morning here?
2      A.   Yes.
3      Q.   8:45 on December 1.  And what he
4  is asking you at this point is are you
5  willing to act as an escrow agent?
6      A.   Right.  And I personally had never
7  done it before although I know the office
8  has and so I basically told them, you know,
9  give me some time and all I really want to
10  do is just run it by Ed and I did that and
11  Ed confirmed it wouldn't be a problem and we
12  went ahead and did it.
13      Q.   So your e-mail at the top going
14  back to Mr. Seward on December 1 at
15  9:48 a.m. New York time, you are saying yes,
16  okay, we will act as an escrow agent?
17      A.   Yes.  By that time I had conferred
18  with my counsel, Mr. Keane, and he confirmed
19  there is no issue with that and we can go
20  ahead and do it.
21      MR. KEANE:  Bad advice there.
22      You can continue.
23  BY MR. WINTON:
24      Q.   These are -- on the top it says

Page 72

Wolfson

1  Marie Cush is that a secretary in your
2  office?
3      A.   Yes.  That is the main -- there is
4  the law office address which gets all the
5  e-mails that come in go to that address so I
6  did searches for documents both on my
7  personal computer and on the computer of all
8  the e-mail that came in the office so I
9  could see everything that was sent to
10  anybody and when I print those out it comes
11  out Marie Cush at the top.  She is a former
12  secretary here.
13      Q.   So when we see Marie Cush we know
14  it came from your office?
15      A.   That is right.
16      It was just printed out from a
17  different machine.  I wanted to make sure I
18  got every document that came in the office
19  so I went to both.
20      Q.   Now we have Exhibit 7 which we
21  previously marked.
22      A.   Got it.
23      Q.   This is a one page e-mail with an
24  attachment of an escrow agreement?

Page 73

Wolfson

1
2   A.   Correct.
3   Q.   So 9:44, this should be New York
4   time, correct?
5   A.   That is my guess, yes.
6   Q.   And he is forwarding to you the
7   proposed escrow agreement?
8   A.   Yes.
9   Q.   That is what is attached?
10   A.   Yes. My understanding was it was
11   still in draft and in fact I believe it was
12   changed later so this is just an earlier
13   draft. It is not the final.
14   Q.   This one is -- has already been
15   stamped and signed on behalf of Milestone
16   Shipping, correct?
17   A.   It looks that way, yes.
18   Q.   But only Milestone?
19   A.   Yes.
20   Q.   Did you have anything to do with
21   the drafting of the escrow agreement, the
22   terms at all?
23   A.   No. I believe at one point the
24   only comment I had throughout was to make
25   sure everyone knew there would be no

Page 74

Wolfson

1
2   interest on the account.
3          MR. WINTON: Exhibit 8.
4          (Letter of credit was marked
5   Exhibit 8 for identification)
6   BY MR. WINTON:
7   Q.   Have you had a chance to look at
8   Exhibit 8?
9   A.   Yes.
10   Q.   Do you recognize that document?
11   A.   Yes. I have seen this. This is a
12   letter of credit.
13          I am not sure how it got to us. I
14   did find it and I really can't say, it says
15   it is from Dan Slane to Mark Seward. I
16   don't see where we show up anywhere on it.
17   I am not sure how we got the document.
18   Q.   That is what I was going to ask
19   you. How did you get this because I don't
20   see --
21   A.   I can only assume it came from
22   Mark Seward but I am not sure how it was
23   e-mailed to us. This is the way it was
24   printed out and there is no -- I think Mark
25   Seward must have just sent it to us,

Page 75

Wolfson

1
2   forwarded it.
3          There was a letter of credit and
4   issues with the letter of credit going on as
5   well throughout this, sort of unrelated to
6   our escrow agency.
7   Q.   Right. That is what I was talking
8   about with regard to you actually providing
9   a legal opinion in response to a request
10   from Mr. Seward related to the assignability
11   of a portion of a letter of credit.
12   A.   Yes. There was one question he
13   had, he was just wondering whether you could
14   have multiple assignments on a letter of
15   credit and I knew the answer and just gave
16   it to him the same way I would give it to
17   anybody who asked me off the cuff.
18          I would not say it was setting up
19   a new attorney-client relationship.
20   Q.   You in fact charged him for that
21   time, right?
22   A.   Yes.
23   Q.   Correct?
24   A.   Yes.
25   Q.   At your hourly billable rate?

Page 76

Wolfson

1
2   A.   That was the same rate I was
3   billing for the escrow agreement, escrow
4   agency.
5   Q.   So that was a yes?
6   A.   Yes.
7          MR. WINTON: Number 9.
8          (One page e-mail dated 12:08 p.m.
9   December 1 was marked Exhibit 9 for
10   identification)
11   BY MR. WINTON:
12   Q.   This is another one page e-mail,
13   this one dated 12:08 p.m. December 1 so
14   again this is from Slane to Seward with no
15   indication of how you got it?
16   A.   That's right.
17   Q.   But --
18   A.   It came from Mark Seward. He gave
19   me this stuff. I don't know why it is not
20   showing on the e-mail. This came from Mark
21   Seward.
22          And now I know who you mean by Jan
23   Michalek.
24   Q.   Do you have a recollection of why
25   Mr. Seward sent this document to you or

Page 77

```
1              Wolfson
2  when?
3     A.   He had suspicions about -- he must
4  be psychic but he had suspicions about the
5  trustworthiness of Mr. Slane and his people
6  and he wanted -- at one point, you know, he
7  asked because he is in London and I am in
8  New York so this is a real bank even and I
9  basically did a Google search and said it
10 looked like a real bank to me.  And that's
11 it.  So he gave me this stuff.
12    Q.   U.S. Bank National Association is
13 who you are talking about questioning
14 whether it was a real bank?
15    A.   I don't remember who the bank was
16 but it is in the e-mail.
17    Q.   If you look at the last page of
18 this exhibit.
19    A.   I wrote him an e-mail about it
20 where I basically said, in sum and
21 substance, it will always come down to a
22 matter of trust, if somebody wants to commit
23 an elaborate fraud with fake bank officers I
24 guess they can do it.
25         But other than to suggest when I
```

Page 78

```
1              Wolfson
2  Google search it I see there is something --
3  this bank seems to exist on the web.
4  Something to that effect.  It is in the
5  e-mail.  I am sure you will mark it.
6     Q.   I will bet they did.
7         But you don't recall when that
8  came to you?
9     A.   No.  It was later as I recall.
10        It would actually maybe be in my
11 billing slip invoice.  Let me see.  I
12 mean -- it appears I may not have even
13 billed for it.  If I did I would say it is
14 around the middle of December, December 15
15 maybe.
16    Q.   Let's look at Exhibit 9.  That may
17 help once it gets marked.
18        Why don't we talk about number 10.
19        (Two e-mails from Mr. Seward on
20 December 1 was marked Exhibit 10 for
21 identification)
22 BY MR. WINTON:
23    Q.   This is a series of two e-mails
24 from Mr. Seward still on December 1.  The
25 first one the time stamp is 5:34.  I assume
```

Page 79

```
1              Wolfson
2  that is London time?
3     A.   Yes.
4     Q.   Probably 12:34 here?
5     A.   Yes.
6     Q.   It is actually 17:34 but we all
7  recognize you subtract 12 gives you 5:34?
8     A.   Okay.
9     Q.   Here is where he is forwarding to
10 you the letter of credit with his question
11 about an assignment, he is asking for your
12 opinion?
13    A.   I should say this is about the
14 assignment where I gave that one line
15 opinion that you referenced before.
16        This is not where I did the Google
17 search about the bank.  I believe that
18 occurred later.
19    Q.   I think you are right.
20        Again he has marked both of these
21 e-mails urgent and he notes tragically I
22 need an answer yesterday as usual?
23    A.   As usual.
24    Q.   So the second one comes in at
25 12:45 p.m. New York time, correct, the one
```

Page 80

```
1              Wolfson
2  on top?
3     A.   Appears to, yes.
4     Q.   It looks like they were about 11
5  minutes apart?
6     A.   I think you have to give or take
7  at least an hour or two.  I don't know.
8         MR. WINTON:  Number 11.
9         (Four-page series of e-mails was
10 marked Exhibit 11 for identification)
11 BY MR. WINTON:
12    Q.   Take a look, if you would, at what
13 we marked as Exhibit 11.
14        This is a four-page series of
15 e-mails?
16    A.   Yes.
17    Q.   Only three of which really have
18 e-mails on them?
19    A.   Yes.
20    Q.   And if you look at the third page
21 it is a carryover from the bottom of the
22 second page so I guess you have to start at
23 the bottom of the second page and the top of
24 the third.
25        Would you agree that is the first
```

Page 81

**Wolfson**

1             Wolfson
2   new e-mail in this chain of e-mails?
3          Because the bottom one is a repeat
4   of the one we just looked at.
5      **A.   Yes. I think what happened was**
6   **Exhibit 10 he followed up on his mobile and**
7   **I replied to the preceding e-mail so, yes,**
8   **the first e-mail we have -- first content we**
9   **haven't seen before begins at the bottom of**
10  **page 2.**
11     Q.   Right. That is why we get these
12  disconnects in e-mails.
13         I suspect what you did is you went
14  back and replied to the substantive e-mail
15  so that his question and your response are
16  juxtaposed to each other rather than having
17  the other e-mail that is really saying this
18  is urgent?
19     **A.   It may have just been random. I**
20  **don't have a system for that.**
21     Q.   Okay. The response of yours that
22  is at the top of page 3 of Exhibit 11 is
23  your legal opinion back to him in response
24  to his question, right?
25     **A.   Again, you are characterizing it**

Page 82

1             **Wolfson**
2   **as you characterizing it but, yes, I mean it**
3   **seemed a simple matter to me and to the**
4   **extent he was asking whether this was an**
5   **assignment like this is contrary to law and**
6   **I said no, it is really a commercial matter.**
7   **It really speaks for itself.**
8      Q.   And what you are saying with this
9   e-mail is effectively this is kind of off
10  the top of my head, I don't see a problem
11  with it, fair statement?
12     **A.   It is an assignment. I mean I**
13  **wasn't even sure what he was asking. I got**
14  **the impression he was asking me for some**
15  **sort of assurance that this was some sort of**
16  **risk-free transaction. I refused to give it**
17  **to him.**
18     Q.   Would you agree that your response
19  here at the top of page 3 of Exhibit 11 is
20  saying this is a, off the top of my head
21  response, I haven't gone out and done a
22  bunch of research on it?
23     **A.   There was really no need. It is**
24  **an assignment.**
25         **Yes. I didn't do any research.**

Page 83

1             **Wolfson**
2   **It is like -- it was a silly question**
3   **because it was really just a commercial**
4   **issue and not really a legal issue. He knew**
5   **full well there was nothing wrong with the**
6   **assignment and that is all it says.**
7      Q.   Some of these questions are
8   innocent simply to set up the next e-mail
9   because the next e-mail he comes back and
10  says, would you mind having a little dig
11  which I interpret to mean, thanks for your
12  offered -- offered opinion, would you do a
13  little bit more thinking and research on it.
14  Would you agree?
15     **A.   I would agree and I came back to**
16  **him with the same -- yes.**
17      MR. KEANE: I want to see my wife
18  and kid and again before this week is
19  over.
20      MS. OROZCO: And I want to go
21  to --
22      MR. WINTON: And I have a flight
23  tomorrow morning so I want to make it.
24  It is really looking in jeopardy at the
25  moment.

Page 84

1             Wolfson
2       MS. OROZCO: That would really be
3   a problem.
4   BY MR. WINTON:
5      Q.   So then he responds here and we
6   don't have your response to his would you
7   give it a little dig?
8      **A.   Probably because I didn't respond**
9   **to it.**
10     Q.   Okay.
11     **A.   The next response you have from me**
12  **is -- appears --**
13     Q.   Well, you do at the bottom of page
14  1 it looks like is your response to the
15  would you mind having a little dig?
16     **A.   That's right.**
17     Q.   Okay. So then he comes back and
18  says, "Under huge time pressure so you will
19  get $500,000 to the escrow shortly in case
20  we do the deal. Any other thoughts on the
21  assignment?"
22         Asking again about the assignment,
23  right?
24     **A.   Yes.**
25     Q.   So we are at 2:56 p.m. on

Page 85

Wolfson

1
2  December 16789 that is probably New York
3  time, would you agree?
4      A.  Yes.  Probably.  Yes.  It seems to
5  have that Wednesday first it is New York
6  time.
7      Q.   Wednesday comes first when it is
8  New York time is what he is saying.
9          Okay.  So now we have an e-mail
10  from you to Mr. Seward, Wednesday,
11  December 1, and it says 20:01 so that is
12  going to be 3:00, 3:01 New York time, right?
13      A.  I guess so.
14      Q.   It wouldn't have been 8:00 at
15  night on Wednesday here at the time you had
16  this -- you sent this e-mail?
17      A.  No.  I was not here at' 8:00.
18      Q.   Okay.  So this time stamp here is
19  20:01 so minus 12 is 8 minus 5 is 3:01?
20      A.  That's right.
21      Q.   Don't make me do math.  It is
22  really ugly.
23          And so the first line of this is
24  your legal advice, your response to his
25  question please have a little dig, right?

Page 86

Wolfson

1
2      A.  I just had a very simple response
3  about how you could have multiple partial
4  assignments which was a simple matter and
5  that is what I gave him.
6      Q.   Your next line you referred to
7  before you told him NB, note benne, that you
8  don't get interest on an IOLA account in New
9  York, is what you are telling him?
10      A.  That's right.  The escrow
11  agreement as worded sort of made that okay
12  but I thought maybe it could be just
13  clarified a little bit more.
14          It turns out I don't know if it
15  ever was but that was my only comment on the
16  escrow agreement.
17      Q.  Okay.  And then the next thing
18  that this e-mail does is you indicate and
19  you have referred to this e-mail previously?
20      A.  Yes.
21      Q.   That you just received a call from
22  charterer's attorneys in Ohio and what you
23  are referring to there is a phone call from
24  Tom Moloney from AES, correct?
25      A.  Yes.

Page 87

Wolfson

1
2      Q.   At the time you did this you
3  thought Tomo was charterer's attorney?
4      A.  He said -- I may have just
5  misspoken but he said he is the counsel for
6  the people sending the $500,000 so it may
7  well be that I just said, like I said, I use
8  the word "charterers" loosely.
9      Q.   And you since learned that Tom
10  Moloney was the general counsel to American
11  Energy Services?
12      A.  Yes.
13      Q.   Okay.  And you note here, "They
14  say they are supposed to wire 500,000 to our
15  account simply to prove they have such funds
16  available."
17          Do you see that?
18      A.  Yes.
19      Q.   And that is what Mr. Moloney told
20  you, correct?
21      A.  That is what he said.  Oh, well,
22  he said that after I inquired because first
23  he said, you know, I need confirmation from
24  you, confirmation from you and again this
25  was the product of negotiations that had

Page 88

Wolfson

1
2  been going without my involvement.
3  Confirmation that I can get the funds back
4  from you upon demand.
5          And I was like what is that about,
6  why are you sending them to me, and he said,
7  oh, just so we can show that we have the
8  money which didn't make much sense to me and
9  so that is why -- I am jumping ahead.  That
10  is why I followed up with Mark about it.
11      Q.   You indicated earlier that one of
12  the things that he said was he wanted to be
13  able to get this money back until he had
14  security for the money, correct?
15      A.  Well, in the first conversation I
16  really didn't understand what he was about.
17  He said I -- he wanted this agreement to get
18  the money back.  It was only -- so it made
19  no sense to me and I wrote to Mark and he
20  said until the escrow agreement is reached
21  and then I got Mr. Moloney's letter and I
22  said well, now I understand, he wanted
23  assurance he can get it back during that
24  period.
25          I was expecting just to have the

Page 89

Wolfson

1  money to come into escrow. I wasn't
2  expecting this interim agreement.
3
4        MR. WINTON:  Objection.
5     Non-responsive.
6  BY MR. WINTON:
7     Q.   You indicated previously that what
8  Mr. Moloney said was he wanted to be able to
9  get the money back until security had been
10  arranged to secure AES's position, correct?
11    A.   I don't know if he said that.
12        He just said he wanted -- the
13  funds would become the escrow if the other
14  agreements upon which -- if the other
15  agreements the parties were still
16  negotiating came to fruition otherwise they
17  would be returned.
18    Q.   Including security?
19    A.   Including security.  For all he
20  knew, for all I knew, somebody else would be
21  putting in the $500,000 and they would get
22  it back.
23        All I know is that he wanted
24  assurance that that $500,000 could be taken
25  back before the final agreement on the

Page 90

Wolfson

1
2  escrow was reached.
3     Q.   Including security?
4     A.   Whatever is in the escrow
5  agreement.  I don't know what you are
6  referring to.
7     Q.   He used the term "security,"
8  right?  He wanted to be able to pull the
9  money back until security for the money was
10  arranged?
11    A.   He didn't really say.  That is
12  what made it so unclear to me because when I
13  talked to him he said, this is just to show
14  we have the money and I need agreement that
15  I can get the money back.
16        And I -- didn't make any sense to
17  me and I questioned him about it and I never
18  got a real answer about what the deal was
19  about.  So I never knew what was going on.
20        It frankly made no sense to me
21  that conversation so then I wrote to Mark
22  Seward about it and he said, then I
23  understood only then, that this was an
24  interim arrangement because I didn't
25  understand why he wants to send me the

Page 91

Wolfson

1
2  escrow money and then have an agreement
3  saying he can take it back whenever he
4  wanted.
5     Q.   Let's go on with the e-mail you
6  sent to Mr. Seward.
7        MR. WINTON:  Objection.
8     Non-responsive.
9  BY MR. WINTON:
10    Q.   Let's go on with the e-mail.
11        "They want me to first confirm in
12  writing that the funds must and will be
13  wired back to them at any time upon their
14  demand whether or not other security is in
15  place."
16    A.   Yes.
17    Q.   Okay?
18    A.   Yes.
19    Q.   Very clear there?
20    A.   Yes.
21    Q.   At any time on demand --
22    A.   That's right.
23    Q.   -- the money comes back to them.
24  That is what Tom Moloney told you?
25    A.   That's right.  I wasn't aware --

Page 92

Wolfson

1
2  yes.  That's right.
3     Q.   That is what he said?
4     A.   That is what he said.
5     Q.   Okay.  And you asked Mr. Seward,
6  is that true, should I send them such
7  written confirmation?
8     A.   Yes.  I knew that couldn't be
9  right.  That is why I said that.  It made no
10  sense to me.
11        MR. KEANE:  He is just asking if
12     that is what you said.
13        THE WITNESS:  Yes.  That is what I
14     said.
15  BY MR. WINTON:
16    Q.   Then Mr. Seward responds at 3:33
17  that same afternoon, "Of course same here,
18  .05 percent max."
19        Is it your understanding he is
20  responding to your middle comment about
21  interest on escrow accounts?
22    A.   Yes.  I think he is just talking
23  about what happens with English trust
24  accounts.  I don't know.
25    Q.   He starts out with, "Of course,"

Page 93

Wolfson

1   Wolfson
2   which could mean he is confirming?
3       A.   Confirming, I thought it was about
4   the interest.
5       Q.   It is not clear, is it?
6       A.   No.  But it certainly wasn't
7   responding to my comment about the call from
8   Mr. Moloney.
9       Q.   How do you know that?  All he says
10  is "of course" and then he goes on with a
11  separate sentence.
12      A.   Okay.  This goes back to what we
13  are saying about people can read words
14  differently.  Your interpretation is like
15  left field.  I am sorry.  That is not the
16  way I read it at all.
17      Q.   Well, certainly you --
18      A.   In fact he followed up.
19      Q.   I know.  But certainly when you
20  get to the next e-mail it makes it clear but
21  that one is --
22      A.   When I read this I -- didn't even
23  occur to me for one thing that he was saying
24  of course to what Mr. Moloney was saying.
25      Q.   Okay.  Let's go on to the next

Page 94

Wolfson

1   Wolfson
2   e-mail.  This is 3:41 so nine minutes --
3   eight minutes later?
4       A.   Yes.
5       Q.   See, don't make me do math.
6           Eight minutes later he comes back
7   with another e-mail marked "Urgent."
8           He says, "You can confirm the
9   money will be wired back 'if the charter
10  party and escrow are not executed.'  We
11  intend to execute the escrow tonight and I
12  will send you the final version when it is
13  to hand shortly."
14      A.   Yes.
15      Q.   Was it your understanding when he
16  said, "You can confirm the money will be
17  wired back 'if the charter party and escrow
18  are not executed,'" that he was telling you
19  go tell Mr. Moloney the following?
20      A.   No.  He was saying what the
21  arrangement would be with the coming
22  agreement with AES would be that that is the
23  way the money would come back.
24      Q.   He says, you can confirm the money
25  will be wired back with a quote.  You can

Page 95

Wolfson

1   Wolfson
2   confirm.  You asked him, can I confirm to
3   Mr. Moloney what Moloney said and Seward
4   says you can confirm this.  You did not read
5   that to mean go back to them and tell them
6   the following?
7       A.   No.  This was the confirmation in
8   writing that Mr. Moloney was talking about
9   and he wanted a formal agreement on our
10  letterhead, which came in just around the
11  exact same time maybe within a few minutes.
12          Moreover, this was what was going
13  on as far as the negotiations between these
14  parties, between Estech, Milestone and AES
15  as to what kind of agreement they were going
16  to have in place so I understood what the
17  situation was.
18          I understood now what Mr. Moloney
19  was talking about and I was waiting for the
20  parties to reach the agreement which -- I
21  got this letter and it seemed to address
22  Mr. Seward's concern by saying that AES's
23  right to the return of the money would only
24  be prior to the escrow agreement being
25  reached and so I said, Mark, is this what

Page 96

Wolfson

1   Wolfson
2   you want me to sign on to or not.  And so
3   then the final confirmation came when I
4   signed that letter.
5           MR. WINTON:  Objection.
6           Non-responsive.
7   BY MR. WINTON:
8       Q.   Truly I am not going to make my
9   flight tomorrow morning if you keep this up.
10          MS. OROZCO:  Let's take a quick
11      break.
12          (Recess)
13  BY MR. WINTON:
14      Q.   Back on the record.
15          Would it be fair to say that you
16  did not at any time and any time is talking
17  about the 1st, 2nd of December, not talking
18  about the 23rd, 29th, any of that stuff at
19  the back end when everybody knows there is a
20  dispute.
21          Back at the time these documents
22  were being worked on would it be fair to say
23  that you never contacted Tom Moloney and
24  said, Tom, there is something weird going on
25  here, I ran your position by Milestone's

Page 97

Wolfson

1
2  representatives and they said, no, totally
3  different deal.  What is up.  You never
4  contacted --
5      A.   Jim, you want a yes or no answer
6  but then you ask a question like that.
7          I never contacted him and said
8  those words.  I never perceived it that way.
9      Q.   I am not asking you if you used
10 those words.  Did you in response to this
11 e-mail that we are looking at --
12     A.   I did not contact AES after that
13 e-mail.  AES contacted me.
14     Q.   Would you agree with me that what
15 Mr. Seward is saying here in this
16 December 1, 3:41 p.m. e-mail to you is quite
17 different from what Mr. Moloney said to you
18 in -- that you have recorded in your 3:01
19 p.m. e-mail to Mr. Seward?
20     A.   I wouldn't say that because what I
21 would say is I didn't really understand what
22 Mr. Moloney was saying and when Mark said
23 that, it put it all in context and I
24 understood what he was saying so my -- what
25 I took from my conversation from Mr. Moloney

Page 98

Wolfson

1
2  was wrong and I would say my initial
3  understanding was very different than my
4  subsequent understanding.
5      Q.   So you are getting -- you are
6  going to be entering a relationship with AES
7  where you are going to undertake a fiduciary
8  duty to AES and you base your understanding
9  of AES's position on what somebody else told
10 you that being Mr. Seward?
11     A.   No.  I got the letter agreement.
12     Q.   We are going to come to the letter
13 agreement.
14     A.   If there was no letter agreement
15 there would have been much more going --
16 communication going on but in fact, like I
17 said, within minutes I received the proposed
18 draft from AES.
19     Q.   Would you agree with me, and I
20 think that is what you just said, you would
21 agree that this statement that Mr. Moloney
22 made to you that is recorded in your 3:01
23 p.m. e-mail to Mr. Seward and Mr. Seward's
24 3:41 p.m. statement back to you are in
25 conflict with each other based on those

Page 99

Wolfson

1
2  statements alone?
3      A.   No.  Because I think it could be
4  consistent if I had understood that
5  Mr. Moloney was just talking about that
6  period before the escrow was reached, it is
7  consistent.  That wasn't made clear to me.
8  I didn't know what he was talking about.
9      Q.   And will be wired back to AES at
10 any time upon demand whether or not security
11 is in place?
12     A.   Right.
13     Q.   Those are pretty clear words,
14 aren't they, "at any time"?
15     A.   Those are my words.  They weren't
16 his words.
17     Q.   But I thought you said that is
18 what he said to you?
19     A.   That is what I took from what he
20 said.  If I misunderstood it I
21 misunderstood.  I didn't understand what was
22 going on, that we were talking about an
23 interim agreement that he could take it back
24 at any time during that period.  That is
25 what I didn't understand.

Page 100

Wolfson

1
2      Q.   So you didn't feel as a person
3  entering a fiduciary relationship with AES
4  that you owed it to AES to confirm with AES
5  on the phone what the deal was here?
6      A.   Like I said --
7          MR. KEANE:  Asked and answered.
8          THE WITNESS:  I would have but I
9      got the draft which put it all in
10     writing.
11         If I didn't have that draft I most
12     assuredly would have had more
13     conversation but I did.
14         MR. WINTON:  Yes.
15         THE WITNESS:  If you are talking
16     about the letter --
17         MR. WINTON:  Exhibit 12.
18         (Three-page document Bates stamped
19 027, 028, 029 was marked Exhibit 12 for
20 identification)
21 BY MR. WINTON:
22     Q.   I would like you to take a look at
23 what we marked as Exhibit 12.
24         MS. OROZCO:  Six pages, right,
25     0027 to 0032?

Page 101

Wolfson

1
2       MR. WINTON:  No.  This one is
3   actually 027, 028, 029.
4  BY MR. WINTON:
5      Q.   Exhibit 12.
6      A.   Got it.
7      Q.   The bottom of the first page and
8  would you agree with me that this exhibit
9  consists of three pages, the first one being
10  a series of e-mails, the second one is just
11  the trailer from that first page and then
12  the last page is a proposed letter
13  agreement?
14      A.   Yes.  It actually says -- again we
15  can call it, escrow agreement.  Whatever.
16      Q.   At the bottom is Mr. Moloney's
17  e-mail to you at 4:17 p.m. New York time.
18      A.   Yes.
19      Q.   And fortunately both Columbus and
20  New York are in the same time zone so we
21  don't have to go through that.
22      A.   But as you can see there is some
23  difference in the computer times because my
24  forwarding of that letter is actually --
25  precedes the time by 14 minutes so there is

Page 102

Wolfson

1
2  some -- again I would say within an hour or
3  so but --
4      Q.   There is clearly some imprecision
5  in the clocks.
6      A.   That's right.  I recall receiving
7  this right around the time that Mark
8  responded to my e-mail that we just
9  discussed.
10      Q.   But I think you would agree that
11  these three e-mails do occur in this
12  sequence from bottom to top?
13      A.   The sequence is correct, yes.
14      Q.   So now we have Mr. Moloney's
15  e-mail to you at 4:17 p.m.-ish saying,
16  "Attached is a proposed letter to us from
17  your firm.  Call if you have any questions
18  or comments when you e-mail it back.
19  Depending on the status of the escrow
20  agreement draft we may not be wiring until
21  morning but we should probably get this
22  letter out this afternoon.  Thanks. Tom."
23      Do you see that?
24      A.   Yes.
25      Q.   And then we have attached to that

Page 103

Wolfson

1
2  a letter that Mr. Moloney drafted for you to
3  put on your letterhead and send back to him;
4  is that correct?
5      A.   That's correct.
6      Q.   And you were supposed to insert
7  your wiring instructions?
8      A.   That's correct.
9      Q.   Mr. Moloney says to you, "Call if
10  you have any questions or comments."
11      That is what that e-mail says,
12  right?
13      A.   That is what it says.
14      Q.   So you then forward that to
15  Mr. Seward asking if he authorizes you to
16  sign it, right?
17      A.   I said please let us know if we
18  should sign on to this language.
19      Q.   Okay.  So you are asking him to
20  authorize you to execute it?
21      A.   I want to know if he wants us to
22  sign it or not.
23      Q.   Then the top e-mail you are going
24  back to Mr. Seward saying, I haven't heard
25  from you, effectively what you are saying is

Page 104

Wolfson

1
2  I haven't heard from you, I am going to have
3  to leave, can we finish this up in the
4  morning.
5      A.   Yes, I wasn't there at 8:00.  I
6  had to leave early that evening.  I forget
7  exactly why.
8      But I wanted to let Mark know that
9  since AES wanted it on our letterhead I
10  would need to be in the office and I wasn't
11  going to be in the office that evening.
12      Q.   Okay.  So let's look at the
13  document that Mr. Moloney sent to you.
14      This is the letter agreement that
15  we have talked about with you from time to
16  time referred to as the side agreement --
17      A.   Yes.
18      Q.   -- before it goes into final,
19  right?
20      A.   Yes.  Although I am noticing his
21  own subject is escrow agreement.
22      Q.   Sure doesn't say side letter, does
23  it?
24      A.   No.
25      Q.   Okay.  In the first paragraph, and

Page 105

Wolfson

1  Wolfson
2  this is the wording that ultimately became
3  the letter agreement with AES but for the
4  insertion of the language in the middle,
5  correct?
6  **A.   There is not a word of it that was**
7  **changed.**
8  **I changed the date and I inserted**
9  **the wiring instructions which were the same**
10 **as those in the escrow agreement and that**
11 **was it. Put in my name and title.**
12 Q.   So rather than talk about that the
13 actual agreement, the actual letter that you
14 signed is coming up so why don't we save
15 that and deal with it in that.
16 A.   Okay.
17       MR. WINTON:  So the next exchange
18 is Exhibit 13.
19       (E-mail was marked Exhibit 13 for
20 identification)
21 BY MR. WINTON:
22 Q.   I think you will see on the second
23 page of Exhibit 13 is a repeat of that last
24 e-mail from you saying, I got to leave
25 shortly, we have to do this in the morning?

Page 106

1  Wolfson
2  **A.   Yes.**
3  Q.   So he comes back to you at what I
4  believe would be 5:47 a.m. the next morning,
5  right?
6  **A.   I think that is right.**
7  Q.   He is asking can you sign and
8  return to them when you get in?
9  **A.   Yes.**
10 Q.   So did you interpret that to mean
11 he was authorizing you to sign that letter?
12 **A.   Yes. I actually don't know how**
13 **else one could interpret that.**
14 Q.   It wasn't a trick question that is
15 how I read it but how I read it is really
16 not important, it is how you read it.
17 **A.   Okay.**
18 Q.   Then he comes back four hours
19 later and he says, "he" being Seward, "I
20 need not to loose time. Can you sign that
21 release please."
22       Do you have an understanding of
23 what "that release" refers to?
24 **A.   He is talking about the letter**
25 **agreement that I previously forwarded him**

Page 107

1  **Wolfson**
2  **from AES.**
3  Q.   So you understood release to refer
4  to this letter agreement with AES?
5  **A.   Yes.**
6  Q.   You go back to him 22 minutes
7  later or so telling, Mr. Seward should have
8  it out within a half an hour or so. You are
9  talking about the trust letter with AES?
10 **A.   Yes. I said I am in transit now,**
11 **I was on my way to the office, should have**
12 **it out within a half hour or so.**
13 Q.   And I take it you would agree with
14 me that when you got Mr. Moloney's letter
15 late in the afternoon on the 1st what you
16 did with it was you sent it to Mr. Seward,
17 right?
18 **A.   Yes.**
19 Q.   But you didn't go back to
20 Mr. Moloney and in response to his call or
21 questions or comments and even repeat for
22 him what Mr. Seward had said, you can
23 commit -- you can confirm, sorry, the money
24 will be wired back if the charter party and
25 escrows are not executed?

Page 108

1  Wolfson
2       MR. KEANE:  Asked and answered.
3       THE WITNESS:  The whole agreement
4  is in the written agreement now -- the
5  written letter. That was what was under
6  consideration so that those prior
7  advices were mooted by the fact --
8  BY MR. WINTON:
9  Q.   It has not been executed as of
10 December 1 in the afternoon?
11 **A.   Right.**
12 Q.   And Mr. Moloney had told you what
13 his intent was that the money would come
14 back at any time on demand and you went to
15 Mr. Seward to get confirmation but you never
16 went back to Mr. Moloney to say --
17 **A.   No, because --**
18 Q.   -- is this right?
19       MR. KEANE:  Asked and answered.
20       THE WITNESS:  No. The letter said
21 it.
22       MR. KEANE:  Let him finish the
23 question.
24       MR. WINTON:  He answered it. "No"
25 was it.

Page 109

| | Wolfson |
|---|---|
| 1 | Wolfson |
| 2 | THE WITNESS:  No, I answered -- |
| 3 | the letter said it. |
| 4 | MR. KEANE:  Off the record. |
| 5 | (Discussion off the record) |
| 6 | MR. WINTON:  Number 14. |
| 7 | (Set of two e-mails with executed |
| 8 | December 2 letter agreement with AES |
| 9 | attached was marked Exhibit 14 for |
| 10 | identification) |
| 11 | BY MR. WINTON: |
| 12 | Q.   Exhibit 14 is a set of two e-mails |
| 13 | with an attachment that being the actual |
| 14 | executed December 2 letter agreement with |
| 15 | AES, would you agree? |
| 16 | A.   Yes, it is. |
| 17 | Q.   Two pages.  M&K33 and 34. |
| 18 | The bottom one is in fact a repeat |
| 19 | of the one we just looked at, correct? |
| 20 | A.   Yes, it is. |
| 21 | Q.   So the top one is your e-mail back |
| 22 | to Mr. Moloney attaching the executed |
| 23 | letter, correct? |
| 24 | A.   That's correct. |
| 25 | Q.   So you sent this back 9:49 New |

Page 110

| 1 | Wolfson |
|---|---|
| 2 | York time on the 2nd? |
| 3 | A.   Again, roughly, yes.  It was after |
| 4 | Seward's response saying thanks and I sent |
| 5 | it off. |
| 6 | Q.   You have said repeatedly that -- |
| 7 | let's look at the letter itself. |
| 8 | You have said repeatedly that you |
| 9 | believe that letter is entirely consistent |
| 10 | with what Mr. Seward told you? |
| 11 | A.   Yes.  I also was appreciating the |
| 12 | fact there were negotiations going on |
| 13 | throughout and I didn't know what the final |
| 14 | form would look like.  This is it. |
| 15 | Q.   So, yes, you read this letter to |
| 16 | be consistent with Mr. Seward's statement to |
| 17 | you of the evening before that the money was |
| 18 | returnable on demand to AES upon AES demand |
| 19 | only until the escrow agreement and the |
| 20 | charter party were signed? |
| 21 | A.   Yes.  I did.  More importantly |
| 22 | Mr. Seward said he want us to sign it, so |
| 23 | yes. |
| 24 | MR. WINTON:  Objection. |
| 25 | Non-responsive. |

Page 111

| 1 | Wolfson |
|---|---|
| 2 | THE WITNESS:  I am just saying he |
| 3 | obviously thought it was important what |
| 4 | he wanted to do. |
| 5 | BY MR. WINTON: |
| 6 | Q.   Mr. Seward however may have been |
| 7 | assuming that you had conveyed to |
| 8 | Mr. Moloney what he said you can confirm to |
| 9 | AES the following -- |
| 10 | A.   What -- |
| 11 | Q.   Would you agree that may have been |
| 12 | in Mr. Seward's mind? |
| 13 | A.   No.  When I say confirm in writing |
| 14 | this is the confirm in writing. |
| 15 | Q.   It didn't say in writing.  It said |
| 16 | you may confirm. |
| 17 | A.   My e-mail said they want us to |
| 18 | confirm in writing. |
| 19 | His response says you may confirm |
| 20 | what he said.  He was referring to the |
| 21 | confirming in writing which came at exactly |
| 22 | the same time. |
| 23 | Q.   And if you will look at it he has |
| 24 | put quotes around the words, "If the charter |
| 25 | party and escrow are not executed." |

Page 112

| 1 | Wolfson |
|---|---|
| 2 | Correct?  Correct? |
| 3 | A.   Yes. |
| 4 | Q.   Okay.  Show me those words in |
| 5 | Exhibit 14, page 2 of the letter that you |
| 6 | signed with AES.  Show me those words. |
| 7 | A.   Those exact words are not here. |
| 8 | Other words are in here and |
| 9 | Mr. Seward agreed to these words.  So the |
| 10 | parties are obviously still negotiating and |
| 11 | this is the final draft they agreed upon. |
| 12 | Q.   His e-mail you said for you to |
| 13 | confirm quote to Moloney, right? |
| 14 | A.   He said I may confirm in the |
| 15 | writing. |
| 16 | Q.   No.  It doesn't say you may |
| 17 | confirm in the writing.  It says confirm |
| 18 | quote. |
| 19 | A.   But you are not referring to the |
| 20 | e-mail.  Look at the e-mail. |
| 21 | Q.   Yes, sir, I am. |
| 22 | A.   When I say confirm they want us to |
| 23 | confirm in writing.  Is this okay.  He says, |
| 24 | you may confirm and then he used those words |
| 25 | but it was referring to the confirm in |

Page 113

**Wolfson**

1
2 **writing. That is the e-mail that I wrote to**
3 **him and his response was --**
4    Q.   No, sir.
5       MR. KEANE:  Let's go to the actual
6 document.
7 BY MR. WINTON:
8    Q.   Exhibit 11.
9 **   A.   You want me to -- first off -- let**
10 **me answer the question.**
11       MR. KEANE:  Garth, there is no
12 question pending.
13 BY MR. WINTON:
14    Q.   Your e-mail to Mr. Seward, you
15 state what Mr. Moloney said to you that the
16 funds must and will be wired back to AES at
17 any time, at any time?
18 **   A.   You are not reading the first**
19 **words.**
20       MR. KEANE:  Listen to the
21 question.
22 BY MR. WINTON:
23    Q.   They want you to confirm in
24 writing that the funds must and will be
25 wired back to AES at any time, at any time

Page 114

Wolfson

1
2 upon their demand, at any time upon their
3 demand. They wanted you to confirm that in
4 writing?
5 **   A.   That's right.**
6    Q.   And you asked Seward should I
7 confirm that and he came back and said what
8 you can confirm is "If the charter party and
9 escrow are not executed."  In other words
10 that the money will come back if and only if
11 the charter party and escrow was not
12 executed, in quotes, right?
13 **   A.   Yes.**
14    Q.   Okay.  And you never conveyed that
15 information to Mr. Moloney, we have agreed
16 with that, correct?
17 **   A.   I never confirmed any further**
18 **information to Mr. Moloney, no.**
19    Q.   Correct.  Despite the fact that
20 Mr. Seward has that language in quotes?
21       MR. KEANE:  Asked and answered.
22 BY MR. WINTON:
23    Q.   And that language is not in the
24 December 2 letter that Mr. Moloney sent to
25 you?

