UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MILESTONE SHIPPING S.A.,

Plaintiff,

-against-

ESTECH TRADING LLC and AMERICAN
ENERGY SERVICES, INC. ,

Defendant.

CASE NO.  11 CIV 0014 (VM)

IN ADMIRALTY

MEMORANDUM OF LAW IN SUPPORT OF AMERICAN ENERGY SERVICES, INC.'S
MOTION FOR SUMMARY JUDGMENT; DECLARATIONS OF THOMAS E. MOLONEY
AND JAMES C. WINTON

TABLE OF CONTENTS

I.      SUMMARY OF ARGUMENT………………………………………………1

II.     STATEMENT OF FACTS……………………………………………………2

        A.      People and Entities…………………………………………………2

        B.      Factual Background……………………………………………… 4

III.    SUMMARY JUDGMENT STANDARD……………………………….…...…12

IV.     THE UNAMBIGUOUS TERMS OF THE TRUST LETTER
        CONTROL THE DISPOSITION OF AES'S
        FUNDS………………………………………….................................................12

        A.      The Unambiguous Terms of the Trust Letter Control
                Disposition of AES's Money ………………………………………………...13

        B.      The Trust Letter Unambiguously Made Movement of the $500,000
                from Trust to Escrow Conditioned on Direction Issued by AES ........................16

        C.      The Promissory Note In No Way Changes This Result........................................20

V.      MILESTONE CANNOT ESTABLISH ITS JOINT LIABILITY THEORIES .............21

        A.      Estech and AES are both Ohio Corporations and, therefore, Issues
                of Joint Liability are Governed by Ohio Law .......................................................21

        B.      There is No Evidence to Support Milestone's Joint Liability Allegations ..........22

VI.     MILESTONE HAS NO CLAIM FOR FRAUD,
        MISREPRESENTATION, DETRIMENTAL RELIANCE OR CONSPIRACY ............23

VII.    CONCLUSION ………………………………………….....................................25

TABLE OF AUTHORITIES

**FEDERAL CASES**

*America Home Assur. Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313 (2d Cir. 2006)................................................................................................15

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) .........12

*Dickerson v. Napolitano*, 604 F.3d 732 (2d Cir. 2010) ....................................................12

*Lovos v. Ocean Fresh Sea Clam, LTD.*, 2010 U.S. Dist. LEXIS 140695 (E.D.N.Y. Dec. 21, 2010)..............................................................................................12

*Opals on Ice Lingerie, Designs by Bernadette, Inc. v. Bodylines Inc.*, 320 F.3d 362 (2d Cir. N.Y. 2003)...........................................................................12

*Response Person, Inc. v. Hartford Fire Insurance Co.*, 2011 U.S. Dist. LEXIS 71293 (S.D.N.Y. June 29, 2011)................................................................12

*Skippers & Maritime Services v. KfW*, No. 06 CV 07041, 2008 U.S. Dist. LEXIS 104821 (S.D.N.Y. Dec. 12, 2008)................................................................15

*Tex. Liquids Holdings, LLC v. Key Bank National Association*, No. 05 CV 5070, 2007 U.S. Dist. LEXIS 23002 (S.D.N.Y. Mar. 27, 2007) ..........................................21

*United States v. Lexington Mil & Elevator Co.*, 232 U.S. 399, 34 S. Ct. 337 (1913)...............................................................................................................19

**STATE CASES**

*Anita Babikian, Inc. v. TMA Realty, LLC*, 912 N.Y.S.2d 598 (N.Y. App. Div. 2010) ...............................................................................................................14

*Center v. Hampton Affiliates, Inc.*, 488 N.E.2d 828 (N.Y. 1985)....................................24

*Matter of Chase Manhattan Bank*, 846 N.E.2d 806 (N.Y. 2006) ....................................14

*Coutu v. Exchange Insurance Co.*, 579 N.Y.S.2d 751 (N.Y. App. Div. 3d Dep't 1992) ...............................................................................................................18

*Diamond v. Oreamuno*, 24 N.Y.2d 494, 248 N.E.2d 910, 301 N.Y.S.2d 78 (N.Y. 1969)................................................................................................................21

*In re Estate of Wallens*, 877 N.E.2d 960 (N.Y. 2007) .......................................................14

*Greenfield v.  Philles Records*, 780 N.E.2d 166 (N.Y. 2002)............................................15

*Kahle v. Turner*, 66 Ohio App. 2d 49, 420 N.E.2d 127 (Ohio App., 1979) ....................23

*Maletta v. Boczkowski*, 461 N.Y.S.2d 42 (N.Y. App. Div. 1983) ....................................14

*Mercury Bay Boating Club v. San Diego Yacht Club*, 557 N.E.2d 87 (N.Y. 1990).........14

*Mount Vernon Fire Insurance Co. v. Creative Housing*, 668 N.E.2d 404 (N.Y. 1996) ............................................................................................................................15

*National City Bank v. de Laville*, 867 N.E.2d 416 (Ohio Ct. App. 2006) ........................15

*Outrigger Construction Co. v. Bank Leumi Trust Co.*, 240 A.D.2d 382, 658 N.Y.S.2d 394 (2d Dep't 1993) ...................................................................................23

*Pack v. Osborn*, 881 N.E.2d 237 (Ohio 2008)..................................................................15

*Sankel v. Spector*, 819 N.Y.S.2d 520 (N.Y. App. Div. 2006)...........................................14

*Vigilant Insurance Co. v. Bear Stearns Cos., Inc.*, 884 N.E.2d 1044 (N.Y. 2008) ...........18

*W.W.W. Associates, Inc. v. Giancontieri*, 566 N.E.2d 639 (N.Y. 1990)...........................15

*Welcome Realty v Arnold*, 891 N.Y.S.2d 857 (N.Y. App. 2009) ......................................18

*Westfield Insurance Co. v. Galatis*, 797 N.E.2d 1256 (Ohio 2003) ..................................15

*Wolfer v. National City Bank of N.Y.*, 68 N.Y.S.2d 212 (N.Y. Sup. Ct. 1947).................15

*Zion v. Kurtz*, 50 N.Y.2d 92, 405 N.E.2d 681, 428 N.Y.S.2d 199 (N.Y. 1980)...............21

## FEDERAL STATUTES

Fed. R. Civ. P. 9(b) ...........................................................................................................23

Fed. R. Civ. P. 56(a) .........................................................................................................12

Fed. R. Civ. P. 56(c) .........................................................................................................12

I.      SUMMARY OF ARGUMENT

At issue between Plaintiff Milestone Shipping S.A. ("Milestone") and Defendant American Energy Services, Inc. ("AES") is whether the $500,000 transferred in trust by AES to Mahoney & Keane, LLP ("M&K") under the express terms of a letter agreement dated December 2, 2010 from M&K to AES (the "Trust Letter") ever moved from that trust to an escrow entered between Milestone, Defendant Estech Trading LLC ("Estech") and M&K. The $500,000 was AES's money and AES had a clear and unilateral legal right to impose on that trust the terms and conditions under which AES was willing to place its money in M&K's hands as trustee. The Trust Letter unequivocally states that AES is entitled to have its money promptly returned to it upon written request by AES to M&K.