Page 115

Wolfson

1
2 **   A.   That exact language is not in the**
3 **letter.**
4    Q.   Okay.  What is in the letter,
5 let's look at the letter.  First paragraph.
6       Our firm, referring to Mahoney &
7 Keane, correct, I am on the second line, far
8 right?
9 **   A.   Yes.**
10    Q.   Let's get the whole thing.
11       This is to confirm Mahoney &
12 Keane's agreement that if American Energy
13 Services wire transfers $500,000 to Mahoney
14 & Keane's trust account pursuant to the
15 wiring instructions below our firm Mahoney &
16 Keane shall hold such funds in trust and
17 shall upon written request from AES to do so
18 wire that same $500,000 back to AES'
19 designated account as soon as possible after
20 our receipt of that request."
21       Did I read that correctly?
22 **   A.   Yes, you did.**
23    Q.   And I will admit that I was
24 substituting Mahoney & Keane in various
25 places where it says "our firm"?

Page 116

Wolfson

1
2 **   A.   We have the letter marked so --**
3       MR. KEANE:  I will stipulate the
4 contents of that letter say what it says
5 if that helps.
6 BY MR. WINTON:
7    Q.   Would you agree with me that the
8 words that Mr. Seward sent to you "if the
9 charter party and escrow are not executed"
10 is completely inconsistent with that first
11 sentence?
12       MR. KEANE:  Objection.
13       THE WITNESS:  You are just looking
14 at one sentence.
15 BY MR. WINTON:
16    Q.   I am only at that first sentence
17 right now, Mr. Wolfson.
18 **   A.   This is silly.  This first**
19 **sentence does not have any of that**
20 **confirming language at all.**
21    Q.   It doesn't say anything about this
22 duty to return the money being limited by
23 the execution of the escrow and the charter
24 party, right?
25 **   A.   No.  Neither does the heading at**

Page 117

1      **Wolfson**
2      **the top where it says Mahoney & Keane.**
3              MR. WINTON:  Objection.
4      Non-responsive.
5              THE WITNESS:  You are wasting our
6      time.
7      BY MR. WINTON:
8      Q.   No, sir.  You are wasting
9      everybody's time.
10             MR. KEANE:  Hang on.
11             Listen to the question.  Give the
12     answer and let's move it along.
13     BY MR. WINTON:
14     Q.   Then we have the wire transfer
15     instructions, right?
16     **A.   Yes, we do.**
17     Q.   The next paragraph, last
18     paragraph, we acknowledge, that is Mahoney &
19     Keane, right?
20     **A.   Yes.**
21     Q.   That this wiring transaction is
22     being initiated in connection with the
23     pending arrangements between the subject
24     parties and that we, Mahoney & Keane, are
25     authorized to notify Milestone both upon

Page 118

1              Wolfson
2      receipt of the wire from AES, that is with
3      the money, right?
4      **A.   Yes.**
5      Q.   And upon receipt of any
6      instruction from AES to wire back the fund
7      transferred to our firm's account.
8              So you have been authorized both
9      to tell Mr. Seward on behalf of Milestone
10     that you received the money and when you
11     receive instructions from AES to return the
12     money?
13     **A.   Yes.  It says what it says.**
14     Q.   You also understand that if an
15     escrow agreement acceptable to all parties
16     can be reached Mahoney & Keane may act as
17     escrow agent under such an agreement in
18     which case AES may direct that these funds
19     be retained by our firm in such capacity.
20             If there is an agreement AES may
21     confirm that you are to retain them.  Isn't
22     that what that says?
23     **A.   I don't understand what you are**
24     **asking me because you are reading and asking**
25     **to intend what it says.**

Page 119

1      **Wolfson**
2      **You are placing emphasis that is**
3      **going to be lost in the transcript anyway.**
4              MR. KEANE:  Garth, will you just
5      answer the question?
6              THE WITNESS:  Yes.  That is what
7      it says.
8      BY MR. WINTON:
9      Q.   You see that is one of the
10     privileges is, I am taking the deposition so
11     I get to ask the question.  Okay.
12             If you want to take your own depo
13     you can ask your own questions.  You are
14     doing a pretty good job of doing that
15     anyway.
16             Second sentence, in the second
17     paragraph.
18             MR. KEANE:  Objection.
19     BY MR. WINTON:
20     Q.   I have lots of objections.
21             We understand, Mahoney & Keane
22     understands that if an escrow agreement
23     acceptable to all parties, now, all parties
24     would include AES, wouldn't it?
25     **A.   If an escrow agreement is**

Page 120

1              **Wolfson**
2      **acceptable to all parties it is undefined**
3      **but I assume it means the escrow**
4      **agreement -- parties to the escrow**
5      **agreement.  Those are the parties to the**
6      **escrow agreement.**
7      Q.   So it says acceptable to all
8      parties.  It doesn't say who all parties is.
9      It says all parties?
10     **A.   When you have an agreement and you**
11     **have parties to the agreement.**
12             **When you are talking about parties**
13     **to the agreement it necessarily refers to**
14     **parties to the agreement.  Other parties are**
15     **not parties to the agreement.**
16     Q.   So you now put your interpretation
17     on all parties so you are limiting all
18     parties?
19     **A.   It doesn't say third parties.  You**
20     **are asking me to read English language and**
21     **define terms for you.**
22     Q.   As a fiduciary to AES?
23     **A.   Is that a question?**
24     Q.   You are interpreting as a
25     fiduciary to AES.

Page 121

Wolfson

1
2     A.   It is not an interpretation.  I am
3   reading English.  I have a brain.  I can
4   read English.
5         The parties to the agreement are
6   parties to the agreement.
7     Q.   It doesn't say parties to the
8   agreement, does it?
9     A.   Well, I guess it could be
10  referring to anybody under the sun though I
11  think that's a strained interpretation.
12    Q.   Does it say parties to the
13  agreement?
14    A.   No.  Nor does it say third
15  parties.
16    Q.   Mahoney & Keane may, was it not
17  your understanding that means might?
18    A.   No.  This is authorizing us to act
19  as escrow agent.  You have to read escrow --
20    Q.   So you read this sentence that we
21  are working on right here to mean that this
22  agreement is authorizing you to be an escrow
23  agent under this other agreement, is that
24  the way you are reading that?
25    A.   If an escrow agreement acceptable

Page 122

Wolfson

1
2   to all parties can be reached our firm may
3   act as the escrow agent.
4         I don't understand what you are
5   asking me except to keep reading the
6   sentence.
7     Q.   I am asking you if I am correctly
8   understanding what you just said before
9   that, that you read this letter itself to
10  authorize Mahoney & Keane to act as escrow
11  agent under this other agreement of this
12  money, that this is a self-executing letter?
13    A.   It is acknowledging the fact that
14  under the escrow agreement once it is
15  finalized we will be acting as the escrow
16  agent.  That is all it is saying.
17    Q.   So where it says in which case AES
18  may direct that these funds be retained by
19  Mahoney & Keane in such capacity, you are
20  just writing that sentence, that portion of
21  the sentence out of existence?
22    A.   I am not writing anything out.
23    Q.   Well, it has no meaning if it says
24  in which case AES may direct?
25    A.   It means before that escrow

Page 123

Wolfson

1
2   agreement is reached AES may withdraw the
3   funds or may allow the funds to stay there.
4         I don't understand what you are
5   asking me.
6     Q.   So you read that if an escrow
7   agreement is reached and you are telling --
8   what your testimony is that once that escrow
9   agreement is agreed to the money moves
10  automatically, right?
11    A.   It may direct that these funds be
12  retained by our firm in such capacity.
13    Q.   But you are reading the first part
14  of that sentence and this letter in whole to
15  mean that upon entry into the escrow
16  agreement that this money comes under the
17  escrow agreement and is no longer recallable
18  by AES?
19    A.   I think that becomes clear in the
20  next sentence.
21    Q.   Is that the way you are reading
22  this?
23    A.   Yes.  The next sentence, yes.
24    Q.   Okay.  So in your mind it says
25  that if the escrow agreement is reached in

Page 124

Wolfson

1
2   which case AES may direct that these funds
3   be retained by Mahoney & Keane in such
4   capacity, that portion of the sentence has
5   no significance to you?
6     A.   It is gearing up to the next
7   sentence.  You have to read it with the next
8   sentence.
9     Q.   It says in no event shall any
10  notification to Milestone or any discussions
11  prior to reaching an acceptable agreement
12  affect Mahoney & Keane's duty to return the
13  500,000 to AES upon its written request?
14    A.   That's right.  Prior to reaching
15  an acceptable escrow agreement.  The
16  agreement that is being referred to is the
17  escrow agreement.
18        Any discussions prior to reaching
19  an acceptable escrow agreement that up until
20  that time we have to -- you have an absolute
21  right to return the funds but it is only up
22  until reaching an acceptable agreement.  It
23  says it right there.
24        What other meaning do those words
25  have I would ask you.

Page 125

**Wolfson**

1
2     Q.   I am not being deposed,
3  Mr. Wolfson.
4     **A.   I know.**
5     Q.   So you do take the position that
6  in which case AES may direct these funds be
7  retained by our firm in such capacity has no
8  significance, where it says "may direct"?
9     **A.   It has a lot of significance.**
10 **Prior to reaching an acceptable escrow**
11 **agreement.**
12    Q.   That is not what that second
13 sentence says.  We understand if an escrow
14 agreement acceptable to all parties can be
15 reached our firm, Mahoney & Keane, may act
16 as escrow agreement -- as escrow agent under
17 such an agreement in which case AES may
18 direct.
19         So you are taking that sentence
20 completely out of this letter?
21    **A.   No.  I am not.  You are just**
22 **arguing with me.**
23    Q.   I am trying to understand how you
24 have gotten to the interpretation you have
25 adopted?

Page 126

Wolfson

1
2     **A.   Does my interpretation really**
3  **matter?  Why don't you depose Milestone.**
4  **Why don't you ask your own client.  This is**
5  **my interpretation.**
6     Q.   My client is going to be deposed
7  so I am sure he will --
8     **A.   This is my reading for what it is**
9  **worth.**
10    Q.   That is all I am trying to
11 understand is how you got to where you got.
12    MR. KEANE:  Why don't you ask him
13 that question?  Put it on the record.
14    THE WITNESS:  It says, prior to
15 reaching an acceptable agreement it
16 specifically says that AES' ability to
17 demand the return of funds, any
18 discussions, anything, this whole
19 agreement applies prior to reaching an
20 acceptable agreement.  That is what it
21 says.  Otherwise those words have no
22 meaning.  Otherwise the commercial
23 context is silly.  It makes no sense.
24    Why would we be holding their
25 money for no reason.  They can demand it

Page 127

Wolfson

1
2  at any time upon for whatever any
3  reason.
4         It is not -- it doesn't serve any
5  commercial function.  It defies all
6  logic and I never heard an explanation
7  as to why it should be interpreted this
8  way even aside from the express language
9  of prior to reaching an acceptable
10 agreement.
11 BY MR. WINTON:
12    Q.   Did it ever occur to you that
13 perhaps AES did not want to lose control
14 over its funds prior to them being
15 secured -- prior to security being obtained
16 for those funds?
17    **A.   Did it ever occur to that you**
18 **there are two sides to --**
19    Q.   Just answer my question,
20 Mr. Wolfson.
21    **A.   That makes no sense to me.**
22    MR. KEANE:  It doesn't matter.  It
23 is a simple question.
24    THE WITNESS:  There is no reason
25 for the other side to enter into such

Page 128

Wolfson

1
2  agreement.
3     MR. KEANE:  He didn't ask you
4  that.
5     THE WITNESS:  I can understand why
6  AES would want its money back.  I cannot
7  understand why AES would not want to
8  post security.  I can understand --
9  BY MR. WINTON:
10    Q.   Why would AES post security for
11 its own funds?  Come on.
12    MR. KEANE:  Garth.  Just look --
13    THE WITNESS:  That is not what I
14 was suggesting.
15    MR. KEANE:  He asked you your
16 understanding.  You put it on the
17 record.  There is a new question.  Did
18 this concept come into your mind?
19    THE WITNESS:  What concept?
20 BY MR. WINTON:
21    Q.   That AES might want to retain the
22 right to recall its money until the loan,
23 the $500,000, is secured?
24    MR. KEANE:  A yes or no question.
25

Page 129

```
1            Wolfson
2  BY MR. WINTON:
3      Q.   That is all we need.  Yes or no.
4  It did or didn't occur to you?
5      A.   I don't understand the question
6  because --
7      Q.   You are saying --
8      A.   I had no knowledge of any loan to
9  AES at the time.  All I knew is what was in
10 this letter agreement.  Okay.  That is what
11 I knew.  This was the agreement that I
12 signed on to.  It seemed to be pretty clear
13 to me.
14     Q.   Okay.  And you --
15     A.   But it also was something that --
16 all right.  Go on.
17         MR. WINTON:  Objection.
18     Non-responsive.
19 BY MR. WINTON:
20     Q.   You said that AES' explanation of
21 what it intended makes no commercial sense.
22         MR. KEANE:  Let's have the
23     question back?
24         THE WITNESS:  It makes no
25     commercial sense.
```

Page 130

```
1            Wolfson
2  BY MR. WINTON:
3      Q.   Stop.  Now, my question is:  Did
4  it ever occur to you that what AES was doing
5  in putting this money in trust in your hands
6  with the right to recall it it was retaining
7  the right to recall it because that money
8  was not yet secured, there is no security
9  for the loan yet?
10         MR. KEANE:  Did that occur to you,
11     that is the question.
12         THE WITNESS:  It did not occur to
13     me because it still makes no sense.
14         MR. WINTON:  Objection.
15     Non-responsive.
16 BY MR. WINTON:
17     Q.   Did AES at any point tell you that
18 you were appointed to determine what made
19 commercial sense for AES's putting money in
20 trust in your hand?
21     A.   No.  You are asking me now.
22     Q.   You are telling me that you
23 decided what is going on here based on your
24 interpretation.
25     A.   I didn't decide anything.  I am
```

Page 131

```
1            Wolfson
2  reading the contract that you drafted and I
3  am telling you my --
4      Q.   I didn't draft anything.
5      A.   Your client drafted and I am
6  telling you my interpretation of it.
7          If the other side was okay with it
8  and if AES was okay with it then I was okay
9  with it.  I was the escrow agent.
10         If there is ambiguity there your
11 client drafted it.
12     Q.   Don't you think as a fiduciary you
13 should have checked to find out what the
14 ambiguity was about?
15     A.   It didn't seem ambiguous to me at
16 all.
17     Q.   So, in other words, your
18 responsibilities as a fiduciary meant
19 nothing to you?
20     A.   My responsibilities --
21     Q.   In terms of your responsibilities
22 to AES.
23     A.   My responsibilities --
24         MR. KEANE:  Objection.
25         THE WITNESS:  -- as a fiduciary
```

Page 132

```
1            Wolfson
2  was not to act as its counsel on how to
3  draft an agreement.
4  BY MR. WINTON:
5      Q.   But it was very much within your
6  scope of work here to confirm with
7  Mr. Seward on behalf of Milestone your
8  firm's client what he intended --
9          MS. OROZCO:  Objection.
10 BY MR. WINTON:
11     Q.    -- but not to go back to AES and
12 find out what they intended.  You just set
13 yourself out to be the interpreter and the
14 arbiter.
15         MR. KEANE:  You are getting
16     argumentative now.  Okay.
17         THE WITNESS:  He has been
18     argumentative for a while.
19         MR. KEANE:  In fairness I think it
20     has been a two-way street.
21         You can't really argue with the
22     witness.  He has told you what he has
23     told you and you have asked for his
24     opinion on things that are really asking
25     today what his construct of this
```

Page 133

Wolfson

1    agreement was.
2        MR. WINTON:  No.  I am trying
3    to -- I am responding to him shoving his
4    opinion down my throat --
5        THE WITNESS:  Nonsense.
6        MR. WINTON:  -- in response to
7    questions about what you did --
8        THE WITNESS:  Can we end the
9    colloquy and just continue?
10       MR. WINTON:  Why don't you let
11   your attorney handle the objections,
12   Mr. Wolfson?
13       THE WITNESS:  You are speaking
14   objections and I am an attorney too and
15   you are wrong.
16       MS. OROZCO:  Can we take a
17   two-minute break?
18       MR. WINTON:  Yes.
19       (Recess)
20       MR. WINTON:  What was the last
21   thing I said?
22       THE WITNESS:  You were challenging
23   me about whether it was my fiduciary
24   duty to have read the contract.

Page 134

Wolfson

1        MR. WINTON:  Did I ask a question?
2        MR. KEANE:  Is there a question
3    pending?  That is what we want to know.
4        THE WITNESS:  Well, I started
5    answering and then --
6        (Record read)
7        MR. WINTON:  I withdraw the
8    question, that one, and object as
9    non-responsive whatever came after that
10   from the witness.
11   BY MR. WINTON:
12       Q.   Did you at the time during this
13   December 1 through December 15 time frame,
14   did you ever have an understanding of
15   whether or not the escrow agreement was
16   finalized?
17       **A.   The escrow agreement was**
18   **finalized.  I believe it was finalized, if I**
19   **am not mistaken December 2, maybe I am wrong**
20   **about the date.  It was very quickly**
21   **finalized.**
22       Q.   Did you ever have an understanding
23   of whether or not the charter party was
24   finalized?

Page 135

Wolfson

1        **A.   Yes.  I understood the charter**
2    **party was finalized around the same time.  I**
3    **am not sure exactly.**
4        Q.   What about the assignment of the
5    security represented by the letter of
6    credit?
7        **A.   I don't know what happened with**
8    **those assignments.  I know Mark asked me**
9    **something about the bank as I referred to**
10   **before but -- really it seemed to me to be a**
11   **separate issue from the escrow agreement.**
12       MR. WINTON:  Number 15.
13       (Two-page document of e-mail
14   exchanges was marked Exhibit 15 for
15   identification)
16   BY MR. WINTON:
17       Q.   Exhibit 15, Exhibit 15 is a
18   two-page document first page consisting of
19   e-mail exchanges, the second one just a
20   trailer from the bottom of the first page.
21       **A.   Is there a question?**
22       Q.   Not yet.
23       In the middle e-mail you were
24   telling Mr. Seward that your bank confirms

Page 136

Wolfson

1    receipt of the 500,000?
2        **A.   Yes.**
3        Q.   Then Mr. Seward at 12:38 on the
4    second, I assume this is New York time, is
5    saying that he hopes to have the escrow to
6    you to look at soon?
7        **A.   Sure.  That is what it says.**
8        MR. WINTON:  Number 16.
9        (Single page document Bates
10   numbered M&K040 was marked Exhibit 16 for
11   identification)
12   BY MR. WINTON:
13       Q.   Exhibit 16 is a single page with
14   two different e-mails on it.
15       Do you see that?
16       **A.   Yes.  Exhibit 16 has several**
17   **pages, has the coverage e-mail and then some**
18   **attachments, I think, right.  So the total**
19   **Exhibit is five pages.**
20       Q.   I think Exhibit 16 should consist
21   of M&K040 only.
22       **A.   No.**
23       MS. OROZCO:  No.  Mine is stapled.
24   It is this.  It is all stapled together.

Page 137

```
1              Wolfson
2          MR. WINTON:  I think that is
3     incorrect.  I think that first one --
4     BY MR. WINTON:
5     Q.   Well, Mr. Wolfson, would you look
6     at it?
7          I assume that that first page is a
8     separate e-mail string from the next couple
9     of pages and they should not have been
10    stapled.  Would you agree?
11         The first one is page 1 of 1 and
12    the second one is enclosing a copy of an
13    escrow agreement.
14    A.   Yes.  I think that is right.
15    Q.   So if you would let me separate
16    those so we don't create anymore confusion
17    than necessary.
18         Exhibit 16 is now a single page
19    consisting of M&K040?
20    A.   Yes.
21    Q.   Who, at the bottom e-mail Denise
22    Amspoker, do you know who she is?
23    A.   I guess Estech must have been
24    provided with my e-mail and they sent it to
25    me because it looks like it is signed off by
```

Page 138

```
1              Wolfson
2     Dan which I suppose is Dan Slane.
3     Q.   Who is not actually with Estech?
4     A.   I have no idea.  This is from --
5     Q.   You associated him with Estech at
6     least at that time, fair statement?
7     A.   Fair statement.
8     Q.   Do you have an understanding of
9     why he was sending that document to you?
10    A.   My understanding is that he needed
11    to have the escrow agreement signed so that
12    the fixture could be reached and the cargo
13    could be carried.
14    Q.   The charter party, correct?
15    A.   Correct.
16         MR. WINTON:  Number 17.
17         (Single page e-mail with
18    attachment document labeled "Escrow
19    Agreement" was marked Exhibit 17 for
20    identification)
21    BY MR. WINTON:
22    Q.   Exhibit 17 is a single page e-mail
23    with an attached document labeled "2nd of
24    December 2010" and labeled "Escrow
25    Agreement."
```

Page 139

```
1              Wolfson
2     This is a retransmission of the
3     escrow agreement because for some reason you
4     weren't able to open the prior one?
5     A.   It was in some primitive DOS
6     format that no one could open.
7     Q.   That would be, yes?
8     A.   Yes.
9          MS. OROZCO:  Exactly.
10         MR. WINTON:  Number 18.
11         (Document Bates labeled M&K49
12    through 52 was marked Exhibit 18 for
13    identification)
14    BY MR. WINTON:
15    Q.   Exhibit 18 is Bates labeled M&K49
16    through 52.  It is an e-mail with an
17    attachment of the escrow agreement, correct?
18    A.   Yes.
19    Q.   The only change really in terms of
20    the escrow agreement is you have now signed
21    it on behalf of Mahoney & Keane?
22    A.   Yes.  So presumably at some point
23    Mark, he may have -- that may have been at
24    the time that he called me, unless it is
25    reflected in any of the other e-mail, he
```

Page 140

```
1              Wolfson
2     told me to go ahead and do it.
3     Q.   So, yes, the attachment is simply
4     the same escrow agreement that you have now
5     signed?
6     A.   Yes.
7     Q.   The e-mail at the bottom of the
8     first page is a repeat of the one before
9     where it is being retransmitted to you in a
10    different format?
11         Right above that is from you to
12    Denise Amspoker where you are saying,
13    thanks, Dan, Dan Slane, right?
14    A.   Yes.
15    Q.   Signed in, subject to agreement
16    and --
17    A.   Right.
18    Q.   -- you are forwarding this subject
19    to agreement on final CP terms which means
20    charter party terms, correct?
21    A.   Right.
22    Q.   You indicated the day before that
23    it was your understanding that Tom Moloney
24    was counsel for the charterers but you are
25    not copying him with this document?
```

Page 141

Wolfson

1                Wolfson
2      A.   No. As I explained before, that
3   was based on the call from him, I had no
4   idea about AES' involvement at all and when
5   I got the proposed letter it was from AES
6   and it was only at that point that I
7   understood that AES was a different entity.
8      Q.   Was there a reason you did not
9   copy Mr. Moloney on this document once you
10   executed it?
11      A.   I was supposed to forward it to
12   the people signing it.  So he wasn't signing
13   it, so, no, I didn't forward it to him
14   because it wasn't for his signature.
15      Q.   It was your understanding that
16   upon execution of this document that would
17   impact the $500,000 that had been wired to
18   you by AES?
19      A.   Yes, but I didn't view it as an
20   anything I should do to send it to him.
21        It didn't see any reason to send
22   it to him.
23      Q.   Then --
24      A.   I had spoken to Mark and he had
25   directed me to send it on to get everyone to

Page 142

1                Wolfson
2   sign it who needed to sign it.
3      Q.   So you forwarded it for execution
4   but despite the fact that it was your
5   understanding that the execution of this
6   document would impact AES's money you didn't
7   send it to AES to keep them in the loop on
8   what was going on?
9      A.   I didn't send it to AES but I
10   think they were in the loop.  They certainly
11   must have understood what was going on.
12        You asked the question that way.
13   I have to answer it that way.
14      MR. WINTON:  Objection.
15   Non-responsive.
16   BY MR. WINTON:
17      Q.   You did not send it to them?
18      A.   I did not send it to them.
19      Q.   So you did not take action
20   individually to keep them in the loop?
21      A.   No.
22      Q.   You made an assumption?
23      A.   I didn't make any assumption.
24        They are letter references in the
25   escrow agreement.  You keep going back to

Page 143

1               Wolfson
2   this.
3      MR. WINTON:  Objection.
4   Non-responsive.
5   BY MR. WINTON:
6      Q.   I am just trying to get through
7   these, Mr. Wolfson.  You keep wanting to go
8   back in circles.
9      A.   Ask a right question, you will get
10   a right answer.
11      MR. WINTON:  Number 19.
12      (Two-page exhibit Bates labeled
13   M&K58 and 59 was marked Exhibit 19 for
14   identification)
15   BY MR. WINTON:
16      Q.   This is a two-page exhibit M&K58
17   and 59 indicating that you are forwarding
18   the escrow agreement Mr. Seward?
19      A.   Yes.
20      Q.   There is no indication that there
21   is an attachment to this one however.  Would
22   you agree?
23      A.   No -- yes, I would agree.  No
24   attachment.
25      Q.   Mr. Seward is telling you in his

Page 144

1               Wolfson
2   response at the top of Exhibit 19, "Fine for
3   us, please sign and send to them."  Them
4   being who, did you have an understanding
5   of --
6      A.   It would be in my next e-mail who
7   I sent it to, probably sent to Estech, I
8   would assume.
9      Q.   I wonder if these are out of
10   sequence.
11      A.   Might be.
12      Q.   Because the Exhibit 18 we looked
13   at has the one where you are forwarding it
14   to Mr. Slane and you say, "Subject to
15   agreement on final charter party terms,"
16   which is what Mr. Seward is telling you to
17   do here.
18      A.   That's right.
19      Q.   So this may be one of those
20   instances where the computers are tricking
21   us on the times.
22      A.   I don't see how it matters.
23      MS. OROZCO:  Look -- off the
24   record.
25      (Discussion off the record)

Page 145

Wolfson

1
2     THE WITNESS:  He was directing me
3   to return it to this Dan Slane.
4   BY MR. WINTON:
5     Q.   So when you say "Dan Slane," you
6   are indicating that at the top of 19 when it
7   says send to them that is Mr. Slane?
8     **A.   Yes.  In fact you can see that**
9   **e-mail to him in -- which followed Exhibit**
10  **19.**
11    Q.   It is actually in 18?
12    **A.   In 18.**
13    Q.   Yes.  That is sort of what I was
14  sorting out in my mind.  I just wanted to
15  make sure I was reading it correctly.
16    So as of this moment in time was
17  it your understanding that the charter party
18  was still needing to be finalized?
19    **A.   Yes.**
20    MR. WINTON:  Number 20.
21    (Document Bates labeled M&K60 to
22  63 was marked Exhibit 20 for identification)
23  BY MR. WINTON:
24    Q.   We have marked as Exhibit 20 M&K60
25  to 63 which is another copy of the escrow

Page 146

Wolfson

1
2   agreement.  Apparently the escrow agreement
3   was changed to reflect the change in the
4   LAYCAN days.  Lay time cancellation is what
5   LAYCAN stands for.
6     So you are reexecuting this
7   document and forwarding it on to Mr. Slane,
8   right?
9     **A.   I believe there was -- yes, there**
10  **was some communication with -- again, I am**
11  **going back to Mark about it just to make**
12  **sure that was correct before I signed and**
13  **forwarded it back to Mr. Slane.  Never acted**
14  **unilaterally on something like that.  I got**
15  **instructions.**
16    Q.   But you weren't in the loop of
17  negotiating?
18    **A.   I was completely out of the loop**
19  **in any of these negotiations.**
20    **My role was to interpret that**
21  **letter agreement and the escrow agreement.**
22    MR. WINTON:  Number 21.
23    (Series of e-mails was marked
24  Exhibit 21 for identification)
25

Page 147

Wolfson

1
2   BY MR. WINTON:
3     Q.   Exhibit 21 is a series of e-mails
4   that I think fit in the sequence of Exhibit
5   20.
6     It may be something that you
7   referred to that you were forwarding these
8   escrow agreement variations on to Mr. Seward
9   to make sure he was approving the changes,
10  correct?
11    **A.   Yes.  You can see in the e-mail**
12  **before you asked -- you inquired earlier**
13  **about me corresponding directly with**
14  **Milestone or their agent, as you can see I**
15  **did so in forwarding the draft of the**
16  **escrow.**
17    Q.   That is here, it says chartering
18  at Chaika Agency, C-H-A-I-K-A, agency?
19    **A.   That is the e-mail address I had**
20  **for them.**
21    Q.   Right.
22    **A.   They may have just been brokers.**
23    Q.   I think as we have discussed
24  previously and so we don't have to go
25  through it on all of these e-mails you were

Page 148

Wolfson

1
2   circulating these among Milestone, Seward,
3   Slane, none of them going to Moloney or AES?
4     **A.   None went to AES.**
5     MR. WINTON:  Number 22.
6     (Document Bates labeled 69 and 70
7   was marked Exhibit 22 for identification)
8     MR. WINTON:  Number 69 and 70,
9   Bates.
10  BY MR. WINTON:
11    Q.   This is Exhibit 22.  And we are
12  still on December 2 fortunately running out
13  of daylight?
14    **A.   Yes.**
15    Q.   This is a series of e-mails.  The
16  bottom one from Mr. Slane to law offices at
17  Mahoney & Keane but he is actually writing
18  to you?
19    **A.   Yes.**
20    Q.   Talking about the change in the
21  LAYCAN date or the range of dates.
22    The middle e-mail says -- is from
23  you to Mr. Seward, "Mark, seems negotiations
24  are ongoing.  Shall I sign and distribute
25  again?"  But I don't see any indication

Page 149

1          Wolfson
2    there is anything attached.
3        **A.   It is a forward so the attachment**
4    **was forwarded to Mark Seward.**
5        Q.   A forward would still show the
6    document attached though.
7        **A.   It may well be that, and you have**
8    **a copy of it from the earlier e-mail so it**
9    **may well be that I didn't print out the**
10   **attachment again but it is the same e-mail**
11   **that is forwarded.**
12       Q.   Apparently this bottom one is --
13   it is from the Slane company with Dan
14   Slane's e-mail address but it says Jan
15   Michalek at the bottom?
16       **A.   Yes.  You are right.**
17       Q.   So this is one of the few times
18   that you and he communicated directly?
19       **A.   I guess so.  It is what it is.**
20       Q.   At the top you have Mr. Seward
21   coming back to you saying please, means,
22   please go ahead and sign and distribute, is
23   that your recollection?
24       **A.   Yes.**
25       Q.   Of what you understood that to

Page 150

1          Wolfson
2    mean?
3        **A.   Yes.**
4        Q.   And then you and he would talk the
5    following day about how much you were going
6    to charge for your services?
7        **A.   Well, to be fair there is some**
8    **exclamation points.  I think he was making a**
9    **joke about how much our days had been**
10   **drained by this one matter and ultimately we**
11   **both charged very little, less than you**
12   **charged, that's for sure.**
13       Q.   I work for free.
14           MR. WINTON:  Number 23.
15           (Document Bates labeled M&K71, 72,
16   73 was marked Exhibit 23 for identification)
17   BY MR. WINTON:
18       Q.   We have now Exhibit 23 which is
19   M&K71, 72, 73, a series of e-mails and
20   finally we made some progress on the date.
21   This is now December 7?
22       **A.   Yes.**
23       Q.   And here, Beverly Unger,
24   U-N-G-E-R, at U.S. Bank is forwarding to JKM
25   at Estech and a bunch of other people an

Page 151

1          Wolfson
2    assignment of proceeds to Milestone and this
3    is the document you were working with
4    Mr. Seward on or discussing with Mr. Seward
5    whether or not multiple assignments are
6    enforceable?
7        **A.   This is the whole assignment**
8    **business.  As I recall this was just an**
9    **inquiry he raised sometime in mid December.**
10          **We now know -- well, this is -- it**
11   **looks like this e-mail may have been an**
12   **attachment to an e-mail which he**
13   **subsequently sent to me on the 15th.**
14       Q.   It looks like what happened here
15   is we have a series of e-mails that
16   ultimately, yes, come to you and it is not
17   clear how.
18       **A.   I think it was he has these**
19   **attachments so I think this probably came as**
20   **an attachment.**
21          **Hold on a second.  Let me see if I**
22   **have it stapled properly.**
23          **Yes.  If you see it may well be I**
24   **just printed it out as I could.  I just**
25   **wanted to make sure everything was copied.**

Page 152

1          **Wolfson**
2        **But if you see there is an e-mail**
3    **dated December 14 and it is entirely**
4    **possible this was an attachment because he**
5    **says in that e-mail attached -- he has**
6    **attached a copy of the assignment and a copy**
7    **of the confirmation of the assignment,**
8    **confirmation from the bank.  I also attach a**
9    **copy of the bank's e-mail below.**
10          **So maybe this came in connection**
11   **with that but this would have made no sense**
12   **to me if I received it as early as the 7th.**
13       Q.   Okay.  So your best recollection
14   is --
15       **A.   It came the 14th.**
16       Q.   -- Exhibit 23 was attached to what
17   we are going to mark as Exhibit 24?
18       **A.   Yes.  And I think as I looked at**
19   **my time, my billing before I think I came to**
20   **the same conclusion then.  I think I noted**
21   **my time on this starting on 12/15 so I**
22   **definitely did not receive it on December 7.**
23       Q.   Okay.
24           MR. WINTON:  Number 24.
25           (Document Bates labeled M&K75, 76,

Page 153

Wolfson

1    77, 78 was marked Exhibit 24 for
2    identification)
3    BY MR. WINTON:
4    Q.   Exhibit 24 is M&K75, 76, 77, 78,
5    correct?
6    **A.   Yes, it is.**
7    Q.   This I believe you alluded to
8    earlier --
9    **A.   Yes.**
10   Q.   -- where Mr. Seward is asking you
11   for information about this bank and the
12   assignment and this is really continuing
13   with some questions he posed to you back on
14   the 1st about these multiple assignments of
15   this letter of credit?
16   **A.   Yes and no.  I mean it is still**
17   **dealing with the letters of credit and the**
18   **assignments but it is a discrete inquiry.**
19   Q.   Discrete in the sense that he is
20   asking you if this is a legitimate bank?
21   **A.   Yes.  It is not so much a legal**
22   **issue as much as, you know, do I have any**
23   **knowledge of this bank or what I think of**
24   **it.**
25

Page 154

Wolfson

1    Q.   Do you know anything about U.S.
2    Bank?
3    **A.   No.  I think he was just asking me**
4    **because I was American not because -- for**
5    **any other reason.**
6    Q.   Did you have an understanding as
7    of December 14 whether or not the charter
8    party had been finalized and existed as of
9    this point in time?
10   **A.   I mean I don't specifically recall**
11   **but I know the escrow agreement was**
12   **finalized so I would -- maybe I was assuming**
13   **but I certainly understood it to have been**
14   **concluded when the escrow agreement was**
15   **completed.**
16   Q.   We have not seen a fully executed
17   version of the escrow agreement in any of
18   these e-mails up to this point, right?
19   **A.   That may be true.**
20   **I also wasn't the central**
21   **depository and supplier of all the e-mails**
22   **that was going on.  Like I said all the**
23   **negotiations were going on between the**
24   **parties without my involvement.**
25

Page 155

Wolfson

1    **There were instances when I was**
2    **told to circulate a draft but that doesn't**
3    **necessarily mean I was the one circulating**
4    **all the e-mail communications.**
5    **I was not the central**
6    **communications hub by any measure.  So all**
7    **that stuff would have been between the**
8    **parties themselves without my involvement, I**
9    **assume.**
10   Q.   So when is it your understanding
11   that the escrow agreement was actually
12   finally executed by all parties or is that
13   something that happened without your
14   knowledge?
15   **A.   I can only go by what was in the**
16   **e-mail but I know after I signed it and sent**
17   **it on I presumed that it was signed in short**
18   **order, right around December 2.**
19   Q.   But you do not know?
20   **A.   Right.  I don't know unless it is**
21   **reflected in the e-mails some place.  I**
22   **can't remember.**
23   Q.   I don't recall seeing an e-mail
24   saying, Mr. Wolfson, here is a copy of the
25

Page 156

Wolfson

1    fully executed escrow agreement for your
2    file or anything like that.
3    **A.   No, but, you know, it was signed**
4    **by Estech, right?  And I signed it and the**
5    **only other party was Seward's people who**
6    **were treating it as if it was done so, you**
7    **know.**
8    Q.   As an escrow agent would you not
9    have expected to receive a fully executed
10   copy upon completion of the document?
11   **A.   Yes.  But it is not uncommon that**
12   **I don't necessarily have a signed copy.  If**
13   **Mark Seward tells me that it is done, you**
14   **know I have no reason not to believe him.**
15   **Milestone was his client.**
16   Q.   But wouldn't you normally expect
17   as the escrow agent to have a copy of the
18   final executed document?
19   **A.   Yes.  In any circumstances it is**
20   **nice to have final executed copy of any**
21   **agreement but as -- you know, in my business**
22   **it is not uncommon that sometimes you don't**
23   **necessarily get the final executed copy of**
24   **anything.**
25

Page 157

**Wolfson**

1
2      **Since I know that the party who**
3   **was my own clients in other words that the**
4   **people I was working for was the escrow**
5   **agency, Estech I know signed it and**
6   **Milestone and I was reporting to daily so**
7   **there was no reason to think it wasn't fully**
8   **signed.**
9      Q.   But you do not have a --
10      A.   **I don't have a copy but that**
11   **doesn't mean I have no understanding as to**
12   **whether it was executed.**
13      Q.   And you don't know in fact when it
14   was finally executed?
15      A.   **I can't say with absolute**
16   **precision but I think it was around**
17   **December 2nd because the fixture wouldn't**
18   **have been done without it.  It was part of**
19   **the fixture.**
20      Q.   So the answer is no, you do not
21   know?
22      A.   **I do not know.**
23      Q.   Do you have an understanding of --
24   when you say "fixture" I think we agreed
25   that you mean the charter party?