While the Trust Letter contemplated that AES "may direct" that the money be held by M&K under the escrow, no such direction from AES was ever requested by any party or ever given by AES. If such direction had been requested, AES would not have given it unless Estech had first provided to AES the two conditions precedent for the loan sought by Estech, acceptable documentation of the underlying shipping transaction and acceptable collateral to secure that loan. Neither of these conditions was ever satisfied and therefore the $500,000 was never released to Estech or for its benefit. Milestone was aware of these conditions but Milestone never did anything to request or confirm transfer of the money from trust to escrow or communicated with AES in any way whatsoever. Milestone is solely responsible for the dilemma in which it finds itself.

Furthermore, there is no merit for Milestone's alleged joint liability theories.

AES is entitled summary judgment herein and to the return of its money.

1

## II.   STATEMENT OF FACTS

### A.   People and Entities

Milestone, apparently a Panamanian corporation,[1] (Dkt. 30, at ¶ 2) operates through Chaika Agency Co. of Odessa, Ukraine and Chaika's agent Yuriy Voevudsky.  (Slane 36:2 – 5; 123:24 – 129:21; Exhs. 18, 20, 21, 24, 33, 41, 49, 51 & 65)  Milestone was also represented in its transaction with Estech by its London solicitor, Mark Seward, of MFB Co. (Slane 46:2 – 9) and in part by its New York attorney, Garth Wolfson, of M&K.  (Wolfson 7:6 – 11:5)[2]

Defendant Estech Trading LLC ("Estech") is an Ohio limited liability company.  (Dkt. 30, at ¶ 3)  Estech was formed in 2010 by Daniel M. Slane ("Slane") and Jan Michalek ("Michalek").  (Michalek at 15:11 – 16:15; Slane at 27:17 - 31:19)  Mr. Michalek is the sole member of Estech which has no other officers, directors or employees.  (15:17 – 22; Slane *Id.*)

Prior to December 2010, As relevant herein, Estech negotiated and entered contracts to purchase iron ore from Grupo Martinez Hipolito S.A. de C.V. ("Hipolito") in Mexico and to resell that ore to Tianjin Materials and Equipments (Group) Corporation, Tianjin, People's Republic of China ("Tianjin") (Exh. 8).  Mr. Michalek principally handled the negotiations for the contracts to purchase the ore and to resell the iron ore.  (Michalek 26:20 – 28:1; Slane 44:21 – 45:20)

Mr. Slane is the co-owner of The Slane Company, a Columbus, Ohio based company that engages in various business ventures and is a personal friend of the president of AES.  (Slane 13:11 – 14:16, 34:6 – 37:9, 47:10 – 48:5, & 91:20 – 92:5)[3]

---

[1] Milestone's real persona is discussed in greater detail in AES's Motion to Dismiss (Dkt. 35 & 36).

[2] Depositions will be cited as, *e.g.*, Wolfson page:line – page:line.

[3]  Mr. Slane is a well-known businessman in Ohio and was formerly Chair of the Board of Trustees of The Ohio State University.  Mr. Slane had previously been a case agent for the Central Intelligence Agency, later was employed in the White House, and is currently Vice Chairman of the US-China Economic and Security Review Commission, a congressional appointment.  He also serves in a number of positions to which he was appointed by

2

Estech, Mr. Michalek, Mr. Slane and The Slane Company are each totally independent of AES.   None of them has ever had any ownership, management, control or other interest whatsoever in either AES or any of AES's affiliates and none of them has ever shared any offices, telephone numbers or other facilities whatsoever with AES or any of its affiliates. (Michalek 118:7 – 123:3; Slane 90:4 – 19, 153:18 – 161:1; Moloney 15:1 – 6, 105:7 – 106:1) Nor has Estech, Mr. Michalek or Mr. Slane, ever acted as agent of AES or any of its affiliates, conducted business using the alias or d/b/a of AES or any of its affiliates, managed AES or any of its affiliates, conducted any business through AES or any of AES's affiliates, and none of them engaged in a joint venture with AES or any of AES's affiliates with regard to the alleged Charter Party, Escrow Agreement, cargo at issue or with regard to any other business.  (Michalek 120:1 – 123:1; Slane 119:6 – 122:14, 155:12 – 161:1; Moloney 18:17 – 24; 32:4 – 10; 19:12 – 20:1, 105:7 – 106:1; Moloney Decl. ¶ 5)

AES, an Ohio corporation in continuous existence since its formation in 1976, has had its sole office and place of business in Columbus, Ohio throughout its existence.  AES has a single shareholder, Francine I. Jacobs.  Its President is Gerald S. Jacobs and its General Counsel and Secretary is Thomas Moloney.  It has only one other officer or employee, Denise Amspoker. (Moloney 8:23 – 10:10, 15:1 - 6)  AES's principal business is oil and gas investments in Ohio, Pennsylvania, West Virginia and Kentucky but it also from time to time makes loans to businesses which present opportunities for profit.   (Moloney 10:11 – 11:15; Moloney Declaration ("Moloney Decl.") at ¶ 2)

AES has never had any ownership, management, control or other interest whatsoever in Estech or any parent, subsidiary or affiliate of Estech and has never shared any office, telephone

---

the Governor of Ohio.  (Slane 97:9 – 107:17)  Before the collapse in the real estate market, Mr. Slane's enterprises had a net worth of about $100,000,000.  (*Id.* 115:15 – 117:6)

number or other facility whatsoever with any of them.  AES has never acted as agent of Estech or any of its parents, subsidiaries or affiliates, has never conducted business using the alias or d/b/a of Estech or any of its affiliates, has never managed Estech or any of its affiliates, and does not conduct any business through Estech or any of its affiliates.  (Michaelk 118:7 – 123:3; Slane 153:18 – 161:1; Moloney 105:7 – 106:1)

Mahoney & Keane is a law firm located in New York, New York.  Garth Wolfson is an attorney admitted to practice law in New York and a partner in that firm.  (Wolfson 5:10 – 7:2) M&K had three different roles herein:  (1) trustee under the Trust Letter with AES under which M&K holds $500,000 of AES's money in trust; (2) proposed escrow agent and intermediary under the Escrow Agreement entered between Milestone, Estech and M&K, which is attached to Plaintiff's Verified Amended Complaint (Dkt. 30, Exh. 2); and (3) counsel to Milestone regarding a partial assignment of a letter of credit to be used to secure various aspects of the proposed transaction herein.  (Wolfson 7:6 – 11:3; Exh. 45)   M&K previously represented Milestone in litigation.  (Wolfson 14:24 – 16:19; Exh. 1)