Page 158

1                    Wolfson
2      A.   **Yes.**
3      Q.   Do you have an understanding of
4   when the charter party was finally executed,
5   if at all?
6      A.   **My understanding is it was**
7   **executed.  I would have to have my head in**
8   **the sand as far as the other documents that**
9   **have been placed in front of me not to have**
10   **that understanding.**
11      Q.   And what do you base that
12   understanding on?
13      A.   **The fact there is a lawsuit, the**
14   **fact that I -- that Milestone demanded the**
15   **return of the funds and alleged the breach.**
16   **All of that.  It is all in my head and kind**
17   **of hard to answer the question without**
18   **having that in my head.**
19      Q.   Do you have an understanding of
20   when the charter party came into existence?
21      A.   **I would have to refer to**
22   **Milestone's pleadings because They would**
23   **know exactly.**
24      Q.   I don't think they say.
25      A.   **I think they produced a copy of**

Page 159

1                    **Wolfson**
2   the charter party.
3      Q.   It is not executed is the problem.
4   That is why I am asking.
5      A.   **As you know with fixtures it is**
6   **not uncommon that they are not executed.**
7   **They are not signed that is often the case.**
8      Q.   And that is why I am asking the
9   question.
10      A.   **No.  I wouldn't be the person to**
11   **ask.**
12      Q.   Okay.
13      A.   **No one ever certainly came to me**
14   **and said, you know, the fixture is done, the**
15   **escrow agreement is done, do anything.**
16   **Funds just sat there.**
17         MR. WINTON:  Number 25.
18         (Four-page document Bates labeled
19   M&K83 to 86 was marked Exhibit 25 for
20   identification)
21         MR. WINTON:  Objection.
22   Non-responsive.
23   BY MR. WINTON:
24      Q.   We have handed you what has been
25   marked as Exhibit 25.  This is a four-page

Page 160

1                    Wolfson
2   document M&K83 to 86?
3      A.   **Yes.**
4      Q.   Again this is -- contains a series
5   of discussions between you and Mr. Seward
6   regarding U.S. Bank and the assignment?
7      A.   **I wouldn't say it is a series of**
8   **discussions.  It is really one discussion.**
9      Q.   I would say it is a series of
10   e-mails discussing the assignment?
11      A.   **Yes.**
12      Q.   It ends with him asking you how
13   much you were going to charge for your work
14   in this matter and you indicated about
15   2,000?
16      A.   **Yes.**
17         MR. WINTON:  Number 26.
18         (Document Bates labeled M&K87
19   through 107 was marked Exhibit 26 for
20   identification)
21   BY MR. WINTON:
22      Q.   Exhibit 26 is a lengthy document
23   that is composed of M&K87 through 107.
24         Do you agree?
25      A.   **Yes.**

Page 161

**Wolfson**

1
2    Q.    Basically this is on the first
3    page contains two e-mails and then a series
4    of documents that are attached.
5         Would you agree that the first
6    e-mail, the lower one is dated December 23
7    of 2010 and is Mr. Seward letting you know
8    that the arrangements between and here he
9    says Slane Corporation, Estech and Milestone
10   apparently have come apart.  I won't quote
11   it.
12        He is asking you for advice about
13   whether or not there is any sort of
14   garnishee procedure available to Milestone.
15        Do you see that second to the
16   bottom full line?
17        "What do you think we can do?  Is
18   there any kind of garnishee procedure
19   available to us?"  And then asking you what
20   you need in order to release the escrow?
21   **A.   Yes.  I see where he says that,**
22   **yes.  As I recall I did not respond to that.**
23        Q.    I guess this is really only a
24   single e-mail, isn't it, and it -- the
25   format is what was confusing me.  It looks

Page 162

1                   **Wolfson**
2    like he has almost used a memo format under
3    the e-mail that is at the top there?
4    **A.   Yes.**
5    Q.    Would you agree with that?
6    **A.   Yes.**
7         MR. WINTON:  Number 27.
8         (Document Bates labeled M&K108 and
9    109 was marked Exhibit 27 for
10   identification)
11   BY MR. WINTON:
12   Q.    Exhibit 27 is M&K108 and 109.
13   Really just a single e-mail on the top of
14   the one we just looked at but now without
15   any of the attachments.
16        This one basically just says
17   Garth, help, exclamation mark, exclamation
18   mark, question mark, right?
19   **A.   Yes.**
20   Q.    So this is just a followup telling
21   you that he is looking for an answer to his
22   prior inquiry, right?
23   **A.   Yes.**
24   Q.    My understanding is that on
25   December 23 when these e-mails came in your

Page 163

1                   Wolfson
2    office was closed?
3    **A.   I was gone.  Our office definitely**
4    **closes around that time.  It would have been**
5    **right before the Christmas holidays so I**
6    **suspect the office was closed.  I actually**
7    **was gone earlier than that.  I was abroad**
8    **and in fact despite advices received from**
9    **Messrs. Verizon & Company my BlackBerry did**
10   **not function in Argentina so I was without**
11   **BlackBerry in fact for -- well, it was**
12   **supposed to have been just a week but**
13   **because of the snowstorm turned longer than**
14   **that.  But the office would have been closed**
15   **that afternoon anyway.  It almost certainly**
16   **would have closed that day early.**
17   Q.    This e-mail --
18   **A.   I did not even see it for some**
19   **time.**
20   Q.    This e-mail is dated December 23
21   at 3:18 p.m.?
22        MS. OROZCO:  December 23rd?
23        MR. WINTON:  What did I say?
24        MS. OROZCO:  You said the 23rd.
25   Mine is the 29th.

Page 164

1                   Wolfson
2         MR. WINTON:  M&K108.
3         MS. OROZCO:  Sorry.
4    BY MR. WINTON:
5    Q.    It indicates 3:18 p.m. so --
6    **A.   I would be very, very surprised if**
7    **the office were open.**
8         **I could probably catch Ed and**
9    **confirm but we would have almost certainly**
10   **closed at least early that day.  We would**
11   **have been closed on the 24th, the Friday**
12   **when Christmas day was celebrated and almost**
13   **certainly I have been here 14 years now and**
14   **we have been closed that day for those**
15   **holidays.**
16   Q.    When you were closed -- when your
17   offices are closed for the holiday is there
18   anyone monitoring e-mails?
19   **A.   Normally I should get the e-mail**
20   **on my BlackBerry but as I said it wasn't**
21   **working so Ed may have received it.**
22        **We both have mobile devices that**
23   **are capable of receiving e-mail and I am not**
24   **sure whether Ed received this since it was**
25   **addressed to me but it is entirely possible**

Page 165

Wolfson

1
2  he did.
3     Q.   When you travel like that you do
4  normally take a laptop so that you can go
5  online and check e-mails?
6     A.   I didn't bring a laptop because I
7  was going into the Andes and it would have
8  been hard to carry a laptop.
9        I did bring the Verizon special
10  World Edition BlackBerry with me and, which
11  I was assured would work and in fact it did
12  not at all and I managed to get word to the
13  office that I was not receiving e-mail but
14  aside from that --
15     Q.   When did you let the office know
16  you were not receiving e-mail?
17     A.   My wife's BlackBerry worked and
18  she -- I used her BlackBerry to e-mail the
19  office and said this is Garth in all caps so
20  they wouldn't delete the e-mail and just let
21  them know that I was not receiving
22  BlackBerry.
23     Q.   Do you recall when you did that?
24     A.   It would have been probably the
25  very day I arrived which would have been

Page 166

Wolfson

1
2  something like the 17th.  It was the 17th.
3  Because I did manage to call Verizon on her
4  BlackBerry and they billed me hundreds of
5  dollars for it for advising Verizon that my
6  BlackBerry was not working despite what they
7  told me.  The roaming charges were more than
8  $5 a minute.
9     Q.   Do you know whether or not anyone
10  in your office received that e-mail and did
11  anything to make sure that someone else was
12  covering?
13     A.   I don't know.  I don't know.
14        With the Christmas holiday the
15  banks had been closed too anyway so -- I
16  don't know.
17     Q.   Do you know when your office
18  reopened?
19     A.   I assume it would have been that
20  Monday.
21     Q.   I am not familiar enough with that
22  particular snowstorm.  I don't remember when
23  it hit or how long New York was shut down.
24     A.   It hit -- I was scheduled to
25  return on the 26th.

Page 167

Wolfson

1
2        MS. OROZCO:  It is the Monday
3  after Christmas.
4        THE WITNESS:  And it was that
5  storm, in fact, the subways weren't
6  running, nothing was running.  There was
7  nobody in any of these offices, even
8  large corporations.
9  BY MR. WINTON:
10     Q.   Okay.  And that is why I asked
11  because you said the office reopened on
12  Monday but --
13     A.   Technically reopened on Monday.
14  Whether anyone was here, I can't believe
15  anyone made it in.  I know the secretaries
16  all live in Staten Island.  There is no way
17  they would have made it in.  You couldn't
18  get here.
19        Ed, I don't know what was going on
20  with Ed so maybe he could have made it in
21  but I would be surprised.  The place was
22  shut down for what seemed a remarkable
23  number of days and it was very frustrating
24  for me personally trying to get back.
25        MR. WINTON:  Number 28.

Page 168

Wolfson

1
2        (E-mail from Mr. Seward to Ed
3  Keane, Mr.Wolfson and Jorge Rodriguez, Bates
4  labeled M&K110 through 117 was marked
5  Exhibit 28 for identification)
6  BY MR. WINTON:
7     Q.   So the next document we have got
8  is Exhibit 28 which has just been handed to
9  you.
10        This is an e-mail from Mr. Seward
11  to Ed Keane, I assume, E. Keane, to you and
12  to Jorge Rodriguez are all here at Mahoney &
13  Keane?
14     A.   I think he was e-mailing everybody
15  he had ever dealt with at Mahoney & Keane.
16  And Jorge doesn't even -- wasn't even
17  working there at the time.  He had left.
18     Q.   Okay.  So this is December 29 and
19  obviously Mr. Seward is still looking for
20  some help with regard to the charter party,
21  right?
22     A.   Yes.  I think he wants his escrow
23  money.
24     Q.   I did not see in the documents you
25  produced in the normal chronological

Page 169

| | Wolfson |
|---|---|
| 1 | Wolfson |
| 2 | sequence a copy of the December 23, 2010 |
| 3 | letter from Tom Moloney at AES -- |
| 4 | **A.   It is there.** |
| 5 | Q.   Let me finish -- |
| 6 | **A.   Okay.** |
| 7 | Q.   -- demanding return of AES's |
| 8 | 500,000. |
| 9 | **A.   Yes.** |
| 10 | Q.   I know it is attached later to |
| 11 | other documents but I didn't see anything at |
| 12 | this point in time between these 23rd |
| 13 | e-mails from Mr. Seward and this 29th e-mail |
| 14 | from Mr. Seward where Mr. Moloney's letter |
| 15 | is accounted for. |
| 16 | Do you have any understanding of |
| 17 | why it is not there? |
| 18 | **A.   I attached the whole string on** |
| 19 | **occasion so sometimes you have to go back on** |
| 20 | **the string.** |
| 21 | **If I were to attach each** |
| 22 | **individual e-mail it would just be** |
| 23 | **duplicative and cause a small stack of** |
| 24 | **documents to become boxes.** |
| 25 | Q.   That is a pretty significant |

Page 170

| | Wolfson |
|---|---|
| 1 | Wolfson |
| 2 | document. |
| 3 | **A.   Yes.  It is there.  It is** |
| 4 | **produced.** |
| 5 | Q.   You didn't think it was |
| 6 | significant enough to produce it as it hit |
| 7 | on the 23rd with an e-mail and an attached |
| 8 | letter by itself? |
| 9 | **A.   I think that is absurd frankly.  I** |
| 10 | **produced the e-mail.  I didn't attach any** |
| 11 | **significance to it how I did that.** |
| 12 | MR. WINTON:  Number 29. |
| 13 | (Single e-mail from Mark Seward to |
| 14 | Ed Keane and Garth Wolfson, Bates labeled |
| 15 | M&K118 was marked Exhibit 29 for |
| 16 | identification) |
| 17 | BY MR. WINTON: |
| 18 | Q.   Exhibit 30 is a one page e-mail |
| 19 | from Mr. Seward dated December 29, do you |
| 20 | see that, M&K118? |
| 21 | MS. OROZCO:  What is Exhibit 29? |
| 22 | Okay. |
| 23 | MR. WINTON:  28 was M&K110 |
| 24 | through -- |
| 25 | MS. OROZCO:  Through 117. |

Page 171

| | Wolfson |
|---|---|
| 1 | Wolfson |
| 2 | MR. WINTON:  Yes. |
| 3 | MS. OROZCO:  Okay.  29 is -- |
| 4 | MR. WINTON:  29 is 118 and |
| 5 | counting -- |
| 6 | MS. OROZCO:  When you said 30 I |
| 7 | thought -- |
| 8 | MR. WINTON:  What you are pointing |
| 9 | out is that I can't count -- |
| 10 | MS. OROZCO:  Well, you said 30 |
| 11 | and -- |
| 12 | MR. WINTON:  No.  That is fair.  I |
| 13 | will plead guilty.  I can't count. |
| 14 | BY MR. WINTON: |
| 15 | Q.   Okay.  29 is the one we are on, |
| 16 | right. |
| 17 | Exhibit 29 is a single e-mail from |
| 18 | Mark Seward to Ed Keane and to you, correct? |
| 19 | **A.   Yes.** |
| 20 | Q.   And the entire text is, "In case |
| 21 | you are satisfied." |
| 22 | Do you see that? |
| 23 | **A.   Yes.** |
| 24 | Q.   This came in on December 29 so |
| 25 | this is before you got back to the office, |

Page 172

| | Wolfson |
|---|---|
| 1 | Wolfson |
| 2 | right? |
| 3 | **A.   Right.** |
| 4 | Q.   Having now read this e-mail do you |
| 5 | have an understanding of what that means? |
| 6 | **A.   Sure.  He is saying in case I am** |
| 7 | **satisfied that the funds should be remitted** |
| 8 | **to Milestone under the escrow agreement** |
| 9 | **these are the bank details for us to do** |
| 10 | **that.** |
| 11 | Q.   So, we have the double line and |
| 12 | then Milestone and a bank in Latvia and so |
| 13 | forth.  That is the bank account they wanted |
| 14 | you to send the $500,000 to; is that |
| 15 | correct? |
| 16 | **A.   Seems obvious to me, yes.** |
| 17 | Q.   I am a little slow. |
| 18 | Do you know when your office first |
| 19 | picked up Mr. Moloney's December 23 letter, |
| 20 | held it in its hand and read it? |
| 21 | **A.   I know there was a discussion, Ed** |
| 22 | **spoke to him before I did because I was** |
| 23 | **abroad and I know at the same time as we** |
| 24 | **have been going through Mr. Seward's e-mails** |
| 25 | **as you pointed out before AES was also** |

Page 173

1          **Wolfson**
2    **demanding return of the funds and so I know**
3    **Ed spoke to him at some point but the first**
4    **time I saw was in an airport and I believe**
5    **it was Dallas.**
6       Q.   I do not see any e-mail and I
7    don't believe I saw an e-mail anywhere in
8    here in which your office forwarded
9    Mr. Moloney's December 23 demand for return
10   of its money to Mr. Seward.  Did I miss it?
11      **A.   I thought I did.  Maybe I didn't**
12   **but I certainly advised him that they were**
13   **demanding return of the funds.**
14          **I wrote some lengthy letters to**
15   **Tom and I forwarded them at the time I wrote**
16   **them to both -- or shortly after I wrote**
17   **them to both -- to Mr. Seward and after he**
18   **retained Mr. Tisdale, to Mr. Tisdale.**
19      Q.   Here on the 29th when all of these
20   e-mails are going back and forth --
21      **A.   I wasn't even here.  I can assure**
22   **you I didn't send anything because I wasn't**
23   **even in the country.**
24          MR. WINTON:  Number 30.
25          (Document Bates labeled M&K119 to

Page 174

1          Wolfson
2    122 was marked Exhibit 30 for
3    identification)
4    BY MR. WINTON:
5       Q.   Exhibit 30 is M&K119 to 123,
6    correct?
7       **A.   I have M&K119 to 122.**
8       Q.   Okay.  122.  You are right.  My
9    copies are not stapled.
10          At the bottom of 119 is an e-mail
11   from Mr. Keane to Mr. Seward and the e-mail
12   carries over to the top of 120?
13      **A.   Yes.**
14      Q.   And Mr. Keane notes to Mr. Seward,
15   "The escrow agreement does not provide for
16   the amount held to be treated as liquidated
17   damages."
18          Do you see that?
19      **A.   Yes.**
20          MR. WINTON:  Number 31.
21          (Document Bates labeled M&K123 was
22   marked Exhibit 31 for identification)
23   BY MR. WINTON:
24      Q.   Exhibit 31 is M&K123.
25          This is just an exchange between

Page 175

1          Wolfson
2    Mr. Seward and Jan Michalek relating to the
3    escrow funds.
4          I really didn't have a whole lot
5    of questions on that one so the next one I
6    want to get to.
7          MR. WINTON:  Number 32.
8          (Document Bates labeled M&K124 to
9    127 was marked Exhibit 32 for
10   identification)
11   BY MR. WINTON:
12      Q.   Exhibit 32 should be M&K124 to
13   127, correct?
14      **A.   Yes.**
15      Q.   I really want to focus on that top
16   e-mail on page 124.
17      **A.   Okay.**
18      Q.   M&K124.  This is an e-mail from
19   Mr. Seward back to Mr. Keane in response to
20   his which is 30, noting that the escrow
21   agreement does not treat the $500,000 as
22   liquidated damages.
23      **A.   I think --**
24      Q.   Let me ask the question.
25      **A.   Sorry.**

Page 176

1          **Wolfson**
2       Q.   You saw that in Mr. Keane's
3    e-mail, right?
4       **A.   Yes.**
5       Q.   Here is Mr. Seward's response:
6          "The only reason the escrow says
7    'liquidated damages' is due to forfeit
8    provisions" -- I assume it means forfeiture
9    but it says forfeit provisions -- "and I did
10   not want it to be construed as a penalty."
11          Do you have any understanding what
12   he is talking about because I have looked at
13   the escrow agreement and I can't find the
14   words "liquidated damages" anywhere in that
15   document.
16          So do you have an understanding?
17   If you don't, you don't.
18      **A.   No.  I really wasn't privy to this**
19   **discussion.  I never looked at it with an**
20   **eye toward that issue.**
21      Q.   Okay.  Fair enough.
22          MR. WINTON:  Number 33.
23          (Document Bates labeled M&K128 to
24   130 was marked Exhibit 33 for
25   identification)

Page 177

Wolfson

1
2  BY MR. WINTON:
3      Q.   Exhibit 33 is M&K128 to 130.
4          This is Igor Violin from Chaika
5  Agency to Mr. Keane, copy to Mr. Seward.
6          Did you receive this?
7      **A.   I know I have seen it because I**
8  **gathered these documents personally.**
9      Q.   But you weren't involved in this
10  exchange?
11      **A.   No.  As I said I was not in the**
12  **country.**
13      Q.   I am sorry if you already said
14  this I apologize.
15          When did you get back into the
16  country?  When did you first come back into
17  the office?
18      **A.   It is a good question.  It is in**
19  **my e-mail to Tom Moloney when I got back.  I**
20  **told him exactly where I was because I**
21  **regretted the delay in responding to him.**
22      Q.   Okay.  We will see it.
23          Do you have an understanding who
24  Igor Violin is?
25      **A.   I have an understanding from this**

Page 178

Wolfson

1
2  **that he must be a representative of**
3  **Milestone or Milestone's interests since it**
4  **is the Chaika Agency address so he obviously**
5  **got Ed's e-mail and wrote to him directly.**
6      Q.   But you don't know what his
7  position is?
8      **A.   I have no idea.**
9          MR. WINTON:  Number 34.
10          (Document Bates labeled M&K135 to
11  138 was marked Exhibit 34 for
12  identification)
13  BY MR. WINTON:
14      Q.   Is -- Exhibit 34 is M&K135, 136?
15      **A.   I have 135 to 138.**
16      Q.   You are right.
17          MS. OROZCO:  I have to 136.
18          MR. WINTON:  It should be just
19  through 138.
20          MS. OROZCO:  Okay.  All right, you
21  are right I do.  That is what I have.
22  Sorry.
23  BY MR. WINTON:
24      Q.   You are not back in the country
25  yet by the time this is going on?  This is

Page 179

Wolfson

1
2  still December 29.
3      **A.   I am not back in the country.  I**
4  **was delayed I think four days.  So I didn't**
5  **get back until around New Year's.  I think I**
6  **got back around the 30th.  It is in the**
7  **e-mail.**
8      Q.   Okay.  But you recognize this to
9  be an exchange between Mr. Seward and
10  Mr. Keane of your office?
11      **A.   Sure.**
12          MR. WINTON:  Number 35.
13          (Document Bates labeled M&K139 to
14  145 was marked Exhibit 35 for
15  identification)
16  BY MR. WINTON:
17      Q.   Exhibit 35 is M&K139 to 145.  Is
18  that correct?
19      **A.   Yes.**
20      Q.   This appears to pick up as a new
21  e-mail on the third page, 141, with an
22  e-mail from Tom Moloney to you dated
23  December 27 saying they haven't received the
24  money back in response to the December 23
25  demand for return of the money?

Page 180

Wolfson

1
2      **A.   Yes.**
3      Q.   Then the 28th the followup saying
4  I haven't heard from you?
5      **A.   Yes.**
6      Q.   Then on the 29th --
7      **A.   It looks like I became aware of**
8  **it.**
9      Q.   Apparently on the 29th at 1:01,
10  there is an e-mail on the bottom of the
11  second page, 140, from Tom Moloney to Ed
12  Keane saying "as requested," which I assume
13  means he is forwarding to Mr. Keane the
14  letter?
15      **A.   I believe Mr. Keane had a**
16  **conversation with Mr. Moloney on that date**
17  **and that is when Mr. Keane I suppose**
18  **responded.  I guess the request was made**
19  **during that conversation.**
20      Q.   What request?
21      **A.   It says, "As requested," and at**
22  **the bottom of M&K140 --**
23      Q.   Right.  I am assuming that in that
24  conversation between Mr. Keane and
25  Mr. Moloney there was a request I am

Page 181

```
 1              Wolfson
 2  assuming for that December 23 letter?
 3      A.  Sure.
 4      Q.  So then we get to the top of the
 5  second page which is 140 from Mr. Moloney,
 6  Ed and Garth, and now he is stating his
 7  position about the money being due to come
 8  back to AES on demand, right?
 9      A.  Sorry.  Can you repeat the
10  question?  I was reading.
11      Q.  Yes.  The top of the second page,
12  140, this is Mr. Moloney to Mr. Keane and to
13  you although you are not back in the office
14  yet, right?
15      A.  Yes.
16      Q.  So do you know whether or not you
17  had BlackBerry service by the 29th?
18      A.  No.  I got my BlackBerry briefly
19  at the Dallas airport when I was on a
20  stopover.
21      Q.  Okay.
22      A.  So much for my direct flight.  My
23  nonstop.
24      Q.  He is stating, "he" being
25  Mr. Moloney, is stating his position that
```

Page 182

```
 1              Wolfson
 2  the deal with -- between Estech and
 3  Milestone that is contained in the escrow
 4  agreement has nothing to do with AES, AES's
 5  rights are contained in the December 2 trust
 6  agreement letter between AES and Mahoney &
 7  Keane?
 8      A.  That's right.
 9      Q.  So on December 29 at, I assume
10  this is 7:32 in the evening here in New
11  York, Mr. Keane is asking Mr. Seward if he
12  has any comments and I can't tell whether he
13  is forwarding that letter or just asking for
14  comments on Mr. Moloney's e-mail that is
15  below that.
16          So you weren't a party to this at
17  this point in time, right?
18      A.  No.
19      Q.  I have asked the court reporter to
20  mark a series -- I think there is about four
21  or five e-mails in a row where I believe
22  Mr. Keane is forwarding to you, yes, he is
23  forwarding to you the chainings of e-mails
24  and what I -- rather than go through them it
25  is forwarding stuff we already looked at I
```

Page 183

```
 1              Wolfson
 2  just wanted you to look at them and identify
 3  them and I will be right back so we can go
 4  off the record while that happens.
 5          MR. WINTON:  Mark this as Exhibit
 6  36.
 7          (Document Bates labeled M&K146 to
 8  149 was marked Exhibit 36 for
 9  identification)
10          MR. WINTON:  Number 37.
11          (Document Bates labeled M&K150 to
12  153 was marked Exhibit 37 for
13  identification)
14          MR. WINTON:  Number 38.
15          (Document Bates labeled M&K154 to
16  156 was marked Exhibit 38 for
17  identification)
18          MR. WINTON:  Number 39.
19          (Document Bates labeled M&K157 to
20  163 was marked Exhibit 39 for
21  identification)
22          MR. WINTON:  Off the record.
23          (Discussion off the record)
24  BY MR. WINTON:
25      Q.  We are back on the record.
```

Page 184

```
 1              Wolfson
 2          We have marked as Exhibits 36, 37,
 3  38 and 39, a series of the e-mails
 4  forwarding -- in which Mr. Keane was
 5  forwarding to you the exchanges in this
 6  matter.
 7          Have you had a chance to look at
 8  those?
 9      A.  Yes.
10      Q.  Do you recognize those to be
11  e-mails that he forwarded to you on the
12  29th?
13      A.  Yes, I do.
14      Q.  36 is M&K146 to 149.
15          37 is M&K150 to 153.
16          38 is M&K154 to 156.
17          And 39 is 157 to 163?
18      A.  That's correct.
19      Q.  We have already gone over I
20  suspect everything that is in there so I
21  don't feel any pressing need to go over it
22  again.
23          MR. WINTON:  Number 40.
24          (Document Bates labeled M&K164 to
25  169 was marked Exhibit 40 for
```

Page 185

Wolfson

1    identification)
2    BY MR. WINTON:
3    Q.   We have marked as Exhibit 40
4    M&K164 to 169.
5         Do you recognize that to be a
6    response from you to Mr. Keane following the
7    various forwards?
8    A.   Yes.
9    Q.   It also includes your e-mail to
10   Mr. Moloney indicating that due to the
11   blizzard you are struggling to get back to
12   the office and this is dated December 29 at
13   6:43 in the evening.
14        Do you see that?
15   **A.   Yes.  This, I believe I sent this**
16   **while I was in the security line at Dallas.**
17   Q.   Then the top e-mail on M&K164 is
18   from you to Ed Keane also December 29 at
19   7:37 p.m.?
20   A.   Yes.
21   Q.   And you say that you are going to
22   review all of this tomorrow, the 30th.  I
23   take it once you get back to the office?
24   A.   Yes.

Page 186

**Wolfson**

1    Q.   You acknowledge you are not sure
2    exactly what is going on.
3         Would you agree with me that the
4    dispute that has developed in this case is
5    precisely the disconnect in those two
6    December 2 communications, the one you sent
7    to Mr. Seward stating what Mr. Moloney told
8    you and then his response to you about what
9    you can confirm to Mr. Moloney?
10   **A.   I think those competing**
11   **understandings are what has since erupted**
12   **now to be the main issue but when I wrote**
13   **this I wasn't referring to that.**
14       **I was saying that I didn't know**
15   **what was going on as far as these forwarded**
16   **messages. I was on BlackBerry and I really**
17   **couldn't see what the dispute was about,**
18   **anything about the breach or whatever**
19   **occurred. So that is all I was talking**
20   **about then.**
21       **Obviously since that time we all**
22   **know that the dispute that has developed has**
23   **been along those lines, about whether the**
24   **funds were intended to move into the escrow**

Page 187

**Wolfson**

1    **or whether AES is entitled to demand they**
2    **return them.**
3    Q.   Would you agree with me that is
4    precisely the discussion that we had about
5    these two e-mails, the one you sent to
6    Mr. Seward that is at the bottom of the
7    first page of Exhibit 11, M&K023, and his
8    response back at the top of Exhibit 11, page
9    023?
10   **A.   I believe I have discussed those**
11   **issues, those e-mails at such length**
12   **already.  I think it does touch upon the**
13   **issue.**
14       **However, I don't believe there is**
15   **a real disconnect there.**
16   Q.   You don't think that those two
17   e-mails are inconsistent with each other?
18   **A.   No. I wrote the e-mail. I know**
19   **what I was thinking when I wrote it.**
20       **I was just not clear what Tom**
21   **Moloney was saying.**
22   Q.   On the first page of Exhibit 40,
23   M&K164 you say, "But as we were merely
24   escrow agents my inclination is to offer

Page 188

Wolfson

1    them time to work it out or litigate."
2         "Them" being AES and Milestone?
3    **A.   Yes.  Possibly Estech. I wasn't**
4    **exactly sure what was going on at that**
5    **point.**
6    Q.   Would you agree with me that when
7    you say we are merely escrow agents that is
8    not entirely accurate, you in this matter
9    acted beyond the mere capacity as an escrow
10   agent?
11   **A.   No.  I disagree with that.**
12   Q.   So you think that when you were
13   providing legal advice to Milestone in
14   response to questions from Milestone's
15   London solicitor --
16       MS. OROZCO:  Objection.
17   BY MR. WINTON:
18   Q.   -- that that is entirely
19   consistent with simply being an escrow
20   agent?
21   **A.   You asked me a general question**
22   **about assignments.  I gave him a one-line**
23   **answer.  If you want to argue that means**
24   **something else feel free to argue it but I**

Page 189

Wolfson

1  am not going to sit here and admit it for
2  you because I don't think it does.
3        In fact when he asked me advice
4  about the escrow, about getting the escrow
5  back, I refused to give it to him.
6     Q.    Well, I am talking about the
7  advice you gave him with regard to the
8  multiple assignments of letter of credit.
9     A.   Which has nothing at all to do
10  with this.
11    Q.    But that is a role you performed
12  in this case in addition to being an escrow
13  agent?
14    A.   I have given Mark Seward advice,
15  short advice all the time and I probably
16  will do so in the future hopefully.
17    Q.    So your position is when you give
18  legal advice to a client and charge him for
19  it that is not acting as a lawyer; is that
20  correct?
21    A.   I have said that, I admitted that
22  line of advice was in the nature of legal
23  advice, however I don't think that it
24  established me as an attorney -- established

Page 190

Wolfson

1  an attorney-client relationship in this
2  matter as the escrow agency.
3        The escrow agency was something
4  separate and distinct.
5     Q.    And as a consequence of your
6  statement that in this -- in regard to this
7  dispute that you acted solely as an escrow
8  agent is not entirely accurate. You did
9  have another role, it may not be relevant to
10  the dispute but you did have another role.
11    A.   I have had lots of other roles.
12    Q.    So you would agree you did have
13  another role and that statement is not
14  accurate?
15    A.   I was an escrow agent. As far as
16  anything to do with the dispute in this
17  lawsuit I was an escrow agent. That is my
18  answer. You can take it or leave it.
19    Q.    You had a series of exchanges with
20  Mr. Moloney, correct?
21    A.   Correct.
22    Q.    In early January where you --
23    A.   If you have the e-mail in front of
24  you you could probably help me find exactly.