### B.   Factual Background

During late November and early December 2010, Estech and Milestone were engaged in hurried negotiations to conclude a charter party for a vessel to carry iron ore from Manzanillo, Mexico to Tianjin, China.  (Wolfson 65:19 – 69:21 & Exhs. 6 – 14; Michalek 17:17 – 21:2; Slane 32:11 – 34:5, 39:7 – 40:7, 122:15 – 123:13)   As part of the negotiations, Milestone demanded that Estech assign to it $2,502,500 of the $10,430,000 Letter of Credit issued on behalf of Tianjin for purchase of iron ore.  The partial assignment was to cover bills of lading issued by the vessel which were to be marked "Freight Prepaid."[4]   (Slane 43:17 – 46:22;

---

[4] The freight due under the charter party alleged herein was $32.50 per metric ton of iron ore with the ship to load

4

Michalek 23:22 – 28:1; & Exhs. 8 & 9)  Estech agreed and a partial assignment in that amount was made.  (Michalek 25:8 – 26:1; Exh. 9)

Shortly before December 1, 2010, Milestone also demanded that Estech fund an escrow account to cover its loss of freight in the event the cargo was not loaded.  Milestone initially sought an escrow in the amount of $1,000,000 but Mr. Slane negotiated that amount down to $500,000.  (Slane 41:4 - 14; Dkt. 30, Page 12, ¶¶ 12 & 13; Exh. 8)

An Escrow Agreement was negotiated between Chaika Agency and Mark Seward on behalf of Milestone and Estech.  (Slane 34:6 – 36:5, 146:7 – 148:19; Exh. 72)  Garth Wolfson handled transmission of various drafts between Estech and Milestone but testified that he was not involved in the drafting or negotiation of the documents.  (Wolfson 66:17 – 74:2, 135:14 – 148:4; Exhs. 7, 16, 17,18, 19 & 45)  The final version of the Escrow Agreement, agreed to late in the day on December 2, 2010, provided that Estech was to transfer $500,000 which would constitute an "Escrow Account" to M&K as Escrow Agent.  (Exh. 19; Dkt. 30, Page 28).

On November 19, 2010, Mr. Slane approached Mr. Jacobs to request a loan from AES on behalf of Estech.  Mr. Slane informed AES that in order for Estech to enter the contract with Tianjin, Estech was required to post a performance bond in the amount of 10% of the contract price.  Mr. Slane requested that AES loan Estech $150,000 for such purpose.  AES agreed to make the loan at that time to Estech.  Mr. Michalek was out of the country at that point and unavailable to execute documents regarding the loan.  On December 6, 2010, Mr. Michalek executed a demand Promissory Note on behalf of Estech, effective as of November 19, 2010.[5]

---

between $63,000 and $77,000 metric tons at the ship's option.  At 77,000 metric tons, the freight was $2,502,500. (Slane 151:24 – 152:13; Dkt. 30, Page 12)

[5] The Promissory Note was in the amount of $344,190.  Of this, only $150,000 was AES's money, the remainder coming from other sources available to Mr. Slane.  Mr. Slane represented that the iron ore deal was "all set" and that the $150,000 would be repaid immediately by him.  Thus, AES did not feel the need for collateral.  (Moloney Decl.¶ 8)

(Michalek 53:10 – 55:12; Moloney Decl. ¶ 8; and Exh. 52)

During the afternoon of December 1, 2010, shortly before 3 p.m., Mr. Slane again went to the office of AES and asked to borrow $500,000 needed to fund an escrow account being demanded by the owners of a vessel that Mr. Slane was attempting to hire to carry the iron ore from Mexico to China.  He met with Mr. Jacobs and AES's General Counsel, Tom Moloney, to request the loan.  Mr. Slane showed Mr. Moloney an escrow agreement that contained shipping acronyms that were "pure gibberish" to Mr. Moloney.  Messrs. Jacobs and Moloney responded that while AES was willing to loan the money, they were not willing to do so without additional supporting details and collateral.[6]  Mr. Slane indicated that the only asset available to Estech to secure the loan was the Letter of Credit ("LOC") posted by Tianjin with U.S. Bank NA for Estech's benefit in the amount of the  purchase price of the iron ore but that the LOC had already been partially assigned to the seller of the iron ore in Mexico and the vessel was demanding a further partial assignment in the full amount of the freight due under the charter party.  AES suggested that Estech could reduce the amount of the assignment of the LOC to the vessel by $500,000 and instead assign that $500,000 to AES to secure AES's position if it loaned the money to Estech.  Mr. Slane advised that the last time Estech had been required to make a partial assignment of the LOC, it had taken weeks.  Mr. Slane stepped aside and made a phone call to which AES was not privy.  (Moloney Decl. ¶ 9)

Mr. Slane then returned and told AES that he just needed the money wired to an account in New York immediately in order to demonstrate to Milestone that Estech had the ability to post the security being demanded.  (Slane 146:7 – 148:19; Moloney 20:3 – 24:14, 33:16 – 34:11)  Mr. Slane testified that he based this understanding on a discussion with Yuriy Voevudsky of Chaika

---

[6] By this time, the $150,000 still had not been repaid and the iron ore deal was no longer "all set".  Thus, AES reverted to its normal business practices and required collateral.  (*Id.* at ¶ 9)

Agency.  (Slane 146:7 – 148:19)  AES advised Mr. Slane that it would wire the money to a trust account while Estech arranged for the requested documentation and security, but only if AES had the right to recall the funds at any time while Estech was arranging for security.    Mr. Slane asked AES to make contact with the escrow agent identified in the draft escrow agreement, M&K.  (*Id.*; Moloney 33:17 – 34:11; Moloney Decl. ¶ 10; Exhibit 11)

Mr. Moloney called M&K and ultimately spoke to one of the partners, Garth Wolfson. Mr. Moloney advised Mr. Wolfson that AES had been asked to wire $500,000 to M&K to be held in trust with regard to a pending shipping contract.  Mr. Moloney told Mr. Wolfson that Mr. Moloney understood the purpose of the wire was to show that the shipper, Estech, had access to such funds, that AES hadn't seen any of the supporting documentation and that the only way that AES was going to send the money was that first M&K would need to confirm in writing that M&K would return the money to AES on demand at any time, whether or not other security was in place.  (Wolfson 80:8 – 88:10 & Exh. 11; Moloney 19:20 24:14; 86:17 – 92:4; Moloney Decl. ¶ 11)

Mr. Wolfson testified that Mr. Moloney's statement of the conditions under which AES was willing to wire the money to M&K in trust made no sense to him so he requested confirmation from Mr. Seward.  (94:15 – 100:13; Exh. 11)  Thus, he sent an e-mail to Mr. Seward advising he had just received a call from "charterer's attorneys in Ohio"[7] stating:

> . . . They say they are supposed to wire $500,000 to our account simply to prove they have such funds available.  They want me to first confirm in writing that *the fund must and will be wired back to them at any time upon their demand, whether or not other security is in place*.  Is that true: should I send them such written confirmation?  (Emphasis added.)