Page 191

Wolfson

1  I was trying to send it out as soon as I got
2  back to the office.
3     Q.    I was trying to expedite but I
4  will go back and do that.
5     A.   It was sometimes around New
6  Year's.
7        MR. WINTON:  Number 41.
8        (Document Bates labeled M&K170 was
9  marked Exhibit 41 for identification)
10  BY MR. WINTON:
11    Q.    We have marked as Exhibit 41
12  M&K170 which is an exchange between Igor
13  Violin and Jan Michalek primarily but it was
14  copied to Ed Keane here.
15        Do you see that?
16    A.   Yes.
17    Q.    I take it you were not involved in
18  this exchange?
19    A.   No. But -- no.
20        MR. WINTON:  Number 42.
21        (Document Bates labeled K181 to
22  190 was marked Exhibit 42 for
23  identification)

Page 192

Wolfson

1  BY MR. WINTON:
2     Q.    Exhibit 42 is M&K181 to 190.
3        Do you see that?
4     A.   Yes, I do.
5     Q.    Would you agree that the first
6  e-mail in this chain is an e-mail from you
7  to Thomas Tisdale?
8     A.   What do you mean, the most recent
9  in the chain?
10    Q.    Yes, the top. The very -- the
11  last one in order but the first one on this
12  exhibit so it is at the top of page 181 of
13  Exhibit 42.
14    A.   Yes.
15    Q.    And what you are doing with
16  this -- in this December 30 e-mail is you
17  are forwarding to Mr. Tisdale this series of
18  exchanges you had with Mr. Moloney where the
19  two of you were?
20    A.   Right. I understood -- somehow I
21  learned that Tom had been retained I think
22  as counsel for Milestone and so rather than
23  reporting just to Mark as I had I felt it
24  behooved me to let both sides know what was

Page 193

Wolfson

1  going on so I sent it on to Tom.
2  
3      Q.   As a mere escrow agent why were
4  you forwarding this information to
5  Milestone's attorneys, litigation counsel?
6      A.   Because Milestone was one of the
7  claimants who was seeking the return of the
8  funds.  So I don't think I hid anything from
9  Tom either in saying that Milestone had also
10  been seeking the return of the funds.
11      Q.   Would you agree with me that once
12  counsel appeared on behalf of AES that you
13  did not similarly forward this information
14  voluntarily so that everybody was on -- was
15  advised of what had happened?
16      A.   I gave this to you.
17      Q.   In response to a subpoena.
18      A.   I know I gave it to you.  I don't
19  remember when I gave it to it.  I know I gave
20  it to you.
21      Q.   You sent this to Mr. Tisdale as
22  counsel for Milestone on September 30,
23  correct?
24      A.   This went to AES.  Presumably you
25  would have already had it from AES anyway.

Page 194

Wolfson

1  
2      This is something I sent to AES.
3      Q.   And you were sending it to --
4  presumably these exchanges went to Milestone
5  as well since it is going to chartering
6  Chaika Agency, Mark Seward, Ed Keane.  All
7  of these people who have been copied on this
8  all along.
9      A.   But you appeared in the context of
10  litigation and as I said in the response to
11  my subpoena once the suit was started I am
12  not giving you everything that was exchanged
13  in discovery and the like but you appeared
14  much later in the action than Mr. Tisdale.
15      Q.   You understood on December 30 that
16  Mr. Tisdale's firm, who is here as counsel
17  for Milestone in this matter, had been
18  retained to represent Milestone in trying to
19  get this $500,000?
20      A.   Yes.
21      Q.   Correct?
22      A.   Yes.
23      Q.   Okay.  So would you agree with me
24  that although you forwarded all this
25  information at your own initiative to

Page 195

Wolfson

1  Milestone's counsel when counsel for AES
2  appeared shortly after the 4th of January
3  you did not similarly forward all this
4  information to AES's counsel?
5      MS. OROZCO:  Objection.
6      THE WITNESS:  That was after the
7  suit had been commenced.  I gave it to
8  you in the course of discovery.
9      I don't know what you are trying
10  to establish.
11  BY MR. WINTON:
12      Q.   In response to a subpoena you
13  produced this to AES.
14      A.   You keep saying in response to a
15  subpoena, Jim.  But I offered to give it to
16  you at any time without any subpoena and you
17  insisted on giving it a subpoena.
18      So let's not try to characterize
19  this as something other than it is.  I have
20  been cooperative with you just as I have
21  with the other side throughout.
22      Q.   You are your own admission --
23      A.   You just don't like my opinion.  I
24  am sorry about that.

Page 196

Wolfson

1  
2      MR. WINTON:  Objection.
3  Non-responsive.
4  BY MR. WINTON:
5      Q.   Come on, let's not go through that
6  again.  Can we just --
7      A.   Don't go through with me.  You are
8  coming after me, my friend.
9      Q.   Question and answer.
10      A.   Stick with questions and answers
11  and we will be fine.
12      Q.   Would you agree that on your own
13  volition -- on your own initiative you sent
14  this to Milestone's counsel but it is your
15  own initiative you never sent it to AES'
16  counsel?
17      MS. OROZCO:  Objection.
18      THE WITNESS:  Disagree.
19  BY MR. WINTON:
20      Q.   Disagree.  On your own initiative
21  you sent this to AES's counsel?
22      MS. OROZCO:  Objection.
23      THE WITNESS:  On my own initiative
24  I offered to give you whatever you
25  wanted from my files many times.

Page 197

Wolfson

1  Wolfson
2  BY MR. WINTON:
3      Q.   When?
4      A.   As soon as we met for the first
5  time in the conference and any time
6  thereafter.
7      Q.   That would have been April 18th, I
8  believe.
9      A.   Now let's put you under oath.
10     Q.   Is that the date of the
11  conference --
12     A.   I don't remember the exact
13  conference but I offered it and I think
14  Claurisse was present when I offered it many
15  times as well.
16     Q.   That was the scheduling conference
17  in this matter when we were all present in
18  the courtroom, correct?
19     A.   Jim, I probably offered it to you
20  if you called me before, I probably offered
21  it to you then.  And it has been a month
22  now.  Are you going to tell me that I
23  haven't done that?  Say it.  Put him under
24  oath and have him say it.
25     Q.   You are a piece of work,

Page 198

Wolfson

1  Wolfson
2  Mr. Wolfson.
3      A.   It is the truth.  I am under oath.
4  Are you?
5      I offered many times to give you
6  whatever I had.  Did I not?
7      Q.   When did you first offer?
8      A.   I don't remember the exact time I
9  offered it but I did offer it many times.
10  Not that this has any bearing on anything.
11     Q.   I think it does have bearing on
12  stuff.
13     A.   I am under oath and I am telling
14  it like it is.
15     Q.   And your testimony under oath is
16  that --
17     A.   Well, let's get yours.
18     Q.   -- on December 30 you sent this to
19  Mr. Tisdale's office, counsel for Milestone?
20     A.   Yes.  I did not send it to you.
21  You had not even appeared in the case yet.
22     Q.   And when I did appear you did not
23  on your own initiative turn around and send
24  a similar message to me even though you had
25  my e-mail address, correct?

Page 199

Wolfson

1  Wolfson
2      A.   I was a garnishee in a lawsuit and
3  I did not undertake, you know, early to send
4  it to you, no.
5      Q.   But you were an escrow agent in
6  this matter yet you unilaterally sent it to
7  Mr. Tisdale, correct, on December 30th way
8  before there was a lawsuit?
9      MS. OROZCO:  Objection.
10     THE WITNESS:  He is counsel for
11  Milestone.
12  BY MR. WINTON:
13     Q.   Your client?
14     MS. OROZCO:  Objection.
15  BY MR. WINTON:
16     Q.   I can't help it if you don't like
17  what --
18     A.   I didn't say --
19     Q.   -- getting called to account for
20  what you did, Mr. Wolfson.
21     A.   I didn't do anything wrong.  I
22  stand by what I did.
23     Q.   We will let the court figure that
24  out.
25     A.   I didn't realize I was a party.

Page 200

Wolfson

1  Wolfson
2      Q.   Don't push your luck.
3      A.   I don't like being threatened by
4  you either.
5      MR. WINTON:  Number 43.
6      (Document Bates labeled M&K191 was
7  marked Exhibit 43 for identification)
8  BY MR. WINTON:
9      Q.   Exhibit 43 is M&K191.
10     Do you recognize that as an e-mail
11  from Mr. Seward to Tom Moloney and to you?
12     A.   Yes, I do.
13     Q.   And in this e-mail Mr. Seward is
14  indicating that he has instructed counsel in
15  New York to commence proceedings against AES
16  for tortious interference with Milestone's
17  dealings, it says.
18     Do you see that?
19     A.   It says what it says, yes.
20     Q.   Did you discuss with Mr. Seward
21  filing suit against AES for tortious
22  interference?
23     A.   No.  It was never my direction for
24  him to do that.  I was advised by them of
25  the suit.  But it was not my idea nor did I

Page 201

Wolfson

1  ever discuss it.
2      I received a call from, I don't
3  remember who it was, Margaret Thompson that
4  they were doing it.
5      MR. WINTON:  Number 44.
6      (Document Bates labeled M&K197
7  through 205 was marked Exhibit 44 for
8  identification)
9  BY MR. WINTON:
10  Q.   Exhibit 44 consists of M&K197
11  through 205.
12      Do you recognize that document,
13  series of exchanges?
14  A.   Yes.
15  Q.   On top is an e-mail from you to
16  Mr. Seward and to Mr. Tisdale?
17  A.   Yes.
18  Q.   With a copy to Mr. Keane?
19  A.   Yes.
20  Q.   You were forwarding to Mr.
21  Tisdale, litigation counsel for Milestone,
22  this exchange?
23  A.   Yes.
24  Q.   Again, you did not --
25

Page 202

Wolfson

1
2  A.   Jim, you hadn't appeared yet.
3  Q.   I understand that.  But I think we
4  appeared fairly shortly after that.
5  A.   I had given you my entire file.  I
6  don't understand what the problems are.
7      Mr. Moloney wanted me to tell them
8  they wanted their money back and while we
9  were there convey their position.
10  Q.   Mr. Moloney asked you to send this
11  to Mr. Tisdale?
12  A.   I believe he wanted me to make it
13  clear to them what his position was.
14  Q.   Is it your testimony that
15  Mr. Moloney asked you to send this to
16  Mr. Tisdale?
17  A.   I don't know if he knew about
18  Mr. Tisdale.  He wanted me to send it to
19  Milestone.  Tisdale was Milestone's
20  attorney.
21  Q.   Well, Seward was Milestone's
22  attorney.
23      Tisdale was Milestone's litigation
24  counsel, right?
25  A.   They are both their attorneys.

Page 203

Wolfson

1
2      MR. WINTON:  Number 45.
3      (Document Bates labeled M&K206
4  through 208 was marked Exhibit 45 for
5  identification)
6  BY MR. WINTON:
7  Q.   Exhibit 45 is M&K206 through 209.
8      Do you see that?
9  A.   Yes.
10  Q.   Take a look at the last page,
11  M&K209 if you would.
12  A.   Yes.
13  Q.   Is -- this is the same as the
14  document that Mr. Keane pulled earlier
15  today, I believe.
16  A.   See that.  We did produce it.
17  Q.   I now see it and recognize it and
18  I appreciate it.  Thank you.
19      MR. KEANE:  You are welcome.
20  BY MR. WINTON:
21  Q.   So actually this Exhibit 45 should
22  not include 209?
23  A.   No.  Because this is an attachment
24  to an e-mail where we were requested by
25  Mr. Seward to forward him a copy of the same

Page 204

Wolfson

1
2  document you asked for.
3  Q.   Right.  So -- and I apologize.  I
4  did not recognize that to be, although it is
5  pretty obvious now that I have seen it, that
6  it is the IOLA deposit.
7      MR. KEANE:  And with all apology
8  we probably should have produced it
9  separately.
10      So anyway, you got it.  There it
11  is and it still sits in our escrow.
12  BY MR. WINTON:
13  Q.   Exhibit 45 is a three-page
14  document, isn't it?
15  A.   Yes.
16  Q.   Exhibit 45 is now a three-page
17  document consisting of M&K206 through 208,
18  correct?
19  A.   Yes.
20  Q.   And the bottom part of the first
21  page, 206, is an e-mail from Mr. Seward to
22  you dated January 10 asking you to invoice
23  him for services or invoice Milestone
24  actually for services setting up the escrow?
25  A.   Yes.

Page 205

Wolfson

1
2    Q.   Then the next sentence, "Other
3  stuff you can deduct also."
4       Can you explain that, what your
5  understanding was?
6    **A.  I meant that to be following**
7  **setting up the escrow, their continued**
8  **involvement in this lawsuit.**
9    Q.  What does it mean -- what did you
10  understand "deduct" to mean?
11    **A.  Billed.  As under the escrow**
12  **agreement they have to pay for our services**
13  **so I have to bill them for it.**
14    Q.  Was it your understanding that
15  what he was suggesting is that you take your
16  services out of the escrow funds when you
17  forwarded them?
18    **A.  Oh, no.  No.  No.  No.**
19    Q.  Don't misunderstand.  I am not
20  suggesting anything improper.
21    **A.  Yes, you are.  A few times you**
22  **asked me these things.  It never would have**
23  **occurred to me in a million years.  And that**
24  **never occurred to me.**
25    Q.  You do that sometimes like if you

Page 206

Wolfson

1
2  are holding funds in trust from a client in
3  advance of fees?
4    **A.  We are in the middle of a dispute**
5  **that is now in suit about it so there --**
6    Q.  I said I understand.  It never
7  crossed your mind --
8    **A.  Never.**
9    Q.  -- to deduct it from --
10    **A.  Never.  Nor do I have any**
11  **suspicion at all that that is what he**
12  **intended to say.**
13    Q.  Okay.  I just didn't understand
14  the word "deduct" when it means "add"?
15    **A.  He is English.  He speaks**
16  **differently.**
17    Q.  Okay.  That is fine.
18      So the next two pages are your
19  invoice for fees.
20      For example, on December 15 you
21  billed a half hour for letter to Mr. Seward
22  re: the bank assignment?
23    **A.  Yes.  It was also about that --**
24  **whether the U.S. Bank was someplace I**
25  **recognized so it wasn't just -- for all I**

Page 207

Wolfson

1
2  **know I just didn't bill for my time in that**
3  **one-line opinion.  I just billed for the**
4  **Google search on U.S. Bank.**
5    Q.  Then on December --
6    **A.  I don't recall -- I am sorry.**
7      **I don't recall frankly U.S. Bank.**
8  **I am quite sure a half hour was less than**
9  **the time I actually spent.**
10    Q.  Okay.  So December 30, the next
11  entry below that, "Telephone calls, MFB,"
12  that means Mr. Seward, right?
13    **A.  Yes.**
14    Q.  And Milestone's New York counsel,
15  that is Mr. Tisdale?
16    **A.  Right.  Now one or the other of**
17  **them told me about the lawsuit, I think at**
18  **that time.  Or maybe not at that time but at**
19  **some point if there is a telephone**
20  **conference.  If that is the last telephone**
21  **conference then that is when I found out**
22  **about it.  Actually, sorry.  I take it back.**
23      **January 2nd.  No.  That is Ed's.**
24  **Never mind.**
25    Q.  Okay.  I am still on December 30.

Page 208

Wolfson

1
2    **A.  December 30.**
3    Q.  You are getting way ahead of me.
4      So on December 30 you are billing
5  Milestone for 4.2 hours it looks like, to, it
6  looks like, principally discussion with
7  Milestone's New York counsel?
8    **A.  Well, that is when I had to sort**
9  **through everything that happened in my**
10  **absence.  I reviewed everything that had**
11  **gone on theretofore, all the stuff we have**
12  **just been plowing through today.**
13      **The recent e-mails that came in my**
14  **absence and then I discussed it at length**
15  **with Tom Moloney in my correspondence to**
16  **him.**
17    Q.  This is talking about letters to
18  Milestone to AES, not telephone conferences
19  with Mr. Moloney, right?
20    **A.  I did have a telephone conference**
21  **with him at some point.  I may not have put**
22  **it down in my billing but I know I did.**
23      **I know I talked about this with**
24  **him after the fact.**
25    Q.  And then On January 3, letters to

Page 209

Wolfson

1 AES, Mr. Seward and Mr. Tisdale Re: status,
2 right?
3 **A.  Yes.**
4 Q.   And then received and reviewed
5 Rule B paperwork, total of 2.9 hours?
6 **A.  Yes.**
7 Q.   So you reviewed the complaint
8 filed in this matter against AES; is that
9 correct?
10 **A.  Yes.  I believe I was served with**
11 **process of maritime attachment and**
12 **garnishment.**
13 Q.   That is what that referred to?
14 **A.  I probably went on the docket and**
15 **downloaded whatever I could about it to the**
16 **extent it was provided so I could know what**
17 **was involved since I was now involved in a**
18 **lawsuit as the garnishee of holding the**
19 **funds in question.**
20 Q.   Is it your -- in your experience
21 is it common from time to time when you have
22 an advance on fees from a client you reach
23 the end of the matter and you are charging
24 the last bill against those fees and then

Page 211

Wolfson

1 Q.   Okay.  And if at some point during
2 the representation you charge fees against
3 that because the fees are now earned you
4 would report that to the client at that
5 time, correct?
6 **A.  I would, yes.  It would tell the**
7 **client and I usually would actually confirm**
8 **it again before I even take it just in case**
9 **there is any dispute about it.**
10 Q.   Sure.
11 And that is when you are dealing
12 solely with a single client and it is just
13 your fees, there is no -- you don't have a
14 complicated situation.  They have given you
15 money in advance.  You are working against
16 the advance and before you draw against it
17 you would send a notice to the client and
18 make sure that they were in agreement,
19 right?
20 **A.  Yes.**
21 Q.   In this case what you told us your
22 understanding was is that money that
23 belonged to AES at some point when the
24 charter party was finalized and the escrow

Page 210

Wolfson

1 returning whatever is left over, if
2 anything, that you account for the fees
3 charged to the client, you send the client
4 some notice that you are charging it against
5 the escrow account?
6 **A.  If I was -- if I had funds in the**
7 **escrow account and I was going to take a fee**
8 **from those funds, it would be with the**
9 **permission of the client.  I would never go**
10 **ahead and just do that.**
11 Q.   Sure.  And that is what really I
12 was getting at is that if you are holding
13 funds in trust, for example, it is common
14 for a lawyer to receive an advance on fees?
15 **A.  Sure.  A retainer.**
16 Q.   Technically it is not a retainer
17 but that is a different issue.  It is an
18 advance on fees.
19 **A.  Sure.**
20 Q.   And so when you receive an advance
21 on fees it has to go into a trust account,
22 correct?
23 **A.  It goes into the same trust**
24 **account, yes.**

Page 212

Wolfson

1 agreement was finalized that those funds
2 would cease to be, in any respect, subject
3 to AES's control and would come solely under
4 the control of the escrow agreement, the
5 Milestone-Estech-Mahoney & Keane agreement,
6 correct?
7 **A.  That is what I thought would**
8 **happen.**
9 Q.   So at the moment in time when
10 those funds were no longer subject to the
11 control of AES wouldn't it be typical to
12 send some communication to the beneficiary
13 of that trust saying, these funds are
14 subject henceforth to the control of this
15 other document or this other person making
16 sure that they are in agreement with that?
17 **A.  No.  There is nothing typical**
18 **about this and to the extent Milestone wants**
19 **to take that position I would expect**
20 **Milestone would be the one making that**
21 **communication.**
22 This was a self-effecting
23 **agreement as I saw it.  So -- in an ideal**
24 **world would more communication have**

Page 213

Wolfson

1               Wolfson
2 **benefited the situation, of course, but as**
3 **far as any sort of typical way of doing it**
4 **or obligation, I think there was none.**
5    Q.  And as you sit here today you
6 cannot pinpoint a moment in time when
7 that -- sort of referred to as a
8 jurisdictional change for lack of any better
9 term, when that 500,000 came out from the
10 control of the trust agreement AES' control
11 and moved to the escrow agreement, as you
12 sit here today you cannot pinpoint when that
13 occurred?
14    A.  **It was when the escrow agreement**
15 **was signed and finalized.**
16      **As to the exact date I think you**
17 **asked me before and I don't remember exactly**
18 **when that occurred.**
19    Q.  Doesn't the escrow agreement and
20 your communications with Mr. Seward say
21 finalize -- finalization of the escrow
22 agreement and the charter party?
23    A.  **I think the letter agreement that**
24 **I signed with AES, the final agreement I**
25 **think it refers to the escrow agreement. I**

Page 215

1               Wolfson
2 **That is why I was hoping my invoices would**
3 **show it.  Maybe January 2, sometime.**
4    Q.  The time charge that we looked
5 at -- I am sorry, that's --
6    A.  **January 3.**
7    Q.  Our reference to it is the time
8 entry on Exhibit 45.
9    A.  **I may not have billed for it but I**
10 **did get a phone call at some point.  It was**
11 **right when they were -- either had filed or**
12 **were about to file the suit.**
13    Q.  Discussing what?
14    A.  **Telling me they were going to --**
15 **they were filing an action. I think they**
16 **were just concerned they didn't want me**
17 **releasing the funds.**
18    Q.  The January -- your time charge
19 which is -- your bill which is Exhibit 45,
20 the time entry for January 3 talks about
21 received and reviewed Rule B paperwork?
22    A.  **Yes.**
23    Q.  Is it your recollection that
24 this -- when you do your time charges you
25 make every effort to make them as accurate

Page 214

1               Wolfson
2 **don't recall it referring to the fixture**
3 **although it does reference the parties'**
4 **understanding.  That was probably the intent**
5 **but the literal reading says, prior to the**
6 **agreement which is the escrow agreement.**
7    Q.  Mr. Seward's e-mail to you
8 referred to both, right?
9    A.  **Right.  And the parties were**
10 **negotiating and then I got this draft from**
11 **them, this is what they want, is this okay**
12 **with you and positions change and that was**
13 **okay with him.**
14    Q.  With him?
15    A.  **Mark Seward, Milestone.**
16    Q.  Did you at any point discuss with
17 Mr. Tisdale's office the complaint in this
18 case in advance of it being filed?
19    A.  **Somebody told me they were doing**
20 **this.  I am not specifically sure whether I**
21 **spoke to -- it was on the phone.  I am not**
22 **sure whether it was Mark Seward or Tom**
23 **Tisdale but somebody told me Tom had been**
24 **retained and there would be an action.**
25      **I am not sure of the exact date.**

Page 216

1               Wolfson
2 as possible?  Is that an accurate date?
3    A.  **Yes.  That is an accurate date I**
4 **think.  Sometimes I prepare and write**
5 **letters and I have them in draft and I don't**
6 **actually click the button to send them until**
7 **a day later, or two days later or sometimes**
8 **many weeks later.  And I do make an effort**
9 **to be accurate.**
10      **I may not have necessarily billed**
11 **for everything I did on the case.  It is not**
12 **unusual that I get a phone call and it lasts**
13 **a minute or two, I may not bill for it.**
14    Q.  Is it your custom and practice
15 when you are holding money in trust or in
16 escrow that before you disburse that money
17 to -- either for purposes of charging fees
18 against it or disburse it to a third-party
19 that you would confirm with the beneficiary
20 that they agreed that all conditions
21 precedent had met and that you were
22 authorized to move the money?
23    A.  **That is a really weird**
24 **hypothetical.  You are talking about a**
25 **disbursement that has nothing do with this**

Page 217

Wolfson

1  situation.  I mean, yes, if I was going to
2  take client money and do anything with it,
3  move it anywhere, I would confirm it with
4  the client.  But this money was not being
5  moved any place.  And the agreement was
6  already in place.
7  Q.   You don't think, from your
8  perspective AES losing control over the
9  money at some point when as you have
10  explained your understanding of these
11  conditions precedent occurred that doesn't
12  constitute the functional equivalent of
13  moving the money?
14      A.   The money did not move and as far
15  as how those agreements worked you can
16  attack me all you want but ultimately Judge
17  Marrero is going to decide whether the funds
18  should stay there, should go to Milestone or
19  should go to AES.
20      MR. WINTON:  Objection.
21  Non-responsive.
22      THE WITNESS:  I don't know what
23  you want from me.  You are saying I
24  should have just released it and --

Page 219

Wolfson

1  Q.   It was your understanding at the
2  time that you had two agreements that -- to
3  which you were the only common signatory,
4  correct?
5      A.   Yeah.  And I also realized that my
6  opinion on the matter notwithstanding I
7  think I have discussed at length where my
8  own inclinations lie, I wasn't willing to
9  completely discount AES' position especially
10  when Mr. Moloney was saying he would come
11  forward with more information and more
12  information so I held the money and I
13  thought at least it was close enough, my own
14  opinion notwithstanding, that it should be
15  decided by the court.
16      MR. KEANE:  Objection.
17  Non-responsive, everything after,
18  "Yeah."
19      In Texas we would say pass the
20  witness but no further questions at this
21  time.
22  EXAMINATION
23  BY MS. OROZCO:
24  Q.   Good afternoon, Mr. Wolfson.  My

Page 218

Wolfson

1  BY MR. WINTON:
2  Q.   No.  No.  You are not listening to
3  the question.  I think the question is
4  fairly simple.
5      A.   There is no -- I have never been
6  involved in any analogous situation.  If --
7  this is not a case where I am taking client
8  money and spending it.
9      This is a case where the client
10  money is staying where it is supposed to
11  stay based on the agreements that were in
12  front of me.
13      There was no reason, in my view,
14  to write anything.  If any confirmation
15  needed to be done that would be Milestone
16  presumably would write something or AES
17  would write something.  But I was simply
18  holding the money.
19      It was not my responsibility to
20  undertake to notify anyone one way or
21  another.  In fact, I didn't even know when
22  the escrow agreement was finalized or when
23  the fixture was finalized.  I was the escrow
24  agent.

Page 220

Wolfson

1  name is a Claurisse Orozco attorney on
2  behalf of Milestone Shipping from the
3  Tisdale law office.
4      I have a few questions to try to
5  clear up the record a little bit.
6      Referring to the Exhibit --
7      A.   The number 12 --
8  Q.   The side letter or the --
9      A.   That is what I am always looking
10  for too.  It is like 11 or 12 or something.
11      MR. WINTON:  No. It was after
12  that.
13      MS. OROZCO:  I just wrote down the
14  number.
15      MR. WINTON:  Here it is.  It is
16  14.
17  BY MS. OROZCO:
18  Q.   Okay.  Exhibit Number 14.
19      A.   Thank you.
20  Q.   Which is the letter on the Mahoney
21  & Keane letterhead dated December 2 to
22  American Energy Services referencing the
23  escrow agreement and attached to it is
24  Mahoney & Keane 0033 which is e-mail

Page 221

Wolfson

1  Wolfson
2  exchanges between yourself and Mr. Moloney,
3  okay?
4      A.   Yes.
5      Q.   Who drafted this letter that is
6  signed by your firm?
7      A.   AES and I believe it was
8  Mr. Moloney himself who was the lawyer at
9  AES.
10     Q.   Did -- you forwarded this -- you
11 testified you forwarded this letter in draft
12 to Mark Seward; is that correct?
13     A.   Yes, I did.  He is also an
14 English-speaking lawyer.
15     Q.   Did Mr. Seward propose any changes
16 to the letter or any edits?
17     A.   None.
18     Q.   Did your firm suggest any edits to
19 the letter other than adding the wire
20 transfer information which is in the middle
21 of the bank details?
22     A.   I did not nor did I view it as my
23 role to do so.
24     Q.   Now, if you -- if we refer back to
25 Exhibits number 11 and 12 -- sorry, Exhibit

Page 222

1  Wolfson
2  11, there was a lot of discussion about this
3  exhibit.  This is M&K0023 through 0026.
4      At the bottom of the first page of
5  that e-mail exchange there is the -- your
6  summary of a conversation that you had with
7  Mr. Moloney; is that correct?
8      A.   That's correct.
9      Q.   Where it says that in -- and you
10 are writing to Mark and copying others
11 including Milestone.
12     At the bottom it says, "I just
13 received a call from charterer's attorney in
14 Ohio."
15     Do you see that?
16     A.   Yes.
17     Q.   Do you recall when Mr. Moloney
18 contacted you during that telephone call,
19 was that the first contact you had with him?
20     A.   Yes.  That is why I was confused.
21 I got a call completely out of the blue by
22 somebody I never heard of, I had no idea
23 this interim agreement was necessary, as the
24 guy who seemed to know what was going on
25 with the negotiations and said, yes, I am

Page 223

Wolfson

1  Wolfson
2  supposed to get a letter from you.  To which
3  I respond, a letter saying what.  So we can
4  get our funds back where they belong.
5      What, I thought I am supposed to
6  get escrow agreement -- escrow funds.
7      He is like, no, we get these funds
8  back.
9      I write to Mark, then I understand
10 and that is -- we have been through that.
11     Q.   I just really wanted to know if
12 that was the first communication?
13     A.   It was.
14     Q.   Okay.  Thank you.
15     MR. WINTON:  I am glad to see you
16 are not having any better luck than I
17 did.
18 BY MS. OROZCO:
19     Q.   Okay.  Now, thereafter you forward
20 this e-mail to Mr. Seward and at the top
21 Mr. Seward responds and says -- at the top
22 of Exhibit 11, page M&K0023, "Garth, you can
23 confirm the money will be wired back if the
24 charter party and escrow are not executed."
25     Do you see that?

Page 224

1  Wolfson
2      A.   Yes.
3      Q.   Did you ever -- I know I believe
4  you asked and answered this but I just
5  want --
6      A.   Yes, I did.
7      Q.   Okay.  You never forward this
8  Mark's e-mail to Tom Moloney; is that
9  correct?
10     A.   No.
11     Q.   Okay.  Did you ever communicate
12 the contents of this e-mail to Mr. Moloney?
13     A.   I believe at the time I had no
14 further telephone communications with
15 Mr. Moloney at all.  It was all in writing.
16     Q.   Okay.  Now if you can go to
17 Exhibit number 14, back to number 14, at the
18 top of that page, okay.  That is also
19 M&K0033.
20     It also is the same date as all
21 the prior e-mails in Exhibit 11 that we have
22 been talking about where you say to
23 Mr. Moloney, "We have now been authorized to
24 sign the letter agreement to you forwarded
25 in draft.  Please find a copy attached."

Page 225

Wolfson
1
2       Do you see that?
3   **A.  Yes.**
4       Q.  Did Mr. Moloney ever come back to
5   you and ask you about the authorization to
6   sign the letter?
7   **A.  No.**
8       Q.  Did he ever ask you whose
9   authorization you sought or you obtained to
10  sign the letter?
11  **A.  I didn't speak to Mr. Moloney at**
12  **all until this dispute.**
13      Q.  Back to Exhibit 14, the actual
14  letter itself which is page 2 of Exhibit 14,
15  M&K0034.
16  **A.  Yes.**
17      Q.  As the signatory of this letter
18  did you or did Mahoney & Keane have any
19  understanding as to whether or not Mahoney &
20  Keane's obligations under this letter would
21  ever terminate?
22  **A.  It was my understanding that once**
23  **an acceptable escrow agreement was executed**
24  **that the funds would become the escrow funds**
25  **and this letter would be no more.**

Page 226

Wolfson
1
2       Q.  Did you ever receive
3   communications that indicated that the
4   escrow agreement was finalized?
5   **A.  I definitely had that indication.**
6   **I can't specifically recall what e-mail it**
7   **came from but I know that I signed it, I**
8   **know Estech signed it and I know Milestone**
9   **must have signed it since they are the ones**
10  **who wanted it.**
11      Q.  Once that confirmation was
12  received that the escrow agreement was
13  finalized did you have any understanding as
14  to where the funds belonged at that time?
15  **A.  Right where they were since the**
16  **escrow account was in fact the same account**
17  **to which the funds were sent.**
18      Q.  Did you have an understanding as
19  to what -- which -- what agreement the
20  $500,000 funds are subject to today?
21      MR. WINTON:  Objection.
22      THE WITNESS:  Again, in my
23  opinion --
24      MR. WINTON:  Objection.  Calls for
25  a legal opinion.

Page 227

Wolfson
1
2   BY MS. OROZCO:
3       Q.  What is your understanding?
4   **A.  My understanding it is the escrow**
5   **funds now but Judge Marrero is going to**
6   **decide that one.**
7       MS. OROZCO:  No further questions.
8   EXAMINATION (CONTINUED)
9   BY MR. WINTON:
10      Q.  Just hopefully one.
11      You indicated in response to
12  Ms. Orozco's question that it was your
13  understanding that the trust agreement
14  signed with AES would terminate upon the
15  funds coming under the control of the escrow
16  agreement, is that a fair statement of what
17  you said?
18  **A.  Yes.**
19      Q.  Would you agree that as a
20  fiduciary it is significant to know when
21  those obligations under that letter end?
22  **A.  As a fiduciary, yes, it was my**
23  **obligation to interpret the agreement that**
24  **Mr. Moloney wanted to apply it to enforce**
25  **it.**

Page 228

Wolfson
1
2   **It wasn't my obligation to draft**
3   **it for him.**
4       Q.  Wasn't it your understanding --
5   wasn't your obligation to understand what
6   Mr. Moloney believed, what AES believed the
7   terms of the agreement were?
8   **A.  I think I understand that from the**
9   **written word.**
10  **This is the product of negotiation**
11  **not just from Mr. Moloney but obviously**
12  **Mr. Moloney contacted me after he had been**
13  **negotiating it some time with Milestone and**
14  **Estech.  I don't know what went into it.**
15  **This is what they wanted to do.**
16  **They wanted me to just interpret it and**
17  **apply it as best I could and I did.**
18      Q.  When did AES ever tell you that
19  they just wanted you to interpret it and
20  apply it as best you could?
21  **A.  They asked me to be the trustee**
22  **under this agreement that they drafted.**
23  **You can phrase it however you**
24  **like.**
25      Q.  So you inferred from that they

Page 229

Wolfson

1  wanted you to interpret it and apply it as
2  you understood it, is that a fair statement?
3  **A.   That is what a trustee is supposed**
4  **to do, it is supposed to apply the trust**
5  **agreement and work under the trust**
6  **agreement, not necessarily just what**
7  **Mr. Moloney says after the fact but what the**
8  **agreement says.**
9  Q.   Would you agree that a trustee
10  also should make sure that if there is any
11  ambiguity whatsoever that the trustee
12  clarifies that ambiguity?
13  **A.   I don't necessarily agree with**
14  **that or disagree with that.  I don't really**
15  **know.**
16  **This is the agreement they wanted.**
17  **To the extent there is any ambiguity in**
18  **there that is what Mr. Moloney, an attorney,**
19  **wanted.  And like I said at one point**
20  **before, for all I know, which is very**
21  **little, he may have wanted it to be**
22  **ambiguous, all right, but from my reading of**
23  **it it was not ambiguous.**
24  MR. WINTON:  Objection.

(numbering 1–25 on left column)

Page 230

Wolfson

1  Non-responsive.
2  BY MR. WINTON:
3  Q.   You said that AES negotiated with
4  Milestone.  What do you base that on?
5  **A.   Because this guy got my number,**
6  **contacted me out of the blue and told me on**
7  **the phone that this is what was going down,**
8  **that he was going to be sending this**
9  **$500,000 but he needed a letter from us**
10  **confirming that he could get it back.**
11  Q.   And in what respect did he tell
12  you that AES had been negotiating with
13  Milestone?
14  **A.   He didn't.  I don't recall any of**
15  **those details like that.**
16  Q.   So you assumed that?
17  **A.   It would have been odd indeed,**
18  **quite a coincidence for somebody to call me**
19  **up out of the blue and say they wanted to**
20  **wire me $500,000 in connection with a**
21  **matter.  I mean they must have had prior**
22  **communications with someone but it wasn't**
23  **me.**
24  Q.   Did ever occur to you that maybe

Page 231

Wolfson

1  they had been talking to Estech and Estech
2  had asked for a loan and this was simply an
3  arrangement with Estech?
4  **A.   I have no idea.**
5  **But the final version of the**
6  **letter did have that language in there which**
7  **seemed to be addressing Mr. Seward's**
8  **concern.**
9  Q.   That is how you interpreted it?
10  **A.   That is how I interpreted it.**
11  **Could it have been more emphatic,**
12  **clearer?  Perhaps.  But it seemed to be**
13  **addressing it and Mr. Seward approved it.**
14  **(Continued on next page)**

Page 232

Wolfson

1  MR. WINTON:  I have no further
2  questions at this time.
3  MS. OROZCO:  I have no further
4  questions.
5  THE WITNESS:  Thank you.
6  (Time noted: 1:52 p.m.)