(Wolfson 86:17 – 92:4 & Exh. 11)

---

[7] Mr. Wolfson confirmed in his deposition that he had misidentified Thomas Moloney as "charterer's attorneys" and that his e-mail in fact referred to his telephone conversation with Mr. Moloney.  (Wolfson 86:21 – 88:10)

7

Shortly thereafter, Mr. Seward responded by e-mail, stating that, "You can confirm that the money will be wired back 'if the charter party and escrow are not executed.'  We intend to execute the escrow tonight and I will send you the final version when it is to hand shortly." (Wolfson 86:21 – 94:14 & Exh. 11)

Mr. Wolfson did not pass this information along to Mr. Moloney, instead he relied on Mr. Seward's statement of Milestone's intent to interpret AES's conditions under which it was willing to wire the money to M&K in trust and determined, along with the Trust Letter received later that day, that there was no conflict.  (Wolfson 94:15 – 100:15, 222:17 – 223:10; Moloney 43:23 – 44:14)

Simultaneously with those discussions between Mr. Wolfson and Mr. Seward, Mr. Moloney was drafting the letter discussed with Mr. Wolfson which M&K was to send to AES on M&K's letterhead.  The initial draft letter contained only one paragraph, that being the first paragraph of Exh. 12 plus the blank for insertion of wiring instructions.     (Moloney 43:23 – 44:14)

Mr. Moloney showed the letter to Mr. Slane who asked that it be modified to make clear that M&K was authorized to advise Milestone of its receipt of the money.  Because Mr. Moloney was concerned that an entity not a party to the trust agreement might misconstrue such disclosure, Mr. Moloney added additional language to that requested by Mr. Slane.  Thus, the last paragraph was added.  (Moloney 43:23 – 47:2; Moloney Decl. ¶ 12 & Exh. 12)

Mr. Wolfson received the draft letter from stating the terms under which AES would wire the $500,000 the afternoon of December 1.   That letter provided, as relevant:

Subject:  Milestone Shipping S.A.—
          Estech Trading, LLC
          <u>Escrow Agreement</u>

> This is to confirm our firm's agreement that, if American Energy Services, Inc. ("AES") wire transfers $500,000 to our firm's trust account . . . our firm shall hold such funds in trust and shall, upon written request from AES to do so, wire that same $500,000 back to AES's designated account as soon as possible after our receipt of that request. . . .
>
> We acknowledge that this wiring transaction is being initiated in connection with the pending arrangements between the subject parties and that we are authorized to notify Milestone Shipping S.A.; both upon receipt of the wire from AES and upon receipt of any instructions from AES to wire back the funds transferred to our firm's account.  We also understand that, if an escrow agreement acceptable to all parties can be reached, our firm may act as escrow agent under such an agreement, in which case AES may direct that these funds be retained by our firm in such capacity.  However, in no event shall any notification to Milestone Shipping S.A. or any discussions prior to reaching an acceptable agreement affect our firm's duty to return that $500,000 to AES upon its written request.

(Wolfson 1-1:5 – 105:11 & Exh. 12)

Between the time between Mr. Slane's first contact with AES to request the $500,000 loan to the time Mr. Moloney sent his draft letter agreement to M&K, was less than an hour and a half.  (Moloney Decl.  ¶¶ 9 – 12)

Mr. Wolfson forwarded the letter to Mr. Seward, inquiring whether he was authorized to execute it but made no comment on what the Trust Letter said and did not advise Mr. Seward that he had not passed his prior message on to Mr. Moloney.  Nor did Mr. Wolfson advise Mr. Moloney that he was seeking instructions from Milestone about the Trust Letter Agreement. (Wolfson 103:14, 104:11, 113:23 – 115:3; & Exh. 12.)

The next morning, Mr. Seward responded, "Can you sign and return to them when you get in.  I would like Slane to have it when he wakes up!"  (Wolfson 105:17 – 109:3 & Exh. 13.) Mr. Wolfson put the letter drafted by Mr. Moloney on M&K letterhead, added the wire transfer information, executed the letter and returned an executed copy to Mr. Moloney the morning of December 2, 2010.  (Wolfson 109:12 – 24)  Upon receipt of that letter and, in reliance thereon, Mr. Moloney immediately instructed that the wire transfer of $500,000 be made.  (Moloney 54:2

9

– 55:21)  M&K advised Mr. Seward of its receipt of the funds on December 2, 2010.  (Wolfson 135:13 – 136:3 & Exhibit 15)

Between the time Mr. Wolfson forwarded Mr. Moloney's letter to Mr. Seward after 9 p.m. in London and the time Mr. Seward instructed Mr. Wolfson to sign it at 10:47 in London meant that little more than an hour and a half had been available to Mr. Seward to review and approve Mr. Wolfson's signing the letter, assuming that he reached his office at 9 am.  (Exhs. 11, 12 & 13)

After the wire transfer had been initiated to M&K's trust account on the morning of December 2, Mr. Moloney reviewed with Mr. Slane the terms of the draft escrow agreement.  It was the only document that Estech had regarding the shipping transaction, and it was important to the proper documentation of the pending loan that this draft escrow agreement made sense to AES as the unrelated lender.  Mr. Moloney suggested substituting English definitions for the acronyms and marked the document to indicate such.  Mr. Moloney handed it to Ms. Amspoker to type up and return to Mr. Slane.  Mr. Moloney never saw the agreement again and had no knowledge whether his suggestions were accepted.  Neither Mr. Moloney or anyone else at AES ever saw a copy of the charter party, in draft or otherwise, and never knew whether a final agreement was ever reached.

The proposed loan to Estech of $500,000 was documented in a demand Promissory Note executed December 6, 2010, effective as of December 2, 2010.  (Moloney 62:20 – 66:3; Michalek 58:20 – 61:19; Exh. 55)  The Promissory Note stated both the $500,000 in principal plus interest on that amount, and was payable on demand.  The interest was the minimum that AES expected to be compensated for the use of its money while in M&K's trust account.[8]  This

---

[8] At the time this Note was drafted, AES anticipated that the required documentation and security would eventually

Promissory Note was not executed on December 2 because Jan Michalek was out of the country. He returned by December 6 and the Promissory Note was executed at that time, effective December 2, 2010.  (Moloney 62:20 – 66:2; Moloney Decl. ¶ 16)

Because Mr. Moloney felt secure with AES's money held in trust by a law firm like M&K, he turned his attention to other matters pending presentation of documentation of security for the loan, knowing that AES could recall its money at any time should security not materialize.  Mr. Moloney expected to receive for review, copies of the Charter Party and Escrow Agreement acknowledging the partial assignment of the Letter of Credit in the amount of $500,000 to AES to secure its loan or some other documentation of security.  Upon receipt of such, if satisfactory to AES, Mr. Moloney would then have "direct[ed] that these funds be retained by [M&K] in such capacity [as escrow agent]" as contemplated by the Trust Letter Agreement.  (Moloney Decl. ¶ 13)  Mr. Moloney has made it quite clear that had Mr. Wolfson conveyed Mr. Seward's comments rejecting AES's intent as stated in Mr. Moloney's phone call to Mr. Wolfson on December 1, the money never would have been wired to M&K until alternative arrangements acceptable to AES had been negotiated and documented.  (Moloney Decl. ¶¶ 7q & 13)