11  _____
    GARTH SETH WOLFSON

13  Subscribed and sworn to
    before me this     day
    of       2011.

15  _____

Page 233

```
1                    Wolfson
2                  CERTIFICATE
3      STATE OF NEW YORK )
4                   : Ss
       COUNTY OF NEW YORK)
5          I, Steven Neil Cohen, a Registered
6      Professional Reporter and Notary Public
7      within and for the State of New York, do
8      hereby certify:  That GARTH SETH WOLFSON,
9      the witness whose deposition is herein
10     before set forth, was duly sworn by me and
11     that such deposition is a true record of the
12     testimony given by such witness.
13          I further certify that I am not
14     related to any of the parties to this action
15     by blood or marriage and that I am in no way
16     interested in the outcome of this matter.
17          I further certify that neither the
18     deponent nor a party requested a review of
19     the transcript pursuant to Federal Rule of
20     Civil Procedure 30(e) before the deposition
21     was completed.
22          In witness whereof, I have
23     hereunto set my hand this 17th day of May
24     2011.
25          -------------------------
                STEVEN NEIL COHEN, RPR
```

Page 234

```
1                    Wolfson
2
3        INDEX OF EXAMINATION
4      WITNESS                  PAGE
5      GARTH SETH WOLFSON        5
6      By Mr. Winton      5, 227
7      By Ms. Orozco      219
8
9              EXHIBITS
10
11     EXHIBIT NO.          MARKED
12     1  Complaint          15
13
14     2  Cover letter        18
15
16     3  Subpoena Duces Tecum    18
17
18     4  Letter from Mr. Wolfson   19
19        to Mr. Winton
20
21     5  Banking records that      40
22        relate to  receipt and
23        holding of $500,000
24        received from AES
25
```

Page 235

```
1                    Wolfson
2      6  Three-page string of     65
3         e-mails
4
5      7  One page e-mail with     66
6         attachment of an escrow
7         agreement
8
9      8  Letter of credit        74
10
11     9  One page e-mail dated    76
12        12:08 p.m. December 1
13
14     10  Two e-mails from Mr.    78
15         Seward on December 1
16
17     11  Four-page series of     80
18         e-mails
19
20     12  Three-page document    100
21         Bates stamped 027, 028,
22         029
23
24     13  E-mail            105
25
```

Page 236

```
1                    Wolfson
2      14  Set of two e-mails with  109
3          executed December 2
4          letter agreement with
5          AES attached
6
7      15  Two-page document of    135
8          e-mail exchanges
9
10     16  Single page document    136
11         Bates numbered M&K040
12
13     17  Single page e-mail with  138
14         attachment document
15         labeled "Escrow
16         Agreement"
17
18     18  Document Bates labeled   139
19         M&K49 through 52
20
21     19  Two-page exhibit Bates   143
22         labeled M&K58 and 59
23
24     20  Document Bates labeled   145
25         M&K60 to 63
```

## Page 237

Wolfson

21 Series of e-mails          146

22 Document Bates labeled   148
   69 and 70

23 Document Bates labeled   150
   M&K71, 72, 73

24 Document Bates labeled   152
   M&K75, 76, 77, 78

25 Four-page document        159
   Bates labeled M&K83 to
   86

26 Document Bates labeled   160
   M&K87 through 107

27 Document Bates labeled   162
   M&K108 and 109

28 E-mail from Mr. Seward    168
   to Ed Keane, Mr.Wolfson

## Page 238

Wolfson
and Jorge Rodriguez,
Bates labeled M&K110
through 117

29 Single e-mail from Mark  170
   Seward to Ed Keane and
   Garth Wolfson, Bates
   labeled M&K118

30 Document Bates labeled   173
   M&K119 to 122

31 Document Bates labeled   174
   M&K123

32 Document Bates labeled   175
   M&K124 to 127

33 Document Bates labeled   176
   M&K128 to 130

34 Document Bates labeled   178
   M&K135 to 138

## Page 239

Wolfson

35  Document Bates labeled   179
    M&K139 to 145

36  Document Bates labeled   183
    M&K146 to 149

37  Document Bates labeled   183
    M&K150 to 153

38  Document Bates labeled   183
    M&K154 to 156

39  Document Bates labeled   183
    M&K157 to 163

40  Document Bates labeled   184
    M&K164 to 169

41  Document Bates labeled   191
    M&K170

42  Document Bates labeled   191
    K181 to 190

## Page 240

Wolfson

43  Document Bates labeled   200
    M&K191

44  Document Bates labeled   201
    M&K197 through 205

45  Document Bates labeled   203
    M&K206 through 208

**Page 241**

```
1              Wolfson
2         DEPOSITION ERRATA SHEET
3    Assignment No.  319710
4    Case Caption:  Milestone vs. Estech
5      DECLARATION UNDER PENALTY OF PERJURY
6       I declare under PENALTY OF PERJURY
7    that I have read the entire transcript of
8    my Deposition taken in the captioned
9    matter or the same has been read to me,
10   and the same is true and accurate, save
11   and except for changes and/or corrections,
12   if any, as indicated by me on the
13   DEPOSITION ERRATA SHEET hereof, with the
14   understanding that I offer these changes
15   as if still under oath.
16   _____
17           GARTH SETH WOLFSON
18   Subscribed and sworn to on the _____ day
     of _____, 2011 before me,
19
20   _____
21   Notary Public,
     in and for the State of _____.
22
23
24
25
```

**Page 242**

```
1              Wolfson
2         DEPOSITION ERRATA SHEET
3    Page No. _____Line No. _____Change to:____
4    _____
5    Reason for change:_____
6    Page No. _____ Line No. _____Change to:____
7    _____
8    Reason for change:_____
9    Page No. _____ Line No. _____Change to:____
10   _____
11   Reason for change:_____
12   Page No. _____ Line No. _____Change to:____
13   _____
14   Reason for change:_____
15   Page No. _____ Line No. _____Change to:____
16   _____
17   Reason for change:_____
18   Page No. _____ Line No. _____Change to:____
19   _____
20   Reason for change:_____
21   Page No. _____Line No. _____Change to:____
22   _____
23   Reason for change:_____
24   SIGNATURE:_____DATE:_____
25           GARTH SETH WOLFSON
```

**Page 243**

```
1              Wolfson
2         DEPOSITION ERRATA SHEET
3    Page No. _____Line No. _____Change to:____
4    _____
5    Reason for change:_____
6    Page No. _____ Line No. _____Change to:____
7    _____
8    Reason for change:_____
9    Page No. _____ Line No. _____Change to:____
10   _____
11   Reason for change:_____
12   Page No. _____ Line No. _____Change to:____
13   _____
14   Reason for change:_____
15   Page No. _____ Line No. _____Change to:____
16   _____
17   Reason for change:_____
18   Page No. _____ Line No. _____Change to:____
19   _____
20   Reason for change:_____
21   Page No. _____ Line No. _____Change to:____
22   _____
23   Reason for change:_____
24   SIGNATURE:_____DATE:_____
25           GARTH SETH WOLFSON
```

**A**

**ability** 126:16
**able** 88:13 89:8 90:8 139:4
**abroad** 163:7 172:23
**absence** 208:10,14
**absolute** 29:12 47:13 53:21 124:20
  157:15
**absolutely** 34:12 48:9 61:16,18
**absurd** 170:9
**accept** 18:24
**acceptable** 118:15 119:23 120:2,7
  121:25 124:11,15,19,22 125:10
  125:14 126:15,20 127:9 225:23
**accepting** 49:4
**accompanied** 19:14
**accompli** 54:9
**account** 33:11 35:18,20 36:17
  37:17 38:7,8,8,15 40:3 41:11 74:2
  86:8 87:15 115:14,19 118:7
  172:13 199:19 210:3,6,8,22,25
  226:16,16
**accounted** 38:17 169:15
**accounts** 43:22 92:21,24
**accurate** 30:23 188:9 190:9,15
  215:25 216:2,3,9 241:10
**accurately** 6:7
**achieve** 49:7
**acknowledge** 117:18
**acknowledging** 122:13
**acquire** 70:2
**act** 9:6,7,14 71:6,17 118:16 121:18
  122:3,10 125:15 132:2
**acted** 8:23 13:12 20:16 34:11
  146:13 188:10 190:8
**acting** 11:20 20:20 122:15 189:20
**action** 12:9 15:2 142:19 194:14
  214:24 215:15 233:14
**active** 17:19,21
**actively** 17:22
**activity** 13:17
**actual** 29:5,8 30:5 47:2 105:13,13
  109:13 113:5 225:13
**add** 41:3 206:14
**added** 7:3 39:11,15
**adding** 221:19
**addition** 21:16 189:13
**address** 26:12,22 27:12,16 72:5,6
  95:21 147:19 149:14 178:4
  198:25
**addressed** 164:25
**addressing** 231:8,14
**administer** 4:9
**admission** 195:23
**admit** 115:23 189:2
**admitted** 5:12 6:13,24,25 189:22
**adopted** 125:25
**advance** 206:3 209:23 210:15,19
  210:21 211:16,17 214:18
**adversaries** 12:6,18
**advice** 9:25 10:23 11:2 71:22 85:24

161:12 188:14 189:4,8,15,16,19
  189:23,24
**advices** 33:12 50:4 108:7 163:8
**advised** 54:9,10 173:12 193:15
  200:24
**advising** 166:5
**AES** 7:12,23 8:4 31:12 33:17,21
  34:5 40:12,21 42:20 43:3,22 44:4
  44:13,18,23,24 45:4,11,18 46:4,7
  47:8,13,25 52:5 54:3 57:2,13
  58:15,18,18 86:24 94:22 95:14
  97:12,13 98:6,8,18 99:9 100:3,4,4
  104:9 105:3 107:2,4,9 109:8,15
  110:18,18 111:9 112:6 113:16,25
  115:17,18 118:2,6,11,18,20
  119:24 120:22,25 122:17,24
  123:2,18 124:2,13 125:6,17
  126:16 127:13 128:6,7,10,21
  129:9,20 130:4,17 131:8,22
  132:11 141:4,5,7,18 142:7,9
  148:3,4 169:3 172:25 181:8 182:4
  182:6 187:2 188:3 193:12,24,25
  194:2 195:2,14 196:15 200:15,21
  208:18 209:2,9 211:24 212:12
  213:10,24 217:9,20 218:17
  219:10 221:7,9 227:14 228:6,18
  230:4,13 234:24 236:5
**AES's** 48:11 57:5 89:10 95:22 98:9
  130:19 142:6 169:7 182:4 195:5
  196:21 212:4
**affect** 124:12
**afternoon** 69:2 92:17 102:22
  107:15 108:10 163:15 219:25
**agencies** 26:5
**agency** 75:6 76:4 147:18,18 157:5
  177:5 178:4 190:3,4 194:6
**agent** 9:5,6,7,22 10:20 26:4 66:23
  71:6,17 118:17 121:19,23 122:3
  122:11,16 125:16 131:9 147:14
  156:9,18 188:11,21 189:14 190:9
  190:16,18 193:3 199:5 218:25
**agents** 23:7 29:18 34:18 187:25
  188:8
**agree** 51:3 58:14 65:8 69:18 80:25
  82:18 83:14,15 85:3 97:14 98:19
  98:21 101:8 102:10 107:13
  109:15 111:11 116:7 137:10
  143:22,23 160:24 161:5 162:5
  186:4 187:4 188:7 190:13 192:6
  193:11 194:23 196:12 227:19
  229:10,14
**agreed** 4:4 9:7 18:23 46:24 50:24
  55:7 62:13 112:9,11 114:15 123:9
  157:24 216:20
**agreement** 7:9,16 8:4,6,8,16,20
  9:22,24 10:20,22 11:5 27:4,11
  33:8,9,9,17 34:4,7 37:21,22 40:21
  41:14,15 42:2,3,4,12,14,22,22
  43:8 44:11,12,23,25,25 45:2,3,5
  45:12,15,18 46:3,5,8,8,14 47:2,5

47:11,12,15 48:5,18 50:2 51:2,15
  51:16 52:15,16 53:2,9,18,23 54:2
  54:23 56:6,15,24 57:3,5,7,21,23
  57:24 58:19,24 59:8,9,17 60:3
  61:2,12,19,20 62:6,7,8,9,24 63:3
  63:4,6,8,10,13 64:2,18,20,23
  66:14 72:25 73:7,21 76:3 86:11
  86:16 88:17,20 89:3,25 90:5,14
  91:2 94:22 95:9,15,20,24 98:11
  98:13,14 99:23 101:13,15 102:20
  104:14,16,21 105:3,10,13 106:25
  107:4 108:3,4 109:8,14 110:19
  115:12 118:15,17,20 119:22,25
  120:4,5,6,10,11,13,14,15 121:5,6
  121:8,13,22,23,25 122:11,14
  123:2,7,9,16,17,25 124:11,15,16
  124:17,19,22 125:11,14,16,17
  126:15,19,20 127:10 128:2
  129:10,11 132:3 133:2 134:16,18
  135:12 137:13 138:11,19,25
  139:3,17,20 140:4,15,19 142:25
  143:18 144:15 146:2,2,21,21
  147:8 154:12,15,18 155:12 156:2
  156:22 159:15 172:8 174:15
  175:21 176:13 182:4,6 205:12
  211:19 212:2,5,6,17,24 213:10,11
  213:14,19,22,23,24,25 214:6,6
  217:6 218:23 220:24 222:23
  223:6 224:24 225:23 226:4,12,19
  227:13,16,23 228:7,22 229:6,7,9
  229:17 235:7 236:4,16
**agreements** 44:16,21 54:11 64:19
  65:9 89:14,15 217:16 218:12
  219:3
**agrees** 20:22
**ahead** 39:14 71:13,21 88:9 140:2
  149:22 208:3 210:11
**airport** 173:4 181:19
**allegations** 8:10
**alleged** 43:17 158:15
**allow** 123:3
**alluded** 69:15 153:8
**altogether** 10:15
**ambiguity** 131:10,14 229:12,13,18
**ambiguous** 56:18,19 131:15 229:23
  229:24
**American** 1:7 3:15 7:11 27:23
  67:25 68:3 87:10 115:12 154:5
  220:23
**amount** 59:11 174:16
**Amspoker** 137:22 140:12
**analogous** 218:7
**Andes** 165:7
**and/or** 241:11
**answer** 9:20 10:15 29:21 30:2,8,17
  30:21,23,25 32:13 34:2 35:4
  45:22 55:16 58:4 59:14 60:12
  62:3,21 63:20 75:15 79:22 90:18
  97:5 113:10 117:12 119:5 127:19
  142:13 143:10 157:20 158:17

162:21 188:24 190:19 196:9
**answered** 100:7 108:2,19,24 109:2
  114:21 224:4
**answering** 60:7 134:6
**answers** 9:12 196:10
**anxious** 32:4
**anybody** 72:11 75:17 121:10
**anymore** 24:24 137:16
**anyway** 24:20 31:2 119:3,15
  163:15 166:15 193:25 204:10
**apart** 53:11 80:5 161:10
**apologies** 66:11
**apologize** 7:3 15:14 177:14 204:3
**apology** 204:7
**apparently** 26:5 68:15 146:2
  149:12 161:10 180:9
**appear** 198:22
**APPEARANCES** 3:2
**appeared** 193:12 194:9,13 195:3
  198:21 202:2,4
**appears** 78:12 80:3 84:12 179:20
**applied** 53:25
**applies** 56:23 126:19
**apply** 20:23 227:24 228:17,20
  229:2,5
**appointed** 130:18
**appreciate** 39:23 203:18
**appreciating** 110:11
**approached** 9:6
**approval** 44:17,23 62:24
**approve** 62:18
**approved** 64:16 231:14
**approving** 147:9
**April** 197:7
**arbiter** 132:14
**arbitration** 11:17,25 13:21
**area** 23:10
**Argentina** 163:10
**arguably** 21:9
**argue** 45:9 132:21 188:24,25
**arguing** 125:22
**argumentative** 132:16,18
**arranged** 89:10 90:10
**arrangement** 90:24 94:21 231:4
**arrangements** 70:12 117:23 161:8
**arrived** 165:25
**articulate** 53:6
**articulated** 54:20
**aside** 28:3 127:8 165:14
**asked** 9:12 20:3,12 25:18 30:17
  35:8,9 46:21 58:11 59:24 63:15
  75:17 77:7 92:5 95:2 100:7 108:2
  108:19 114:6,21 128:15 132:23
  135:9 142:12 147:12 167:10
  182:19 188:22 189:4 202:10,15
  204:2 205:22 213:17 224:4
  228:21 231:3
**asking** 21:25 24:11 25:2 30:22 37:9
  39:24 46:18,20 55:13 57:6 71:5
  79:11 82:4,13,14 84:22 92:11

97:9 103:15,19 106:7 118:24,24
  120:20 122:5,7 123:5 130:21
  132:24 153:11,21 154:4 159:4,8
  160:12 161:12,19 182:11,13
  204:22
**assignability** 75:10
**assigned** 12:19
**assignment** 10:2 79:11,14 82:5,12
  82:24 83:6 84:21,22 135:5 151:2
  151:7 152:6,7 153:13 160:6,10
  206:22 241:3
**assignments** 9:18 11:3 20:19 75:14
  86:4 135:9 151:5 153:15,19
  188:23 189:9
**associated** 138:5
**Association** 77:12
**assume** 5:21 6:10 18:19 70:13
  74:21 78:25 120:3 136:5 137:7
  144:8 155:10 166:19 168:11
  176:8 180:12 182:9
**assumed** 63:3 230:17
**assuming** 67:18 111:7 154:13
  180:23 181:2
**assumption** 142:22,23
**assumptions** 28:21 70:5,6
**assurance** 52:11 53:10,13 82:15
  88:23 89:24
**assure** 173:21
**assured** 165:11
**assuredly** 100:12
**attach** 152:8 169:21 170:10
**attached** 21:24 73:9 102:16,25
  109:9 138:23 149:2,6 152:5,6,16
  161:4 169:10,18 170:7 220:24
  224:25 236:5
**attaching** 109:22
**attachment** 66:13 72:25 109:13
  138:18 139:17 140:3 143:21,24
  149:3,10 151:12,20 152:4 203:23
  209:12 235:6 236:14
**attachments** 136:19 151:19 162:15
**attack** 217:17
**attorney** 5:11 29:10 33:11 87:3
  133:12,15 189:25 202:20,22
  220:2 222:13 229:19
**attorneys** 3:8,15,23 17:14 86:22
  193:5 202:25
**attorney-client** 75:19 190:2
**authenticity** 16:13
**authorization** 225:5,9
**authorize** 103:20 122:10
**authorized** 4:8 117:25 118:8
  216:22 224:23
**authorizes** 103:15
**authorizing** 106:11 121:18,22
**automatically** 123:10
**available** 87:16 161:14,19
**aware** 8:4 25:7 44:24 45:5,18 63:3
  63:12 91:25 180:7
**a.m** 2:3 68:7 71:16 106:4

**B**

**B** 13:17,19,20 14:8 209:6 215:21
**back** 23:6,22 24:2 26:16 37:5 38:23
  39:7,24 40:15 50:23 52:8,12,21
  52:23,25 53:12 55:8,11 56:10
  60:23 61:6 62:12 69:12 70:21
  71:15 81:14,23 83:9,15 84:17
  88:3,13,18,23 89:9,22,25 90:9,15
  91:3,13,23 93:12 94:6,9,17,23,25
  95:5 96:14,19,21 98:24 99:9,23
  102:18 103:3,24 106:3,18 107:6
  107:19,24 108:14,16 109:21,25
  113:16,25 114:7,10 115:18 118:6
  128:6 129:23 132:11 142:25
  143:8 146:11,13 149:21 153:14
  167:24 169:19 171:25 173:20
  175:19 177:15,16,19 178:24
  179:3,5,6,24 181:8,13 183:3,25
  185:12,24 187:9 189:6 191:3,5
  202:8 207:22 221:24 223:4,8,23
  224:17 225:4,13 230:11
**Bad** 71:22
**BAKER** 3:11
**bandied** 29:11
**bank** 35:20 36:14 37:10,15 38:4
  77:8,10,12,14,15,23 78:3 79:17
  135:10,25 150:24 152:8 153:12
  153:21,24 154:3 160:6 172:9,12
  172:13 206:22,24 207:4,7 221:21
**banking** 36:23 40:10,19 234:21
**banks** 166:15
**bank's** 152:9
**bar** 6:25
**BARBARA** 29:3 30:7
**base** 48:12 98:8 158:11 230:5
**based** 20:2 42:17 54:19 98:25
  130:23 141:3 218:12
**basically** 19:21 26:8 38:15 53:21
  71:9 77:9,20 161:2 162:16
**Bates** 39:11,13,22 100:18 136:10
  139:11,15 143:12 145:21 148:6,9
  150:15 152:25 159:18 160:18
  162:8 168:3 170:14 173:25
  174:21 175:8 176:23 178:10
  179:13 183:7,11,15,19 184:24
  191:9,22 200:6 201:7 203:3
  235:21 236:11,18,21,24 237:5,8
  237:11,15,18,21 238:3,8,11,14,17
  238:20,23 239:2,5,8,11,14,17,20
  239:23 240:2,5,8
**bearing** 38:14 198:10,11
**Beaver** 2:8 3:20
**begins** 81:9
**behalf** 33:19 41:9 64:10 73:15
  118:9 132:7 139:21 193:12 220:3
**behooved** 192:25
**believe** 6:14,20,23 7:20 9:8 10:11
  25:20 36:11 42:24 43:25 50:10
  52:2 66:7 73:11,23 79:17 106:4
  110:9 134:19 146:9 153:8 156:15

167:14 173:4,7 180:15 182:21
185:16 187:11,15 197:8 202:12
203:15 209:11 221:7 224:3,13
**believed** 228:6,6
**bell** 28:5
**belong** 223:4
**belonged** 211:24 226:14
**beneficiary** 57:17 212:13 216:19
**benefited** 213:2
**benne** 86:7
**best** 39:19 152:13 228:17,20
**bet** 78:6
**better** 51:10 213:8 223:16
**Beverly** 150:23
**beyond** 32:8 188:10
**bill** 21:12,13 205:13 207:2 209:25
215:19 216:13
**billable** 75:25
**billed** 10:8,15 78:13 166:4 205:11
206:21 207:3 215:9 216:10
**billing** 11:7 21:7,10 76:3 78:11
152:19 208:4,22
**bit** 11:8 83:13 86:13 220:6
**BlackBerry** 68:16 163:9,11 164:20
165:10,17,18,22 166:4,6 181:17
181:18 186:17
**blizzard** 185:12
**blood** 233:15
**blue** 49:11 51:22 222:21 230:7,20
**board** 62:6
**bookkeeping** 37:18,24 42:9
**boring** 24:8
**bottom** 66:19 70:20 80:21,23 81:3
81:9 84:13 101:7,16 102:12
109:18 135:21 137:21 140:7
148:16 149:12,15 161:16 174:10
180:10,22 187:7 204:20 222:4,12
**bound** 39:20
**boxes** 169:24
**brain** 55:2 121:3
**breach** 43:14,15,18 158:15 186:19
**break** 96:11 133:18
**briefly** 181:18
**bring** 165:6,9
**bringing** 32:19
**brokers** 29:18 147:22
**brought** 32:17
**Brown** 9:9 10:24 11:13 12:5,9,9,14
12:22 13:13,23 14:11 20:14 26:18
**bunch** 82:22 150:25
**burdens** 47:21
**burdensome** 20:10
**business** 151:8 156:22
**busy** 13:18
**button** 216:6

**C**

**C** 3:9,17
**call** 7:15 20:10 34:7,8 38:10,13
47:9 48:19 50:19 51:6,15,15

52:19 54:21 56:3 64:7 86:21,23
93:7 101:15 102:17 103:9 107:20
141:3 166:3 201:3 215:10 216:12
222:13,18,21 230:19
**called** 5:2 7:16,20 15:23 47:8 49:10
49:16 51:21 52:3 54:6 64:25
139:24 197:20 199:19
**calling** 51:18 58:16
**calls** 7:19 207:11 226:24
**cancellation** 146:4
**capable** 32:18 164:23
**capacities** 7:8,14 10:18
**capacity** 119:12 122:19 123:12
124:4 125:7 188:10
**caps** 165:19
**Caption** 241:4
**captioned** 241:8
**care** 47:10 51:6
**cargo** 47:22 138:12
**carried** 138:13
**carries** 174:12
**carry** 58:25 59:7 165:8
**carrying** 47:22
**carryover** 80:21
**case** 1:6 9:16 11:20 13:16 21:5,7,9
35:12 41:21 84:19 118:18 122:17
122:24 124:2 125:6,17 159:7
171:20 172:6 186:5 189:13
198:21 211:9,22 214:18 216:11
218:8,10 241:4
**cases** 9:15 13:5 14:4,8,9 20:17
**casually** 9:21
**casualties** 11:24
**cat** 60:25
**catch** 164:8
**cause** 169:23
**CD** 22:10
**cease** 212:3
**celebrated** 164:12
**central** 154:21 155:6
**certain** 7:21 20:17 58:17
**certainly** 14:5 16:15 35:25 39:21
45:17 48:11 53:7 67:15 93:6,17
93:19 142:10 154:14 159:13
163:15 164:9,13 173:12
**CERTIFICATE** 233:2
**certify** 233:8,13,17
**Chaika** 26:5 147:18 177:4 178:4
194:6
**chain** 81:2 192:7,10
**chainings** 182:23
**challenging** 133:23
**chance** 74:7 184:7
**change** 31:13 66:10 139:19 146:3
148:20 213:8 214:12 242:3,5,6,8
242:9,11,12,14,15,17,18,20,21,23
243:3,5,6,8,9,11,12,14,15,17,18
243:20,21,23
**changed** 73:12 105:7,8 146:3
**changes** 147:9 221:15 241:11,14

**characterization** 32:21
**characterize** 7:17 20:20 33:24
195:19
**characterizing** 81:25 82:2
**charge** 150:6 160:13 189:19 211:3
215:4,18
**charged** 75:20 150:11,12 210:4
**charges** 21:15 166:7 215:24
**charging** 209:24 210:5 216:17
**charter** 8:25 10:4 29:24 30:11
43:16,17,18 46:14 48:4 66:23
70:7 94:9,17 107:24 110:20
111:24 114:8,11 116:9,23 134:24
135:2 138:14 140:20 144:15
145:17 154:8 157:25 158:4,20
159:2 168:20 211:25 213:22
223:24
**chartered** 47:20
**charterer** 29:11,15,16 52:6
**charterers** 29:20,20 87:8 140:24
**charterer's** 52:3 86:22 87:3 222:13
**chartering** 70:11 147:17 194:5
**chase** 6:10
**check** 165:5
**checked** 131:13
**Christmas** 43:14 163:5 164:12
166:14 167:3
**Christmastime** 44:6 55:5
**chronological** 168:25
**circles** 143:8
**Circuit** 13:25
**circulate** 155:3
**circulated** 27:11
**circulating** 148:2 155:4
**circulation** 25:19 27:3
**circumstances** 156:20
**Civil** 233:20
**claim** 19:18
**claimants** 193:7
**clarified** 60:12 86:13
**clarifies** 229:13
**clarify** 61:7
**Claurisse** 3:9 197:14 220:2
**clear** 47:17 91:19 93:5,20 99:7,13
123:19 129:12 151:17 187:21
202:13 220:6
**clearer** 231:13
**clearly** 53:7 102:4
**click** 216:6
**client** 11:16,21 12:19,21 126:4,6
131:5,11 132:8 156:16 189:19
199:13 206:2 209:23 210:4,4,10
211:5,8,13,18 217:3,5 218:8,10
**clients** 12:11 157:3
**clocks** 67:13 102:5
**close** 219:14
**closed** 163:2,6,14,16 164:10,11,14
164:16,17 166:15
**closes** 163:4
**Cohen** 1:22 2:9 233:5,25

coincidence 230:19
Coke 47:9
colloquy 133:10
Columbus 101:19
combatant 58:5
combination 50:3
come 11:7 14:7 26:9 37:5 42:11,13
  51:12 52:9 65:13 72:6 77:21 89:2
  94:23 98:12 108:13 114:10
  128:11,18 151:16 161:10 177:16
  181:7 196:5 212:4 219:11 225:4
comes 21:16 22:22 72:11 79:24
  83:9 84:17 85:7 91:23 94:6 106:3
  106:18 123:16
coming 14:2 53:3 69:12,24 94:21
  105:14 149:21 196:8 227:15
commence 200:15
commenced 195:8
comment 73:24 86:15 92:20 93:7
comments 102:18 103:10 107:21
  182:12,14
commercial 55:19 82:6 83:3 126:22
  127:5 129:21,25 130:19
commit 77:22 107:23
common 12:25 209:22 210:14
  219:4
communicate 224:11
communicated 25:22 149:18
communication 20:4,13 21:3 27:20
  42:19 44:4 67:4 98:16 146:10
  212:13,22,25 223:12
communications 23:22 25:3 26:15
  27:18 155:5,7 186:7 213:20
  224:14 226:3 230:23
company 27:9 149:13 163:9
competing 186:11
complaint 15:9,22 16:4,7 209:8
  214:17 234:12
complete 30:21
completed 154:16 233:21
completely 32:18 49:11 116:10
  125:20 146:18 219:10 222:21
completion 156:11
complicated 211:15
composed 160:23
computer 72:8,8 101:23
computers 67:13 144:20
concept 128:18,19
concern 35:7 95:22 231:9
concerned 9:23 215:16
concert 9:14
concluded 154:15
conclusion 152:20
conclusions 70:16
condition 56:22
conditions 42:23 216:20 217:12
conference 197:5,11,13,16 207:20
  207:21 208:20
conferences 208:18
conferred 71:18

confirm 52:24 91:11 94:8,16,24
  95:2,2,4 100:4 107:23 111:8,13
  111:14,16,18,19 112:13,14,17,17
  112:22,23,24,25 113:23 114:3,7,8
  115:11 118:21 132:6 164:9
  186:10 211:8 216:19 217:4
  223:23
confirmation 36:13 52:7,20 56:11
  87:23,24 88:3 92:7 95:7 96:3
  108:15 152:7,8 218:15 226:11
confirmed 44:2 71:12,19 114:17
confirming 59:18 93:2,3 111:21
  116:20 230:11
confirms 135:25
conflict 98:25
confused 222:20
confusing 161:25
confusion 137:16
connection 117:22 152:10 230:21
consent 44:17
consequence 190:6
consider 44:8
consideration 108:6
consist 136:21
consistent 99:4,7 110:9,16 188:20
consisting 135:19 137:19 204:17
consists 101:9 201:11
constitute 217:13
construct 60:2 132:25
construed 9:18 176:10
contact 26:23 97:12 222:19
contacted 96:23 97:4,7,13 222:18
  228:12 230:7
contained 7:10 182:3,5
contains 160:4 161:3
content 81:8
contents 116:4 224:12
context 13:24 97:23 126:23 194:9
contingency 53:24
continue 71:23 133:10
continued 205:7 227:8 231:15
continuing 153:13
contract 131:2 133:25
contrary 82:5
control 127:13 212:4,5,12,15
  213:10,10 217:9 227:15
convention 24:3 68:2,3,24
conversation 50:8,17 51:20 88:15
  90:21 97:25 100:13 180:16,19,24
  222:6
convey 202:9
conveyed 56:3 111:7 114:14
cooperative 195:21
copied 151:25 191:15 194:7
copies 15:15 22:17 174:9
copy 22:7,13 23:4 63:25 137:12
  141:9 145:25 149:8 152:6,6,9
  155:25 156:11,13,18,21,24
  157:10 158:25 169:2 177:5
  201:19 203:25 224:25

copying 140:25 222:10
Corporation 161:9
corporations 167:8
correct 5:17,19 7:12 8:5,20 9:3,4
  10:5,10 36:9 38:19 45:8 48:10
  56:12 57:14,18 59:20 64:21 73:2
  73:4,16 75:23 79:25 86:24 87:20
  88:14 89:10 102:13 103:4,5,8
  105:5 109:19,23,24 112:2,2
  114:16,19 115:7 138:14,15
  139:17 140:20 146:12 147:10
  153:6 171:18 172:15 174:6
  175:13 179:18 184:18 189:21
  190:21,22 193:23 194:21 197:18
  198:25 199:7 204:18 209:10
  210:23 211:6 212:7 219:5 221:12
  222:7,8 224:9
corrections 241:11
correctly 20:25 115:21 122:7
  145:15
correspondence 7:21 31:24,25 32:6
  208:15
corresponding 147:13
correspondingly 43:5
counsel 4:4 8:24 9:13,14 12:14,16
  12:17 13:8,13 16:19 20:21 35:4
  51:24 52:4 71:19 87:5,10 132:2
  140:24 192:23 193:5,12,22
  194:16 195:2,2,5 196:14,16,21
  198:19 199:10 200:14 201:22
  202:24 207:14 208:7
count 171:9,13
counting 171:5
country 173:23 177:12,16 178:24
  179:3
COUNTY 233:4
couple 26:20 137:8
course 92:17,25 93:10,24 195:9
  213:2
court 1:2 15:12,20 18:13 19:10
  20:10,21 70:22 182:19 199:23
  219:16
courtroom 197:18
cover 18:6,20 234:14
coverage 136:18
covering 166:12
co-counsel 20:16
CP 140:19
crazy 39:13
create 33:2 35:19 137:16
credit 10:3 74:4,12 75:3,4,11,15
  79:10 135:7 153:16,18 189:9
  235:9
crossed 206:7
crystalized 50:18
cuff 9:20 75:17
Cush 72:2,12,14
custom 216:14
cut 6:10 59:12
CV 1:5

**C-H-A-I-K-A** 147:18

**D**

**daily** 157:6
**Dallas** 173:5 181:19 185:17
**damages** 174:17 175:22 176:7,14
**Dan** 27:7 74:15 138:2,2 140:13,13
  145:3,5 149:13
**dark** 14:17
**date** 10:21 24:3 44:7 68:14 105:8
  134:21 148:21 150:20 180:16
  197:10 213:16 214:25 216:2,3
  224:20 242:24 243:24
**dated** 16:21 76:8,13 152:3 161:6
  163:20 170:19 179:22 185:13
  204:22 220:22 235:11
**dates** 68:24 148:21
**day** 42:7 68:2 140:22 150:5 163:16
  164:10,12,14 165:25 216:7
  232:13 233:23 241:18
**daylight** 69:9 148:13
**days** 34:23,25 146:4 150:9 167:23
  179:4 216:7
**deal** 25:13 27:14 39:14,17 48:23,24
  53:10,13 55:2 69:16 84:20 90:18
  97:3 100:5 105:15 182:2
**dealing** 29:18 153:18 211:12
**dealings** 25:5,8,9,12 27:6 200:17
**dealt** 25:14,15 70:17 168:15
**December** 10:12,13,19,21 31:15
  33:16 37:20,22 40:22 56:8,9 65:5
  65:8,12 67:9 68:7,23 69:8 71:4,15
  76:9,13 78:14,14,20,24 85:2,11
  96:17 97:16 108:10 109:8,14
  114:24 134:14,14,20 138:24
  148:12 150:21 151:9 152:3,22
  154:8 155:19 157:17 161:6
  162:25 163:20,22 168:18 169:2
  170:19 171:24 172:19 173:9
  179:2,23,24 181:2 182:5,9 185:13
  185:19 186:7 192:17 194:15
  198:18 199:7 206:20 207:5,10,25
  208:2,4 220:22 235:12,15 236:3
**decide** 130:25 217:18 227:6
**decided** 130:23 219:16
**decision** 55:15 57:3 58:20 59:17
**DECLARATION** 241:5
**declare** 241:6
**deduct** 205:3,10 206:9,14
**Defendant** 3:15
**Defendants** 1:8 2:6 5:3
**defies** 127:5
**define** 120:21
**defining** 34:16
**definitely** 152:22 163:3 226:5
**delay** 177:21
**delayed** 179:4
**delete** 165:20
**deleted** 36:4,7
**demand** 52:12,22 55:11 88:4 91:14

91:21 99:10 108:14 110:18,18
  114:2,3 126:17,25 173:9 179:25
  181:8 187:2
**demanded** 44:5 158:14
**demanding** 169:7 173:2,13
**Demitrus** 28:23
**Denise** 137:21 140:12
**Depending** 102:19
**depo** 119:12
**deponent** 233:18
**depose** 126:3
**deposed** 5:22 6:2 34:22,25 125:2
  126:6
**deposing** 30:12
**deposit** 31:11 33:4 36:8,11 37:10
  204:6
**deposition** 2:5 4:6,7 5:19 15:18
  37:6 119:10 233:9,11,20 241:2,8
  241:13 242:2 243:2
**depositions** 5:23 6:2,10
**depository** 154:22
**described** 49:18
**designated** 115:19
**designation** 47:6
**despite** 114:19 142:4 163:8 166:6
**details** 172:9 221:21 230:16
**determine** 130:18
**developed** 186:5,23
**devices** 164:22
**Diet** 47:9
**difference** 23:24 101:23
**different** 7:8,14 10:18 12:23 37:16
  57:11 60:4 65:15 67:12,13,14
  68:14 72:18 97:3,17 98:3 136:15
  140:10 141:7 210:18
**differently** 93:14 206:16
**difficult** 14:15
**dig** 19:23 83:10 84:7,15 85:25
**dimension** 9:15
**dinner** 30:19
**direct** 27:6 30:25 118:18 122:18,24
  123:11 124:2 125:6,8,18 181:22
**directed** 141:25
**directing** 145:2
**direction** 200:23
**directly** 25:23 27:19 34:21 147:13
  149:18 178:5
**disagree** 188:12 196:18,20 229:15
**disburse** 216:16,18
**disbursement** 44:13 46:7,11 216:25
**disconnect** 186:6 187:16
**disconnects** 81:12
**discount** 219:10
**discovery** 194:13 195:9
**discrete** 153:19,20
**discuss** 50:5 200:20 201:2 214:16
**discussed** 18:22 45:8 50:11 67:11
  102:9 147:23 187:11 208:14
  219:8
**discussing** 151:4 160:10 215:13