On December 21, Jan Michalek approached AES and advised that Hipolito was demanding additional money needed to procure transportation of the iron ore to the port for loading.  AES agreed to loan $312,500 which was made the subject of another demand Promissory Note, this one dated December 21, 2010.[9]  (Moloney Decl. ¶ 20)

---

be arranged and the loan ultimately funded, but because none of those terms had been finalized, this Note was drafted as a demand Note.  When those terms were finalized, this Note would have been substituted by a Note that had different payment terms.  However, those terms were never finalized because Estech never provided to AES any additional documentation or collateral prior to its demand to M&K to return the trust funds to AES.  (Moloney ¶ 17)

[9] Security was not required for this loan because it was funded entirely by Bass Energy, a separate unaffiliated

No security was ever provided for the $500,000 loan and, as a consequence, on December 23, 2010, AES demanded in writing the return of its money.  (Slane 164:2 – 168:24; Moloney 72:20 – 73:7; Exh. A)

III.    SUMMARY JUDGMENT STANDARD

The standard for summary judgment, regardless of whether maritime law is applied or not, and regardless of the cause of action, is the same: Summary judgment will be granted where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Response Pers., Inc. v. Hartford Fire Ins. Co.*, 2011 U.S. Dist. LEXIS 71293, 10-11 (S.D.N.Y. June 29, 2011) (applying the same standard to a claim for breach of an insurance contract); *Opals on Ice Lingerie, Designs by Bernadette, Inc. v. Bodylines Inc.*, 320 F.3d 362, 370 (2d Cir. N.Y. 2003) (applying the same standard to an arbitration clause in a joint venture agreement); *Lovos v. Ocean Fresh Sea Clam, LTD.*, 2010 U.S. Dist. LEXIS 140695, 3-5 (E.D.N.Y. Dec. 21, 2010) (applying same standard to a maritime tort claim).

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In making this determination, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the non-movant's claims cannot be

---

corporation that was a long time on-going partner with AES in oil and gas deals.  This loan was not further documented because the entire transaction fell apart two days later.  (Moloney Decl.¶ 20, Exh. 53)

sustained, the opposing party must set out specific facts showing a genuine issue for trial, and cannot rely merely on allegations or denials contained in the pleadings. A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment, as mere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist. *Response Pers., Inc. v. Hartford Fire Ins. Co.*, 2011 U.S. Dist. LEXIS 71293, at *10-11 (S.D.N.Y. June 29, 2011).

IV.   THE UNAMBIGUOUS TERMS OF THE TRUST LETTER CONTROL THE DISPOSITION OF AES'S FUNDS

Milestone contends that it has a right to the $500,000 because the fully funded escrow was a condition precedent to its entry into the charter party, and that once the Escrow Agreement was fully funded and executed, the charter party was entered.[10]  Milestone argues, in effect, that the money is theirs because the Milestone did in fact enter the charter party and, therefore, the escrow must have been funded.  In other words, the escrow was funded because the charter party was entered and the charter party was entered because the escrow was funded.  Milestone's logic is fatally circular.

The real question here is:  Was the escrow ever funded?  The answer is clearly no.

A.   The Unambiguous Terms of the Trust Letter Control Disposition of AES's Money

The plain fact that Milestone ignores is that the $500,000 was AES's money and AES had the right to do whatever it wanted with its money, including imposition of whatever terms it chose on the trust in which such funds were held.

> In the administration of a trust, the discovered intent of the trustor is of controlling importance, and the trust is to be administered in the manner laid down by him. Neither the court nor a beneficiary nor the legislature is competent to violate such intent and to substitute its discretion for that of the trustor.

---

[10] Dkt. 42, Endorsed Letter from Plaintiff's Counsel.

13

*Maletta v. Boczkowski*, 461 N.Y.S.2d 42, 43 (N.Y. App. Div. 1983), quoting 61 NY Jur, Trusts, § 287.

It is the intention of the trustor as manifested in an unambiguous trust instrument that controls.

> The court must search not merely for the settlor's probable intention, but for the intention which the instrument itself, either expressly or by implication, declares. No technical rules of construction or artificial analysis of language used may defeat the creator's intention where that intention is manifest in the language of the instrument itself. Language that is unambiguous and supports a reasonable meaning of a trust must be accepted as manifesting the grantor's intention; the court is bound to such language and the canons of construction do not come into play.

106 N.Y. Jur. 2d Trusts § 92. *See also In re Estate of Wallens*, 877 N.E.2d 960, 962 (N.Y. 2007) ("[T]he trust instrument is to be construed as written and the settlor's intention determined solely from the unambiguous language of the instrument itself."); and *Matter of Chase Manhattan Bank*, 846 N.E.2d 806 (N.Y. 2006) (trust funds can be disbursed only as directed by the trustor); and *Sankel v. Spector*, 819 N.Y.S.2d 520, 523 (N.Y. App. Div. 2006) ("[T]he court, in determining the intent of a grantor of an *inter vivos* trust, must look to the words used in the trust instrument and, once it is determined, must effectuate that intent unless it is contrary to public policy or the law")

The Court in *Mercury Bay Boating Club v. San Diego Yacht Club*, 557 N.E.2d 87, 93 (N.Y. 1990) dealt with the interpretation of the America's Cup deed of gift and whether its requirement that the defending yacht club use "any one yacht or vessel" within the specified range of load water-line length, required defender/appellee to race a vessel of the same type or one evenly matched to that of the challenger, thereby precluding the defender's use of a catamaran. There the Court observed:

> Long-settled rules of construction preclude an attempt to divine a settlor's intention by looking first to extrinsic evidence. Rather, the trust instrument is to

14

be construed as written and the settlor's intention determined solely from the unambiguous language of the instrument itself. It is only where the court determines the words of the trust instrument to be ambiguous that it may properly resort to extrinsic evidence. The rationale underlying this basic rule of construction is that the words used in the instrument itself are the best evidence of the intention of the drafter of the document. (citations omitted)

Extrinsic evidence of intent may be considered only if the agreement is ambiguous. *Anita Babikian, Inc. v. TMA Realty, LLC*, 912 N.Y.S.2d 598, 600 (N.Y. App. Div. 2010) (disallowing extrinsic evidence in the interpretation of an unambiguous lease renewal clause).