**discussion** 15:8 40:8 109:5 144:25
  160:8 172:21 176:19 183:23
  187:5 208:6 222:2
**discussions** 28:25 50:14 54:7
  124:10,18 126:18 160:5,8
**disponent** 29:13
**dispute** 57:21 96:20 186:5,18,23
  190:8,11,17 206:4 211:10 225:12
**distinct** 190:5
**distinction** 24:18
**distribute** 148:24 149:22
**DISTRICT** 1:2,2
**docket** 209:15
**document** 16:13 17:11 19:10 23:3
  24:13 25:19 27:3 28:8 33:18
  40:25 51:8 72:19 74:10,17 76:25
  100:18 104:13 113:6 135:14,19
  136:10 138:9,18,23 139:11
  140:25 141:9,16 142:6 145:21
  146:7 148:6 149:6 150:15 151:3
  152:25 156:11,19 159:18 160:2
  160:18,22 162:8 168:7 170:2
  173:25 174:21 175:8 176:15,23
  178:10 179:13 183:7,11,15,19
  184:24 191:9,22 200:6 201:7,13
  203:3,14 204:2,14,17 212:16
  235:20 236:7,10,14,18,24 237:5,8
  237:11,14,18,21 238:11,14,17,20
  238:23 239:2,5,8,11,14,17,20,23
  240:2,5,8
**documents** 18:21,23 19:15,25
  21:24 23:14 25:17 26:22 27:15
  28:19 31:4,20 36:3 38:4 39:10
  42:17 45:7 72:7 96:21 158:8
  161:4 168:24 169:11,24 177:8
**dog** 60:21,22,25
**doing** 10:14 32:18 119:14,14 130:4
  192:16 201:5 213:3 214:19
**dollars** 166:5
**DOS** 139:5
**double** 172:11
**doubt** 16:10,13 41:4
**downloaded** 209:16
**draft** 53:17 58:23 62:15,18 73:11
  73:13 98:18 100:9,11 102:20
  112:11 131:4 132:3 147:15 155:3
  214:10 216:5 221:11 224:25
  228:2
**drafted** 103:2 131:2,5,11 221:5
  228:22
**drafting** 73:21
**drained** 150:10
**draw** 70:16 211:17
**DT** 18:20 21:23
**Duces** 18:10 234:16
**due** 176:7 181:7 185:11
**duly** 5:3 233:10
**duplication** 39:18
**duplicative** 169:23
**duties** 34:5,6,8,8,9

**duty** 58:22 63:18 98:8 116:22
   124:12 133:25

**E**

**E** 168:11
**earlier** 17:2 73:12 88:11 147:12
   149:8 153:9 163:7 203:14
**early** 104:6 152:12 163:16 164:10
   190:23 199:3
**earned** 211:4
**easily** 6:4
**East** 3:5
**ECF** 1:6
**Ed** 71:11,12 164:8,21,24 167:19,20
   168:2,11 170:14 171:18 172:21
   173:3 180:11 181:6 185:19
   191:15 194:6 237:25 238:7
**Edition** 165:10
**edits** 221:16,18
**EDWARD** 3:24
**Ed's** 178:5 207:23
**effect** 32:6 78:4
**effectively** 42:21 44:12 46:6 82:9
   103:25
**effort** 215:25 216:8
**eight** 94:3,6
**either** 24:2 29:6 30:6 67:22 193:9
   200:4 215:11 216:17
**elaborate** 77:23
**electronic** 22:9,14 23:15 24:14,17
**electronically** 22:2,5,18,21
**emphasis** 119:2
**emphatic** 231:12
**enclosing** 137:12
**ends** 38:17 160:12
**Energy** 1:7 3:16 7:11 27:23 87:11
   115:12 220:23
**enforce** 227:24
**enforceable** 151:6
**England** 9:10
**English** 57:9,10 92:23 120:20 121:3
   121:4 206:15
**English-speaking** 221:14
**enter** 127:25
**entered** 8:5
**entering** 34:3 98:6 100:3
**entire** 171:20 202:5 241:7
**entirely** 16:11 26:16 110:9 152:3
   164:25 188:9,19 190:9
**entitled** 22:20 187:2
**entity** 25:2 141:7
**entries** 42:9
**entry** 37:19,24 123:15 207:11
   215:8,20
**equivalent** 217:13
**ERRATA** 241:2,13 242:2 243:2
**erupted** 186:12
**escrow** 8:16,19 9:5,6,7,22,22 10:20
   10:21 11:5 23:7 27:4 33:8,9 34:8
   34:17 37:22 38:7 42:4,14,22,25

43:7 44:12,22,24 45:2,3,5,12,18
   46:5,7,13,16 47:15 48:5 52:15,16
   53:2,9,23 54:2 55:10 56:23 57:20
   57:22 61:12,20 62:23 63:2,4,8,10
   63:13 64:2,20,23 66:14,23 71:6
   71:17 72:25 73:7,21 75:6 76:3,3
   84:19 86:10,16 88:20 89:2,13
   90:2,4 91:2 92:21 94:10,11,17
   95:24 99:6 101:15 102:19 104:21
   105:10 110:19 111:25 114:9,11
   116:9,23 118:15,17 119:22,25
   120:3,4,6 121:19,19,22,25 122:3
   122:10,14,15,25 123:6,8,15,17,25
   124:15,17,19 125:10,13,16,16
   131:9 134:16,18 135:12 136:6
   137:13 138:11,18,24 139:3,17,20
   140:4 142:25 143:18 145:25
   146:2,21 147:8,16 154:12,15,18
   155:12 156:2,9,18 157:4 159:15
   161:20 168:22 172:8 174:15
   175:3,20 176:6,13 182:3 186:25
   187:25 188:8,10,20 189:5,5,13
   190:3,4,8,16,18 193:3 199:5
   204:11,24 205:7,11,16 210:6,8
   211:25 212:5 213:11,14,19,21,25
   214:6 216:16 218:23,24 220:24
   223:6,6,24 225:23,24 226:4,12,16
   227:4,15 235:6 236:15
**escrows** 107:25
**ESI** 23:11
**especially** 219:10
**ESQ** 3:9,17,24
**establish** 195:11
**established** 189:25,25
**Estech** 1:6 9:2,3 10:5 27:14,16,19
   43:19 44:18 46:5 54:3 95:14
   137:23 138:3,5 144:7 150:25
   156:5 157:5 161:9 182:2 188:4
   226:8 228:14 231:2,2,4 241:4
**estimate** 14:3
**European** 68:23,25
**evasive** 62:20
**evening** 68:11 104:6,11 110:17
   182:10 185:14
**event** 124:9
**events** 59:25 67:5
**everybody** 96:19 168:14 193:14
**everybody's** 117:9
**exact** 44:7 95:11 112:7 115:2
   197:12 198:8 213:16 214:25
**exactly** 21:21 45:10 67:15 104:7
   111:21 135:4 139:9 158:23
   177:20 186:3 188:5 190:25
   213:17
**EXAMINATION** 5:5 219:23 227:8
   234:3
**example** 11:16,18 14:6 20:5,22
   206:20 210:14
**exception** 27:24
**exchange** 54:21 65:23 105:17

174:25 177:10 179:9 191:13,19
   201:23 222:5
**exchanged** 194:12
**exchanges** 69:14 135:15,20 184:5
   190:20 192:19 194:4 201:14
   221:2 236:8
**exclamation** 150:8 162:17,17
**execute** 94:11 103:20
**executed** 7:9 27:12 33:17 64:19
   94:10,18 107:25 108:9 109:7,14
   109:22 111:25 114:9,12 116:9
   141:10 154:17 155:13 156:2,10
   156:19,21,24 157:12,14 158:4,7
   159:3,6 223:24 225:23 236:3
**execution** 116:23 141:16 142:3,5
**exhibit** 15:6,9,13,22 18:4,6,8,11
   19:4,6,11 31:5 40:12,17 51:9
   65:20,22 66:10,14,18 72:21 74:3
   74:5,8 76:9 77:18 78:16,20 80:10
   80:13 81:6,22 82:19 100:17,19,23
   101:5,8 105:18,19,23 109:9,12
   112:5 113:8 135:15,18,18 136:11
   136:14,17,20,21 137:18 138:19
   138:22 139:12,15 143:12,13,16
   144:2,12 145:9,22,24 146:24
   147:3,4 148:7,11 150:16,18
   152:16,17 153:2,5 159:19,25
   160:19,22 162:9,12 168:5,8
   170:15,18,21 171:17 174:2,5,22
   174:24 175:9,12 176:24 177:3
   178:11,14 179:14,17 183:5,8,12
   183:16,20 184:25 185:4 187:8,9
   187:23 191:10,12,23 192:3,13,14
   200:7,9 201:8,11 203:4,7,21
   204:13,16 215:8,19 220:7,19
   221:25 222:3 223:22 224:17,21
   225:13,14 234:11 236:21
**Exhibits** 18:14 184:2 221:25 234:9
**exist** 78:3
**existed** 42:24 154:9
**existence** 122:21 158:20
**expect** 156:17 212:20
**expected** 156:10
**expecting** 88:25 89:3
**expedite** 191:4
**experience** 13:22 209:21
**explain** 56:14 205:4
**explained** 141:2 217:11
**explanation** 55:14,17,18 127:6
   129:20
**explicitly** 50:10
**express** 127:8
**expressly** 61:22
**extent** 19:22 20:8,9,19,21 38:4 48:3
   82:4 209:17 212:19 229:18
**eye** 176:20
**e-mail** 25:21 26:7,12,21,22 27:11
   27:16,21 28:14 42:18 44:7 52:2
   64:10 65:22 66:13,20 67:16 71:14
   72:9,24 76:8,12,20 77:16,19 78:5

81:2,7,8,14,17 82:9 83:8,9 85:9
85:16 86:18,19 91:5,10 93:20
94:2,7 97:11,13,16,19 98:23
101:17 102:8,15,18 103:11,23
105:19,24 109:21 111:17 112:12
112:20,20 113:2,14 135:14,20,24
136:18 137:8,21,24 138:17,22
139:16,25 140:7 144:6 145:9
147:11,19 148:22 149:8,10,14
151:11,12 152:2,5,9 155:5,17,24
161:6,24 162:3,13 163:17,20
164:19,23 165:13,16,18,20
166:10 168:2,10 169:13,22 170:7
170:10,13,18 171:17 172:4 173:6
173:7 174:10,11 175:16,18 176:3
177:19 178:5 179:7,21,22 180:10
182:14 185:10,18 187:19 190:24
192:7,7,17 198:25 200:10,13
201:16 203:24 204:21 214:7
220:25 222:5 223:20 224:8,12
226:6 235:5,11,24 236:8,13
237:24 238:6
**e-mailed** 74:23
**e-mailing** 168:14
**e-mails** 22:6 23:25 39:18 65:19
66:18 69:23 72:6 78:19,23 79:21
80:9,15,18 81:2,12 101:10 102:11
109:7,12 136:15 146:23 147:3,25
148:15 150:19 151:15 154:19,22
155:22 160:10 161:3 162:25
164:18 165:5 169:13 172:24
173:20 182:21,23 184:3,11 187:6
187:12,18 208:13 224:21 235:3
235:14,18 236:2 237:3

**F**

**fact** 8:3 9:25 10:8 25:13 26:3 27:25
36:3,20 73:11 75:20 93:18 98:16
108:7 109:18 110:12 114:19
122:13 142:4 145:8 157:13
158:13,14 163:8,11 165:11 167:5
189:4 208:24 218:22 226:16
229:8
**fair** 12:15 26:24 43:2 54:24 56:12
56:13 57:4 82:11 96:15,22 138:6
138:7 150:7 171:12 176:21
227:16 229:3
**fairly** 59:22 202:4 218:5
**fairness** 132:19
**fait** 54:8
**fake** 77:23
**fall** 6:20,23 53:11
**falls** 57:22,23
**familiar** 166:21
**far** 9:22 22:15 60:12 63:25 95:13
115:7 158:8 186:16 190:16 213:3
217:15
**faster** 32:14
**February** 16:21
**Federal** 233:19

**fee** 210:8
**feel** 60:18 61:14 62:4 100:2 184:21
188:25
**fees** 206:3,19 209:23,25 210:3,15
210:19,22 211:3,4,14 216:17
**fell** 44:11
**felt** 61:5 192:24
**fiduciaries** 34:18
**fiduciary** 32:25 33:6,20 34:5,11
45:25 57:2,13,16,20 58:15,18,23
63:18 98:7 100:3 120:22,25
131:12,18,25 133:24 227:20,22
**field** 23:11 93:15
**fight** 41:24
**figure** 60:9 67:19 199:23
**file** 7:22 9:17 16:19 156:3 202:5
215:12
**filed** 16:4 209:9 214:18 215:11
**files** 196:25
**filing** 4:6 200:21 215:15
**final** 21:16 45:15 68:6 73:13 89:25
94:12 96:3 104:18 110:13 112:11
140:19 144:15 156:19,21,24
213:24 231:6
**finalization** 47:15 53:9 213:21
**finalize** 213:21
**finalized** 46:14,15 122:15 134:17
134:19,19,22,25 135:3 145:18
154:9,13 211:25 212:2 213:15
218:23,24 226:4,13
**finally** 64:17 150:20 155:13 157:14
158:4
**find** 21:7 74:14 131:13 132:12
176:13 190:25 224:25
**fine** 21:22 25:11 35:14 39:16 41:11
144:2 196:11 206:17
**finish** 37:14 104:3 108:22 169:5
**firm** 5:16 17:12 21:17 41:10 102:17
115:6,15,25 118:19 122:2 123:12
125:7,15 194:16 221:6,18
**firming** 70:11
**firms** 12:23 13:2,18 38:15
**firm's** 40:18 118:7 132:8
**first** 5:22,25 24:16 25:2 47:17 55:5
67:4 70:20 78:25 80:25 81:8,8
85:5,7,23 87:22 88:15 91:11
101:7,9,11 104:25 113:9,18 115:5
116:10,16,18 123:13 135:19,21
137:3,7,11 140:8 161:2,5 172:18
173:3 177:16 187:8,23 192:6,12
197:4 198:7 204:20 222:4,19
223:12
**Fisher** 9:9 10:24 11:12 12:5,8,9,13
12:22 13:13,23 14:10 20:14 26:17
**fit** 23:12 147:4
**fits** 65:3
**five** 136:20 182:21
**fixed** 48:4 70:8
**fixing** 70:11
**fixture** 138:12 157:17,19,24 159:14

214:2 218:24
**fixtures** 159:5
**flight** 83:22 96:9 181:22
**floating** 28:18
**Floor** 3:21
**focus** 175:15
**focusing** 65:12
**follow** 22:24 34:20
**followed** 81:6 88:10 93:18 145:9
**following** 94:19 95:6 111:9 150:5
185:7 205:6
**follows** 5:4
**followup** 162:20 180:3
**fora** 12:2
**forcing** 46:18
**forfeit** 176:7,9
**forfeiture** 176:8
**forget** 44:6 104:6
**form** 4:10 23:15 24:14 27:19 45:13
110:14
**formal** 19:2 95:9
**format** 22:14 24:23 68:14 139:6
140:10 161:25 162:2
**formats** 22:22
**former** 72:12
**forth** 23:22 24:3 26:16 33:4 66:24
69:25 172:13 173:20 233:10
**fortunately** 101:19 148:12
**forward** 25:16,19 27:2 103:14
141:11,13 149:3,5 193:13 195:4
203:25 219:12 223:19 224:7
**forwarded** 27:15 75:2 106:25 142:3
146:13 149:4,11 173:8,15 184:11
186:16 194:24 205:17 221:10,11
224:24
**forwarding** 25:25 26:3,21 73:6 79:9
101:24 140:18 143:17 144:13
146:7 147:7,15 150:24 180:13
182:13,22,23,25 184:4,5 192:18
193:4 201:21
**forwards** 185:8
**found** 31:23 32:9,11 207:21
**four** 24:9 34:25 65:25 106:18 179:4
182:20
**four-page** 80:9,14 159:18,25
235:17 237:14
**frame** 56:9 60:4,16 134:14
**frankly** 90:20 170:9 207:7
**fraud** 77:23
**free** 96:18 150:13 188:25
**Friday** 1:13 164:11
**friend** 196:8
**front** 47:2 61:2 158:9 190:24
218:13
**fruition** 89:16
**frustrating** 30:13 167:23
**full** 30:21 83:5 161:16
**fully** 154:17 156:2,10 157:7
**fun** 35:2
**function** 127:5 163:10

**functional** 217:13
**fund** 118:6
**funds** 32:3 33:11 36:20 38:6 44:5
  44:13,14,20 46:15,16 53:22 55:15
  61:18 63:11 87:15 88:3 89:13
  91:12 113:16,24 115:16 118:18
  122:18 123:3,3,11 124:2,21 125:6
  126:17 127:14,16 128:11 158:15
  159:16 172:7 173:2,13 175:3
  186:25 193:8,10 205:16 206:2
  209:20 210:7,9,14 212:2,11,14
  215:17 217:18 223:4,6,7 225:24
  225:24 226:14,17,20 227:5,15
**further** 61:7 114:17 219:21 224:14
  227:7 232:2,4 233:13,17
**futile** 61:20
**future** 189:17

**G**

**garnishee** 161:14,18 199:2 209:19
**garnishment** 209:13
**Garth** 1:11 2:5 3:23 5:2,9 59:4
  66:22 113:11 119:4 128:12
  162:17 165:19 170:14 181:6
  223:22 232:11 233:8 234:5 238:8
  241:17 242:25 243:25
**gathered** 177:8
**gearing** 124:6
**general** 29:17 87:10 188:22
**generally** 70:8
**George** 6:17
**Gerasimov** 28:20
**getting** 6:8 34:13 98:5 132:15 189:5
  199:19 208:3 210:13
**give** 9:12 21:19 30:21,22 60:20
  67:16 71:10 75:16 80:6 82:16
  84:7 117:11 189:6,18 195:16
  196:24 198:5
**given** 20:17 22:17 23:3 189:15
  202:5 211:15 233:12
**gives** 79:7
**giving** 194:12 195:18
**glad** 223:15
**go** 6:9 24:2 28:10 32:14 35:6 39:13
  53:13 56:10 60:23 61:5,15 62:4
  62:12 68:5 70:19 71:20 72:6
  83:20 91:5,10 93:25 94:19 95:5
  101:21 107:6,19 113:5 129:16
  132:11 140:2 143:7 147:24
  149:22 155:16 165:4 169:19
  182:24 183:3 184:21 191:5 196:5
  196:7 210:10,22 217:19,20
  224:16
**goes** 60:8 93:10,12 104:18 210:24
**going** 6:5 15:19 23:20 24:7 36:5
  38:17 42:7 59:10 60:10,16 62:5
  62:11 64:9 67:13 68:4 70:20
  71:14 74:18 75:4 85:12 88:2
  90:19 95:12,15 96:8,24 98:6,7,12
  98:15,16 99:22 103:23 104:2,11

110:12 119:3 126:6 130:23 142:8
  142:11,25 146:11 148:3 150:5
  152:17 154:23,24 160:13 165:7
  167:19 172:24 173:20 178:25
  185:22 186:3,16 188:5 189:2
  193:2 194:5 197:22 210:8 215:14
  217:2,18 222:24 227:5 230:8,9
**good** 24:20 42:6 55:16 119:14
  177:18 219:25
**Google** 77:9 78:2 79:16 207:4
**gotten** 125:24
**governed** 44:20
**graduate** 6:15 7:4
**great** 39:17
**guess** 33:22 43:23 44:6 70:5,13
  73:5 77:24 80:22 85:13 121:9
  137:23 149:19 161:23 180:18
**guilty** 171:13
**guy** 52:19 222:24 230:6
**guys** 40:3

**H**

**half** 107:8,12 206:21 207:8
**hand** 94:13 130:20 172:20 233:23
**handed** 15:13,20,21 18:14 159:24
  168:8
**handle** 133:12
**hands** 130:5
**Hang** 117:10
**happen** 12:19 64:9,14 212:9
**happened** 44:20 65:4 81:5 135:8
  151:14 155:14 193:15 208:9
**happens** 65:13 92:23 183:4
**happy** 22:25 23:8 36:25
**hard** 13:15 14:3,6 22:7,13,17 23:4
  24:5 60:9 67:14 158:17 165:8
**head** 28:17 29:14 37:13 82:10,20
  158:7,16,18
**heading** 116:25
**hear** 13:7 32:4
**heard** 17:7 55:4 103:24 104:2
  127:6 180:4 222:22
**held** 33:25 41:14 55:9,10 172:20
  174:16 219:13
**help** 58:23 78:17 162:17 168:20
  190:25 199:16
**helps** 46:25 116:5
**henceforth** 212:15
**hereof** 241:13
**hereto** 4:5
**hereunto** 233:23
**Hi** 66:22
**hid** 193:8
**high** 57:16
**hired** 12:21
**hit** 166:23,24 170:6
**hold** 23:6 24:22 33:23 66:23 68:4
  115:16 151:21 241:12
**holding** 40:11,20 126:24 206:2
  209:19 210:13 216:15 218:19

234:23
**holiday** 164:17 166:14
**holidays** 163:5 164:15
**home** 68:16
**honest** 59:23
**hopefully** 189:17 227:10
**hopes** 136:6
**hoping** 215:2
**HOSTETLER** 3:11
**hour** 80:7 102:2 107:8,12 206:21
  207:8
**hourly** 75:25
**hours** 68:3 106:18 208:5 209:6
**Houston** 3:14 69:10
**hub** 155:7
**huge** 69:17 84:18
**hundreds** 14:8 166:4
**hung** 51:4
**hypothetical** 216:24

**I**

**idea** 67:17 138:4 141:4 178:8
  200:25 222:22 231:5
**ideal** 212:24
**identification** 15:10 18:7,11 19:7
  40:13 65:20 66:15 74:5 76:10
  78:21 80:10 100:20 105:20
  109:10 135:16 136:12 138:20
  139:13 143:14 145:22 146:24
  148:7 150:16 153:3 159:20
  160:20 162:10 168:5 170:16
  174:3,22 175:10 176:25 178:12
  179:15 183:9,13,17,21 185:2
  191:10,24 200:7 201:9 203:5
**identify** 183:2
**Igor** 177:4,24 191:13
**immediately** 47:24 69:25
**impact** 141:17 142:6
**important** 106:16 111:3
**importantly** 110:21
**impose** 24:12
**imprecision** 102:4
**impression** 82:14
**improper** 205:20
**inaccurate** 61:20
**inclination** 187:25
**inclinations** 219:9
**include** 119:24 203:22
**included** 25:21
**includes** 185:10
**including** 20:18 21:7,8 89:18,19
  90:3 222:11
**inconsistent** 116:10 187:18
**incorrect** 52:5 137:3
**INDEX** 234:3
**indicate** 42:10 86:18 186:2
**indicated** 88:11 89:7 140:22 160:14
  226:3 227:11 241:12
**indicates** 67:9 164:5
**indicating** 19:18 37:11 143:17

145:6 185:11 200:14
**indication** 41:13 42:15 76:15
 143:20 148:25 226:5
**indigent** 38:18
**individual** 169:22
**individually** 142:20
**infamous** 13:16
**inferred** 228:25
**information** 22:2,5,21 26:8 41:6
 56:4 114:15,18 153:12 193:4,13
 194:25 195:5 219:12,13 221:20
**initial** 54:20 56:2 98:2
**initiated** 117:22
**initiative** 194:25 196:13,15,20,23
 198:23
**innocent** 83:8
**inquired** 87:22 147:12
**inquiry** 151:9 153:19 162:22
**insert** 103:6
**inserted** 105:8
**insertion** 105:4
**insisted** 195:18
**instance** 36:19
**instances** 11:24 12:4 144:20 155:2
**instruct** 30:20 31:19
**instructed** 30:15 200:14
**instruction** 118:6
**instructions** 27:2 103:7 105:9
 115:15 117:15 118:11 146:15
**intend** 65:4 94:11 118:25
**intended** 21:4 129:21 132:8,12
 186:25 206:12
**intent** 20:7 108:13 214:4
**intentionally** 56:18
**interest** 32:2 38:16 43:25 55:12
 63:7 74:2 86:8 92:21 93:4
**interested** 233:16
**interests** 29:19,20,24 178:3
**interference** 200:16,22
**interim** 53:8 89:3 90:24 99:23
 222:23
**internal** 37:18,23
**international** 9:15
**interpret** 83:11 106:10,13 146:20
 227:23 228:16,19 229:2
**interpretation** 50:15 54:22 55:4
 93:14 120:16 121:2,11 125:24
 126:2,5 130:24 131:6
**interpretations** 57:12
**interpreted** 20:25 127:7 231:10,11
**interpreter** 132:13
**interpreting** 120:24
**interrupt** 40:6
**introduced** 51:23
**invoice** 78:11 204:22,23 206:19
**invoices** 215:2
**involved** 12:5 16:16 30:10 44:19
 177:9 191:18 209:18,18 218:7
**involvement** 7:7 88:2 141:4 154:25
 155:9 205:8

**IOLA** 38:10 40:2,4,5 41:11,16 86:8
 204:6
**IOLTA** 38:13
**irritating** 24:8
**ish** 102:15
**Island** 167:16
**issue** 71:20 83:4,4 135:12 153:23
 176:20 186:13 187:14 210:18
**issues** 75:4 187:12
**item** 31:4

**J**

**JAMES** 3:17
**Jan** 28:4,4 76:22 149:14 175:2
 191:14
**January** 190:23 195:3 204:22
 207:23 208:25 215:3,6,18,20
**jeopardy** 83:24
**Jim** 21:6 30:24 97:5 195:16 197:19
 202:2
**JKM** 150:24
**job** 1:23 119:14
**Johan** 28:12
**joke** 150:9
**Jorge** 168:3,12,16 238:2
**judge** 35:6 56:24 217:17 227:5
**jumping** 88:9
**jurisdiction** 42:12,13 43:7 44:10,11
 46:4
**jurisdictional** 213:8
**jurisdictionally** 42:21
**juxtaposed** 81:16

**K**

**K** 39:15
**Keane** 2:7 3:19,24 5:16 6:19 8:23
 11:13 13:12 14:25 16:5,18 17:3
 17:13,15,25 23:5 24:16 25:10
 31:10,21 33:20 34:10,16,22 35:11
 35:18 36:22,25 37:7,12 38:2,23
 38:24 39:11,12 40:4,6,16 41:3,18
 42:10,20 43:21 51:3,12 59:4,10
 59:21 60:11,15 63:22 65:5,11,16
 69:5 71:19,22 83:17 92:11 100:7
 108:2,19,22 109:4 113:5,11,20
 114:21 115:7,16,24 116:3,12
 117:2,10,19,24 118:16 119:4,18
 119:21 121:16 122:10,19 124:3
 125:15 126:12 127:22 128:3,12
 128:15,24 129:22 130:10 131:24
 132:15,19 134:3 139:21 148:17
 168:3,11,11,13,15 170:14 171:18
 174:11,14 175:19 177:5 179:10
 180:12,13,15,17,24 181:12 182:7
 182:11,22 184:4 185:7,19 191:15
 194:6 201:19 203:14,19 204:7
 212:6 219:17 220:22,25 225:18
 237:25 238:7
**Keane's** 17:7 115:12,14 124:12
 176:2 225:20

**keep** 32:25 33:2 96:9 122:5 142:7
 142:20,25 143:7 195:15
**kept** 55:13
**kid** 83:18
**kind** 37:23 82:9 95:15 158:16
 161:18
**knew** 70:7 73:25 75:15 83:4 89:20
 89:20 90:19 92:8 129:9,11 202:17
**know** 6:3 7:13 8:9,9 12:4 14:16
 17:20 22:15,23 26:10 28:13,16,22
 29:7,9,21 32:4 33:5,13 34:13,24
 35:22,23 38:24 46:10 49:11 50:20
 51:22 52:9,20 56:16,18 67:11
 70:12 71:8,9 72:14 76:19,22 77:6
 80:7 86:14 87:23 89:11,23 90:5
 92:24 93:9,19 99:8 103:17,21
 104:8 106:12 110:13 125:4 134:4
 135:8,9 137:22 151:10 153:23
 154:2,12 155:17,20,21 156:4,8,15
 156:22 157:2,5,13,21,22 158:23
 159:5,14 161:7 165:15,21 166:9
 166:13,13,16,17 167:15,19
 169:10 172:18,21,23 173:2 177:7
 178:6 181:16 186:15,23 187:19
 192:25 193:18,19 195:10 199:3
 202:17 207:2 208:22,23 209:17
 217:23 218:22 222:24 223:11
 224:3 226:7,8,8 227:20 228:14
 229:16,21
**knowledge** 25:9 29:8 30:4,9 31:2
 129:8 153:24 155:15
**knows** 96:19
**K181** 191:22 239:24

**L**

**labeled** 39:13 138:18,23,24 139:11
 139:15 143:12 145:21 148:6
 150:15 152:25 159:18 160:18
 162:8 168:4 170:14 173:25
 174:21 175:8 176:23 178:10
 179:13 183:7,11,15,19 184:24
 191:9,22 200:6 201:7 203:3
 236:15,18,22,24 237:5,8,11,15,18
 237:21 238:3,9,11,14,17,20,23
 239:2,5,8,11,14,17,20,23 240:2,5
 240:8
**lack** 213:8
**laid** 48:13
**language** 49:20 53:19,20 57:5 61:7
 103:18 105:4 114:20,23 115:2
 116:20 120:20 127:8 231:7
**laptop** 165:4,6,8
**large** 11:24 167:8
**largely** 43:13
**lasts** 216:12
**late** 56:9 65:8 107:15
**Latvia** 172:12
**law** 3:4 5:15 6:13,15 38:15 72:5
 82:5 148:16 220:4
**lawsuit** 41:25 158:13 190:18 199:2

199:8 205:8 207:17 209:19
**lawyer** 189:20 210:15 221:8,14
**lawyers** 9:11 15:16 30:12
**Lay** 146:4
**LAYCAN** 146:4,5 148:21
**lead** 34:20
**learned** 87:9 192:22
**leave** 104:3,6 105:24 190:19
**left** 93:15 168:17 210:2
**legal** 9:17,18,25 10:22 11:2 34:15
  35:4,5,9 38:18 75:9 81:23 83:4
  85:24 153:22 188:14 189:19,23
  226:25
**legitimate** 153:21
**length** 187:12 208:14 219:8
**lengthy** 160:22 173:14
**letter** 7:9,15,16,19,21,24 8:3,17
  9:24 10:3 18:6,20 19:5,14 20:6
  33:7,24 40:21 42:13,18 44:25
  45:20 46:3,25 47:4,7 48:15,16,17
  48:18 49:20,21 50:15,22 51:2
  53:17,17,19 56:7,15 63:16 64:17
  74:4,12 75:3,4,11,14 79:10 88:21
  95:21 96:4 98:11,12,14 100:16
  101:12,24 102:16,22 103:2
  104:14,22 105:3,13 106:11,24
  107:4,9,14 108:5,20 109:3,8,14
  109:23 110:7,9,15 112:5 114:24
  115:3,4,5 116:2,4 122:9,12
  123:14 125:20 129:10 135:6
  141:5 142:24 146:21 153:16
  169:3,14 170:8 172:19 180:14
  181:2 182:6,13 189:9 206:21
  213:23 220:9,21 221:5,11,16,19
  223:2,3 224:24 225:6,10,14,17,20
  225:25 227:21 230:10 231:7
  234:14,18 235:9 236:4
**letterhead** 95:10 103:3 104:9
  220:22
**letters** 153:18 173:14 208:17,25
  216:5
**letting** 161:7
**let's** 51:3 70:6 78:16 91:5,10 93:25
  96:10 104:12 110:7 113:5 115:5
  115:10 117:12 129:22 195:19
  196:5 197:9 198:17
**lie** 219:9
**life** 7:4
**limited** 9:21 11:2 116:22
**limiting** 120:17
**line** 79:14 85:23 86:6 115:7 161:16
  172:11 185:17 189:23 242:3,6,9
  242:12,15,18,21 243:3,6,9,12,15
  243:18,21
**lines** 186:24
**linked** 61:21,21
**liquidated** 174:16 175:22 176:7,14
**list** 21:24 28:14 31:3
**listen** 30:16 113:20 117:11
**listening** 218:3

**literal** 214:5
**litigate** 188:2
**litigation** 11:25 193:5 194:10
  201:22 202:23
**little** 11:8 29:12 83:10,13 84:7,15
  85:25 86:13 150:11 172:17 220:6
  229:22
**live** 167:16
**LLC** 1:6 3:4 9:2
**LLP** 2:7 3:11,19
**loan** 128:22 129:8 130:9 231:3
**locations** 70:9
**logic** 127:6
**London** 11:17 12:23 13:5,20,21
  14:18 23:23 24:2 26:17 67:20
  68:9 69:2 70:23 77:7 79:2 188:16
**long** 6:12 10:25 42:7 166:23
**longer** 59:11 123:17 163:13 212:11
**look** 16:3 18:16 19:9 21:23 31:3,18
  31:19 32:8,10 45:9 66:21 67:23
  74:7 77:17 78:16 80:12,20 100:22
  104:12 110:7,14 111:23 112:20
  115:5 128:12 136:7 137:5 144:23
  183:2 184:7 203:10
**looked** 53:18 77:10 81:4 109:19
  144:12 152:18 162:14 176:12,19
  182:25 215:4
**looking** 9:16 15:25 16:23 18:18
  83:24 97:11 116:13 162:21
  168:19 220:10
**looks** 16:6 73:17 80:4 84:14 137:25
  151:11,14 161:25 180:7 208:6
**loop** 142:7,10,20 146:16,18
**loose** 106:20
**loosely** 87:8
**lose** 127:13
**losing** 217:9
**lost** 119:3
**lot** 10:13 13:17 32:14 63:19 69:19
  125:9 175:4 222:2
**lots** 5:23 119:20 190:12
**Louisiana** 3:12
**lower** 161:6
**luck** 200:2 223:16

**M**

**M** 39:15
**machine** 72:18
**Mahoney** 2:7 3:19 5:16 6:18 8:23
  11:13 13:12 14:25 16:4 17:3,15
  17:22,25 25:10 31:10,21 33:20
  35:17 38:23 39:3,11,12 42:10,19
  43:21 115:6,11,13,15,24 117:2,18
  117:24 118:16 119:21 121:16
  122:10,19 124:3,12 125:15
  139:21 148:17 168:12,15 182:6
  220:21,25 225:18,19
**main** 72:4 186:13
**maintain** 33:2 35:24 36:2
**majority** 13:22