Whether or not a writing is ambiguous is a question of law for the court. *W.W.W. Associates, Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990). A contract is unambiguous if the language it uses has a definite and precise meaning, without danger of misconception in the intent of the agreement and about which there is no reasonable basis for dispute. *Greenfield v. Philles Records*, 780 N.E.2d 166, 170-71 (N.Y. 2002) ("[I]f the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity.") A contract is not ambiguous merely because the parties offer competing interpretations. *Mount Vernon Fire Ins. Co. v. Creative Hous.*, 668 N.E.2d 404, 406 (N.Y. 1996).[11]

AES had an absolute right unilaterally to dictate the terms under which its money was to be held in trust. *Wolfer v. National City Bank of N.Y.*, 68 N.Y.S.2d 212, 216 (N.Y. Sup. Ct. 1947) ("It is well settled in this state, however, that a settlor of a trust has the right to select the

---

[11] Although the issues of trust and contract interpretation are presented in this memorandum under New York law, Ohio law does not differ in this area and, therefore, AES need not address conflict of law issues. *See, e.g., Pack v. Osborn*, 881 N.E.2d 237, 241 (Ohio 2008); Nat'l City Bank v. de Laville, 867 N.E.2d 416, 420 (Ohio Ct. App. 2006); Westfield Ins. Co. v. Galatis, 797 N.E.2d 1256, 1261 (Ohio 2003). Similarly, the analysis of the trust letter would not differ under maritime law. See, e.g., Am. Home Assur. Co. v. Hapag Lloyd Container Linie, GmbH, 446 F.3d 313, 316 (2d Cir. 2006) (looking to state law to interpret a maritime contract); and Skippers & Mar. Servs. v. KfW, No. 06 CV 07041, 2008 U.S. Dist. LEXIS 104821, at *9 (S.D.N.Y. Dec. 12, 2008) (holding that the court's interpretation of a contract would be the same regardless of whether New York state law or maritime law was applicable).

15

agencies by which his bounty is to be distributed and to impose the terms and conditions under which it is done").

        B.    <u>The Trust Letter Unambiguously Made Movement of the $500,000 from Trust to Escrow Conditioned on Direction Issued by AES</u>

The money at issue was unquestionably AES's. AES could choose to transfer the money in trust or not. If it chose to transfer the money in trust, it had the unilateral right to do so on whatever terms it chose, so long as the trustee accepted them. There is no question as to what the words were used in setting out the terms and conditions of the trust or that M&K accepted them. (Exh. 14)

Even Milestone must concede that at the time the $500,000 was transferred to M&K, it was subject solely to the terms of the Trust Letter. As noted in Mr. Seward's e-mail to Mr. Wolfson, the money was recallable by AES until the Escrow Agreement and charter party were executed. (Wolfson 114:6 - 13; Exhs. 11 & 19) Neither agreement was finalized and entered until, at the earliest, several hours after the money was wired to M&K in trust under the terms of the Trust Letter. (Wolfson 143:25 – 148:2; Slane 149:4 – 23; Exhs. 20 & 73) Therefore, the question is whether or not the money was ever released from the trust under the terms and conditions of the Trust Letter and made subject to the escrow created by the later Escrow Agreement.

The words used in the Trust Letter are without dispute. (Exh. 14) The Trust Letter identifies the "Subject" of the letter as "Milestone Shipping S.A.—Estech Trading, LLC <u>Escrow Agreement</u>." The Trust Letter from M&K to AES then provides:

> This is to confirm our firm's agreement that, if American Energy Services, Inc. ("AES") wire transfers $500,000 to our firm's trust account . . . <u>*our firm*</u> shall hold such funds in trust and <u>*shall, upon written request from AES to do so, wire that same $500,000 back to AES's*</u> designated account as soon as possible after our receipt of that request. . . .

16

We acknowledge that this wiring transaction is being initiated in connection with the pending arrangements between the subject parties and that we are authorized to notify Milestone Shipping S.A. both upon receipt of the wire from AES and *upon receipt of any instructions from AES to wire back the funds* transferred to our firm's account.  We also understand that, if an escrow agreement acceptable to all parties can be reached, *our firm may act as escrow agent* under such an agreement, in which case *AES may direct* that these funds be retained by our firm in such capacity.   However, in no event shall any notification to Milestone Shipping S.A. *or* any discussions prior to reaching an acceptable agreement affect our firm's duty to return that $500,000 to AES upon its written request. (emphasis added)

Milestone apparently asserts that the Trust Letter dissolved upon Milestone and Estech entering the Escrow Agreement because Milestone required the escrow to be funded before it would enter the charter party and, after all, it entered the charter party.  Thus, the Trust Letter must have dissolved of its own terms.  This ignores the plain language of the Trust Letter.

The Trust Letter between AES and M&K imposed the following terms and conditions of the trust on M&K's possession of AES's money:

    a.    The Trust Letter confirms M&K's agreement that:

    b.    If AES wire transfers $500,000 to M&K's trust account, then M&K shall hold such funds in trust;

    c.    If AES wire transfers $500,000 to M&K's trust account, then M&K shall, upon written request from AES to do so, wire that same $500,000 back to AES's designated account as soon as possible after M&K's receipt of that request;

    d.    M&K acknowledges that the wiring transaction is being initiated in connection with pending arrangements between Milestone and Estech;

    e.    M&K is authorized [by AES] to notify Milestone upon receipt of the money from AES;

    f.    M&K is authorized [by AES] to notify Milestone upon receipt of any instructions from AES to return the money to AES;

    g.    If an escrow agreement acceptable to Milestone and Estech can be reached, M&K may act as escrow agent under such agreement;

17

h.    If an escrow agreement acceptable to Milestone and Estech can be reached, AES may direct that the $500,000 be retained by M&K as escrow agent;

i.    In no event shall any notification to Milestone affect M&K's duty to return the $500,000 to AES upon AES's written request; and

j.    In no event shall any discussions prior to reaching an acceptable agreement affect M&K's duty to return the $500,000 to AES upon AES's written request.

It is not possible, without grossly distorting the plain meaning of the words of the Trust Letter, to turn these terms and conditions into an automatic, self-executing release of the $500,000 from trust and a transfer to escrow upon creation of the Escrow Agreement.

All words of a contract must be given their ordinary meaning. *Vigilant Ins. Co. v. Bear Stearns Cos., Inc.*, 884 N.E.2d 1044, 1047 (N.Y. 2008) (construction of contracts requires that unambiguous provisions be given their plain and ordinary meaning). A court cannot read words out of existence in interpreting an unambiguous document. *Welcome Realty v Arnold*, 891 N.Y.S.2d 857, 858, *2 (N.Y. App. 2009) (party's argument would "essentially read out of existence" certain provisions of the agreement, "and run afoul of the basic precept of contract construction that courts should avoid an interpretation that would leave contractual clauses meaningless"). Two disjoined phrases in a sentence are each to be interpreted so as to stand on their own, each given equal meaning and weight. *Coutu v. Exchange Ins. Co.*, 579 N.Y.S.2d 751, 752 (N.Y. App. Div. 3d Dep't 1992) ("Because the words 'vacant or unoccupied' are stated in the disjunctive, the words must be separately considered and either word if supported by a proper showing will trigger the exclusion.").