**making** 35:22 50:22 55:12 58:17
  150:8 212:16,21
**manage** 166:3
**managed** 165:12
**Margaret** 201:4
**Marie** 72:2,12,14
**maritime** 13:2,18 29:9 209:12
**mark** 10:23 14:10 15:5 18:4,8 19:3
  25:24 26:14 49:17 50:4 51:7
  52:18,23 54:4,10,13 65:17 66:12
  66:22 68:13 74:15,22,24 76:18,20
  78:5 88:10,19 90:21 95:25 97:22
  102:7 104:8 135:9 139:23 141:24
  146:11 148:23 149:4 152:17
  156:14 162:17,18,18 170:13
  171:18 182:20 183:5 189:15
  192:24 194:6 214:15,22 221:12
  222:10 223:9 238:6
**marked** 15:9,13,21 18:6,10,14 19:6
  19:10 40:12,17 65:20 66:14,17
  72:22 74:4 76:9 78:17,20 79:20
  80:10,13 94:7 100:19,23 105:19
  109:9 116:2 135:15 136:11
  138:19 139:12 143:13 145:22,24
  146:23 148:7 150:16 153:2
  159:19,25 160:19 162:9 168:4
  170:15 174:2,22 175:9 176:24
  178:11 179:14 183:8,12,16,20
  184:2,25 185:4 191:10,12,23
  200:7 201:8 203:4 234:11
**Mark's** 224:8
**Marrero** 56:24 217:18 227:5
**marriage** 233:15
**material** 22:11
**math** 85:21 94:5
**matter** 7:7 8:24 9:23 15:22 17:5
  18:21,23 20:18 25:4,6,14 29:17
  46:19 77:22 82:3,6 86:4 126:3
  127:22 150:10 160:14 184:6
  188:9 190:3 194:17 197:17 199:6
  209:9,24 219:7 230:22 233:16
  241:9
**matters** 144:22
**max** 92:18
**mean** 7:13 8:10 16:12 17:20 33:5
  46:10 56:13 70:5 76:22 78:12
  82:2,12 83:11 93:2 95:5 106:10
  121:21 123:15 150:2 153:17
  154:11 155:4 157:11,25 192:9
  205:9,10 217:2 230:22
**meaning** 31:10 122:23 124:24
  126:22
**means** 120:3 121:17 122:25 140:19
  149:21 172:5 176:8 180:13
  188:24 206:14 207:12
**meant** 56:14 131:18 205:6
**measure** 155:7
**mechanism** 47:23 48:2
**memo** 162:2
**mentioned** 11:11 26:11

**mere** 188:10 193:3
**merely** 187:24 188:8
**mess** 39:19
**message** 198:24
**messages** 186:17
**Messrs** 163:9
**met** 14:18,21 42:24 197:4 216:21
**MFB** 207:11
**Michalek** 28:4 76:23 149:15 175:2
    191:14
**mid** 151:9
**middle** 78:14 92:20 105:4 135:24
    148:22 206:4 221:20
**Mikhail** 28:19
**Milestone** 1:3 8:13,24,25 10:5,9
    14:25 16:2 17:4,10,13 25:3,6,10
    25:12,16,21,23 26:2,3,24 29:2,5
    30:5 42:24 43:6,19,22 44:14,18
    46:6 47:19 54:4 55:20 58:6 64:11
    73:15,18 95:14 117:25 118:9
    124:10 126:3 132:7 147:14 148:2
    151:2 156:16 157:6 158:14 161:9
    161:14 172:8,12 178:3 182:3
    188:3,14 192:23 193:6,9,22 194:4
    194:17,18 198:19 199:11 201:22
    202:19 204:23 208:5,18 212:19
    212:21 214:15 217:19 218:16
    220:3 222:11 226:8 228:13 230:5
    230:14 241:4
**Milestone's** 32:16,20 96:25 158:22
    178:3 188:15 193:5 195:2 196:14
    200:16 202:19,21,23 207:14
    208:7
**Milestone-Estech-Mahoney** 212:6
**million** 205:23
**mind** 83:10 84:15 111:12 123:24
    128:18 145:14 206:7 207:24
**mine** 23:11 136:24 163:25
**minus** 69:2,5,7,9,10,10 85:19,19
**minute** 15:16 166:8 216:13
**minutes** 80:5 94:2,3,6 95:11 98:17
    101:25 107:6
**misspoken** 87:5
**mistaken** 25:20 134:20
**misunderstand** 205:19
**misunderstood** 99:20,21
**mobile** 68:21 81:6 164:22
**Moloney** 27:25 28:2 39:3 44:5 49:9
    49:15,16 50:2,6,8,9,12,17,25
    51:21 53:5,16 54:6,21,24 55:6,13
    56:7,10 57:10 58:17,23 59:19
    61:6 62:12,24 64:8,21,23,25
    86:24 87:10,19 89:8 91:24 93:8
    93:24 94:19 95:3,3,8,18 96:23
    97:17,22,25 98:21 99:5 103:2,9
    104:13 107:20 108:12,16 109:22
    111:8 112:13 113:15 114:15,18
    114:24 140:23 141:9 148:3 169:3
    177:19 179:22 180:11,16,25
    181:5,12,25 185:11 186:8,10

**mere**
187:22 190:21 192:19 200:11
    202:7,10,15 208:15,19 219:11
    221:2,8 222:7,17 224:8,12,15,23
    225:4,11 227:24 228:6,11,12
    229:8,19
**Moloney's** 56:2 63:10 88:21 101:16
    102:14 107:14 169:14 172:19
    173:9 182:14
**moment** 83:25 145:16 212:10 213:6
**Monday** 166:20 167:2,12,13
**money** 31:22 33:3,21 34:4 35:21
    36:2,5,16 37:11,16,19 38:16
    39:25 41:10,12,25 42:11,20,25
    43:6,12,23 44:9 45:25 46:2,7
    47:14 48:3 50:23 52:8,12,21
    53:11,14 55:7,9 88:8,13,14,18
    89:2,9 90:9,9,14,15 91:2,23 94:9
    94:16,23,24 95:23 107:23 108:13
    110:17 114:10 116:22 118:3,10
    118:12 122:12 123:9,16 126:25
    128:6,22 130:5,7,19 142:6 168:23
    173:10 179:24,25 181:7 202:8
    211:16,23 216:15,16,22 217:3,5
    217:10,14,15 218:9,11,19 219:13
    223:23
**monitoring** 164:18
**month** 68:2 197:21
**monthly** 41:5
**mooted** 108:7
**morning** 69:3 71:2 83:23 96:9
    102:21 104:4 105:25 106:4
**move** 117:12 186:25 216:22 217:4
    217:15
**moved** 36:5 37:21 38:6 40:2 41:11
    41:12 213:11 217:6
**movement** 31:13 33:3 35:20 37:16
**moves** 123:9
**moving** 42:21 217:14
**Mr.Wolfson** 168:3 237:25
**multiple** 11:25 15:15 75:14 86:3
    151:5 153:15 189:9
**mutual** 12:11
**M&K0023** 222:3 223:22
**M&K0033** 224:19
**M&K0034** 225:15
**M&K023** 187:8
**M&K040** 136:11,22 137:19 236:11
**M&K108** 162:8,12 164:2 237:22
**M&K110** 168:4 170:23 238:3
**M&K118** 170:15,20 238:9
**M&K119** 173:25 174:5,7 238:12
**M&K123** 174:21,24 238:15
**M&K124** 175:8,12,18 238:18
**M&K128** 176:23 177:3 238:21
**M&K135** 178:10,14 238:24
**M&K139** 179:13,17 239:3
**M&K140** 180:22
**M&K146** 183:7 184:14 239:6
**M&K150** 183:11 184:15 239:9
**M&K154** 183:15 184:16 239:12

**M&K157** 183:19 239:15
**M&K164** 184:24 185:5,18 187:24
    239:18
**M&K170** 191:9,13 239:21
**M&K181** 192:3
**M&K191** 200:6,9 240:3
**M&K197** 201:7,11 240:6
**M&K206** 203:3,7 204:17 240:9
**M&K209** 203:11
**M&K33** 109:17
**M&K49** 139:11,15 236:19
**M&K58** 143:13,16 236:22
**M&K60** 145:21,24 236:25
**M&K71** 150:15,19 237:9
**M&K75** 152:25 153:5 237:12
**M&K83** 159:19 160:2 237:15
**M&K87** 160:18,23 237:19

---

**N**

**name** 5:7 28:8,15,18 105:11 220:2
**named** 26:10
**Namviet** 15:23,24 16:2
**National** 77:12
**native** 22:22 24:23
**nature** 189:23
**NB** 86:7
**necessarily** 19:19 36:11 60:23
    120:13 155:4 156:13,24 216:10
    229:7,14
**necessary** 23:17 24:13 61:14 62:4
    137:17 222:23
**need** 23:14 24:23 45:9 50:22 52:7
    52:11 60:23 61:5 66:22 69:13,24
    79:22 82:23 87:23 90:14 104:10
    106:20 129:3 161:20 184:21
**needed** 138:10 142:2 218:16
    230:10
**needing** 145:18
**needs** 32:16 52:20
**negotiated** 56:17 64:5 230:4
**negotiating** 30:10 89:16 112:10
    146:17 214:10 228:13 230:13
**negotiation** 54:3 228:10
**negotiations** 87:25 95:13 110:12
    146:19 148:23 154:24 222:25
**Neil** 1:22 2:9 233:5,25
**neither** 116:25 233:17
**never** 7:23 12:8 25:22 27:12 28:14
    38:6 40:2 41:10,12 42:18 43:3,5
    47:8 50:25 55:16 62:23 63:14
    64:20,25 65:4,10 71:7 90:17,19
    96:23 97:3,7,8 108:15 114:14,17
    127:6 146:13 176:19 196:15
    200:23 205:22,24 206:6,8,10
    207:24 210:10 218:6 222:22
    224:7
**new** 1:2,12,12 2:8,8,11 3:7,7,22,22
    5:12 6:13 11:18 13:2,12 14:21
    67:20 69:10 71:16 73:3 75:19
    77:8 79:25 81:2 85:2,5,8,12 86:8

101:17,20 109:25 128:17 136:5
166:23 179:5,20 182:10 191:6
200:15 207:14 208:7 233:3,4,7
**nice** 156:21
**night** 85:15
**nine** 94:2
**noncompliance** 22:16
**Nonsense** 133:6
**nonstop** 181:23
**non-interest** 38:14
**non-responsive** 32:8 45:21 54:17
55:23 58:2 61:24 89:5 91:8 96:6
110:25 117:4 129:18 130:15
134:10 142:15 143:4 159:22
196:3 217:22 219:18 230:2
**normal** 168:25
**normally** 35:11 156:17 164:19
165:4
**Notary** 2:10 233:6 241:21
**note** 86:7 87:13
**noted** 39:9 152:20 232:7
**notes** 79:21 174:14
**notice** 2:6 210:5 211:18
**notices** 43:23
**noticing** 104:20
**notification** 124:10
**notify** 117:25 218:21
**noting** 175:20
**notwithstanding** 219:7,15
**number** 6:6 7:5 14:7 39:15 40:9
65:17 76:7 78:18 80:8 109:6
135:13 136:9 138:16 139:10
143:11 145:20 146:22 148:5,8
150:14 152:24 159:17 160:17
162:7 167:23,25 170:12 173:24
174:20 175:7 176:22 178:9
179:12 183:10,14,18 184:23
191:8,21 200:5 201:6 203:2 220:8
220:15,19 221:25 224:17,17
230:6
**numbered** 136:11 236:11
**numbers** 39:11

**O**

**oath** 4:9 197:9,24 198:3,13,15
241:15
**object** 20:8 32:20 45:21 47:6 134:9
**objection** 32:7 54:16 55:22 57:25
58:7 59:21 60:15 61:23 62:14
89:4 91:7 96:5 110:24 116:12
117:3 119:18 129:17 130:14
131:24 132:9 142:14 143:3
159:21 188:17 195:6 196:2,17,22
199:9,14 217:21 219:17 226:21
226:24 229:25
**objections** 4:9 19:22 60:19 119:20
133:12,15
**obligation** 35:18,24 36:2 58:25
213:4 227:23 228:2,5
**obligations** 47:21 57:17,20 58:15

225:20 227:21
**obtained** 50:13 127:15 225:9
**obvious** 172:16 204:5
**obviously** 17:6,12 41:24 54:7 65:14
111:3 112:10 168:19 178:4
186:22 228:11
**occasion** 169:19
**occasions** 26:20,25
**occur** 93:23 102:11 127:12,17
129:4 130:4,10,12 230:25
**occurred** 43:14 79:18 186:20
205:23,24 213:13,18 217:12
**odd** 24:16 230:18
**offer** 187:25 198:7,9 241:14
**offered** 83:12,12 195:16 196:24
197:13,14,19,20 198:5,9
**office** 68:15 71:8 72:3,5,9,15,19
104:10,11 107:11 163:2,3,6,14
164:7 165:13,15,19 166:10,17
167:11 171:25 172:18 173:8
177:17 179:10 181:13 185:13,24
191:3 198:19 214:17 220:4
**officer** 4:8
**officers** 77:23
**offices** 2:7 3:4 5:18 148:16 164:17
167:7
**oh** 66:6 87:21 88:7 205:18
**Ohio** 86:22 222:14
**okay** 6:12 10:8 23:2 28:18 34:2
38:20,25 41:17 48:21 54:14 58:12
58:13 60:15 61:13 62:17 65:11
68:7,8,10,12 69:12 71:17 79:8
81:21 84:10,17 85:9,18 86:11,17
87:13 91:17 92:9,12,25 103:19
104:12,25 105:16 106:17 112:4
112:23 114:14 115:4 119:11
123:24 129:14 131:7,8,8
132:16 152:13,23 159:12 167:10
168:18 169:6 170:22 171:3,15
174:8 175:17 176:21 177:22
178:20 179:8 181:21 194:23
206:13,17 207:10,25 211:2
214:11,13 220:19 221:3 223:14
223:19 224:7,11,16,18
**once** 25:18 64:17 65:13 78:17
122:14 123:8 141:9 185:24
193:11 194:11 225:22 226:11
**ones** 226:9
**one-line** 188:23 207:3
**ongoing** 148:24
**online** 165:5
**open** 139:4,6 164:7
**opinion** 10:10 20:19 35:5,9 46:19
46:20 55:21 75:9 79:12,15 81:23
83:12 132:24 133:5 195:24 207:3
219:7,15 226:23,25
**opponent** 13:9
**opposite** 12:7
**oral** 27:19
**order** 66:8 155:19 161:20 192:12

**originally** 60:10
**Orozco** 3:9 31:5 32:15 39:8 51:7
58:7 62:14 83:20 84:2 96:10
100:24 132:9 133:17 136:24
139:9 144:23 163:22,24 164:3
167:2 170:21,25 171:3,6,10
178:17,20 188:17 195:6 196:17
196:22 199:9,14 219:24 220:2,14
220:18 223:18 227:2,7 232:4
234:7
**Orozco's** 227:12
**outcome** 233:16
**outlined** 34:7
**overbroad** 20:9
**overturned** 13:25
**owed** 100:4
**owner** 29:2,10,13,14,15,15 47:19
**owners** 29:19,19,22,24

**P**

**page** 16:3 50:7 58:19 66:3,13,19,21
70:20 72:24 76:8,12 77:17 80:20
80:22,23 81:10,22 82:19 84:13
101:7,11,12 105:23 112:5 135:19
135:21 136:10,14 137:7,11,18
138:17,22 140:8 161:3 170:18
175:16 179:21 180:11 181:5,11
187:8,9,23 192:13 203:10 204:21
222:4 223:22 224:18 225:14
231:15 234:4 235:5,11 236:10,13
242:3,6,9,12,15,18,21 243:3,6,9
243:12,15,18,21
**pages** 65:25 100:24 101:9 109:17
136:18,20 137:9 206:18
**paperwork** 209:6 215:21
**paragraph** 104:25 115:5 117:17,18
119:17
**part** 12:12 24:5 69:16 123:13
157:18 204:20
**partial** 10:2 86:3
**particular** 8:2 12:24 13:20 15:2
36:19 53:20 166:22
**particularly** 23:23
**parties** 4:5 25:17 32:3 46:9,24
56:16 62:6,17 89:15 95:14,20
112:10 117:24 118:15 119:23,23
120:2,4,5,8,8,9,11,12,14,14,15,17
120:18,19 121:5,6,7,12,15 122:2
125:14 154:25 155:9,13 214:3,9
233:14
**partly** 24:17
**partner** 5:15 16:7 20:5 21:3
**partners** 17:17 18:2
**party** 8:25 10:4 12:10 29:16,25
30:11 43:16,17,18 46:15 48:4
51:24 94:10,17 107:24 110:20
111:25 114:8,11 116:9,24 134:24
135:3 138:14 140:20 144:15
145:17 154:9 156:6 157:2,25
158:4,20 159:2 168:20 182:16

199:25 211:25 213:22 223:24
    233:18
**pass** 219:20
**passing** 6:25
**pay** 205:12
**penalty** 176:10 241:5,6
**pending** 113:12 117:23 134:4
**people** 32:4 50:21 54:8 57:11 61:11
    77:5 87:6 93:13 141:12 150:25
    156:6 157:4 194:7
**perceived** 97:8
**percent** 92:18
**performance** 10:4
**performed** 189:12
**period** 53:8 88:24 99:6,24
**PERJURY** 241:5,6
**permission** 210:10
**person** 60:24 100:2 159:10 212:16
**personal** 16:9 25:8 29:8 30:4,9 31:2
    72:8
**personally** 13:23 16:8 17:9 30:10
    31:18 71:7 167:24 177:8
**perspective** 48:23 217:9
**pertain** 31:10
**phone** 27:25 36:12 64:7 86:23
    100:5 214:21 215:10 216:12
    230:8
**phrase** 228:23
**pick** 179:20
**picked** 172:19
**piece** 197:25
**pinpoint** 213:6,12
**pitching** 23:12
**place** 47:24 53:3,14 91:15 95:16
    99:11 155:22 167:21 217:6,7
**placed** 158:9
**places** 115:25
**placing** 119:2
**plaintiff** 1:4 3:8 8:13 25:4
**plead** 171:13
**pleadings** 158:22
**please** 5:8 18:17 30:16 58:4 62:3
    65:18 85:25 103:17 106:21 144:3
    149:21,22 224:25
**plowing** 208:12
**point** 23:12 24:11 26:11,23 29:3
    32:17 38:2 44:3 52:16 59:12 71:5
    73:23 77:6 130:17 139:22 141:6
    154:10,19 169:12 173:3 182:17
    188:6 207:19 208:21 211:2,24
    214:16 215:10 217:10 229:20
**pointed** 39:8,16 172:25
**pointing** 171:8
**points** 150:8
**popped** 7:5
**portion** 75:11 122:20 124:4
**posed** 153:14
**position** 32:16,20 64:13 89:10
    96:25 98:9 125:5 178:7 181:7,25
    189:18 202:9,13 212:20 219:10

**positions** 214:12
**possession** 31:21
**possible** 16:11 69:21 115:19 152:4
    164:25 216:2
**Possibly** 188:4
**post** 128:8,10
**practically** 14:2 49:19 53:15
**practice** 5:12 6:13 216:14
**practicing** 17:23
**precedent** 42:23 216:21 217:12
**precedes** 101:25
**preceding** 81:7
**precisely** 186:6 187:5
**precision** 29:12 157:16
**predominantly** 10:12
**preferred** 18:25
**prepare** 22:10 216:4
**present** 197:14,17
**preserved** 23:16
**pressing** 184:21
**pressure** 69:20 70:10 84:18
**presumably** 139:22 193:24 194:4
    218:17
**presumed** 155:18
**pretty** 12:25 45:4 99:13 119:14
    129:12 169:25 204:5
**previous** 68:11
**previously** 72:22 86:19 89:7 106:25
    147:24
**primarily** 191:14
**primitive** 139:5
**principally** 208:6
**print** 22:12 72:11 149:9
**printed** 72:17 74:24 151:24
**printout** 66:11
**prior** 15:2 47:14 50:16 52:25 53:22
    53:25 56:8 95:24 108:6 124:11,14
    124:18 125:10 126:14,19 127:9
    127:14,15 139:4 162:22 214:5
    224:21 230:22
**privilege** 19:18,20 20:2,22
**privileges** 119:10
**privy** 54:5 176:18
**probably** 10:11,14 14:4,5,8 24:8
    41:3 70:23 79:4 84:8 85:2,4
    102:21 144:7 151:19 164:8
    165:24 189:16 190:25 197:19,20
    204:8 209:15 214:4
**problem** 39:22 60:6 69:17 71:12
    82:10 84:3 159:3
**problems** 202:6
**procedure** 161:14,18 233:20
**proceeding** 11:17,18,19
**proceedings** 200:15
**proceeds** 151:2
**process** 209:12
**produce** 18:23 22:4,9 36:8 170:6
    203:16
**produced** 11:6 22:7 31:24 32:5,9
    32:11 36:22 39:21 40:17 65:23

158:25 168:25 170:4,10 195:14
    204:8
**product** 54:2 87:25 228:10
**production** 19:15
**Professional** 2:9 233:6
**progress** 150:20
**pronounce** 40:3
**properly** 151:22
**propose** 221:15
**proposed** 54:13 73:7 98:17 101:12
    102:16 141:5
**prove** 87:15
**provide** 174:15
**provided** 137:24 209:17
**providing** 75:8 188:14
**provisions** 176:8,9
**psychic** 77:4
**Public** 2:10 233:6 241:21
**pull** 90:8
**pulled** 203:14
**purpose** 47:16
**purposes** 216:17
**pursuant** 2:6 115:14 233:19
**push** 200:2
**pushing** 63:18
**put** 10:10 22:13 97:23 100:9 103:3
    105:11 111:24 120:16 126:13
    128:16 197:9,23 208:21
**putting** 50:21 51:25 89:21 130:5,19
**p.m** 76:8,13 79:25 84:25 97:16,19
    98:23,24 101:17 102:15 163:21
    164:5 185:20 232:7 235:12

---

### Q

**question** 9:17,18 10:16 11:3 15:19
    30:2,3,16,17 32:14 34:15 41:24
    42:8 45:22,23 49:13 58:12 59:12
    59:13,24 60:3,6,9 62:21 63:15,21
    63:23 75:12 79:10 81:15,24 83:2
    85:25 97:6 106:14 108:23 113:10
    113:12,21 117:11 119:5,11
    120:23 126:13 127:19,23 128:17
    128:24 129:5,23 130:3,11 134:2,3
    134:9 135:22 142:12 143:9
    158:17 159:9 162:18 175:24
    177:18 181:10 188:22 196:9
    209:20 218:4,4 227:12
**questioned** 90:17
**questioning** 41:20 77:13
**questions** 9:12 34:21 35:5 39:25
    58:4 60:7 62:3 83:7 102:17
    103:10 107:21 119:13 133:8
    153:14 175:5 188:15 196:10
    219:21 220:5 227:7 232:3,5
**quick** 96:10
**quickly** 32:3 69:20 70:12 134:21
**quite** 97:16 207:8 230:19
**quote** 94:25 112:13,18 161:10
**quotes** 111:24 114:12,20

## R

**raised** 151:9
**ran** 96:25
**random** 81:19
**range** 148:21
**rate** 75:25 76:2
**reach** 95:20 209:23
**reached** 48:5 49:25 55:14 88:20 90:2 95:25 99:6 118:16 122:2 123:2,7,25 125:15 138:12
**reaching** 53:23,25 56:23 124:11,14 124:18,22 125:10 126:15,19 127:9
**read** 57:9,10 60:22 93:13,16,22 95:4 106:15,15,16 110:15 115:21 120:20 121:4,19,20 122:9 123:6 124:7 133:25 134:7 172:4,20 241:7,9
**reading** 56:21 113:18 118:24 121:3 121:24 122:5 123:13,21 126:8 131:2 145:15 181:10 214:5 229:23
**real** 77:8,10,14 90:18 187:16
**realize** 199:25
**realized** 219:6
**reallocation** 31:12
**really** 6:8 9:4 14:3 20:7 22:14 39:2 42:7 52:10 62:19 68:11 71:10 74:14 80:17 81:17 82:6,7,23 83:3 83:4,24 84:2 85:22 88:16 90:11 97:21 106:15 126:2 132:21,24 135:11 139:19 153:13 160:8 161:23 162:13 175:4,15 176:18 186:17 210:12 216:23 223:11 229:15
**reason** 16:12 22:8 55:10 126:25 127:3,24 139:3 141:8,21 154:6 156:15 157:7 176:6 218:14 242:5 242:8,11,14,17,20,23 243:5,8,11 243:14,17,20,23
**recall** 7:25 10:13 13:11,15 15:4 16:8,16 18:22 25:18 26:21 27:22 28:16 32:6 36:18 50:11 63:25 64:22 78:7,9 102:6 128:22 130:6 130:7 151:8 154:11 155:24 161:22 165:23 207:6,7 214:2 222:17 226:6 230:15
**recallable** 123:17
**recapitulates** 59:22
**receipt** 31:14,22 33:3,19 35:19 37:11 40:11,19 49:25 115:20 118:2,5 136:2 234:22
**receive** 118:11 152:22 156:10 177:6 210:15,21 226:2
**received** 32:3,5 33:10 36:17 37:20 40:11,20 43:13 44:2,3 53:16 55:25 56:6 86:21 98:17 118:10 152:12 163:8 164:21,24 166:10 179:23 201:3 209:5 215:21 222:13 226:12 234:24

**receiving** 34:4 102:6 164:23 165:13 165:16,21
**Recess** 39:5 96:12 133:20
**recognize** 18:19 19:13 65:24 66:2 74:10 79:7 179:8 184:10 185:6 200:10 201:13 203:17 204:4
**recognized** 206:25
**recollection** 16:9,14,15,24,25 17:3 17:8,9 28:6 67:3,6 76:24 149:23 152:13 215:23
**reconciling** 23:21
**record** 5:8 15:7,8 36:6 37:10,15,18 39:4,7,9,17 40:7,8,15 67:12 96:14 109:4,5 126:13 128:17 134:7 144:24,25 183:4,22,23,25 220:6 233:11
**recorded** 97:18 98:22
**recordings** 31:9
**records** 11:7 33:2,10 35:19,22,23 35:25 36:23 40:10,19 234:21
**redeposit** 31:13
**reexecuting** 146:6
**refer** 7:12 9:2 12:20 13:5 28:9 29:19,22 31:9 51:8 107:3 158:21 221:24
**reference** 19:17 25:22 214:3 215:7
**referenced** 45:2,3,6,19 63:16 79:15
**references** 142:24
**referencing** 220:23
**referral** 13:13
**referred** 7:23 13:19 14:4 16:17 50:25 86:6,19 104:16 124:16 135:10 147:7 209:14 213:7 214:8
**referring** 8:2 9:13 10:6 11:21 12:14 12:16,17 13:8 22:15,24 33:14 43:15 53:5 86:23 90:6 111:20 112:19,25 115:6 121:10 186:14 214:2 220:7
**refers** 106:23 120:13 213:25
**reflect** 146:3
**reflected** 139:25 155:22
**refresh** 16:24
**refused** 82:16 189:6
**regard** 10:2 22:16 33:21,21 75:8 168:20 189:8 190:7
**regarding** 20:18 43:22 160:6
**registered** 2:9 29:14 233:5
**regretted** 177:21
**relate** 21:4,9 31:9,21 40:10,19 234:22
**related** 75:10 233:14
**relates** 36:9
**relating** 8:24 33:2 36:4 175:2 208:5
**relationship** 9:9 12:13 29:5 30:5 34:17 75:19 98:6 100:3 190:2
**relationships** 13:4
**relayed** 33:12
**release** 106:21,23 107:3 161:20
**released** 217:25
**releasing** 215:17

**relevant** 190:10
**relied** 54:25
**remarkable** 167:22
**remember** 28:7 77:15 155:23 166:22 193:19 197:12 198:8 201:4 213:17
**remitted** 172:7
**rendered** 43:21
**rendering** 10:9,22
**reopened** 166:18 167:11,13
**repeat** 30:3 81:3 105:23 107:21 109:18 140:8 181:9
**repeated** 41:6
**repeatedly** 110:6,8
**replied** 81:7,14
**report** 211:5
**Reported** 1:22
**reporter** 2:10 15:12,21 18:13 19:10 182:19 233:6
**reporting** 157:6 192:24
**represent** 194:18
**representation** 24:22 211:3
**representative** 178:2
**representatives** 97:2
**represented** 14:25 17:13 135:6
**representing** 12:8 17:4 29:23
**request** 10:23 21:2,2 24:25 31:8 37:9 75:9 115:17,20 124:13 180:18,20,25
**requested** 21:25 31:4 180:12,21 203:24 233:18
**required** 23:9 32:25
**research** 82:22,25 83:13
**reserved** 4:10
**reserving** 19:21
**respect** 47:21 212:3 230:12
**respective** 4:5
**respond** 22:25 84:8 161:22 223:3
**responded** 102:8 180:18
**responding** 92:20 93:7 133:4 177:21
**responds** 34:21 84:5 92:16 223:21
**response** 56:5 68:6 75:9 81:15,21 81:23 82:18,21 84:6,11,14 85:24 86:2 97:10 107:20 110:4 111:19 113:3 133:7 144:2 175:19 176:5 179:24 185:7 186:9 187:9 188:15 193:17 194:10 195:13,15 227:11
**responsibilities** 131:18,20,21,23
**responsibility** 218:20
**rest** 7:2
**results** 13:21
**resume** 37:5
**retain** 24:14 118:21 128:21
**retained** 9:5 118:19 122:18 123:12 124:3 125:7 173:18 192:22 194:18 214:24
**retainer** 210:16,17
**retaining** 130:6
**retention** 24:13

**retransmission** 139:2
**retransmitted** 140:9
**return** 44:5 47:13 53:22 95:23
   106:8 116:22 118:11 124:12,21
   126:17 145:3 158:15 166:25
   169:7 173:2,9,13 179:25 187:3
   193:7,10
**returnable** 110:18
**returned** 48:3 89:17
**returning** 210:2
**review** 185:23 233:18
**reviewed** 208:10 209:5,8 215:21
**right** 5:24 8:11 17:8 20:10 36:15,18
   45:16 46:22 47:13 48:20 49:18
   53:21 56:19,20 58:21 59:3 63:6
   65:4,11 66:8 68:18 69:22,24
   70:23 71:7 72:16 75:7,21 76:16
   79:19 81:11,24 84:16,23 85:12,20
   85:25 86:10 90:8 91:22,25 92:2,9
   95:23 99:12 100:24 102:6,7
   103:12,16 104:19 106:5,6 107:17
   108:11,18 112:13 114:5,12 115:8
   116:17,24 117:15,19 118:3
   121:21 123:10 124:14,21,23
   128:22 129:16 130:6,7 136:19
   137:14 140:11,13,17,21 143:9,10
   144:18 146:8 147:21 149:16
   154:19 155:19,21 156:5 162:18
   162:22 163:5 168:21 171:16
   172:2,3 174:8 176:3 178:16,20,21
   180:23 181:8,14 182:8,17 183:3
   192:21 202:24 204:3 207:12,16
   208:19 209:3 211:20 214:8,9
   215:11 226:15 229:23
**rights** 182:5
**ring** 28:5
**risk-free** 82:16
**road** 65:13
**roaming** 166:7
**RODON** 29:3 30:6
**Rodriguez** 168:3,12 238:2
**role** 9:21 16:8 33:7,8 35:13 58:6
   146:20 189:12 190:10,11,14
   221:23
**roles** 190:12
**ROM** 22:10
**rough** 21:15 67:16
**roughly** 110:3
**roughs** 21:19
**row** 182:21
**RPR** 1:22 233:25
**rule** 13:17,19,20 14:8 23:9 209:6
   215:21 233:19
**rules** 6:9 22:3,12
**run** 71:11
**running** 148:12 167:6,6
**rush** 69:17 70:3

―――――― S ――――――

**sand** 158:8

**SANTA** 29:3 30:7
**sat** 159:16
**satisfied** 171:21 172:7
**save** 105:14 241:10
**savings** 69:9
**saw** 45:12,14 49:20 173:4,7 176:2
   212:24
**saying** 13:7 35:24 36:16 42:20 43:6
   49:17 50:11 52:19 53:20 69:12
   70:21 71:16 81:17 82:8,20 85:8
   91:3 93:13,23,24 94:20 95:22
   97:15,22,24 102:15 103:24,25
   105:24 110:4 111:2 122:16 129:7
   136:6 140:12 149:21 155:25
   172:6 179:23 180:3,12 186:15
   187:22 193:9 195:15 212:14
   217:24 219:11 223:3
**says** 45:10 50:21 52:7 60:21 66:3
   67:16 68:20,22 71:25 74:14 83:6
   83:10 84:18 85:11 93:9 94:8,24
   95:4 101:14 103:9,11,13 106:19
   111:19 112:17,23 115:25 116:4
   117:2 118:13,13,22,25 119:7
   120:7,9 122:17,23 123:24 124:9
   124:23 125:8,13 126:14,16,21
   136:8 145:7 147:17 148:22
   149:14 152:5 161:9,21 162:16
   176:6,9 180:21 200:17,19,19
   214:5 222:9,12 223:21 229:8,9
**scheduled** 166:24
**schedules** 70:9
**scheduling** 197:16
**Schild** 28:12
**school** 6:16
**scope** 132:6
**score** 8:12
**sealing** 4:5
**search** 77:9 78:2 79:17 207:4
**searches** 72:7
**second** 13:24 66:21 79:24 80:22,23
   101:10 105:22 115:7 119:16,16
   125:12 135:20 136:5 137:12
   151:21 161:15 180:11 181:5,11
**secretaries** 167:15
**secretary** 72:2,13
**secure** 10:3 13:21 89:10
**secured** 127:15 128:23 130:8
**security** 47:23 52:9,17 66:24 88:14
   89:9,18,19 90:3,7,9 91:14 99:10
   127:15 128:8,10 130:8 135:6
   185:17
**see** 16:4 19:17 23:15 24:17 28:10
   28:18 31:16,19 37:7 45:10 54:11
   66:25 67:8 68:6,19 69:13,23
   72:10,14 74:16,20 78:2,11 82:10
   83:17 87:17 94:5 101:22 102:23
   105:22 119:9 136:16 141:21
   144:22 145:8 147:11,14 148:25
   151:21,23 152:2 161:15,21
   163:18 168:24 169:11 170:20

171:22 173:6 174:18 177:22
   185:15 186:18 191:16 192:4
   200:18 203:8,16,17 222:15
   223:15,25 225:2
**seeing** 155:24
**seeking** 193:7,10
**seen** 17:6 40:25 42:18 74:11 81:9
   154:17 177:7 204:5
**self-effecting** 212:23
**self-executing** 122:12
**semantics** 51:5
**send** 55:9 63:24 90:25 92:6 94:12
   103:3 141:20,21,25 142:7,9,17,18
   144:3 145:7 172:14 173:22 191:2
   198:20,23 199:3 202:10,15,18
   210:4 211:18 212:13 216:6
**sending** 64:22 68:20 87:6 88:6
   138:9 194:3 230:9
**sense** 49:23 55:3,4,8,12,19 58:20
   64:15 88:8,19 90:16,20 92:10
   126:23 127:21 129:21,25 130:13
   130:19 152:11 153:20
**sent** 18:20 26:21 39:10 43:3,5,23
   54:12,23 62:16,23 64:9,20 67:9
   72:10 74:25 76:25 85:16 91:6
   104:13 107:16 109:25 110:4
   114:24 116:8 137:24 144:7,7
   151:13 155:17 185:16 186:7
   187:6 193:2,21 194:2 196:13,15
   196:21 198:18 199:6 226:17
**sentence** 60:21 93:11 116:11,14,16
   116:19 119:16 121:20 122:6,20
   122:21 123:14,20,23 124:4,7,8
   125:13,19 205:2
**separate** 46:8,9 61:19 93:11 135:12
   137:8,15 190:5
**separately** 204:9
**September** 193:22
**sequence** 23:21 67:5 102:12,13
   144:10 147:4 169:2
**series** 22:6 78:23 80:9,14 101:10
   146:23 147:3 148:15 150:19
   151:15 160:4,7,9 161:3 182:20
   184:3 190:20 192:18 201:14
   235:17 237:3
**serve** 18:25 127:4
**served** 209:11
**service** 181:17
**services** 1:7 3:16 7:11 10:9 27:23
   38:18 87:11 115:13 150:6 204:23
   204:24 205:12,16 220:23
**set** 83:8 109:7,12 132:12 233:10,23
   236:2
**Seth** 1:11 2:5 3:23 5:2,9 232:11
   233:8 234:5 241:17 242:25
   243:25
**setting** 75:18 204:24 205:7
**Seward** 10:23 14:10,14 25:15,24
   26:14,16 49:17 50:4,14 52:3
   53:12 54:4,10,13,22 56:4 61:15