Milestone asks this Court selectively to read words actually used in the Trust Letter and then rewrite others. Milestone would have the Court ignore the first paragraph of the letter entirely. That paragraph unquestionably sets out AES's right to recall its money without

18

limitation in time or circumstances:  "[I]f American Energy Services, Inc. ("AES") wire transfers $500,000 to [M&K's] trust account . . . . [M&K] shall hold such funds in trust and *shall, upon written request from AES to do so, wire that same $500,000 back to AES*'s designated account as soon as possible after receipt of [AES's] request."  (emphasis added)  (Exhibit 14)

Milestone then selectively reads the first sentence of the second paragraph, ignoring that portion of the second sentence which authorizes M&K to notify Milestone of instructions from AES to return its money.  Milestone would then have the Court ignore the second sentence of the second paragraph which states that, "if an escrow agreement acceptable to all parties can be reached, then . . . AES *may direct* that these funds be retained by [M&K] [as escrow agent]." Milestone then asks this Court to ignore the language preceding the disjunctive in the last sentence of the second paragraph.  Finally Milestone invites the Court to re-write the words that follow the disjunctive "or" to read "upon Milestone and Estech entering the Escrow Agreement, this Trust Letter shall become null and void."

The second sentence in the second paragraph clearly states a condition and an action which might follow, an "if—then".  "If" an escrow acceptable to all parties can be reached, then M&K might act as an escrow agent, and AES might direct that the funds be held by M&K as escrow agent.  There is absolutely nothing automatic contemplated in that sentence.

The word "may" is in fact used twice in the last paragraph of the Trust Letter:  "[M&K] *may act* as escrow agent," in which case, "AES *may direct* that these funds be retained by M&K [as escrow agent].  (emphasis added)  May is an auxiliary or helping verb which qualifies the meaning of another verb by expressing ability, competency, liberty, permission, possibility, probability or contingency.[12]  To understand a helping verb, it must be read in context with the

---

[12] Black's Law Dictionary, Fifth Edition, 1979, citing *United States v. Lexington Mil & Elevator Co*., 232 U.S. 399,

19

verb to which it relates.[13]  As used here, the phrases are "may act" and "may direct".  Since the issue before the Court is whether the funds were "retained by M&K as escrow agent," the key phrase is "may direct" although the analysis regarding the word "may" is  the same for both phrases.

The word "direct" can be a verb, an adjective or an adverb.[14]  As a verb, which is its usage here, it means:  to guide, order, command or instruct.[15]  To "direct" is clearly a word connoting action.  What is clear here is that in the context of the last sentence, "may direct" meant that *if* an escrow agreement was reached, then AES might order, command or instruct that M&K retain the $500,000 as escrow agent.

The "order, command or instruction" by AES that would have released the money from trust and would have made it subject to the escrow, was never issued by AES because Estech never provided the necessary security.  Thus, the condition precedent to the $500,000 being subject to the Escrow Agreement never occurred and AES was and is entitled to the immediate return of its money pursuant to the express terms of the Trust Letter.

C.      The Promissory Note In No Way Changes This Result

Milestone argues that the demand Promissory Note executed by Estech in favor or AES, on December 6, 2010, confirms that the $500,000 was transferred to Estech.  Milestone again engages in circular reasoning.[16]

---

34 S.Ct. 337, 340(1913).   "May" can be construed to mean shall or must but as a general rule will not be treated as a word of command unless there is something in the context or subject matter to indicate that it was used in such a sense.   Presumably, "may" as opposed to "shall" is indicative of discretion or choice between two or more alternatives, but the context in which the word appears is controlling.  *Id.*   Webster's Ninth New Collegiate Dictionary, Merriam-Webster, 1987, defines "may" when used as an auxiliary verb as:  expressing a wish or desire or a purpose or expectation.

[13] OED, supra, As auxiliary verb, often used elliptically with verb understood or supplied from the context.

[14] Webster's Ninth Collegiate Dictionary, supra.

[15] (Black's Law Dictionary, Fifth Edition, supra.  See also, Black's Ninth Edition, supra; OED, supra; and Webster's Ninth New Collegiate Dictionary.

[16] Milestone was not a party to the Promissory Note and has no standing to dispute the stated intent of the parties

AES wired its $500,000 to M&K at the request of Estech to show that Estech had access to the money necessary to fund the escrow, once security was arranged.  Dan Slane testified that is what Milestone required at that moment.  Even if Milestone can create an issue of fact as to that point, it matters not, as that is what AES understood and that is why AES wired the money in trust pending placement of security.  Because AES had lost the use of its money while it sat "in trust" awaiting placement of security and funding of the loan, it expected to be paid interest on that money.  That was the immediate purpose of the Promissory Note.  As of December 6, AES still expected that security would be arranged and the $500,000 would ultimately be loaned to Estech.  However, that never happened and, as a consequence, AES never relinquished control of its $500,000.

Unless and until AES relinquished control of its money, Estech would not owe repayment of the $500,000.  Nonetheless, Estech still "used" AES's money during the interim period and owed AES interest for that use.  Unless and until AES relinquishes control of its money, that is all that is due under the Promissory Note.

V.       MILESTONE CANNOT ESTABLISH ITS JOINT LIABILITY THEORIES

     A.       Estech and AES are both Ohio Corporations and, therefore, Issues of Joint Liability are Governed by Ohio Law

The corporate relationship between AES and Estech is a matter of Ohio law where both are incorporated.  The "generally accepted choice-of-law rule with respect to . . . 'internal affairs' [of the corporation] is to apply the law of the place of incorporation." *Zion v. Kurtz*, 50 N.Y.2d 92, 100, 405 N.E.2d 681, 428 N.Y.S.2d 199 (N.Y. 1980); *see also Diamond v. Oreamuno*, 24 N.Y.2d 494, 503-04, 248 N.E.2d 910, 301 N.Y.S.2d 78 (N.Y. 1969) (holding that

---

thereto.  Tex. Liquids Holdings, LLC v. Key Bank Nat'l Ass'n, No. 05 CV 5070, 2007 U.S. Dist. LEXIS 23002, at *4 (S.D.N.Y. Mar. 27, 2007) (non-parties to contract had no standing to argue breach of that contract).

for issues of corporate governance, "[t]he primary source of law . . . ever remains that of the State which created the corporation.").

Thus, Milestone's various joint liability theories are governed by Ohio law, which is also the law of the place where their dealings with each other occurred.