62:5,13 63:5 64:10 66:20,22
69:24 71:15 74:15,22,25 75:10
76:14,18,21,25 78:19,24 85:10
90:22 91:6 92:5,16 95:3 97:15,19
98:10,23 103:15,24 106:19 107:7
107:16,22 108:15 110:10,22
111:6 112:9 113:14 114:6,20
116:8 118:9 132:7 135:25 136:4
143:18,25 144:16 147:8 148:2,23
149:4,20 151:4,4 153:11 156:14
160:5 161:7 168:2,10,19 169:13
169:14 170:13,19 171:18 173:10
173:17 174:11,14 175:2,19 177:5
179:9 182:11 186:8 187:7 189:15
194:6 200:11,13,20 201:17
202:21 203:25 204:21 206:21
207:12 209:2 213:20 214:15,22
221:12,15 223:20,21 231:14
235:15 237:24 238:7
**Seward's** 27:2 56:5 62:10 64:13
95:22 98:23 110:4,16 111:12
156:6 172:24 176:5 214:7 231:8
**SHEET** 241:2,13 242:2 243:2
**shift** 60:16
**shifted** 66:6
**shipping** 1:3 15:23 17:4 25:3 26:4
73:16 220:3
**short** 10:15 155:18 189:16
**shortly** 84:19 94:13 105:25 173:16
195:3 202:4
**short-term** 38:16
**shoving** 133:4
**show** 74:16 88:7 90:13 112:4,6
149:5 215:3
**showed** 17:11
**showing** 76:20
**shut** 166:23 167:22
**side** 7:15,19,20,24 8:17 9:23 12:7
13:14 33:23 46:25 47:4,7 48:18
49:19,20 50:22 51:2 62:16,17
104:16,22 127:25 131:7 195:22
220:9
**sides** 12:7 46:18 127:18 192:25
**sign** 7:14,18 27:5 54:14 62:5 63:5
96:2 103:16,18,22 106:7,11,20
110:22 142:2,2 144:3 148:24
149:22 224:24 225:6,10
**signatory** 8:15 219:4 225:17
**signature** 16:3 141:14 242:24
243:24
**signed** 4:7 8:19 16:7 44:16,16,22
46:3,5 64:21 73:15 96:4 105:14
110:20 112:6 129:12 137:25
138:11 139:20 140:5,15 146:12
155:17,18 156:4,5,13 157:5,8
159:7 213:15,24 221:6 226:7,8,9
227:14
**significance** 124:5 125:8,9 170:11
**significant** 169:25 170:6 227:20
**signing** 63:2 64:16 141:12,12

**silence** 43:13
**silly** 83:2 116:18 126:23
**similar** 198:24
**similarly** 11:23 20:12,15 48:2
193:13 195:4
**simple** 63:15 64:4 82:3 86:2,4
127:23 218:5
**simply** 32:22 83:8 87:15 140:3
188:20 218:18 231:3
**simultaneity** 47:18
**simultaneously** 53:15
**single** 136:10,14 137:18 138:17,22
161:24 162:13 170:13 171:17
211:13 236:10,13 238:6
**sir** 8:7 112:21 113:4 117:8
**sit** 189:2 213:5,12
**sits** 204:11
**situation** 12:10 65:15 95:17 211:15
213:2 217:2 218:7
**situations** 70:14
**Six** 17:16 100:24
**Slane** 27:7,9,13 74:15 76:14 77:5
138:2 140:13 144:14 145:3,5,7
146:7,13 148:3,16 149:13 161:9
**Slane's** 149:14
**slip** 36:8,11 37:10 78:11
**slips** 21:8,10 33:4
**sloppy** 12:12
**slow** 172:17
**small** 169:23
**snowstorm** 163:13 166:22
**solely** 21:5 190:8 211:13 212:4
**solicitor** 26:17 188:16
**solicitors** 9:10 11:22 13:5
**somebody** 15:23,24 26:10 28:7,14
50:20 77:22 89:20 98:9 214:19,23
222:22 230:19
**someplace** 206:24
**soon** 115:19 136:7 191:2 197:4
**sorry** 6:22 7:5 11:11 15:25 38:23
48:7 55:20 66:6 69:7 93:15
107:23 164:3 175:25 177:13
178:22 181:9 195:25 207:6,22
215:5 221:25
**sort** 7:7 22:14,16 23:11 24:9 27:14
41:13 42:19 75:5 82:15,15 86:11
145:13 161:13 208:8 213:3,7
**sorting** 68:4 145:14
**sought** 225:9
**source** 23:25
**SOUTHERN** 1:2
**speak** 225:11
**speaking** 28:7 50:12 59:5 133:14
**speaks** 47:11 82:7 206:15
**special** 165:9
**specifically** 7:25 33:4 45:3,6,19
68:20 126:16 154:11 214:20
226:6
**spend** 24:24
**spending** 218:9

**spent** 10:14 207:9
**spoke** 27:13 28:2,15 172:22 173:3
214:21
**spoken** 141:24
**Spot** 60:21,22,25
**Ss** 233:3
**stab** 14:16
**stack** 169:23
**stamp** 78:25 85:18
**stamped** 73:15 100:18 235:21
**stamping** 39:22
**stand** 30:8 199:22
**stands** 146:5
**stapled** 136:24,25 137:10 151:22
174:9
**start** 15:19 80:22
**started** 6:20,23 134:5 194:11
**starting** 152:21
**starts** 67:4 92:25
**state** 2:10 5:7,12 6:7 113:15 233:3
233:7 241:21
**stated** 48:22
**statement** 12:15 26:24 43:2 49:24
54:24 56:2,12,13 57:4 82:11
98:21,24 110:16 138:6,7 190:7,14
227:16 229:3
**statements** 41:5 99:2
**Staten** 167:16
**STATES** 1:2
**stating** 64:8 181:6,24,25 186:8
**status** 31:14 102:19 209:2
**stay** 123:3 217:19 218:12
**stayed** 41:18
**staying** 218:11
**Steven** 1:22 2:9 233:5,25
**Stick** 196:10
**stipulate** 16:18 34:10 41:9 116:3
**stipulated** 4:3 17:12 34:19 35:13
**stipulation** 17:7
**Stop** 130:3
**stopover** 181:20
**stored** 22:2,5,18,21
**storm** 167:5
**strained** 121:11
**street** 2:8 3:5,20 132:20
**string** 39:18 65:19 66:18 137:8
169:18,20 235:2
**struggle** 23:20
**struggling** 67:19 185:12
**stuff** 24:23 66:7 68:20 76:19 77:11
96:18 155:8 182:25 198:12 205:3
208:11
**subject** 21:4 42:2,3 47:3 104:21
117:23 140:15,18 144:14 212:3
212:11,15 226:20
**subpoena** 18:10,20,24 19:2 21:23
193:17 194:11 195:13,16,17,18
234:16
**Subscribed** 232:12 241:18
**subsequent** 59:25 98:4

**subsequently** 151:13
**substance** 77:21
**substantive** 81:14
**substantively** 45:4
**substituting** 115:24
**subtract** 79:7
**subways** 167:5
**suggest** 8:11 63:19 77:25 221:18
**suggesting** 55:20 128:14 205:15,20
**suggestion** 51:11
**suit** 194:11 195:8 200:21,25 206:5
    215:12
**Suite** 3:6,13
**sum** 77:20
**summary** 222:6
**sun** 121:10
**supplied** 26:13
**supplier** 154:22
**suppose** 7:8 138:2 180:17
**supposed** 33:22 64:14 87:14 103:6
    141:11 163:12 218:11 223:2,5
    229:4,5
**supposedly** 44:9
**sure** 6:11 8:18 10:21 11:10 12:25
    15:17 19:12 21:17 23:13,16 24:12
    26:25 30:14 41:4 45:4 50:6,23
    60:25 62:12 72:18 73:25 74:13,17
    74:22 78:5 82:13 104:22 126:7
    135:4 136:8 145:15 146:12 147:9
    150:12 151:25 164:24 166:11
    172:6 179:11 181:3 186:2 188:5
    207:8 210:12,16,20 211:11,19
    212:17 214:20,22,25 229:11
**surprised** 164:6 167:21
**suspect** 32:17 81:13 163:6 184:20
**suspicion** 206:11
**suspicions** 77:3,4
**sworn** 4:8 5:4 232:12 233:10
    241:18
**system** 38:20 81:20
**S.A** 1:3 25:4

---
                    **T**
---
**take** 18:16 19:9 31:3 38:2 44:8
    46:18 59:10 80:6,12 91:3 96:10
    99:23 100:22 107:13 119:12
    125:5 133:17 142:19 165:4
    185:24 190:19 191:18 203:10
    205:15 207:22 210:8 211:9
    212:20 217:3
**taken** 2:6 5:23 6:2 15:18 89:24
    241:8
**talk** 8:16,17 11:8 17:5 23:8 27:25
    78:18 105:12 150:4
**talked** 90:13 104:15 208:23
**talking** 21:18 35:17 52:14 54:12
    75:7 77:13 92:22 95:8,19 96:16
    96:17 99:5,8,22 100:15 106:24
    107:9 120:12 148:20 176:12
    186:20 189:7 208:17 216:24

**talks** 215:20
**tangent** 60:8
**task** 39:24
**tasks** 10:14
**team** 12:3
**technically** 52:6 167:13 210:17
**Tecum** 18:10 234:16
**tedious** 24:8
**telephone** 36:21 56:3 207:11,19,20
    208:18,20 222:18 224:14
**tell** 38:5 48:16 94:19 95:5 118:9
    130:17 182:12 197:22 202:7
    211:7 228:18 230:12
**telling** 32:22 49:14 63:9 86:9 94:18
    107:7 123:7 130:22 131:3,6
    135:25 143:25 144:16 162:20
    198:13 215:14
**tells** 156:14
**ten** 14:5 34:23
**term** 29:10 51:13 90:7 213:9
**terminate** 225:21 227:14
**terms** 7:10 25:5 33:16 42:2 46:2
    56:15 59:7 68:14 73:22 120:21
    131:21 139:19 140:19,20 144:15
    228:7
**testified** 5:4 221:11
**testify** 17:2 45:11
**testimony** 59:23 123:8 198:15
    202:14 233:12
**testing** 16:14 28:6
**Texas** 3:14 219:20
**text** 171:20
**Thank** 64:24 203:18 220:20 223:14
    232:6
**thanks** 83:11 102:22 110:4 140:13
**thereof** 31:15
**theretofore** 208:11
**thing** 20:16 27:24 28:23,24 38:14
    65:3 70:4 86:17 93:23 115:10
    133:22
**things** 21:25 23:19 88:12 132:24
    205:22
**think** 6:6 10:16 16:2 20:7 22:20
    27:3,10 32:19 35:8,9 51:9 53:2
    56:22 59:22,24 60:3,5,6 65:25
    66:5 67:23 69:15 74:24 79:19
    80:6 81:5 92:22 98:20 99:3
    102:10 105:22 106:6 121:11
    123:19 131:12 132:19 136:19,21
    137:2,3,14 142:10 147:4,23 150:8
    151:18,19 152:18,19,20 153:24
    154:4 157:7,16,24 158:24,25
    161:17 168:14,22 170:5,9 175:23
    179:4,5 182:20 186:11 187:13,17
    188:13 189:3,24 192:22 193:8
    197:13 198:11 202:3 207:17
    213:4,16,23,25 215:15 216:4
    217:8 218:4 219:8 228:8
**thinking** 83:13 187:20

**thinks** 32:15
**third** 66:19 80:20,24 120:19 121:14
    179:21
**third-party** 216:18
**Thomas** 192:8
**Thompson** 201:4
**thought** 44:15 50:24 53:24 60:2
    64:15 86:12 87:3 93:3 99:17
    111:3 171:7 173:11 212:8 219:14
    223:5
**thoughts** 84:20
**thousand** 30:15
**threatened** 200:3
**three** 7:8,14 10:17 17:18 18:2 80:17
    101:9 102:11
**three-page** 65:19,22 66:18 100:18
    204:13,16 235:2,20
**throat** 133:5
**time** 4:10 5:22,25 10:10,14 14:7
    21:15 23:24 24:3,24 25:15 29:3
    30:18 32:17 47:14 49:19,21 52:21
    52:25 53:22 55:5,8,12 56:8,8,10
    59:11,18 60:4,16 67:20,20 68:9
    68:14 69:20 70:10,23 71:10,16,18
    73:4 75:21 78:25 79:2,25 84:18
    85:3,6,8,12,15,18 87:2 91:13,21
    95:11 96:16,16,21 99:10,14,24
    101:17,20,25 102:7 104:15,16
    106:20 108:14 110:2 111:22
    113:17,17,25,25 114:2 117:6,9
    124:20 127:2 129:9 134:13,14
    135:3 136:5 138:6 139:24 145:16
    146:4 152:19,21 154:10 163:4,19
    168:17 169:12 172:23 173:4,15
    178:25 182:17 186:22 188:2
    189:16 195:17 197:5,5 198:8
    207:2,9,18,18 209:22,22 211:6
    212:10 213:6 215:4,7,18,20,24
    219:3,22 224:13 226:14 228:13
    232:3,7
**times** 13:8,11 14:13,17 30:16
    101:23 144:21 149:17 196:25
    197:15 198:5,9 205:21
**Tisdale** 3:4 173:18,18 192:8,18
    193:21 194:14 199:7 201:17,22
    202:11,16,18,19,23 207:15 209:2
    214:23 220:4
**Tisdale's** 194:16 198:19 214:17
**title** 105:11
**today** 5:19 17:6 23:20 24:6 69:13
    132:25 203:15 208:12 213:5,12
    226:20
**told** 25:16 71:9 86:7 87:19 91:24
    98:9 108:12 110:10 132:22,23
    140:2 155:3 166:7 177:20 186:8
    207:11 211:22 214:19,23 230:7
**Tom** 27:25 65:2 86:24 87:9 91:24
    96:23,24 102:22 140:23 169:3
    173:15 177:19 179:22 180:11
    187:21 192:22 193:2,9 200:11

208:15 214:22,23 224:8
**Tomo** 87:3
**tomorrow** 83:23 96:9 185:23
**tonight** 30:19 94:11
**top** 28:16 71:14,25 72:12 80:2,23
  81:22 82:10,19,20 102:12 103:23
  109:21 117:2 144:2 145:6 149:20
  162:3,13 174:12 175:15 181:4,11
  185:18 187:9 192:11,13 201:16
  223:20,21 224:18
**tortious** 200:16,21
**total** 136:19 209:6
**totally** 65:14 68:13 97:2
**touch** 187:13
**track** 24:5 35:19
**Trading** 1:6 9:2 27:14
**tragically** 79:21
**trailer** 101:11 135:21
**transaction** 46:13 49:22 82:16
  117:21
**transcript** 119:3 233:19 241:7
**transfer** 31:22 117:14 221:20
**transferee** 31:12
**transferred** 31:11 118:7
**transfers** 115:13
**transit** 107:10
**travel** 165:3
**treat** 175:21
**treated** 174:16
**treating** 156:7
**trial** 4:11
**trick** 106:14
**tricking** 144:20
**tried** 30:24
**trip** 39:2
**trolley** 65:14
**true** 15:17 52:22 54:10 68:4 92:6
  154:20 233:11 241:10
**Truly** 96:8
**trust** 7:9,10,16 9:24 10:20 33:11,17
  33:23,25 34:8 37:20,21 38:7
  40:21 42:2,3,12,22 43:2 44:10,13
  44:14 46:3 47:4 48:18 50:2,15,25
  51:15,16 54:23 55:10 56:6 57:17
  57:24 61:19 62:7,9 63:5 64:17
  77:22 92:3 107:9 115:14,16
  130:5,20 182:5 206:2 210:14,22
  210:24 212:14 213:10 216:15
  227:13 229:5,6
**trustee** 10:19 228:21 229:4,10,12
**trustworthiness** 77:5
**truth** 25:14 198:3
**try** 39:14 51:19 61:19 195:19 220:5
**trying** 23:6 62:20,20 125:23 126:10
  133:3 143:6 167:24 191:2,4
  194:18 195:10
**turf** 34:23
**turn** 198:23
**turned** 163:13
**turns** 86:14

**twice** 25:19
**twisting** 62:19
**two** 23:25 29:6 44:15 78:19,23 80:7
  109:7,12,17 127:18 136:15 161:3
  186:6 187:6,17 192:20 206:18
  216:7,13 219:3 235:14 236:2
**two-minute** 133:18
**two-page** 135:14,19 143:12,16
  236:7,21
**two-way** 132:20
**typed** 21:20
**typical** 212:12,18 213:3

**U**

**ugly** 85:22
**ultimately** 105:2 150:10 151:16
  217:17
**unclear** 90:12
**uncommon** 57:11 70:10,14 156:12
  156:23 159:6
**undefined** 120:2
**understand** 25:6 38:9 40:18 46:17
  48:25 52:4,13 88:16,22 90:25
  97:21 99:21,25 118:14,23 119:21
  122:4 123:4 125:13,23 126:11
  128:5,7,8 129:5 202:3,6 205:10
  206:6,13 223:9 228:5,8
**understanding** 5:11 7:6 8:22 14:24
  15:3 22:12 29:4 32:24 33:15 34:3
  35:10,16 40:23,24 41:2 45:17,24
  46:21,22,23 47:12 48:6,7,8,10,11
  48:13 49:2,5,8,25 50:6,13,19
  54:19 56:11 57:6,8 58:9 59:7,19
  61:4,5,17 62:11 64:8 65:7 70:3
  73:10 92:19 94:15 98:3,4,8
  106:22 121:17 122:8 128:16
  134:15,23 138:8,10 140:23
  141:15 142:5 144:4 145:17 154:7
  155:11 157:11,23 158:3,6,10,12
  158:19 162:24 169:16 172:5
  176:11,16 177:23,25 205:5,14
  211:23 214:4 217:11 219:2
  225:19,22 226:13,18 227:3,4,13
  228:4 241:14
**understandings** 186:12
**understands** 119:22
**understood** 10:25 26:23 27:16
  46:12 47:25 49:21 53:4 59:3,8
  63:12,14 64:6 90:23 95:16,18
  97:24 99:4 107:3 135:2 141:7
  142:11 149:25 154:14 192:21
  194:15 229:3
**undertake** 34:9 98:7 199:3 218:21
**undertook** 34:5,6 47:20
**unduly** 20:9
**unedited** 24:15
**unequivocally** 38:6
**unfamiliar** 34:23
**Unfortunately** 24:7
**Unger** 150:23

**unilaterally** 146:14 199:6
**UNITED** 1:2
**University** 6:17
**unmodified** 24:15
**unrelated** 75:5
**unusual** 70:18 216:12
**upside** 15:25
**urgent** 79:21 81:18 94:7
**use** 87:7
**uses** 67:25 68:2
**usual** 79:22,23
**usually** 211:8
**U-N-G-E-R** 150:24
**U.S** 66:23 77:12 150:24 154:2
  160:6 206:24 207:4,7

**V**

**vague** 20:9
**variations** 147:8
**various** 10:14 25:17 115:24 185:8
**Verizon** 163:9 165:9 166:3,5
**version** 21:20 94:12 154:18 231:6
**versions** 22:9
**versus** 15:23,24 16:2
**vessel** 29:2 30:6,6 47:20
**vessels** 29:6 70:8,11
**view** 23:7 60:12 141:19 218:14
  221:22
**Violin** 177:4,24 191:14
**vis-a-vis** 29:15,16
**volition** 196:13
**voluntarily** 18:24,25 193:14
**vs** 241:4

**W**

**wait** 15:16 38:22 60:14
**waiting** 36:19 95:19
**waive** 20:23
**waived** 4:7
**waiving** 19:19
**want** 7:17 22:10,24 24:6 33:24
  34:14 35:5 36:23 37:5 38:22 41:9
  48:19 51:14 54:14 58:9 63:20
  71:10 83:17,20,23 91:11 96:2
  97:5 103:21 110:22 111:17
  112:22 113:9,23 119:12 127:13
  128:6,7,21 134:4 175:6,15 176:10
  188:24 214:11 215:16 217:17,24
  224:5
**wanted** 21:17 47:25 53:10,12 72:18
  77:6 88:12,17,22 89:8,12,23 90:8
  91:4 95:9 104:8,9 111:4 114:3
  145:14 151:25 172:13 183:2
  196:25 202:7,8,12,18 223:11
  226:10 227:24 228:15,16,19
  229:2,17,20,22 230:20
**wanting** 143:7
**wants** 77:22 90:25 103:21 168:22
  212:19
**Washington** 6:17

**wasn't** 6:5 41:20 47:17 48:24 50:18
   63:2 82:13 89:2 91:25 93:6 99:7
   104:5,10 106:14 141:12,14
   154:21 157:7 164:20 168:16
   173:21,22 176:18 186:14 188:4
   206:25 219:9 228:2,4,5 230:23
**wasting** 117:5,8
**way** 39:20 42:16 46:12 51:8 55:2
   68:4 70:21 73:17 74:23 75:16
   93:16 94:23 97:8 107:11 121:24
   123:21 127:8 142:12,13 167:16
   199:7 208:3 213:3 218:21 233:15
**web** 78:3
**Wednesday** 85:5,7,10,15
**week** 83:18 163:12
**weeks** 216:8
**weird** 96:24 216:23
**welcome** 203:19
**went** 23:22 39:14 61:8,11 71:13
   72:20 81:13 108:14,16 148:4
   193:24 194:4 209:15 228:14
**weren't** 99:15 139:4 146:16 167:5
   177:9 182:16
**whatsoever** 229:12
**wheels** 65:13
**whereof** 233:22
**wife** 83:17
**wife's** 165:17
**willing** 71:6 219:9
**Winterstorm** 13:16,25
**Winton** 3:17 5:6 15:5,11 16:20 18:4
   18:8,12 19:3,6,8 23:5,10 24:19
   31:6,7 32:7,12 34:20,24 35:8,15
   36:24 37:4,8,14 38:9,12 39:4,6
   40:7,9,14 41:8,20,22 51:17 54:16
   54:18 55:22,24 57:25 58:3,10
   59:15 60:5,14,18 61:9,23 62:2,22
   64:3 65:7,17,21 66:9,16 69:6
   71:24 74:3,6 76:7,11 78:22 80:8
   80:11 83:22 84:4 89:4,6 91:7,9
   92:15 96:5,7,13 100:14,17,21
   101:2,4 105:17,21 108:8,24 109:6
   109:11 110:24 111:5 113:7,13,22
   114:22 116:6,15 117:3,7,13 119:8
   119:19 127:11 128:9,20 129:2,17
   129:19 130:2,14,16 132:4,10
   133:3,7,11,19,21 134:2,8,12
   135:13,17 136:9,13 137:2,4
   138:16,21 139:10,14 142:14,16
   143:3,5,11,15 145:4,20,23 146:22
   147:2 148:5,8,10 150:14,17
   152:24 153:4 159:17,21,23
   160:17,21 162:7,11 163:23 164:2
   164:4 167:9,25 168:6 170:12,17
   170:23 171:2,4,8,12,14 173:24
   174:4,20,23 175:7,11 176:22
   177:2 178:9,13,18,23 179:12,16
   183:5,10,14,18,22,24 184:23
   185:3 188:18 191:8,11,21 192:2
   195:12 196:2,4,19 197:2 199:12

199:15 200:5,8 201:6,10 203:2,6
   203:20 204:12 217:21 218:2
   220:12,16 223:15 226:21,24
   227:9 229:25 230:3 232:2 234:6
   234:19
**wire** 36:16 87:14 115:13,18 117:14
   118:2,6 221:19 230:21
**wired** 36:10 91:13 94:9,17,25 99:9
   107:24 113:16,25 141:17 223:23
**wiring** 102:20 103:7 105:9 115:15
   117:21
**wish** 20:20,23
**withdraw** 123:2 134:8
**withhold** 19:25
**witness** 5:2 32:10 34:12 35:3,14
   38:3,11 40:5 51:4,14,19 58:8 59:6
   60:20 62:15 63:24 65:6 92:13
   100:8,15 108:3,20 109:2 111:2
   116:13 117:5 119:6 126:14
   127:24 128:5,13,19 129:24
   130:12 131:25 132:17,22 133:6,9
   133:14,23 134:5,11 145:2 167:4
   195:7 196:18,23 199:10 217:23
   219:21 226:22 232:6 233:9,12,22
   234:4
**witnesses** 15:17 30:15,20 35:4
**Wolfson** 1:1,11 2:1,5 3:1,23 4:1 5:1
   5:2,9,10 6:1 7:1 8:1 9:1 10:1 11:1
   12:1 13:1 14:1 15:1,12 16:1 17:1
   18:1,13 19:1,5 20:1 21:1 22:1
   23:1 24:1 25:1 26:1 27:1 28:1
   29:1 30:1 31:1 32:1 33:1 34:1
   35:1 36:1 37:1 38:1 39:1 40:1,16
   41:1 42:1 43:1 44:1 45:1 46:1
   47:1 48:1 49:1 50:1 51:1 52:1
   53:1 54:1 55:1 56:1 57:1 58:1
   59:1 60:1 61:1 62:1 63:1 64:1
   65:1 66:1 67:1 68:1 69:1 70:1
   71:1 72:1 73:1 74:1 75:1 76:1
   77:1 78:1 79:1 80:1 81:1 82:1
   83:1 84:1 85:1 86:1 87:1 88:1
   89:1 90:1 91:1 92:1 93:1 94:1
   95:1 96:1 97:1 98:1 99:1 100:1
   101:1 102:1 103:1 104:1 105:1
   106:1 107:1 108:1 109:1 110:1
   111:1 112:1 113:1 114:1 115:1
   116:1,17 117:1 118:1 119:1 120:1
   121:1 122:1 123:1 124:1 125:1,3
   126:1 127:1,20 128:1 129:1 130:1
   131:1 132:1 133:1,13 134:1 135:1
   136:1 137:1,5 138:1 139:1 140:1
   141:1 142:1 143:1,7 144:1 145:1
   146:1 147:1 148:1 149:1 150:1
   151:1 152:1 153:1 154:1 155:1,25
   156:1 157:1 158:1 159:1 160:1
   161:1 162:1 163:1 164:1 165:1
   166:1 167:1 168:1 169:1 170:1,14
   171:1 172:1 173:1 174:1 175:1
   176:1 177:1 178:1 179:1 180:1
   181:1 182:1 183:1 184:1 185:1

186:1 187:1 188:1 189:1 190:1
   191:1 192:1 193:1 194:1 195:1
   196:1 197:1 198:1,2 199:1,20
   200:1 201:1 202:1 203:1 204:1
   205:1 206:1 207:1 208:1 209:1
   210:1 211:1 212:1 213:1 214:1
   215:1 216:1 217:1 218:1 219:1,25
   220:1 221:1 222:1 223:1 224:1
   225:1 226:1 227:1 228:1 229:1
   230:1 231:1 232:1,11 233:1,8
   234:1,5,18 235:1 236:1 237:1
   238:1,8 239:1 240:1 241:1,17
   242:1,25 243:1,25
**wonder** 144:9
**wonderful** 67:5
**wondering** 75:13
**word** 87:8 105:6 165:12 206:14
   228:9
**worded** 86:11
**wording** 105:2
**words** 22:6 93:13 97:8,10 99:13,15
   99:16 111:24 112:4,6,7,8,9,24
   113:19 114:9 116:8 124:24
   126:21 131:17 157:3 176:14
**work** 10:11 11:12,14 13:19,20 14:2
   132:6 150:13 160:13 165:11
   188:2 197:25 229:6
**worked** 12:6 14:13 96:22 165:17
   217:16
**working** 12:2,8 14:10 17:10 61:11
   121:21 151:3 157:4 164:21 166:6
   168:17 211:16
**world** 9:11 165:10 212:25
**worst** 15:17
**worth** 126:9
**wouldn't** 43:9 71:12 85:14 97:20
   119:24 156:17 157:17 159:10
   160:7 165:20 212:12
**write** 216:4 218:15,17,18 223:9
**writing** 91:12 95:8 100:10 111:13
   111:14,15,18,21 112:15,17,23
   113:2,24 114:4 122:20,22 148:17
   222:10 224:15
**writings** 31:9
**written** 8:6,8 65:9 92:7 108:4,5
   115:17 124:13 228:9
**wrong** 8:11 56:24 58:21 83:5 98:2
   133:16 134:20 199:21
**wrote** 21:21 49:16 52:18,23 77:19
   88:19 90:21 113:2 173:14,15,16
   178:5 186:13 187:19,20 220:14

---

|  |  | **X** |  |  |

**x** 1:3,9
**XYZ** 36:17

---

|  |  | **Y** |  |  |

**Yeah** 219:6,19
**years** 7:4 9:8 20:4,13 164:13
   205:23

**Year's** 179:5 191:7
**yesterday** 79:22
**York** 1:2,12,12 2:8,8,11 3:7,7,22,22
    5:13 6:13 11:18 13:2,12 14:21
    67:20 69:10 71:16 73:3 77:8
    79:25 85:2,5,8,12 86:9 101:17,20
    110:2 136:5 166:23 182:11
    200:15 207:14 208:7 233:3,4,7
**Yuri** 26:11

---
#### Z
---

**zone** 101:20

---
#### $
---

**$5** 166:8
**$500,000** 31:11,14 33:19 36:9,10
    40:11,20 50:21 51:25 84:19 87:6
    89:21,24 115:13,18 128:23
    141:17 172:14 175:21 194:19
    226:20 230:10,21 234:23

---
#### 0
---

**0014(VM)** 1:5
**0026** 222:3
**0027** 100:25
**0032** 100:25
**0033** 220:25
**023** 187:10
**027** 100:19 101:3 235:21
**028** 100:19 101:3 235:21
**029** 100:19 101:3 235:22
**05** 92:18

---
#### 1
---

**1** 10:12 15:6,9,13,22 65:12 66:3
    67:9 68:7,22 71:4,15 76:9,13
    78:20,24 84:14 85:11 97:16
    108:10 134:14 137:11,11 234:12
    235:12,15
**1st** 96:17 107:15 153:15
**1:01** 180:9
**1:23** 68:25
**1:45** 70:22
**1:52** 232:7
**10** 78:18,20 81:6 204:22 235:14
**10th** 3:21
**100** 6:3 235:20
**1000** 3:12
**10005** 3:22
**10165** 3:7
**105** 235:24
**107** 160:19,23 237:19
**109** 162:9,12 236:2 237:22
**11** 1:5 80:4,8,10,13 81:22 82:19
    113:8 187:8,9 220:11 221:25
    222:2 223:22 224:21 235:17
**117** 168:4 170:25 238:4
**118** 171:4
**119** 174:10
**12** 31:4 79:7 85:19 100:17,19,23

    101:5 220:8,11 221:25 235:20
**12/15** 152:21
**12:08** 76:8,13 235:12
**12:34** 79:4
**12:38** 136:4
**12:45** 79:25
**120** 174:12
**122** 174:2,7,8 238:12
**123** 174:5
**124** 175:16
**127** 175:9,13 238:18
**13** 16:21 105:18,19,23 235:24
**13:23** 68:24,25
**130** 176:24 177:3 238:21
**135** 178:15 236:7
**136** 178:14,17 236:10
**138** 178:11,15,19 236:13 238:24
**139** 236:18
**14** 101:25 109:6,9,12 112:5 152:3
    154:8 164:13 220:17,19 224:17
    224:17 225:13,14 236:2
**14th** 152:15
**140** 180:11 181:5,12
**141** 179:21
**143** 236:21
**145** 179:14,17 236:24 239:3
**146** 237:3
**148** 237:5
**149** 183:8 184:14 239:6
**15** 78:14 134:14 135:13,15,18,18
    206:20 234:12 236:7
**15th** 151:13
**150** 237:8
**152** 237:11
**153** 183:12 184:15 239:9
**156** 183:16 184:16 239:12
**157** 184:17
**159** 237:14
**16** 136:9,11,14,17,21 137:18
    236:10
**160** 237:18
**162** 237:21
**163** 183:20 184:17 239:15
**1638** 3:6
**16789** 85:2
**168** 237:24
**169** 184:25 185:5 239:18
**17** 138:16,19,22 236:13
**17th** 166:2,2 233:23
**17:34** 79:6
**170** 238:6
**173** 238:11
**174** 238:14
**175** 238:17
**176** 238:20
**178** 238:23
**179** 239:2
**18** 139:10,12,15 144:12 145:11,12
    234:14,16 236:18
**18th** 197:7

**181** 192:13
**183** 239:5,8,11,14
**184** 239:17
**19** 143:11,13 144:2 145:6,10
    234:18 236:21
**190** 191:23 192:3 239:24
**191** 239:20,23
**1977** 6:19
**1996** 6:21,24
**1997** 6:14 7:2

---
#### 2
---

**2** 10:13,19,21 18:5,6,14 33:16
    37:20,22 40:22 65:12 66:4 81:10
    109:8,14 112:5 114:24 134:20
    148:12 155:19 182:5 186:7 215:3
    220:22 225:14 234:14 236:3
**2nd** 96:17 110:2 138:23 157:17
    207:23
**2,000** 160:15
**2.9** 209:6
**2:56** 84:25
**20** 7:3 14:17 145:20,22,24 147:5
    236:24
**20:01** 85:11,19
**200** 240:2
**2000** 3:13
**2009** 16:21,22
**201** 240:5
**2010** 31:15 33:16 40:22 67:10
    68:23 138:24 161:7 169:2
**2011** 1:13 2:2 232:13 233:24
    241:18
**203** 240:8
**205** 201:8,12 240:6
**206** 204:21
**208** 203:4 204:17 240:9
**209** 203:7,22
**21** 146:22,24 147:3 237:3
**219** 234:7
**22** 107:6 148:5,7,11 237:5
**227** 234:6
**23** 56:8 150:14,16,18 152:16 161:6
    162:25 163:20 169:2 172:19
    173:9 179:24 181:2 237:8
**23rd** 96:18 163:22,24 169:12 170:7
**24** 152:17,24 153:2,5 237:11
**24th** 164:11
**25** 159:17,19,25 237:14
**26** 160:17,19,22 237:18
**26th** 166:25
**27** 162:7,9,12 179:23 237:21
**28** 167:25 168:5,8 170:23 237:24
**28th** 180:3
**29** 168:18 170:12,15,19,21 171:3,4
    171:15,17,24 179:2 182:9 185:13
    185:19 238:6
**29th** 96:18 163:25 169:13 173:19
    180:6,9 181:17 184:12

**3**

**3** 18:9,11,15 31:5,15 66:3,4,4,4
  81:22 82:19 208:25 215:6,20
  234:16
**3:00** 85:12
**3:01** 85:12,19 97:18 98:22
**3:18** 163:21 164:5
**3:33** 92:16
**3:41** 94:2 97:16 98:24
**30** 170:18 171:6,10 173:24 174:2,5
  175:20 192:17 193:22 194:15
  198:18 207:10,25 208:2,4 238:11
**30th** 179:6 185:23 199:7
**30(e)** 233:20
**31** 174:20,22,24 238:14
**319710** 1:23 241:3
**32** 175:7,9,12 238:17
**33** 176:22,24 177:3 238:20
**34** 109:17 178:9,11,14 238:23
**35** 179:12,14,17 239:2
**36** 183:6,8 184:2,14 239:5
**37** 183:10,12 184:2,15 239:8
**38** 183:14,16 184:3,16 239:11
**39** 183:18,20 184:3,17 239:14

**4**

**4** 19:4,6,11 234:18
**4th** 195:3
**4.2** 208:5
**4:17** 101:17 102:15
**40** 184:23,25 185:4 187:23 234:21
  239:17
**41** 191:8,10,12 239:20
**42** 191:21,23 192:3,14 239:23
**42nd** 3:5
**43** 200:5,7,9 240:2
**44** 201:6,8,11 240:5
**45** 203:2,4,7,21 204:13,16 215:8,19
  240:8

**5**

**5** 40:9,12,17 69:2,8,9 85:19 234:5,6
  234:21
**5:34** 78:25 79:7
**5:47** 106:4
**50** 14:6
**500,000** 87:14 124:13 136:2 169:8
  213:9
**52** 139:12,16 236:19
**59** 143:13,17 236:22

**6**

**6** 1:13 2:2 65:18,20,22 66:10,18
  69:5,10,11 235:2
**6:43** 185:14
**60** 3:5
**63** 145:22,25 236:25
**65** 235:2
**66** 235:5
**69** 148:6,8 237:6

**7**

**7** 66:12,14 72:21 150:21 152:22
  235:5
**7th** 152:12
**7:32** 182:10
**7:37** 185:20
**70** 148:6,8 237:6
**72** 150:15,19 237:9
**73** 150:16,19 237:9
**74** 235:9
**76** 2:7 3:20 152:25 153:5 235:11
  237:12
**77** 7:4 153:2,5 237:12
**77002-5009** 3:14
**78** 153:2,5 235:14 237:12

**8**

**8** 74:3,5,8 85:19 235:9
**8:00** 85:14,17 104:5
**8:23** 69:2
**8:45** 70:25 71:4
**80** 235:17
**86** 159:19 160:2 237:16

**9**

**9** 76:7,9 78:16 235:11
**9:30** 2:3
**9:42** 68:8
**9:42:52** 67:9
**9:44** 73:3
**9:48** 68:7 71:16
**9:49** 109:25