     B. <u>There is No Evidence to Support Milestone's Joint Liability Allegations</u>

Milestone has alleged in its Verified Amended Complaint that:  Estech is an alias or agent of AES and vice versa (Dkt. 30, ¶¶ 26); AES and Estech share common ownership and operation such that Estech is owned or managed by AES (*Id.* at ¶ 27); Estech is an agent of AES such that Estech is contacted to present business opportunities to AES (*Id.* at ¶ 28); AES funded the escrow account as an agent of Estech (*Id*. at ¶ 29); Estech and AES share the same contact phone number published in trade journals (*Id.* at ¶ 30); Estech is merely a shell corporation through which AES conducts its business (*Id.* at ¶ 31); Estech and AES are joint venturers in the charter party and/or cargo at issue (*Id.* at ¶ 32); AES furnished the $500,000 to fund the escrow account in order to induce Milestone to enter the charter party (*Id.* at ¶ 36); and Estech and AES conspired to induce Plaintiff to enter the charter party (*Id.* at ¶ 46).  There is no evidence to support these allegations.

AES and Estech are separate companies, they have no common owners, officers, directors or employees.  They have separate offices and, contrary to Milestone's assertion, they do not share a phone number.  AES has no control over Estech and Estech has no control over AES or any of its subsidiaries.

AES had nothing to do with the charter party.  It never saw the charter party and in fact had no idea whether it was ever finalized.  AES also had nothing to do with the escrow agreement other than suggesting some changes to eliminate "gibberish" in the wording in order

to protect its position as lender.  It never saw the final document or had any knowledge whether any of its changes were incorporated.

Moreover, AES and Estech were not joint venturers.  AES exercised no control over the venture and was not in any way involved in the negotiation or management of the contracts between Estech and Hipolito, Tianjin or Milestone.[17]

AES's role as an arm's length lender cannot seriously be disputed.  A lender is simply not liable for the failure of the underlying transaction.  (*See, e.g., Outrigger Constr. Co. v. Bank Leumi Trust Co.*, 240 A.D.2d 382, 658 N.Y.S. 2d 394 (2d Dep't 1993).)  *A fortiori*, a third party to a commercial transaction that was to be financed from the proceeds of a loan that was never funded due to a failure on the part of the borrower to supply the necessary security and documentation has no liability for a failed underlying commercial transaction.

VI.   <u>MILESTONE HAS NO CLAIM FOR FRAUD, MISREPRESENTATION, DETRIMENTAL RELIANCE OR CONSPIRACY</u>

In its letter to this Court dated July 8, Milestone states that any interpretation of the Trust Letter other than that asserted by it would render the transfer of the $500,000 meaningless, the Escrow Agreement illusory and would be evidence of fraud by AES.[18]  Milestone alleges in its Complaint that it was ignorant of AES's right to recall its money and that it relied on AES's actions and various representations in entering the Charter Party.[19]

However, Milestone has not asserted fraud in its complaint.  (Dkt. 30)  Because Fed. R. Civ. P. 9(b) requires that fraud claims must be pled with particularity, there are no "implied"

---

[17] The elements of a joint venture are:  (1) contributions of effort, property, skill, knowledge and other assets to the common undertaking; (2) a joint property interest in the subject matter of the venture and a right of mutual control or management of the enterprise; (3) expectation of profits; (4) a right to participate therein; and, usually, (5) a limitation of the objective to a single undertaking. *Kahle v. Turner*, 66 Ohio App.2d 49, 52, 420 N.E.2d 127, 130 (Ohio App., 1979).

[18] Dkt. 42, Page 2.

[19] Verified Amended Complaint, Dkt. 30, at ¶¶ 47 – 51.

fraud claims in federal court.

Moreover, AES never concealed anything from Milestone. The evidence is indisputable that AES told Milestone's attorney in New York precisely what AES intended and that information was forwarded to Milestone's solicitor in London. That information in the hands of lawyers acting for Milestone is the equivalent of AES telling Milestone directly. *Center v. Hampton Affiliates, Inc.*, 488 N.E.2d 828, 829 (N.Y. 1985) ("The general rule is that knowledge acquired by an agent acting within the scope of his agency is imputed to his principal and the latter is bound by such knowledge although the information is never actually communicated to it.").

Tom Moloney called Milestone's attorney, Garth Wolfson and told him exactly what AES intended to do with its money which is exactly the same thing AES asserts here. (Exh. 11) Mr. Wolfson forwarded that information to Milestone's London solicitor, Mark Seward. While Mr. Seward stated a contrary intent regarding the $500,000, that information was never communicated to AES.[20] Moloney then followed with his letter, the document that became the trust instrument on which AES relies here. That letter again went to Milestone's attorney, Garth Wolfson, who passed it on to Milestone's solicitor, Mr. Seward. Mr. Seward authorized Mr. Wofson to execute the Trust Letter and return it to AES. Mr. Wolfson did so. Upon M&K accepting the terms of the Trust Letter, AES wired its money to M&K to hold in trust.

The problem is not that Milestone was not told precisely what AES's intent was, Milestone simply "jumped the gun," rushing into the Charter Party without first confirming with AES that M&K was authorized to release the $500,000 from trust and place it in escrow. That is

---

[20] Mr. Moloney testified that had Mr. Seward's comments been passed on to him, based on his custom and practice over the last 37 years as a lawyer, AES would not have forwarded the money until the issue was resolved. (Moloney Decl. ¶ 7q)

solely Milestone's fault, not AES's.

VII.    CONCLUSION

There is no evidence to support Milestone's alleged theories of joint liability.

AES's role with regard to the $500,000 was to have been as an arm's length lender to Estech.  While AES was willing to respond to the request of a well-respected Columbus, Ohio businessman to accommodate his effort to demonstrate his access to funds, it was not willing to give away its money.  Thus, it agreed only to place money in trust with a reputable New York law firm which had agreed to act as trustee under the terms of a Trust Letter which expressly stated that the money was subject to recall by AES unless and until AES took the additional step of directing that M&K retain the money as escrow agent under the contemplated Escrow Agreement.  AES never received security for the loan, M&K never sought instructions from AES to act as "escrow agent" for the money under the terms of the Escrow Agreement and Milestone never sought confirmation from AES that the money was "in escrow."  AES recalled the money on December 23 and is entitled to immediate possession thereof.  Milestone is the architect of its own demise due to its failure to confirm release of the money by AES.

AES is entitled to recover its $500,000 under the terms of the Trust Letter.

Respectfully submitted,

Dated:   July 26, 2011

/s/ *J. C. Winton*

Timothy S. Pfeifer                         James C. Winton
Baker & Hostetler LLP                  Admitted Pro Hac Vice
45 Rockefeller Plaza, 11th Floor   BAKER & HOSTETLER LLP
New York, New York  10111          1000 Louisiana, Suite 2000
Tel:  212-589-4200                        Houston, Texas  77002-5018
Fax:  212-589-4201                        Tel: 713.751.1600
tpfeifer@bakerlaw.com                   Fax: 713.751.1717

Attorneys for Defendant
AMERICAN ENERGY SERVICES, INC.

25

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document was served on counsel of record via the Court's Notice of Electronic Filing on this 26th day of July 2011.

_____/s/ J. C. Winton_____
James C. Winton
